## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

GSA Network, Students Engaged in
Advancing Texas, Texas AFT,
Rebecca Roe by and through her
next friend, Ruth Roe, Adrian Moore,
by and through his next friend, Julie
Johnson, and Polly Poe,

     Plaintiffs,

v.

Mike Morath, in an official capacity
as Commissioner of the Texas
Education Agency, Houston
Independent School District, Katy
Independent School District, and
Plano Independent School District,

     Defendants.

Civil Action No. 4:25-cv-04090

## FIRST AMENDED COMPLAINT

1. The First Amendment prohibits laws that target and suppress speech from disfavored viewpoints. But the Texas Legislature has done exactly that with Senate Bill 12 ("S.B. 12" or "Student Identity Censorship Law"), which censors huge swaths of constitutionally protected speech in and surrounding Texas schools. S.B. 12 is an overzealous attempt to ban what lawmakers referred to as "DEI" in every public and charter school in Texas. But the

"solution" to that so-called "problem" is a law so sprawling and vague that it contains at least four flagrantly unconstitutional provisions. It wrongfully: (1) bans all student organizations "based on sexual orientation or gender identity"; (2) prohibits any reference to "race, color, ethnicity, gender identity, or sexual orientation" in any policy, procedure, training, activity, or program "develop[ed] or implement[ed]" by a school employee, contractor, or volunteer "at, for, or on behalf of" a school; (3) bars school employees from "assisting" any student's social transition, including by providing "any information" about this topic; and (4) prevents all educators and third parties from providing any "instruction, guidance, activities, or programming regarding sexual orientation or gender identity to students enrolled in prekindergarten through 12th grade"[1]—even outside the school day or in that individual's private capacity. This does not pass constitutional muster.

2. This Student Identity Censorship Law silences the voices and viewpoints of Plaintiffs, along with many others. Plaintiffs are two nonprofit organizations, a labor union, two students, and an educator that speak about issues relating to race, gender identity, and sexual orientation inside and beyond Texas schools but are inhibited from doing so by S.B. 12. The First and

---

[1]     Tex. S.B. 12, 88th Leg., Reg. Sess. (2025), is codified in numerous places in the Texas Education Code, including Tex. Educ. Code §§ 1.007, 11.005, 11.401, 28.0043, and 33.0815.

Fourteenth Amendments do not permit state officials to censor viewpoints they dislike, nor does the Equal Access Act allow school districts to prohibit students from participating in student organizations based on content. The challenged provisions of this law are also unconstitutionally vague, overbroad, restrict Plaintiffs' freedom of association, and operate as a prior restraint on speech.

3. Unless these unconstitutional and unlawful aspects of S.B. 12 are enjoined, Plaintiffs' freedom of speech, freedom of expressive association, and due process rights will be irreparably suppressed—both in this current school year and indefinitely into the future.

4. Plaintiffs Genders and Sexualities Alliance Network ("GSA Network"), Students Engaged in Advancing Texas ("SEAT"), Texas American Federation of Teachers ("Texas AFT"), Rebecca Roe,[2] by and through her next friend, Ruth Roe, Adrian Moore,[3] by and through his next friend, Julie Johnson, and Polly Poe (collectively, "Plaintiffs") bring this action to enjoin the enforcement of these unconstitutional and unlawful provisions of S.B. 12. Defendants include Mike Morath, in an official capacity as Commissioner of

---

[2]    Rebecca Roe, Ruth Roe, and Polly Poe are all pseudonyms. The individual Plaintiffs in this case filed a motion to proceed pseudonymously with the Court to protect their identities and defend themselves and their families from retaliation in connection with this lawsuit. *See* Dkt. 27 (Unopposed Motion for Leave to Proceed under Pseudonyms).

[3]    Adrian is the affirming/chosen name of Julie Johnson's minor child. His legal name is already known by Katy ISD and will be shared with all other Defendants in this case, subject to a protective order from the Court. *See* Dkt. 28 (Unopposed Motion to Enter Protective Order).

the Texas Education Agency ("TEA"), Houston Independent School District ("Houston ISD"), Katy Independent School District ("Katy ISD"), and Plano Independent School District ("Plano ISD") (collectively, "Defendants").

## I.    Jurisdiction and Venue

5. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action raises federal questions and seeks to vindicate civil rights protected by the First and Fourteenth Amendments to the U.S. Constitution, pursuant to 42 U.S.C. § 1983, as well as claims under the Equal Access Act, 20 U.S.C. § 4071.

6. The Court has personal jurisdiction over Defendants because they are residents and officials in the State of Texas.

7. Venue in this District is proper under 28 U.S.C. § 1391(b) because at least one Defendant resides in this District and because all Defendants are residents of the State in which this District is located.

8. This Court has jurisdiction to issue declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. § 1983, and Fed. R. Civ. P. 65.

9. This Court has authority to award costs and attorney's fees under 42 U.S.C. § 1988.

## II.    Parties

10. Plaintiff GSA Network, also referred to as the Genders and Sexualities Alliance Network, is a national 501(c)(3) nonprofit organization

4

whose mission is to empower and train queer, trans, and allied youth leaders to advocate, organize, and mobilize an intersectional movement for safer schools and healthier communities. GSA Network brings claims in this case on behalf of itself and its Texas members, which are student-run organizations registered with the network, along with student members of those organizations. The GSA Network asserts claims in this lawsuit against the Commissioner and Plano ISD.

11. Plaintiff Students Engaged in Advancing Texas ("SEAT") is a nonpartisan, nonprofit grassroots civic organization whose mission is to empower youth through hands-on civic engagement, advocacy, and leadership development to address systemic inequities and drive change in Texas communities. This mission requires SEAT and its members to engage in free and robust debate, including by discussing race, ethnicity, gender identity, and sexual orientation on school property in Texas and at school-sponsored events. SEAT brings claims in this lawsuit on behalf of itself and its members against the Commissioner, Houston ISD, and Katy ISD.

12. Plaintiff Texas American Federation of Teachers ("Texas AFT") is a statewide labor union that represents over 66,000 employees throughout Texas, including teachers, librarians, counselors, nurses, teaching assistants, and other public and charter school employees. Texas AFT advocates for the employment rights of its members and champions high quality public

5

education, fairness, democracy, and economic opportunity for students, families, and communities. Texas AFT brings claims on behalf of its members against the Commissioner, Houston ISD, Katy ISD, and Plano ISD.

13. Plaintiff Rebecca Roe is a first-year high school student in Houston ISD. She brings claims by and through her next friend, Ruth Roe, against the Commissioner and Houston ISD.

14. Plaintiff Adrian Moore is a senior high school student in Katy ISD. He brings claims by and through his next friend, Julie Johnson, against the Commissioner and Katy ISD.

15. Plaintiff Polly Poe is a high school teacher in Plano ISD who is a member of Texas AFT and recently served as the advisor to a GSA registered with the GSA Network. She asserts claims against the Commissioner and Plano ISD.

16. Defendant Mike Morath is the Commissioner of TEA and is being sued in an official capacity because he is statutorily tasked with enforcing S.B. 12. He has been served with process at the Office of the Texas Education Agency, 1701 N. Congress Avenue; Austin, Texas, 78701.

17. Defendant Houston ISD is an independent school district. It has been served with process at its headquarters, 4400 W 18th St., Houston, TX 77092.

18. Defendant Katy ISD is an independent school district. It has been served with process at its headquarters, 6301 S. Stadium Lane, Katy, TX 77494.

19. Defendant Plano ISD is an independent school district. It has been served with process at its headquarters, 2700 W. 15th St., Plano, TX 75075.

## III.  Factual Background

### A. Senate Bill 12

20. S.B. 12 was signed by Governor Abbott on June 20, 2025. It took effect on September 1, 2025. The caption of the law states: "Relating to parental rights in public education, to certain public school requirements and prohibitions regarding instruction, diversity, equity, and inclusion duties, and social transitioning, and to student clubs at public schools."[4]

21. The law is 37 pages long. It contains 31 sections that amend various sections of the Texas Education Code. Plaintiffs here challenge only four unconstitutional and unlawful provisions of S.B. 12 and their related enforcement: (1) the GSA Ban, (2) the Inclusivity Ban, (3) the Social Transition Ban, and (4) the Don't Say LGBTQ+[5] Ban.

---

[4]      Tex. S.B. 12, 88th Leg., Reg. Sess. (2025).

[5]      "LGBTQ+" is an "acronym for lesbian, gay, bisexual, transgender, and questioning or queer: an inclusive term used to refer to the diverse forms of gender identity and sexual orientation, and to those whose gender identity differs from the culturally and socially determined gender roles for their assigned sex." *LGBTQ*, APA DICTIONARY OF PSYCH., AM. PSYCH. ASS'N (last updated Nov. 15, 2023), https://dictionary.apa.org/lgbtq.

### i. GSA Ban

22. Section 27 of S.B. 12 states that school districts and charter schools in Texas "***may*** authorize or sponsor a student club" but "***may not*** authorize or sponsor a student club based on sexual orientation or gender identity." S.B. 12 § 27 (amending Tex. Educ. Code § 33.0815(a)-(b)) (emphases added).

23. This section is a GSA Ban because it singles out one subset of student organizations for disfavored treatment, namely Genders and Sexualities Alliances ("GSAs", formerly known as "Gay Straight Alliances"). GSAs are student-run organizations that unite LGBTQ+ and allied youth to build community and organize around issues impacting them in their schools and communities.

### ii. Inclusivity Ban

24. Section 3 is entitled "Prohibition on Diversity, Equity, and Inclusion Duties." S.B. 12 § 3 (amending Tex. Educ. Code § 11.005). This section prohibits school districts and charter schools from "assign[ing] diversity, equity, and inclusion duties to any person" and requires them to "prohibit a district employee, contractor, or volunteer from engaging in diversity, equity, and inclusion duties ***at***, for, or on behalf of the district," except "as required by state or federal law." *Id.* § 3(b) (emphasis added). The section defines "diversity, equity, and inclusion duties" to include "developing

8

or implementing policies, procedures, trainings, activities, or programs that **reference** race, color, ethnicity, gender identity, or sexual orientation. . ..." *Id.* § 3(a)(3) (emphasis added).

25. This prohibition applies outside of school hours to any activity "at, for, or on behalf of the district." *Id.* § 3(b)(2). Under this section, every district employee, contractor, and volunteer is prohibited from "developing" or "implementing" any policy, procedure, training, activity, or program that so much as references race, color, ethnicity, gender identity, or sexual orientation.

26. S.B. 12's Inclusivity Ban contains several exceptions, including:

i. Policies, procedures, trainings, activities, or programs "for the purpose of student recruitment efforts by colleges and universities designated as historically black colleges and universities in collaboration with school districts or open-enrollment charter schools," *id.* § 3(a)(3)(A);

ii. Policies, procedures, trainings, activities, or programs "necessary to comply with state or federal law," *id.* § 3(a)(3)(B);

iii. "[C]ontracting with historically underutilized businesses or businesses owned by members of a minority group or by women in accordance with applicable state law," *id.* § 3(e)(1);

iv. "[A]cknowledging or teaching the significance of state and federal holidays or commemorative months and how those holidays or months fit into the themes of history and the stories of this state and the United States of America in accordance with the essential knowledge and skills adopted under Subchapter A, Chapter 28," *id.* § 3(e)(2);

      v.   "[A]nalyzing school-based causes and taking steps to eliminate unlawful discriminatory practices as necessary to address achievement gaps and differentials described by Section 39.053." *Id.* § 3(e)(4).

27. This section also does not apply to:

      i.   "[C]lassroom instruction that is consistent with the essential knowledge and skills adopted by the State Board of Education;

      ii.   [T]he collection, monitoring, or reporting of data;

      iii.   [A] policy, practice, procedure, program, or activity intended to enhance student academic achievement or postgraduate outcomes that is designed and implemented without regard to race, sex, color, or ethnicity; or

      iv.   A student club that is in compliance with the requirements of Section 33.0815 [the GSA Ban]." *Id.* § 3(e)(5).

28. Through this last exception, the Inclusivity Ban explicitly incorporates the GSA Ban, thus requiring that any student organization based on gender identity or sexual orientation is completely prohibited.

29. The Inclusivity Ban also contains a clause stating that "[n]othing in this section may be construed to . . . affect a student's rights under the First Amendment to the United States Constitution or Section 8, Article I, Texas Constitution[.]" *Id.* § 3(e)(3).

### iii. Social Transition Ban

30. Section 7 of S.B. 12 is entitled "Assistance with Social Transitioning Prohibited." It amends Section 11.401 of the Texas Education Code to require every school district to "adopt a policy prohibiting an employee of the district from assisting a student enrolled in the district with social transitioning, including by providing any information about social transitioning or providing guidelines intended to assist a person with social transitioning." S.B. 12 § 7(b). "Assisting" is not further defined.

31. This section defines "social transitioning" as "a person's transition from the person's biological sex at birth to the opposite biological sex through the adoption of a different name, different pronouns, or other expressions of gender that deny or encourage a denial of the person's biological sex at birth." *Id.* § 7(a). The text of this section is not limited to at-school interactions or conversations within a school employee's official duties. As written, it applies everywhere.

### iv. Don't Say LGBTQ+ Ban

32. Section 24 of S.B. 12 states that a "school district, open-enrollment charter school, or district or charter school employee may not provide or allow a third party to provide instruction, guidance, activities, or programming regarding sexual orientation or gender identity to students enrolled in prekindergarten through 12th grade." S.B. 12 § 24(a).

11

33. This section purports that it "may not be construed to . . . limit a student's ability to engage in speech or expressive conduct protected by the First Amendment to the United States Constitution or by Section 8, Article I, Texas Constitution, that does not result in material disruption to school activities[.]" *Id.* § 24(b)(1).

34. This section also states that it does not "limit the ability of a person who is authorized by the district to provide physical or mental health-related services to provide the services to a student, subject to any required parental consent," and it does not "prohibit an organization whose membership is restricted to one sex and whose mission does not advance a political or social agenda from meeting on a school district or open-enrollment charter school campus." *Id.* § 24(b)(2)-(3).

**B. Enforcement Mechanisms**

35. S.B. 12 is enforced in several ways. First, the Commissioner is required to receive and publish on TEA's website certifications of compliance from every school district and charter school in the state. S.B. 12 § 28(a)-(c).

36. These certifications must be approved by a majority of the board of trustees of each district or the governing body of a charter school, who must affirm "that the district or school is in compliance with this section and Sections 11.005 and 28.002." *Id.* § 28(a)-(b). Those sections refer to the Inclusivity Ban (Section 11.005) and Don't Say LGBTQ+ Ban (Section 28.002).

37. Because the Inclusivity Ban explicitly incorporates the GSA Ban, *id.* § 3(e)(5)(d) (permitting only student clubs "in compliance with the requirements of Section 33.0815 [the GSA Ban]"), this certification of compliance necessarily incorporates the GSA Ban, too. The Commissioner is therefore statutorily obligated to oversee compliance with the GSA Ban, Inclusivity Ban, and Don't Say LGBTQ+ Ban and publish all certifications of compliance on the TEA website.

38. S.B. 12 also tasks the Commissioner with enforcing the Social Transition Ban by requiring him to accept reports of any violations of this section from school boards. If a board "determines that a district employee has assisted a student enrolled at the district with social transitioning, the board shall immediately report the violation to the commissioner." *Id.* § 7(c).

39. The Commissioner is the "educational leader of the state." Tex. Educ. Code § 7.055(b)(1). As such, the Commissioner "may authorize special investigations to be conducted" in response to complaints and "as the commissioner [] determines necessary." Tex. Educ. Code § 39.003. The Commissioner may then decide whether to impose sanctions against a school employee or school district, including by forcing school districts into conservatorship. *See* Tex. Educ. Code § 39A.003.

40. While the Commissioner asserts significant authority over school employees and school districts, he has even more control over charter schools.

13

Chapter 12 of the Texas Education Code, which governs charter schools, mandates that the Commissioner "shall revoke the charter of an open-enrollment charter school or reconstitute the governing body of the charter holder if the commissioner determines that the charter holder . . . failed to comply with this subchapter or another applicable law or rule." Tex. Educ. Code § 12.115(c). The Commissioner is also required to audit charter schools, withhold funding, and impose other sanctions "if an open-enrollment charter school, as determined by a report issued under Section 39.004(b) . . . fails to comply with this subchapter or another applicable rule or law." Tex. Educ. Code § 12.1162(c).

41. Because both public schools and charter schools are specifically required by S.B. 12 to certify their compliance with the law to the Commissioner—and the Commissioner is statutorily required to accept and publish those certifications, *see* S.B. 12 § 28(a)-(c)—the Commissioner is tasked with enforcing S.B. 12 and has multiple mechanisms at his disposal if school districts or charter schools do not comply.

42. The Commissioner has already announced that he will enforce S.B. 12's requirements and take affirmative steps to require school districts and charter schools to comply with the law. The Commissioner has posted publicly on TEA's website that the agency will require certifications of

14

compliance from all school districts and charter schools in Texas.[6] He has announced that certifications of compliance will be due in 2026,[7] and he published legislative guidance to superintendents on how S.B. 12 must be enforced.[8] The Commissioner explained, among other requirements, that because of S.B. 12: (1) "Sexual Orientation and Gender Identity instruction and student clubs are prohibited"; (2) "DEI is prohibited in school districts"; (3) "Boards must annually certify compliance with DEI and CRT prohibitions"; and (4) "Gender Transitioning support from school districts is prohibited."[9]

43. Beyond the Commissioner's enforcement, S.B. 12 also directly requires school districts and charter schools to enforce the provisions challenged in this case. Section 1 of the law states that a "public elementary or secondary school, the school's governing body, and the school's employees shall implement and comply with each policy the school is required to adopt under this code or other law." S.B. 12 § 1(b) (amending Tex. Educ. Code § 1.007). In that section, "public elementary or secondary schools" is defined as "a school district and a district, campus, program, or school operating under a charter. .

---

[6]    Texas Education Agency, *89th Legislature Updates* (last updated Aug. 21, 2025), https://tea.texas.gov/about-tea/government-relations-and-legal/government-relations/89th-legislature-updates.

[7]    *Id.*

[8]    Texas Education Agency, *TEA Monthly Superintendent Call 89th Legislature Updates* (June 26, 2025), at 27, https://tea.texas.gov/texas-educators/superintendents/89th-legislature-updates.pdf.

[9]    *Id.*

. ." *Id.* § 1(a). Thus, Section 1 mandates that every school district and charter school, as well as their governing leaders, must implement and comply with S.B. 12, including the four challenged provisions in this case.

44. Each of these sections additionally requires school districts and charter schools to implement and enforce the law. The GSA Ban states that a "school district or open-enrollment charter school may not authorize or sponsor a student club based on sexual orientation or gender identity." *Id.* § 27(b). The Inclusivity Ban provides that a "school district shall adopt a policy and procedure for the appropriate discipline, ***including termination***, of a district employee or contractor who intentionally or knowingly engages in or assigns to another person diversity, equity, and inclusion duties. The district shall provide a physical and electronic copy of the policy and procedure to each district employee or contractor." *Id.* § 3(c) (emphasis added). Section 8 of S.B. 12 also requires that charter schools must prohibit their employees, contractors, and volunteers from engaging in any activity prohibited by Section 11.005, which refers to the Inclusivity Ban. *Id.* § 8(b)(3)(Z).

45. The Social Transition Ban requires all school districts to "adopt a policy prohibiting an employee of the district from assisting a student enrolled in the district with social transitioning, including by providing any information about social transitioning or providing guidelines intended to assist a person with social transitioning." *Id.* § 7(b). It also states that the board "shall

investigate any suspected violation and determine whether violation occurred." *Id.* § 7(c). Although the Social Transition Ban does not explicitly mention charter schools, it arguably applies to them through charter schools' inclusion in the mandatory compliance requirements of Section 1. *See id.* § 1(a)-(b).

46. The Don't Say LGBTQ+ Ban states that a "school district, open-enrollment charter school, or district or charter school employee may not provide or allow a third party to provide instruction, guidance, activities, or programming regarding sexual orientation or gender identity to students enrolled in prekindergarten through 12th grade." *Id.* § 24(a).

47. Based on the law's plain text, school districts and charter schools are statutorily and mandatorily tasked with enforcing every challenged provision of S.B. 12.

48. Through their final policymakers—*i.e.,* their school boards—Defendants Houston ISD, Katy ISD, and Plano ISD either already have or are required to adopt policies formally implementing S.B. 12 and enforcing each of the law's challenged provisions. They are therefore proper Defendants subject to liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978), because the district's final policymakers have already adopted or will imminently be required to adopt formal policies that are the moving force of constitutional infringements of Plaintiffs' rights. *See Littell v. Houston Indep.*

*Sch. Dist.*, 894 F.3d 616, 623 (5th Cir. 2018). As municipal entities, these school districts are also "persons" under 42 U.S.C. § 1983 and not immune from suit when they "cause [] the particular constitutional or statutory violation at issue." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989).

### C. Legislative History of S.B. 12

49. On January 29, 2025, Lieutenant Governor Dan Patrick listed "Establishing a Parental Bill of Rights in Public Education" as one of his top 40 priorities of the 2025 Texas Legislative Session.[10]

50. Senator Brandon Creighton filed S.B. 12 in the Texas Senate on February 24, 2025.[11] Senator Creighton's original statement of legislative intent stated that the goals of the bill were to: (1) strengthen parental rights; (2) eliminate DEI in public schools; and (3) prohibit instruction on sexual orientation and gender identity from pre-K through twelfth grade; among other provisions.[12]

---

[10]    Dan Patrick, "Lt. Gov. Dan Patrick Announces First Round of Top 40 Priority Bills For the 2025 Legislative Session," (Jan. 29, 2025), https://www.ltgov.texas.gov/2025/01/29/lt-gov-dan-patrick-announces-first-round-of-top-40-priority-bills-for-the-2025-legislative-session/ (last visited Aug. 21, 2025).

[11]    S.B. 12 Bill Analysis, Author's/Sponsor's Statement of Intent, 89th Leg., R.S. (2025), https://capitol.texas.gov/tlodocs/89R/analysis/pdf/SB00012I.pdf#navpanes=0.

[12]    *Id.* at 2-3.

51. The original version of the bill did not include the GSA Ban or Social Transition Ban, but it did include the Inclusivity Ban and Don't Say LGBTQ+ Ban.[13]

52. On March 17, 2025, the Senate Committee on Education K-16 amended S.B.12 to include the GSA Ban.[14] The bill then passed the Senate on March 19, 2025.[15]

53. Following concerns from lawmakers about whether S.B. 12's restrictions on programs and activities referencing "gender identity" would hinder same-gender schools or programs,[16] the House Committee amended the bill to include an exception only to the Don't Say LGBTQ+ Ban stating that "[t]his section may not be construed to . . . prohibit an organization whose membership is restricted to one sex and whose mission does not advance a

---

[13]    S.B. 12 (Introduced version), 89th Leg., R.S. (2025), https://capitol.texas.gov/tlodocs/89R/billtext/pdf/SB00012I.pdf#navpanes=0.

[14]    S. COMM. ON EDUC.,  89th Leg., R.S. (Tex. 2025), S. COMM. REP. ON SB-12 at 13, https://capitol.texas.gov/tlodocs/89R/billtext/pdf/SB00012S.pdf#navpanes=0.

[15]    S.B. 12, 89th Leg., R.S. (2025), https://capitol.texas.gov/BillLookup/History.aspx?LegSess=89R&Bill=SB12.

[16]    During the House committee hearing, Representative James Talarico said, "[t]he other part I had concern about is . . . there's also programs based on gender, race, that kind of thing that would be banned under the bill. This I don't see carveouts for, but I want to flag that we have schools in my district, we have the Gus Garcia Young Men's Leadership Academy, a program based on sex. I know in Dallas we also have the Women's STEM Academy. We do have all boys and all girls' schools. I want to make sure that those don't fall under a prohibition of programs based on gender or sex." Tex. House, Public Education Committee Hearing on S.B. 12, 89th Leg, R.S. (Tex. May 13, 2025) (video at 47:39-48:26), Representative Leach responded, "I think those are fair points as well, Representative Talarico, and I'm happy to work on clarifying language with you." *Id.*

19

political or social agenda from meeting on a school district or open-enrollment charter school campus."[17]

54. The Social Transition Ban was added to the bill at the very end of the legislative process—in conference committee before S.B. 12 secured final passage from both the House and Senate.[18]

55. The bill author's statement of intent in the final passage of the law claims that the goals of S.B. 12 are to "[p]rohibit clubs based on sexual orientation and gender identity" and that "[f]or student clubs related to sex, race, color and ethnicity, teachers may only supervise the club and cannot provide instruction."[19]

56. According to this official statement of legislative intent, the law's aim is to "[e]liminat[e] diversity, equity, and inclusion (DEI) in public schools," including by "broaden[ing]" the "DEI duties definition [] to include all activities and programs."[20] The statement explains that "[s]chool districts must implement local discipline policies for violations, including termination for employees engaging in prohibited DEI activities" and "certify compliance" with

---

[17]    S.B. 12 (House Committee Report version) § 24(b)(3), 89th Leg., R.S. (2025), https://capitol.texas.gov/tlodocs/89R/billtext/pdf/SB00012H.pdf#navpanes=0.

[18]    S.B. 12 CONF. COMM. REP., 89th Leg., R.S. (2025), https://lrl.texas.gov/scanned/89ccrs/sb0012.pdf#navpanes=0.

[19]    S.B. 12 Bill Analysis, Author's/Sponsor's Statement of Intent, 89th Leg., R.S. (2025) at 2, https://capitol.texas.gov/tlodocs/89R/analysis/pdf/SB00012F.pdf#navpanes=0.

[20]    *Id.* at 1-2.

the Inclusivity Ban "at a public meeting," and it also requires that "[c]harter

schools must comply with these prohibitions."[21]

57. The legislative debate on S.B. 12 confirms that the law is aimed

at suppressing views involving race, sexual orientation, and gender identity.

During the Senate floor debate, S.B. 12's author, Senator Creighton, stated

that the goal of the law "right off the bat" is to "prohibit[] clubs based on sexual

orientation or sexual identity if they're solely based on those tenets."

> **Senator Kolkhorst:** So those are banned?
>
> **Senator Creighton:** And that's consistent with the rest of the bill that there can be no classroom instruction on sexual orientation and gender identity . . .[22]

58. Senator Creighton added that he believes diversity, equity, and

inclusion efforts to be inherently discriminatory.

> **Senator Miles:** You believe DEI is a means of discrimination?
>
> **Senator Creighton:** There have been absolute, concrete examples of discrimination with DEI, yes.
>
> **Senator Miles:** So you believe—simple yes or no—you believe DEI is discrimination?
>
> **Senator Creighton:** Uh, well, yes.[23]

---

[21]    *Id.*

[22]    Tex. Senate, Floor Debate on S.B. 12, 89th Leg, R.S. (Tex. March. 19, 2025) (video at 3:50:13-3:50:52), https://senate.texas.gov/videoplayer.php?vid=21397&lang=en.

[23]    *Id.* (video at 4:00:20).

59. Senator Creighton also confirmed that the law's numerous prohibitions relating to gender identity or sexual orientation specifically target LGBTQ+ and transgender students and their identities, as opposed *all* gender identities and sexual orientations, including cisgender[24] or heterosexual[25] identities:

> **Senator West:** "And when you use gender identity . . . and also sexual orientation, that deals with someone being LGBTQ or transgender, is that correct?"

> **Senator Creighton:** "That's correct. That's a reference other than biology, biological sex. In other words, how a particular student identifies."[26]

60. In response to questions about the GSA Ban, Senator Creighton dismissed concerns about the rights of LGBTQ+ students to associate and the benefits of those students being able to build community and mutual support in light of their shared identities. [27] He also implied that LGBTQ+ identities

---

[24]    Cisgender refers to someone whose gender identity aligns with their sex assigned at birth. The majority of people in society are cisgender, which means that their "internal gender identity matches, and presents itself in accordance with, the externally determined cultural expectations of the behavior and roles considered appropriate for one's assigned sex as male or female." *Cisgender*, APA DICTIONARY OF PSYCH., AM. PSYCH. ASS'N (Nov. 15, 2023), https://dictionary.apa.org/cisgender.

[25]    Heterosexuality is characterized by "sexual, romantic, or emotional attraction or activity between members of the opposite sex." *Heterosexuality*, APA DICTIONARY OF PSYCH., AM. PSYCH. ASS'N (Nov. 15, 2023), https://dictionary.apa.org/heterosexuality. The majority of people in society identify as heterosexual.

[26]    *Id.* (video at 3:39:08).

[27]    Tex. Senate, Floor Debate on S.B. 12, 89th Leg, R.S. (Tex. March. 19, 2025) (video at 4:50:16), https://senate.texas.gov/videoplayer.php?vid=21397&lang=en.

are so inappropriate that they should only be discussed outside of school campuses: "[LGBTQ+ students] can join the [] republican or democrat club, they can join a math club, or they can meet afterschool together, if they want to go down the street from a Whataburger if they want to get together."[28]

61. When asked for examples of objectionable programs and activities that would be prohibited by this law, Senator Creighton only named programs meant to discuss and ensure the wellbeing of students from diverse LGBTQ+, racial, and religious backgrounds: "[Teacher] trainings including Coahuiltecan spirituality, humanity's creation of the sacred springs of San Marcos, combatting and how to be an ally among homophobia, celebrating diversity and inclusion in our classrooms, privilege 101, and many other types of trainings . . . and culturally responsive approaches in music, and integrating bias checks into daily practice in a systemically racist nation."[29]

62. Representative Jeff Leach was the sponsor of S.B. 12 before the Texas House. During a committee hearing before the House Committee on Public Education, Representative Leach explained that one goal of the law is to "get away from some of the more toxic social issues, or indoctrinational

---

[28]    *Id.*

[29]    Tex. Senate, Floor Debate on S.B. 12, 89th Leg, R.S. (Tex. March. 19, 2025) (video at 4:36:04), https://senate.texas.gov/videoplayer.php?vid=21397&lang=en.

issues."[30] He was also asked: "Does your bill prohibit a school district from assigning people to schools . . . so that children in the school see some of the faculty members that look like them?" and responded "Yes, of course it prohibits that . . . and rightfully so."[31]

63. On the House floor, Representative Alan Schoolcraft, who introduced the amendment banning GSAs, expressed disdain for GSAs and other clubs supportive of LGBTQ+ students and his intention to censor the speech they facilitate. He explained: "sexual orientation and gender identity, they're difficult issues, they're confusing issues. . . . These issues are also extremely controversial and divisive."[32]

64. Representative Schoolcraft specifically mentioned Plaintiff GSA Network and called them out for "pushing some of these clubs in our schools."[33] He explained, "I define gender identity as male or female; however, there seems to be some confusion over that. The whole gender thing has gotten very complex."[34] Representative Schoolcraft criticized the GSA Network for listing a number of different pronouns on its website as a reason to support S.B. 12's

---

[30]    Hearing before the Tex. H. of Representatives, 89th Leg., R.S. (Tex. May 13th, 2025) (video at 18:58-19:10), https://house.texas.gov/videos/22103.

[31]    *Id.* (video at 32:53).

[32]    Tex. H. of Representatives, Floor Debate on S.B. 12, 89th Leg., R.S. (Tex. May 24, 2025) (video at 11:09:38-11:11:40), https://house.texas.gov/videos/22257.

[33]    *Id.* (video at 11:09:38-11:11:40).

[34]    *Id.* (video at 11:10:17-11:10:30).

GSA Ban.[35] He added that, in his determination, clubs like GSAs "should not exist on campus,"[36] and he called many of the things he encountered on the GSA Network's website—such as guidance on respecting affirming pronouns—"lunacy."[37] In his view, GSAs "are not about social clubs, they're about efforts to fundamentally change our social structure and the moral fabric of this country."[38]

65. The House bill sponsor, Representative Leach, went further by calling GSAs "school-sponsored and school-sanctioned sex clubs" and "sexual in nature."[39] He explained, "We're not going to allow gay clubs and we're not going to allow straight clubs. We shouldn't be sexualizing our kids in public schools . . . and we shouldn't have clubs based on sex."[40] He added, "I've listened [...] to members [...] debate about library books and I've been repulsed at some of the things that I've heard, and some of the things that I've seen."[41] Representative Leach also added that GSA clubs seemed to be sources of "indoctrinat[ion]."[42]

---

[35]    *Id.*

[36]    *Id.* (video at 11:13:01-11:15:18).

[37]    Tex. H. of Representatives, Floor Debate on S.B. 12, 89th Leg., R.S. (Tex. May 31, 2025) (video at 4:02:00-4:04:13), https://house.texas.gov/videos/22353.

[38]    *Id.*

[39]    *Id.* (video at 2:24:32-2:28:50).

[40]    *Id.*

[41]    *Id.* (video at 2:24:42-2:28:33).

[42]    *Id.* (video at 4:56:39).

66. Representative Brad Buckley, the chair of the House committee that advanced the bill, characterized GSAs as not "community minded" and "based on a characteristic this bill does not allow."[43] When asked about any specific problems or concerns he knew about regarding GSAs, Representative Buckley said that he did not know about or recall any.[44]

67. There was no public testimony on the Social Transition Ban, which was added to the bill during conference committee before it secured final passage from both the House and Senate.[45]

68. Governor Abbott signed S.B. 12 into law on June 20, 2025.[46]

69. The law's effective date is September 1, 2025,[47] and its prohibitions "appl[y] beginning with the 2025-2026 school year."[48]

### D. Plaintiffs and Their Harms Under S.B. 12

#### i. GSA Network

70. Plaintiff GSA Network is a national 501(c)(3) nonprofit organization. Its mission is to empower and train queer, trans, and allied youth

---

43    *Id.* (video at 3:46:30).
44    *Id.* (video at 3:47:02-3:47:22).
45    *S.B. 12 Conference Committee Report Form*, 89th Leg., R.S. (2025), https://lrl.texas.gov/scanned/89ccrs/sb0012.pdf#navpanes=0
46    *Governor Abbott Signs Over 600 Critical Bills Passed During 89th Regular Legislative Session*, Office of the Texas Governor (June 21, 2025), https://gov.texas.gov/news/post/governor-abbott-signs-over-600-critical-bills-passed-during-89th-regular-legislative-session (last visited August 22, 2025).
47    S.B. 12, 89th Leg., R.S. (Tex. 2025).
48    *Id.* § 30.

leaders to advocate, organize, and mobilize an intersectional movement for safer schools and healthier communities. GSA Network has a core belief that trans, queer, and two-spirit youth (TQ2S+)[49] exist, belong, and have the right to self-determination. Racial justice and LGBTQ+ rights are at the heart of GSA Network's activities and those of the Genders and Sexualities Alliance clubs ("GSA clubs") in its network.

71. GSA Network brings claims in this lawsuit on behalf of itself and its members against the Commissioner and Plano ISD to enjoin their enforcement of S.B. 12's GSA Ban, Inclusivity Ban, Social Transition Ban, and Don't Say LGBTQ+ Ban because these provisions of S.B. 12 prevent GSA Network from being able to support GSAs and their activities in Texas, forbid student members from being able to form or join GSAs, likely force existing GSAs to disband, and prohibit or drastically limit many of the activities that GSA Network and its registered GSAs engage in at schools. This harms the

---

[49]    "Trans, Queer and Two-Spirit+" is the term GSA Network uses to describe the core community it serves. "Trans" is an umbrella term to describe a broad range of gender identities that differ from someone's sex assigned at birth. "Queer" is an umbrella term that describes sexual orientations other than heterosexuality and includes people who identify as lesbian, gay, and bisexual. "Two-Spirit" is a modern umbrella term utilized by some Indigenous North Americans to describe gender identities that do not fit within a binary understanding of gender. GSA Network more recently began utilizing the acronym TQ2S+ to describe its base instead of the more popularized acronym "LGBTQ+" which is used throughout Plaintiffs' complaint.

freedom of speech and expressive association of GSA Network and its member students.

72. GSA Network is a membership-based organization with three different types of members: the GSA clubs registered with GSA Network; the student leaders organizing GSA clubs that are registered; and the state-level organizational partners in the National Association of GSA Networks. GSA clubs in schools or communities can register as members of GSA Network. GSA Network provides resources and support to these clubs. The clubs are student-led, and usually have a school faculty advisor who supervises, provides guidance, and assists with leadership transition and maintaining the club when student leaders graduate.

73. As of the most recent GSA registration cycle, GSA Network has 22 active GSA clubs registered in Texas, which are located in fourteen different school districts, including in Plano ISD.

74. GSA clubs provide a place for LGBTQ+ and allied students to meet each other, form community bonds, advocate for LGBTQ+ rights and racial justice, and support each other's identities, including those of students who are transgender and want to discuss topics relating to social transitions. While GSA clubs often engage in programs, activities, and discussions that explicitly reference racial justice, sexual orientation, and gender identity—and GSA Network itself provides information and resources on these topics to GSA

clubs and student members—GSAs are also spaces for students to connect with each other and socialize about general topics in a safe and inclusive environment.

75. In many cases, students who participate in GSAs feel safer, more supported, and more confident in expressing their true selves to their family members and peers. Being part of a GSA brings them closer with their families, rather than creating distance and isolation when students do not have the confidence to share who they are. Being part of a GSA can also help students alleviate stress and anxiety, build community, improve academic performance, and counteract the harmful effects of bullying, discrimination, and harassment faced by LGBTQ+ students in their schools.

76. GSA Network provides support and resources to GSA clubs and students involved in the clubs in many ways, including resources for organizing days of action for racial justice and gender justice, educational workshop guides, and toolkits for virtual organizing. GSA Network also distributes a monthly newsletter to GSA clubs, which offers analysis of recent policies impacting LGBTQ+ rights and racial justice, trainings that students can attend or conduct at their GSA club meetings, and opportunities for funding for GSA clubs. GSA Network often emails teachers and students through their school-affiliated email addresses and sometimes sends physical mail with information and resources directly to school campuses.

29

77. Although GSA clubs are student-run, school employees often play a critical role in GSA clubs. Faculty advisors encourage and support students in taking on projects, provide guidance about school regulations for specific activities, mediate conflicts that arise between club members or with other students or faculty, serve as liaisons between GSA club members and the school administration and students' families, and facilitate activities which require an adult (such as field trips). Many faculty advisors serve as the point of contact between GSA Network and the GSA clubs, often using their school email address and/or school mailing address to receive materials from GSA Network. Faculty advisors also play an important role in facilitating leadership transition in GSA clubs when one year's student leaders graduate. Many of the activities that GSA clubs organize or participate in would not be possible, either for practical reasons or due to school rules, without a school faculty advisor supporting the activities.

78. As of the filing of this complaint, GSA Network has already learned that at least one registered GSA has been shut down in Plano ISD due to S.B. 12.

79. If the challenged provisions of S.B. 12 are not enjoined, all Texas students in public and charter schools, including GSA Network members, will likely be unable to join or establish GSA clubs at their schools. Even though the law does not define what it means for a student club to be "based on sexual

orientation or gender identity," GSA Network expects its 22 registered GSA clubs in Texas to be shut down because of S.B. 12 since many of these clubs focus on issues relating to sexual orientation or gender identity, and because Texas lawmakers specifically invoked GSA Network and GSAs by name when advocating for the GSA Ban.

80. The GSA Ban directly harms GSA Network and its members. GSA Network's mission is to support students to form GSA clubs and advocate, organize, and mobilize an intersectional movement for safer schools and healthier communities. If students are unable to form GSA clubs or engage in activities that even reference race, ethnicity, sexual orientation, or gender identity, GSA Network will be impeded from achieving its mission.

81. GSA Network's own freedom of speech will also be curtailed by S.B. 12 because it will be prohibited from sharing resources and information with audiences in Texas. GSA Network currently distributes information directly to GSA clubs through their student leaders and faculty advisors, such as its monthly newsletter that frequently mentions issues involving racial justice, sexual orientation, and gender identity. If GSAs are no longer permitted to be school clubs, meet on school campuses, use school resources, or have the support of faculty sponsors, GSA Network's speech will be burdened, and its mission will be impeded.

82. Even if GSA Network's student members try to meet outside of school to replace the many benefits that GSAs provide, GSA Network would have to expend far more resources to connect with these students and stay in touch over time, since the official connection of students to a school with a faculty sponsor that helps maintain continuity year after year would be lost. Even if GSAs are only banned in Texas for a short amount of time, shutting them down could irretrievably disrupt GSA Network's connections with student members and GSA sponsors.

83. The GSA Ban also irrevocably harms GSA Network's members by suppressing their freedom of speech and association and denying them equal access to school facilities guaranteed by the Equal Access Act. By permitting all clubs other than those "based on sexual orientation or gender identity" in Texas schools, the GSA Ban ostracizes GSA Network members who have a sexual orientation or gender identity that differs from other students and also harms allies of LGBTQ+ students who seek to learn about issues impacting their friends and advocate for a safer and more inclusive school environment.

84. Because the Inclusivity Ban explicitly incorporates the GSA Ban, S.B. 12 § 3(e)(5)(D), it reinforces the GSA Ban by entirely shutting down clubs registered with GSA Network. The Inclusivity Ban's prohibition of all school employees, contractors, and volunteers from engaging in any "diversity, equity, and inclusion" duties, including by "developing or implementing policies,

32

procedures, trainings, activities, or programs that reference race, color, ethnicity, gender identity, or sexual orientation," *id.*§ 3(a)(3), also harms GSA Network and its student members by burdening their speech and making it impossible for any faculty advisor or other school employee, contractor, or volunteer to help "implement" the numerous GSA Network programs that explicitly reference race, sexual orientation, and gender identity. Without being permitted to have a faculty sponsor that shares any information with students about these topics, GSA Network will not be able to communicate directly with its members and the members themselves will lose access to valuable information.

85. The Social Transition Ban similarly harms GSA Network and its members. Because this restriction prohibits all school employees from sharing "any information" about "social transitioning," *id.*§ 7(b), which is broadly and vaguely defined, *id.*§ 7(a), GSA Network's speech is burdened because GSA sponsors cannot share resources or information regarding gender identity for fear that it will violate this section. GSA Network's members also lose access to critical information about transgender students and their rights in schools and will not be able to freely speak with school employees about this topic. Most critically, GSA Network's members who are transgender themselves will

lose vital support at school, could be deadnamed[50] or misgendered[51] due to the Social Transition Ban, and will be ostracized and marginalized in school as any discussion of or support of their identities by school employees is banned in Texas schools.

86. The Don't Say LGBTQ+ Ban also threatens to irreparably harm GSA Network and its members. As a "third party" itself, GSA Network is now directly prohibited from providing any "instruction, guidance, activities, or programming regarding sexual orientation or gender identity to students." S.B. 12 § 24(a). Thus, the materials, resources, and activities that GSA Network provides to its GSA clubs, with or without the support of GSA sponsors, are prohibited by S.B. 12. This section and the other challenged restrictions of S.B. 12 fundamentally impair the activities, speech, and freedom of association of GSA Network's clubs and members.

87. If S.B. 12 did not exist, GSA Network would continue supporting its GSA clubs and student members in Texas as it had previously planned. But because of this new law, GSA Network has had to reallocate considerable time

---

[50]    A "deadname" is the name that a transgender person was given at birth and no longer uses upon transitioning. *Deadname*, MERRIAM-WEBSTER ONLINE, https://www.merriam-webster.com/dictionary/deadname#h1 (last visited Aug. 21, 2025); *see also Deadname (verb)*, *id.* ("to speak of or address (someone) by their deadname").

[51]    "Misgender" means "to identify the gender of (a person, such as a nonbinary or transgender person) incorrectly (as by using an incorrect label or pronoun)." *Misgender*, MERRIAM-WEBSTER ONLINE, https://www.merriam-webster.com/dictionary/misgender (last visited Aug. 21, 2025).

and resources from its regular operations in order to support students and GSA clubs in preparing for the impact of S.B. 12. The GSA Network has been forced to try to find avenues to keep supporting GSAs, club sponsors, and student members while also complying with the requirements of S.B. 12. The GSA Network is spending time and resources traveling to Texas to meet with partners about how to navigate this law's restrictions, which would not be needed if S.B. 12 had not been passed. Facilitating these meetings has cost GSA Network several thousand dollars, which otherwise would have been used for other areas of GSA Network's work around the country.

88. GSA Network has also begun planning additional trips to Texas to support GSA clubs organizing, to meet with student GSA club leaders off-campus to strategize which activities they can still legally engage in, and to determine further resources or other support the clubs may require because of S.B. 12. These trips were not planned or budgeted for before S.B. 12 was passed, and now the organization has to divert resources because of this new law and its harmful impacts on GSA Network clubs and members. GSA Network anticipates that, because GSA clubs will be banned from Texas schools, GSA clubs will likely require additional resources to secure meeting locations outside of school, provide transportation for GSA club members to those offsite locations, and establish new means of coordinating GSA club

meetings, information, and membership outside of the structure provided for in-school clubs.

89. The time and resources that GSA Network will have to spend supporting these students cannot change the fact that S.B. 12 bans GSAs and suppresses the free and open discussion of issues relating to race, gender identity, and sexual orientation in Texas schools. Even if GSA Network had unlimited resources to counter this law's impact, which it does not, S.B. 12's infringement on the constitutional rights of GSA Network and its members— and the concrete harms the law imposes—are impermeable and devastating.

### ii. SEAT

90. SEAT is a nonpartisan, nonprofit grassroots civic organization whose mission is to empower youth through hands-on civic engagement, advocacy, and leadership development to address systemic inequities and drive change in Texas communities. This requires SEAT and its members to engage in free and robust debate, including by discussing race, ethnicity, gender identity, and sexual orientation on school property in Texas and at school-sponsored events.

91. SEAT brings claims in this lawsuit on behalf of itself and its members against the Commissioner, Houston ISD, and Katy ISD to enjoin their enforcement of S.B. 12's GSA Ban, Inclusivity Ban, Social Transition Ban, and Don't Say LGBTQ+ Ban because these provisions of S.B. 12 burden the

speech of SEAT and its members and impair the organization's ability to continue working with schools, educators, student organizations, and students across Texas in a variety of ways to advance its mission.

92. SEAT is comprised of approximately 282 members, who form the backbone of the organization and provide input and feedback to inform the organization's strategies and initiatives. SEAT has members in at least 30 school districts and charter schools throughout Texas, including in Houston ISD and Katy ISD. SEAT's members reflect the diversity of Texas in every way and come from many different backgrounds in terms of race, religion, gender identity, sexual orientation, national origin, wealth, disability, and more.

93. While anyone can sign up for updates through SEAT's website, the organization's membership is comprised only of people who are invited to join its online messaging platform. Once people join SEAT's online messaging platform, they are able to actively participate in discussions and help guide the organization. SEAT's members all have connections to Texas and either currently attend or recently attended school in Texas.

94. SEAT's members are Texas students in middle school, high school, college, and graduate school who seek to engage in advocacy and policymaking on issues of public importance. Because SEAT's mission is to empower Texas youth through hands-on civic engagement, advocacy, and leadership development to address systemic inequities and drive change in their

communities, SEAT necessarily incorporates and discusses racial justice and LGBTQ+ justice throughout its programs, activities, and events.

95. SEAT supports students in various school districts and charter schools who serve as advocates and leaders in their schools and communities. As part of this support, SEAT provides know-your-rights information to students, educators, and others, both on and off school district property. In particular, SEAT provides know-your-rights lanyard cards to students and teachers that contain information about Title IX's prohibition on discrimination related to sexual orientation and gender identity, and the Civil Rights Act's prohibition on discrimination related to race, color, or sex. Many teachers and students carry and wear these lanyards at schools, and teachers often share this information with their students. The lanyards include a link to SEAT's student resource hub with other information about racial diversity, gender identity, and sexual orientation, as well as information about upcoming civic engagement events, and information about joining SEAT. To date, SEAT has distributed over 1,000 lanyard cards with this information.

96. SEAT also shares resources from partner organizations with students and educators, including guides to fighting the banning of books related to LGBTQ+ and racial diversity issues along with LGBTQ+ mental health resource fliers. SEAT has also created a project to share information with students and teachers about web filtering and surveillance in Texas

schools. As part of this project, SEAT created a website that mentions the censoring of queer, trans, Black, and Brown voices through school website filtering. SEAT has been sharing this website with teachers in Texas high schools who teach AP Government or U.S. History, who in turn share it with their students. SEAT also shares this website with teacher sponsors of school clubs that might be interested in this topic.

97. Some of the information that SEAT shares with educators and students could be viewed as relating to social transitioning, at least as this term is vaguely and broadly defined by S.B. 12. Teachers have attended SEAT trainings and shared information about their own experiences with gender identity, including the use of pronouns that differ from their sex assigned at birth. SEAT also shares resources with teachers and students about laws prohibiting discrimination based on gender identity, which references topics relating to social transitioning.

98. In addition to sharing resources directly with students and teachers in Texas schools, SEAT works with and through GSAs to engage in student support, advocacy, and leadership development. SEAT has provided information and resources to GSAs, especially about federal and state laws and local school board policies, including how these laws and policies relate to racial and LGBTQ+ justice.

99. SEAT has also helped its members create and maintain GSAs at their schools. For example, in Katy ISD, SEAT connected members active in GSAs to the leaders of GSAs in other schools, thereby helping students share information with each other and advocate for more inclusive policies in Katy ISD. SEAT also provides students with information about GSAs, helps students locate faculty sponsors, connects students to GSA Network, and distributes information to GSAs about Equal Access Act rights and relevant school board policies. Several SEAT members have been members, as well as leaders, of GSAs at their schools.

100. SEAT has also co-hosted training sessions and programs with GSAs on school property in multiple school districts. At these trainings, SEAT specifically discussed issues relating to race, sexual orientation, and gender identity. For example, on school property in Cypress-Fairbanks ISD, SEAT held a poster-making party and training sessions with students, parents, and educators to prepare them to testify before the district's school board meeting. During three events, SEAT provided information and resources about the district's proposed policies impacting LGBTQ+ students and seeking to censor discussions of race (and other topics) from certain textbooks. SEAT distributed know-your-rights resources, including its lanyards, at these events, and also partnered with students in debate clubs to help them express their views to the school board.

101. In Houston ISD, SEAT attended school board meetings to advocate against the closure of district libraries. SEAT partnered with Community Voices for Public Education-Houston to hold a read-in, where SEAT distributed and read books explicitly mentioning topics of racial justice, sexual orientation, and gender identity on Houston ISD property.

102. In Katy ISD, SEAT worked with a network of GSAs to distribute books that were removed from school libraries because they feature characters and topics relating to race, gender identity, and sexual orientation. Many of the books SEAT distributed include works that explicitly discuss race, ethnicity, color, gender identity, and sexual orientation.

103. When Katy ISD proposed an anti-LGBTQ+ school board policy in August 2023, SEAT partnered with Sexualities and Genders Alliance (SAGA), a Katy ISD GSA, to help prepare students to speak at the board meeting. SEAT first distributed its know-your-rights lanyards on Katy ISD property, and students then took these lanyards to their campuses and distributed them throughout their high schools in Katy ISD. Several teachers in Katy ISD also took SEAT's lanyards and gave them out to students at school. Since Katy ISD's anti-LGBTQ+ school board policy was enacted, SEAT and its members have continued to attend Katy ISD school board meetings, urge the district's leaders to adopt more inclusive policies, and distribute know-your-rights information on Katy ISD campuses.

104. SEAT has engaged in similar activities in other school districts, where SEAT works with students, parents, and educators to host training sessions, programs, and activities that explicitly discuss topics of race, sexual orientation, and gender identity. SEAT members receive no compensation for attending these events and often rely on teachers and student organizations to help host or organize training sessions, programs, and activities on school district property. In addition to partnering with GSAs, SEAT has also collaborated with Black student unions and clubs based on Latino heritage to engage in leadership and advocacy projects, including in Houston ISD.

105. One of SEAT's largest events is its Advocacy Day, also called the SEAT Summit. The Summit is a nonpartisan event that was recognized as an official field trip by several school districts, including Houston ISD. While all the programming was student-led, teachers helped chaperone the Summit and joined students in discussions about issues of public concern—including those relating to race, ethnicity, gender identity, and sexual orientation—before, during, and after the event.

106. One of the clubs that attended the SEAT Summit was the La Raza Student Alliance from Houston ISD. They were accompanied by their teacher advisor and other chaperones, and students in that club joined other attendees in actively discussing bills and issues before the Texas Legislature,

including those concerning race, ethnicity, gender identity, and sexual orientation.

107. The keynote speaker at the SEAT Summit this year was a transgender woman who spoke about her own gender identity. The Summit also had panel discussions about diversity, equity, and inclusion, protecting immigrant communities, LGBTQ+ erasure, voter suppression in Black and Brown communities in Houston, and racial disparities in youth discipline and surveillance. SEAT intends to hold another Advocacy Day next spring, where the organization hopes to continue partnering with schools, teachers, and clubs to help bring students to SEAT events and to be able to keep discussing issues of public concern, like race, sexual orientation, and gender identity. In order to make these events a success, SEAT relies on school districts and charter schools to provide transportation and excuse absences for students, and on school employees to help chaperone and supervise the events.

108. SEAT hopes to continue each of its aforementioned activities this coming school year and has also developed a fellowship program to provide mentorship and leadership development for student organizing. As part of its inaugural Fellowship Program, SEAT has sponsored 27 fellows for the upcoming school year. Twenty-two of SEAT's fellows attend public high schools and five are in college, and they come from rural, urban, and suburban areas across Texas. As part of this fellowship, student organizers will each create a

capstone project that involves fostering a more welcoming and inclusive environment in their school community. Some capstone projects will involve starting or expanding a GSA, whereas others will involve working with educators, parents, and community members to discuss topics of race, gender identity, and sexual orientation in schools.

109. SEAT worries that S.B. 12's restrictions will substantially interfere with these fellowship projects, with SEAT's other activities, and with the speech and freedom of association of SEAT and its members.

110. S.B. 12 threatens to harm SEAT directly because it will limit SEAT's ability to continue collaborating with school districts, educators, student clubs, and students while engaging in its programs and activities.

111. Prohibiting school districts and charter schools from authorizing GSAs will negatively impact SEAT because it inhibits SEAT from working with GSAs to share information and resources directly with students, as it has done in the past. Without GSAs, SEAT will no longer have teachers to act as GSA sponsors, which provides continuity for GSA clubs, and with whom SEAT can share resources and information. It will thus be harder for SEAT to communicate directly with students and engage in events or activities on school campuses.

112. Barring any educator or third party from providing any "instruction, guidance, activities, or programming regarding sexual

44

orientation or gender identity to students enrolled in prekindergarten through 12th grade," S.B. 12 § 24(a), also directly harms SEAT because it prevents SEAT (as a "third party") from continuing to speak about issues relating to gender identity and sexual orientation in its programs and activities. This provision directly restricts SEAT from being able to share resources and know-your-rights guidance with educators, student clubs, and students themselves because SEAT's resources, activities, and programs often include information related to sexual orientation or gender identity.

113. SEAT is also injured by S.B. 12's prohibition on school employees from providing "any information" to students about social transitions. Because many of SEAT's resources mention gender identity and issues relating to social transitions—and because this section is so vague and broadly worded—school employees will likely no longer accept SEAT's resources and information or share them with students, and they may no longer be able to chaperone students at SEAT events, like its Summit that featured a transgender speaker.

114. S.B. 12's Inclusivity Ban, which prohibits all school employees, contractors, and "volunteers" from "developing or implementing policies, procedures, trainings, activities, or programs that reference race, color, ethnicity, gender identity, or sexual orientation," will also burden and interfere with SEAT's programs and activities. Because SEAT itself frequently relies on volunteers, it may directly be prohibited from developing or implementing any

policy, procedure, training, activity, or program that mentions these topics "at, for, or on behalf of" a school district or charter school. Even if SEAT members are not themselves considered to be "volunteers," SEAT often relies on school employees to help develop or implement its trainings, programs, and events on school property, or to attend its Summit as chaperones and help facilitate student engagement in discussions referencing race, sexual orientation, and gender identity.

115. Without the active support of schools, educators, and student clubs like GSAs, far fewer students would be able to attend the SEAT Summit and other events. With fewer attendees, SEAT will not be able to effectively fulfill its mission to empower youth through hands-on civic engagement, advocacy, and leadership development to address systemic inequities and drive change in Texas communities.

116. S.B. 12 also harms SEAT's members by preventing students in public and charter schools from receiving information and resources about topics relating to race, ethnicity, color, gender identity, and sexual orientation. As educators are no longer able to share SEAT's materials that reference these topics directly with students, SEAT members will lose access to information and be deprived of enriching conversations with educators, including actively speaking about LGBTQ+ issues and social transitions. SEAT members will

also lose the ability to speak on these issues by distributing this information themselves.

117. SEAT's members will also be deprived of their ability to form student organizations "based on sexual orientation or gender identity." SEAT's members are active in GSAs that would be banned by S.B. 12, and at least one member wants to start a new GSA this coming year. As a result, SEAT members will not be able to freely express themselves and associate with other students in GSAs and other clubs.

118. Without the support of their schools to "implement" programs and activities that reference race, ethnicity, color, gender identity, or sexual orientation, it will be much more difficult for SEAT's members to attend any SEAT event. They will likely have to arrange their own transportation to Advocacy Days and may not have their absences excused by their schools. They would also need to find other adults to accompany them if their teachers were not able to serve as chaperones at SEAT's events for fear of violating S.B. 12.

119. SEAT's members are also negatively impacted by the Social Transition and Don't Say LGBTQ+ Bans. Both of these sections are so vague that SEAT's members do not know what is prohibited, and SEAT members are now afraid to speak with their teachers or other school employees about issues relating to gender identity or social transitioning for fear of getting them in trouble. Transgender members of SEAT are especially harmed by the Social

47

Transition Ban as educators are now prohibited from "assisting" their social transitions and may be unable to fully support SEAT's transgender members as their full and authentic selves. SEAT's members also want to actively discuss LGBTQ+ issues with school employees and third parties, including SEAT itself, but the Don't Say LGBTQ+ Ban now makes this impossible in any activity or program involving students in pre-K through twelfth grade.

120. If S.B. 12 did not exist, SEAT would continue all of the activities outlined above this coming school year, including in Houston ISD and Katy ISD, but S.B. 12 now threatens to impede and derail SEAT's plans. Because of S.B. 12's restrictions, SEAT will have to expend more resources to fulfill its mission and continue its activities and events, including by having to spend more time and resources to secure new methods of communication, transportation, and adult supervision if it can no longer rely on schools, student organizations, school-sponsored transportation, and teacher chaperones to help facilitate SEAT's activities and events.

121. On August 25, 2025, Katy ISD formally adopted an official board policy to implement and enforce S.B. 12.[52] According to this resolution, "the Board of Trustees of [Katy ISD] directs all staff and contractors to comply with

---

[52]    *Resolution Regarding Senate Bill 12 and Parent Rights*, Katy Indep. Sch. Dist. (Aug. 25, 2025), https://resources.finalsite.net/images/v1756235888/katyisdorg/jsevscsdsfl20ei5bw5v/SB12RESOLUTION.pdf

the following requirements and directives [among other requirements of S.B. 12]:

- Except as required by state or federal law, employees and contractors may not assign diversity, equity, and inclusion duties to any person, and the District hereby prohibits a District employee, contractor, or volunteer from engaging in diversity, equity, and inclusion duties at, for, or on behalf of the District;

- An employee or contractor who intentionally or knowingly engages in or assigns to an- other person diversity, equity, and inclusion duties or engages in prohibited instruction will be appropriately disciplined, up to and including termination; . . .

- Employees of the District are prohibited from assisting a student enrolled in the District with social transitioning, including providing any information about social transitioning or providing guidelines intended to assist a person with social transitioning; . . .

- No employee may provide or allow a third party to provide instruction, guidance, activities, or programming regarding sexual orientation or gender identity to students enrolled in prekindergarten through grade 12; . . . [and]

- No student club authorized or sponsored by the District may be based on sexual orientation or gender identity[.]"

122. Katy ISD's official policy implementing and enforcing S.B. 12 harms SEAT and its members because SEAT will no longer be able to partner with GSAs in Katy ISD that it has worked with in the past and hopes to continue partnering with in the future; SEAT will be inhibited from continuing to engage in trainings, programs, and other activities with student organizations and educators in Katy ISD that "reference" race, sexual

orientation, gender identity, or topics relating to "social transitioning" as broadly and vaguely defined by S.B. 12; and SEAT as a "third party" can no longer provide "guidance, activities, or programming regarding sexual orientation or gender identity" in the district. SEAT's members in Katy ISD will also be barred from joining or establishing GSAs and other student groups supportive of LGBTQ+ issues, from actively participating in and learning about issues of race, sexual orientation, and gender identity in various trainings, programs, and activities; from actively discussing or learning about issues relating to social transitioning from school employees; and from discussing and learning issues of gender identity and sexual orientation from all school employees and third parties on Katy ISD property, including SEAT itself.

### iii. Texas AFT

123. Texas AFT is a statewide labor union that represents over 66,000 employees throughout Texas, including teachers, librarians, counselors, nurses, teaching assistants, and other public and charter school employees. Texas AFT believes that education is the path to a just and democratic society and that the only way to give students a quality education is through the dedicated work of empowered public educators.

124. Texas AFT brings claims in this lawsuit on behalf of its members against the Commissioner, Houston ISD, Katy ISD, and Plano ISD to enjoin

their enforcement of S.B. 12's GSA Ban, Inclusivity Ban, Social Transition Ban, and Don't Say LGBTQ+ Ban because these provisions of S.B. 12 burden the speech of Texas AFT's members and subject them to impermissibly vague restrictions that violate their constitutional rights.

125. Texas AFT's members reflect the diversity of Texas in every way and come from various backgrounds with regards to race, religion, gender identity, sexual orientation, national origin, wealth, disability, and more. Texas AFT has members in over 480 public school districts in Texas, including Houston ISD, Katy ISD, and Plano ISD. It also has members in various charter school systems across Texas.

126. Racial justice and LGBTQ+ justice are both critical to Texas AFT's mission of supporting its members and public education in Texas. If the challenged aspects of S.B. 12 are not enjoined, Texas AFT's members will be subject to vague, arbitrary, and discriminatory provisions that impair their free speech and due process rights, and members will be blocked from discussing topics of race, ethnicity, gender identity, and sexual orientation with students, parents, third parties, and other educators in and surrounding Texas schools.

127. Plaintiff Polly Poe is a member of Texas AFT in Plano ISD.

128. Texas AFT's members are harmed by every aspect of S.B. 12 challenged in this case.

129. Texas AFT members are injured by S.B. 12's GSA Ban, which provides no guidance to educators about how to determine whether a club is "based on sexual orientation or gender identity." This section also conflicts with Texas AFT members' legal and ethical requirements that educators may not discriminate against their students or shut down student clubs based on content. Having to discriminate against LGBTQ+ students also makes Texas AFT members who are LGBTQ+ themselves feel more marginalized and isolated when any student organizations supporting LGBTQ+ identities are banished from Texas schools.

130. S.B. 12's Inclusivity Ban also provides insufficient guidance as to what is actually prohibited and bars Texas AFT members from being able to engage in policies, procedures, trainings, programs, and activities by schools previously approved and established as appropriate forums for free and open discussion of race and other topics. For example, many schools in Texas have student newspapers, literary magazines, or debate clubs where students speak with teachers about current events, including topics of race, gender identity, and sexual orientation. Under S.B. 12, Texas AFT members are now prohibited from "implementing" any of those programs that even "reference" race or other disfavored topics. Even when Texas AFT members chaperone field trips or speak with students about these issues even outside of school, their speech on any topic relating to race, gender identity, or sexual orientation is chilled and

suppressed by S.B. 12, and the law requires schools to discipline any teacher who violates these vague and ambiguous provisions.

131. Texas AFT's members are harmed by S.B. 12's Social Transition Ban, since this section is so vague and broad that it fails to give educators notice as to what is prohibited. Texas AFT members who are accused of violating this section of S.B. 12 can be reported to the Commissioner and have an "investigative warning" placed on their teaching certificates, even without a finding of guilt. The harsh consequences that flow from this section can be triggered without a clear burden of proof or sufficient due process rights, which puts Texas AFT members' licenses at risk, even if they do not seek or intend to violate the law.

132. Given the detrimental consequences of violating S.B. 12, and the vague and ambiguous rules, Texas AFT's members are now afraid to fully support their students, which threatens the bonds and relationships between members and the communities they serve.

133. Because Texas AFT has many members who want to keep supporting their transgender students—including by respecting their affirming names and pronouns—S.B. 12 places educators in an untenable position of having to either harm their students by not supporting their full and authentic identities or facing potential investigation, suspension, and loss of employment.

134. On its face, the Social Transition Ban is not limited to only curricula, in-class discussions, or school employees' official duties. Because it applies to Texas AFT members' private speech far removed from their official duties—such as when educators encounter students on the weekend or at a community event—this section restricts Texas AFT members' constitutionally protected speech.

135. S.B. 12's requirement that no district or charter school employee may "provide or allow a third party to provide instruction, guidance, activities, or programming regarding sexual orientation or gender identity to students enrolled in prekindergarten through 12th grade" also harms Texas AFT members. This provision is vague since it does not define its key terms or give any indication as to what kind of "instruction, guidance, activities, or programming" would or would not violate the law.

136. Because Texas AFT members cannot even "allow" any third party to address these topics, S.B. 12 puts educators in an impossible situation of having to predict what any guest speaker or third party might say before they say it. This requires Texas AFT members to act as censors in all types of programs and activities related to schools and puts them in an untenable dilemma where they may face legal liability for violating the constitutional rights of third parties and being forced to suppress other people's free speech. Because public school employees can be sued if they violate someone's

constitutional rights, S.B. 12 creates a legal risk for Texas AFT's members and puts them in an unenviable position of having to dictate or determine how to enforce this law.

137. Like the Social Transition Ban, the Don't Say LGBTQ+ prohibition is not limited to the curriculum or educators' official duties and threatens to suppress Texas AFT members' speech in their own private capacity, including if educators encounter students on the weekends, after school, or at community events.

138. Each of these challenged provisions also creates an irreconcilable dilemma with the Texas Educator Code of Ethics, which many of Texas AFT's members are required to adhere to as certified educators in Texas.

139. If Texas AFT members are required to use a name or pronouns for transgender students based on their birth sex, that could reveal confidential information about them and expose their private medical information. It would also adversely affect or endanger their learning, safety, and physical and mental health. Texas educators are not allowed to misrepresent any facts regarding a student, which would occur if they are forced to deny students' identities and are silenced from mentioning anything involving race, gender identity, or sexual orientation at school. Texas AFT members are also not permitted to discriminate against any student based on race, gender, or sexual orientation, which the requirements of S.B. 12 could

lead them to do. By requiring Texas AFT members to stop GSAs from meeting and to stop sharing information with students about race, gender, and sexual orientation, S.B. 12 puts Texas AFT members in an untenable position. If these members are accused of violating the Texas Educators' Code of Ethics, they may face threats to their certifications or other disciplinary sanctions imposed by the State Board for Educator Certification (SBEC).

140. Many Texas AFT members are also parents or guardians of children in Texas schools in pre-kindergarten through twelfth grade who will be negatively impacted by this law. Texas AFT members with kids in public or charter schools are in a particularly tenuous position under this law, because S.B. 12's prohibitions are not limited to in-school discussions, curricula, or educators' official duties. As a result, Texas AFT members worry that they could be accused of violating S.B. 12's restrictions even when speaking with their own children or their children's friends in their role as a parent.

141. Texas AFT has already heard from many of its members harmed by these provisions of S.B. 12. Texas AFT's grievance hotline has received a high volume of inquiries from members seeking guidance about what S.B. 12 means and who are upset about its implications including its harsh professional consequences and the harm it is causing their relationships with their students and concerned parents.

56

### iv. Rebecca Roe

142. Rebecca is a first-year student at Kinder High School for the Performing and Visual Arts ("HSPVA") in Houston ISD. She has been a student in Houston ISD since 2018 and identifies as queer and lesbian. She brings claims against the Commissioner and Houston ISD by and through her next friend, her mother Ruth Roe.

143. While in middle school, Rebecca participated in a GSA during sixth and seventh grade. Although the GSA was inactive during Rebecca's eighth grade year because a teacher sponsor was unavailable, participating in the GSA was a highlight of Rebecca's middle school experience and is something she hopes to have access to again in high school through a GSA or similar student organization focused on issues relating to gender identity and sexual orientation. Her middle school GSA met once a week before the school day, on school campus, and was an inclusive and welcoming place for students to discuss issues relating to sexual orientation and gender identity, their experiences as members of the LGBTQ+ community, and many other topics, including their families, friends, and struggles in middle school. Their club also held a "Queers and Careers" speaker series, where LGBTQ+ adults spoke with them about various issues, including their coming-out experiences and career trajectory. Through her middle school GSA, Rebecca found community and

support in her own experience of coming out as an LGBTQ+ student and felt safer and happier.

144. While in middle school, Rebecca also appreciated being able to learn about and freely discuss topics concerning race, sexual orientation, and gender identity, including topics related to social transitioning. Although Rebecca is cisgender, she has several transgender and non-binary friends whose deeply held sense of gender does not align with their sex assigned at birth, and she appreciated being able to share and receive information with her teachers about how to foster a supportive environment for her friends, including by learning about and respecting gender-affirming names and pronouns. During middle school, Rebecca also enjoyed attending programs and activities supported by school staff that explicitly mentioned race or ethnicity, such as a Black History performance in which students participated and a Hispanic Heritage performance, which celebrated notable Hispanic artists and art forms.

145. Rebecca is suing to enjoin the Commissioner and Houston ISD's enforcement of S.B. 12's restrictions because they burden her ability to participate in activities and programming regarding race, sexual orientation, or gender identity, including a GSA. Rebecca benefited from extracurricular activities where she could learn about and discuss these topics in her middle school, and she seeks to learn from and actively participate in similar programs

and activities in high school. But S.B. 12 threatens to significantly interfere with and substantially burden her freedom of speech and expressive association.

146. Although Rebecca does not know if there is an active GSA offered at her high school, there was one listed on the school's website in the past that is no longer listed for the coming school year. If S.B.12 does not block her efforts, Rebecca wants to join, start, or restart a GSA at her high school this school year. But she worries that she will not be allowed to if the law is enforced against her, and her ability to organize, speak with, and connect with other students in a school club based on sexual orientation and gender identity will be suppressed.

147. Rebecca also seeks to actively participate in her high school's diversity programs that will likely be burdened by S.B. 12. In the past, these events have included: (1) Carnaval: Hispanic Heritage & History Festival, (2) Alphabet Soup: LGBTQ+ Festival, (3) Koffee House: African American Heritage Festival, (4) VenUS: Women's History Festival, and (5) 790 Night Market: Asian American Heritage Festival. The purpose of these festivals is to highlight and showcase diversity at HSPVA, create performance and leadership opportunities for students, and promote student involvement in their community. Rebecca hopes to actively participate in VenUS and Alphabet Soup because, given Rebecca's identity as a girl and a queer person, Rebecca

would like the opportunity to celebrate the history of women and the LGBTQ+ community by creating art and organizing events for the festivals. Rebecca is also looking forward to attending Carnaval, Koffee House, and 790 Market to learn more about Hispanic, African American, and Asian American history, culture, and art.

148. Rebecca is grateful to attend HSPVA because the school offers incredible arts education and celebrates diversity. Rebecca thinks it is important to learn about communities that have been discriminated against in the visual and performing arts world and our broader society so that Rebecca can be part of the effort to create a more inclusive environment. Rebecca worries that if S.B. 12 shuts down or interferes with these events, she will be impeded from participating in and learning from valuable activities and programming that explicitly references race, sexual orientation, and gender identity.

149. Houston ISD has not yet provided guidance as to whether these activities and programs will be inhibited by S.B. 12. Rebecca's school has also not yet informed her about whether she may join or establish a GSA. But because S.B. 12's restrictions facially burden and restrict Rebecca's speech and right to expressive association, she brings these claims to prevent the law's enforcement. Rebecca already feels that S.B. 12 is suppressing her ability to

speak with teachers about topics prohibited by the law, including social transitioning.

150. S.B. 12 also burdens Rebecca's mom's, Ruth's, speech both as a "third party" and "volunteer" in her child's school. Ruth previously supported Rebecca's involvement in her middle school GSA, including by providing donuts for numerous meetings, helping table at open-house events, and providing Pride-themed swag for the GSA. Although some Texas lawmakers called S.B. 12 a "Parents' Bill of Rights," it infringes on Ruth's rights as a parent because it prohibits her and her child from speaking and learning about topics that are important to them and many other students and parents.

### v. Adrian Moore

151. Adrian is a high school senior in Katy ISD who is 17 years old. Adrian is a gay, transgender boy who uses the pronouns he, him, and his, and he has been known by all of his teachers and friends by his chosen name, Adrian, since seventh grade.

152. In all classroom discussions, extracurricular activities, and school-related or adjacent events, Katy ISD's teachers and staff have referred to Adrian by this name for nearly the past five years, even though his legal name still appears in the school's electronic records.

153. Adrian is autistic and has anxiety, which are recognized as physical and mental impairments by Katy ISD, and his Section 504 Plan and corresponding documents all list his name as Adrian and use he/him pronouns.

154. Adrian has thrived in Katy ISD schools while being recognized as his true and authentic self. He excels in school, takes Advanced Placement and honors classes, and is active in a number of activities, including choir, theater, and his school's Pride/Diversity Club.

155. Adrian has loved to sing from even before he started to talk, and he has participated in choir since third grade. As a member of his school's varsity and jazz choirs, Adrian sings as both Alto and Tenor and is permitted to wear a suit at concerts with other boys, while the girls in choir wear dresses. Throughout his years at Katy ISD, Adrian's choir directors have been supportive of his social transition and have allowed him to sing and dress in accordance with his gender identity.

156. Adrian also loves to act and perform in musical theater. Towards the end of his seventh-grade year, Adrian performed in a play in Katy ISD, and the school listed his name as Adrian in the theater playbill. Over the past five years, Adrian has continued participating in theater at Katy ISD and has performed in many theatrical roles in his male identity. Even when he has performed in female roles, the programs have still listed his name as Adrian.

157. During his freshman year in high school, several of Adrian's friends started the process of rebuilding a Pride Club, which had previously been waning at his school. Adrian joined them and became active in Pride Club at the start of his sophomore year. Participating in the Pride Club gave Adrian a chance to connect with other LGBTQ+ students and be himself in a safe and supportive space. Students in Pride Club supported each other's LGBTQ+ identities, discussed topics of gender identity and sexual orientation, and welcomed allies and non-LGBTQ+ students as well. Adrian and other students relied on the Pride Club as a place to congregate and discuss LGBTQ+ issues, while also hanging out, playing board games, doing karaoke, and engaging in activities like making bracelets. The students checked in on each other and supported each other while also teaching each other single-slide LGBTQ+ history lessons, which Adrian helped lead and initiate. The Pride Club also had a faculty sponsor who supported students in the club.

158. During Adrian's sophomore year, school administrators in Katy ISD required the Pride Club to change its name to the "Diversity Club." To Adrian's knowledge, they did this to comply with Katy ISD's anti-LGBTQ+ policy enacted in August 2023 that prohibits certain concepts of "gender

identity."[53] Despite this name change, the Diversity Club was able to continue the same activities that took place in Pride club, and Adrian was still able to congregate with his friends and discuss topics relating to gender identity and sexual orientation with his friends throughout his junior year.

159. Adrian's school regularly has spirit days and special events that sometimes reference topics of race and ethnicity. For example, his school had a "Cultural Night" last school year that included performances by an African Ghanaian Drums and Dance group, a French Circque or Zouk team, a Japanese Contemporary Dance group, a Mexican Ballet Folklorico, a Mariachi band, and a Spanish Flamenco ensemble. These same groups explicitly referencing race and ethnicity also performed at a Cultural Night during Adrian's freshman year, and he hopes to continue being able to watch and participate in similar events in the future that celebrate the rich racial, ethnic, and cultural heritage of his school and the entire Katy community.

---

[53]     Pursuant to Katy ISD's FA (Local), "No course of instruction, unit of study, materials, instructional materials, or any other curricular or District-sponsored extracurricular offerings adopting, supporting, or promoting gender fluidity will be used or introduced in any District classroom." FA (Local), Katy ISD (Aug. 28, 2023), https://pol.tasb.org/PolicyOnline/PolicyDetails?key=594&code=FA#localTabContent.
    This policy also states that "District staff will not promote, require, or encourage the use of pronoun identifiers for students or any other persons in any manner inconsistent with the biological sex of such person" but that "[i]n the event a minor student with the written consent of such student's parent or an adult student specifically, in writing, requests or directs the use of specific pronouns for that particular student, District staff interacting with the student may comply with such request."

160. Adrian is very close with teachers and staff in Katy ISD and typically connects more with adults than with people his own age. Adrian relies on having close conversations with his teachers, including about race, gender identity, and social transitioning, to help foster a sense of belonging in school.

161. Pursuant to Katy ISD's previous policies, Adrian's mom, Julie Johnson, gave explicit permission in writing to authorize Adrian's teachers and staff members to call him "Adrian" and use he/him pronouns. But because of Katy ISD's enforcement of S.B. 12, all of Adrian's teachers are now prohibited from calling him by this name.

162. Right before the start of the 2025-2026 school year, one of Adrian's school administrators told his mom that Katy ISD would soon begin implementing S.B. 12. The district did so by instructing Adrian's teachers that they could no longer use his chosen name when referring to him inside or outside of class. Even though Adrian has gone by this name in Katy ISD for nearly the past five years, his teachers were told that they could only call him by the name given to him at birth, his last name, or no name at all. Many of Adrian's teachers have taken this last option and no longer use any name for him whatsoever, but this makes him feel nameless and dehumanized at school.

163. Although S.B. 12's Social Transition Ban does not explicitly prohibit school districts from using transgender students' chosen names—especially with parental permission—the section is so vague that Katy ISD has

65

interpreted it to completely bar all school employees from doing so, even in defiance of parents' wishes and explicit permission.

164. Because he can no longer be called by his name at school, Adrian told his mom after the second day of school that he "didn't feel like I was a human being" at school. His mom then cried harder than she ever had in her life as a parent.

165. Adrian feels isolated and hurt by Katy ISD's refusal to use his name due to S.B. 12, and he feels especially targeted since teachers and staff have continued using nicknames and shortened names for Adrian's cisgender peers. At first, Adrian though his school district would ban all nicknames, but now all cisgender students at his school seem to be able to go by their chosen or shortened names, whereas he cannot.

166. When teachers are barred from directly addressing Adrian using his name, it creates an exclusionary learning environment between Adrian and his peers. Before S.B. 12 started being enforced against him, Adrian was an active class participant and engaged in class discussions while relying on teachers to support and facilitate group formations and discussions. When teachers do not address Adrian by his name, it creates a barrier not only between teachers and Adrian but also between Adrian and other students, which harms his educational inclusion and success.

167. Being nameless at school is not an option for Adrian, and neither is using the name assigned to him at birth. He has not gone by that name since seventh grade and having anyone use it aggravates his gender dysphoria and anxiety. Adrian is the name he has used since seventh grade and what his mom explicitly asked Katy ISD to use, but the district has now instructed teachers and staff to stop using this name due to S.B. 12's Social Transition Ban.

168. This aspect of S.B. 12, as well as the other sections challenged by this lawsuit, have irreparably harmed the ties and relationships that Adrian previously had with his teachers. Despite previously being so close to them, Adrian now he feels like he has to walk on eggshells, and he worries that his teachers could get fired if they support or "assist" him being his authentic self in any way. Even small gestures of decency and respect—like his choir directors allowing him to wear masculine clothing or his theater directors assigning him male roles—could arguably be considered to "assist" Adrian's social transition as that term is vague and undefined. The Inclusivity Ban and Don't Say LGBTQ+ Ban also prohibit Adrian's teachers, as well as third parties and volunteers, from speaking with him about race, gender identity, and sexual orientation, and they threaten the cultural events that Adrian has come to appreciate and participate in at school.

169. Katy ISD has also completely shut down the Pride Club/Diversity Club that Adrian has actively participated in for the past two

years due to S.B. 12's GSA Ban. Adrian seeks the ability to continue participating in this club and building the community and camaraderie that the club previously provided without it being shut down due to S.B. 12.

170. Adrian and his mom have repeatedly asked Katy ISD not to implement S.B. 12 in ways that erase his identity and discriminate against him and other students—including by emailing the superintendent and school board members, giving public comment at school board meetings, speaking to the media, and requesting meetings and phone calls with school officials—but their requests have been rejected or ignored.

171. Adrian brings this lawsuit so that he can continue to go by the name that he has been known as by all of his teachers and friends in Katy ISD for nearly the past five years, and so that he can continue participating in clubs, programs, activities, and conversations that he did previously without his freedom of speech and due process rights being interfered with by S.B. 12's GSA Ban, Inclusivity Ban, Social Transition Ban, and Don't Say LGBTQ+ Ban.

### vi. Polly Poe

172. Polly Poe is a teacher in Plano ISD and a member of Texas AFT.

173. Last school year, Poe served as the GSA sponsor at the high school where she teaches, but the GSA has now been shut down due to S.B. 12.

174. Poe's GSA was a registered member of the GSA Network.

68

175. Poe brings claims on behalf of herself against the Commissioner and Plano ISD to enjoin the enforcement of S.B. 12's GSA Ban, Inclusivity Ban, Social Transition Ban, and Don't Say LGBTQ+ Ban.

176. S.B. 12's restrictions burden Poe's constitutionally protected speech in at least two ways. They abridge her right to engage with students in a limited public forum established by Texas law and Plano ISD; and the law's restrictions are not limited to speech within Poe's official duties, such that they also inhibit her purely private speech on matters of public concern. S.B. 12's restrictions are also so vague that Poe does not know how to comply with them, especially while maintaining her ethical obligations and complying with other federal and state laws. Without clear guidance, Poe can only implement S.B. 12 in arbitrary and discriminatory ways.

177. The GSA at Poe's school included not only students who are LGBTQ+, but also students who are allies and supportive of their LGBTQ+ friends. At club meetings, GSA members would talk with each other, watch movies, play games, and create a supportive atmosphere for each other. The GSA helped students find community and collectively support each other in a welcoming environment that was generally free from the bullying and discrimination that many LGBTQ+ high schoolers face.

178. While the GSA at Poe's school was student-led, GSA members often turned to Poe to ask questions and discuss topics relating to their lived

experiences. As a club advisor, Poe was keenly aware that the GSA helped members feel seen, heard, and respected at school. Poe shared resources and materials with GSA members to answer their questions, including newsletters, webinars, and other information from GSA Network that explicitly mentioned race, sexual orientation, gender identity, and issues relating to social transition, at least how that term is broadly and vaguely defined by S.B. 12. Poe received GSA Network's resources on her school email account and then shared this information with her students who enjoyed learning about and discussing these topics and being part of GSA Network. Several GSA student members also joined GSA Network webinars, where they could discuss these issues and connect with students in GSAs at other schools. Poe also shared resources with GSA members from the Trevor Project, which provides suicide prevention and anti-bullying resources focused on the LGBTQ+ community, and her students asked her to give presentations on topics relating to suicide prevention and community service opportunities.

179. The GSA student members were deeply interested in topics relating to race, sexual orientation, and gender identity, including issues relating to social transitioning as that term is broadly and vaguely defined by S.B. 12. Because many members of Poe's GSA were transgender or non-binary, they would sometimes ask her questions about laws or policies in Texas impacting transgender youth and other topics relating to gender identity or

social transition. Even though the GSA was student-led, Poe tried to answer students' questions when she could and point them towards resources and information on these topics, including from GSA Network.

180. Through her role as faculty sponsor of the GSA, it was clear to Poe that the GSA provided a vital meeting space for its student members. She saw students become happier and more confident in themselves through the GSA and the friendships they forged there. Participating in a student organization was also one of the few places on campus where students could connect across grade levels and find role models older than them.

181. On or around July 21, 2025, Poe met with administrators at her school, who told her that the GSA would not exist this school year. They added that Plano ISD was still figuring out what to do about other clubs and that teachers could be investigated if they did not use students' deadnames or pronouns assigned at birth.

182. Before the start of school, Poe attended a staff development meeting where she and other school employees were told that because of S.B. 12, all "DEI duties," which "includes creating programs or trainings that refer to race, ethnicity, gender identity, or sexual orientation" would be banned this school year. She was also told that S.B. 12 "bans teaching about gender identity and sexual orientation in all grades, from Pre-K through 12" and that "[s]chool employees are prohibited from helping a student 'socially transition,' which is

defined as a student adopting a different name, pronouns, or other expressions that are different from their biological sex at birth."

183. After receiving this presentation, Poe went online and learned that during the Plano ISD Board of Trustees' August 5, 2025 meeting, the school board received a similar presentation and reviewed PowerPoint slides posted to the Board's official agenda. Under a slide called "Controversial Topics," the presentation states: "In response to SB 12, Plano ISD will:

- Review curriculum documents to ensure no prohibited content is included.
- Reinforce policies and practices to support educators in delivering TEKS-aligned content and restrict topics deemed politically or socially controversial.
- Prohibit instruction or programming related to sexual orientation, DEI practices or gender identity.
- Not use different names or pronouns inconsistent with the student's biological sex.
- Apply these standards across classrooms, clubs, events, guest speakers, and all instructional-day activities."

184. Through this official guidance, Plano ISD seems to interpret S.B. 12's requirement that school employees not "assist" any student's social transition as also requiring that they not acknowledge or affirm transgender students' use of different names or pronouns, even with parental permission. The district is also interpreting S.B. 12's restrictions to "restrict topics deemed politically or socially controversial."

185. On a slide called "Clubs & Organizations," Plano ISD also stated, "SB 12 requires parental consent for clubs, bans clubs on sexual orientation/gender identity, and limits staff roles in race or ethnicity-based clubs." It continues, "In response to SB 12, Plano ISD will:

- Continue to require the annual approval of student clubs.
- Require annual parental or guardian consent for all student club participation.
- Define role for staff sponsors of student clubs.
- Provide targeted staff training to ensure understanding and enforcement of these requirements annually.
- Prohibit clubs and organizations based on sexual orientation or gender identity."

186. Poe also received additional guidance on or around August 11, 2025, from Plano ISD about student clubs, which clarified that "SB 12 bans student clubs 'based on sexual orientation or gender identity.' Schools may not authorize or support such groups, and staff may not lead or facilitate them." This same document states that "Non-Curricular, Interest-Based & Religious Clubs" are still permitted as long as students receive parental permission to participate.

187. Poe also received another document entitled "Plano ISD Legislative Guidance and Staff Attestation Form 2025-2026" and was asked to sign this form. This document instructs school employees: "Do not sponsor or lead clubs centered on sexual orientation or gender identity." It also states that

"I will not teach or promote content prohibited under SB 12 or other applicable legislation."

188. Upon learning of these new rules, Poe confirmed with an administrator at her school that the GSA would indeed be disbanded. She also heard from teachers at other schools in Plano ISD, who said that their GSAs were disbanded too.

189. S.B. 12's impact has been swift and severe. Now that the school's GSA has been shut down, student GSA members no longer have a club where they can congregate with other students and receive and discuss critical information from GSA Network, other nonprofits, and school employees. The GSA's student officers were so upset that they met with a school administrator to ask if they could start a similar club with a different name to continue supporting LGBTQ+ students, but the school administrator told them no because S.B. 12 prohibits any club related to gender identity or sexual orientation.

190. The GSA officers at Poe's school came into this school year with a lot of passion and ideas for what GSA members wanted to do. They wanted to grow the club and engage more in the community, including by volunteering at community service events. Now that the GSA is shut down, these events cannot happen, and the GSA leaders will be deprived of their ability to be

officers in the organization and put this club on their resumes and college applications.

191. Since the GSA was shut down, several GSA members have spoken with Poe to express their concerns. She has also heard from parents who are angered by S.B. 12's restrictions and implementation.

192. The transgender members of Poe's GSA are especially disturbed and impacted by this. Some of them are high school seniors who are already 18 years old, and it is traumatizing for them to not be called by a name and pronouns that align with who they are and their deeply held sense of gender. One of Poe's students has elected to leave school and be homeschooled because of the disbandment of the GSA and the fact that their affirming name and pronouns will no longer be respected by teachers and staff. Even though Poe has always strived to respect her students' wishes and treat them with decency and respect, S.B. 12 now puts her in legal jeopardy and creates a massive gray area about how and whether she can support her transgender students.

193. Some teachers at Poe's school have now started calling students by their last name since they are no longer allowed to refer to trans students by their chosen names, but this places a target on these students' back. Poe finds it discriminatory to treat these students differently while the school district seemingly permits other students to go by nicknames.

194. As an educator, Poe finds it difficult to interpret or implement S.B. 12's requirements. She has no idea what it means to "assist" a student's "social transitioning." Plano ISD has instructed her not to "use different names or pronouns inconsistent with the student's biological sex," but Poe has no way of knowing her students' biological sex. She does not ask students for their private medical information or presume to know what sex any of her students were assigned at birth. Her typical practice is to ask students what name and pronouns they prefer and to do her best to respect their wishes in consultation with their parents. While Plano ISD has interpreted the requirements of S.B. 12 to prevent that, the law's wording is so vague and confusing that Poe cannot tell if using a student's name and pronouns that align with their gender identity is actually prohibited. Despite these conflicting interpretations, Plano ISD has strongly suggested that Poe could be disciplined if she continues to respect her transgender students' affirming names and pronouns, even with parental consent or when those students are legally adults.

195. The implementation of this provision is particularly confusing to Poe since her school district told her that student nicknames are still permitted as long as they match a student's biological sex. That is impossible for Poe to determine and extremely vague, since many student names do not exclusively align with a single gender.

196. By prohibiting Poe and other school employees from providing "any information" about social transitioning, S.B. 12 stops Poe from being able to engage in conversations with students about their identities and transgender people more broadly.

197. Poe also finds it difficult to understand what S.B. 12 means when it prohibits her from "develop[ing]" or "implement[ing]" any "policy, procedure, training, program, or activity that references race, color, ethnicity, gender identity, or sexual orientation." This language is so vague and broad that Poe does not know how she can avoid being accused of violating it, especially when students choose to talk to her about these topics or when clubs she supervises want to host activities involving these issues.

198. S.B. 12's requirement that Poe "may not provide or allow a third party to provide instruction, guidance, activities, or programming regarding sexual orientation or gender identity" is also vague and confusing. It seems to prohibit Poe's speech even outside of school and her official work duties and gives her insufficient guidance as to what is prohibited.

199. This provision also requires Poe to prevent any "third party" from providing information on these topics to her students, which means that she can no longer share newsletters and resources from GSA Network and other nonprofit organizations with her students. Over the past year, Poe frequently shared these GSA Network newsletters with students, but now they

are banned since they discuss prohibited topics from a "third party." Poe also

does not always know what third parties at her school will say or share with

students, such as parents helping volunteer or chaperone at school-related

activities or events. Because S.B. 12 has no scienter or *mens rea* requirement,

Poe could be accused of violating the Don't Say LGBTQ+ Ban if she simply

allows a third party to be present who then shares information with students

without Poe's knowledge or intent.

200. All of these provisions of S.B. 12 create a climate of fear and

discrimination in Poe's school, where the voices of LGBTQ+ students and

educators are suppressed, and they also conflict with Poe's ethical obligations

as a certified teacher under the Texas Educators' Code of Ethics.[54] If Poe is

required to use a name or pronouns for transgender students that does not

align with their gender identity and expression, that could reveal confidential

---

[54]    Among other requirements, the Texas Educator Code of Ethics requires Poe and other certified educators to:

- "[N]ot reveal confidential information concerning students unless disclosure serves lawful professional purposes or is required by law";
- "[N]ot intentionally, knowingly, or recklessly treat a student or minor in a manner that adversely affects or endangers the learning, physical health, mental health, or safety of the student or minor";
- "[N]ot intentionally, knowingly, or recklessly misrepresent facts regarding a student"; and
- "[N]ot exclude a student from participation in a program, deny benefits to a student, or grant an advantage to a student on the basis of race, color, gender, disability, national origin, religion, family status, or sexual orientation[.]" 19 Tex. Admin. Code § 247.2(3).

information about them and expose their private medical information. It would also adversely affect or endanger these students' learning, safety, and physical and mental health. Poe is also not permitted to discriminate against any student based on gender or sexual orientation, which the requirements of S.B. 12 seem to make her do. By requiring Poe to shut down her school's GSA and stop sharing information with any of her students about race, gender, or sexual orientation, S.B. 12 places Poe in legal jeopardy as a government employee being required to violate her students' constitutional rights, and she cannot reconcile the legal and ethical dilemmas that S.B. 12 creates unless its challenged provisions are enjoined.

201. Poe seeks to be able to engage in discussions with her students and participate in her school's GSA in the future as a faculty sponsor without the restrictions that S.B. 12 imposes. She also hopes to be able to continue helping her students build happy and successful lives, as she was able to do before this law's implementation.

202. Because of S.B. 12, Poe is worried about the safety and mental and physical well-being of her students. She is worried about her students losing vital sources of social support, and their confidence and sense of self being stripped away. She is especially worried about transgender students at her school who are now being discriminated against, including her student who dropped out of school to avoid this law's damaging and lasting effects.

203. Poe is also worried about her own career as a teacher. Because S.B. 12's requirements are so vague and broad, she does not know how to implement the law's provisions while also fulfilling her ethical and constitutional obligations as a public-school teacher.

## IV. Causes of Action

204. For each Count, all of the foregoing allegations are repeated and realleged as though fully set forth therein.

### Count One: Viewpoint Discrimination in Violation of the First Amendment, via 42 U.S.C. § 1983

205. Plaintiff GSA Network asserts this claim against the Commissioner and Plano ISD's enforcement of the GSA Ban, Inclusivity Ban, Social Transition Ban, and Don't Say LGBTQ+ Ban, because these sections burden the constitutionally protected speech of GSA Network and its members based on viewpoint without satisfying strict scrutiny.

206. Plaintiff SEAT brings this claim against the Commissioner, Houston ISD, and Katy ISD's enforcement of the GSA Ban, Inclusivity Ban, Social Transition Ban, and Don't Say LGBTQ+ Ban, because these sections burden the constitutionally protected speech of SEAT and its members based on viewpoint without satisfying strict scrutiny.

207. Plaintiff Texas AFT asserts this claim against the Commissioner, Houston ISD, Katy ISD, and Plano ISD's enforcement of the

GSA Ban, Inclusivity Ban, Social Transition Ban, and Don't Say LGBTQ+ Ban, because these sections burden the constitutionally protected speech of Texas AFT's members based on viewpoint without satisfying strict scrutiny.

208. Plaintiff Rebecca Roe brings this claim against the Commissioner and Houston ISD's enforcement of the GSA Ban, Inclusivity Ban, Social Transition Ban, and Don't Say LGBTQ+ Ban, because these sections burden her constitutionally protected speech and right to receive information based on viewpoint without satisfying strict scrutiny.

209. Plaintiff Adrian Moore asserts this claim against the Commissioner and Katy ISD's enforcement of the GSA Ban, Inclusivity Ban, Social Transition Ban, and Don't Say LGBTQ+ Ban, because these sections burden his constitutionally protected speech and right to receive information based on viewpoint without satisfying strict scrutiny.

210. Plaintiff Polly Poe brings this claim against the Commissioner and Plano ISD's enforcement of the GSA Ban, Inclusivity Ban, Social Transition Ban, and Don't Say LGBTQ+ Ban, because these sections burden her constitutionally protected speech based on viewpoint without satisfying strict scrutiny.

## A. The Challenged Provisions Burden Plaintiffs' Constitutionally Protected Speech

211. "As a general rule, the First Amendment prohibits government actors from 'dictating what we see or read or speak or hear.'" *Porter v. Ascension Par. Sch. Bd.*, 393 F.3d 608, 616 (5th Cir. 2004) (quotation omitted).

212. S.B. 12 violates this fundamental precept by dictating what Plaintiffs see, read, speak, and hear in countless programs and activities that have long been established as forums of free speech. Because S.B. 12's provisions discriminate based on viewpoint in all types of forums, they are subject to strict scrutiny, which they cannot withstand.

213. Even in limited and nonpublic forums, government officials may not discriminate based on viewpoint without meeting strict scrutiny. S.B. 12 itself establishes that student clubs, programs, and activities may continue—thereby creating limited public forums—but the law prohibits disfavored topics, which is viewpoint discrimination.

214. Defendants Houston ISD, Katy ISD, and Plano ISD have all adopted explicit policies "establish[ing] a limited open forum for secondary school students enrolled" in their districts for "noncurriculum-related student groups to meet on school premises during noninstructional time."[55] Because

---

[55]    FNAB (Local), Houston ISD (April 1, 2005), https://pol.tasb.org/PolicyOnline/PolicyDetails?key=592&code=FNAB#localTa

these districts have established limited open forums, invoking S.B. 12's restrictions to burden or shut down certain clubs, programs, or activities based on viewpoint triggers strict scrutiny.

215. S.B. 12's provisions directly suppress Plaintiff GSA Network's constitutionally protected speech based on viewpoint. In particular, the GSA Ban burdens GSA Network's ability to share resources and information with GSAs and other student organizations "based on sexual orientation or gender identity," which makes it much more difficult for GSA Network to speak with GSA members, their parents, and faculty advisors about issues of LGBTQ+ rights, racial justice, and other matters of public concern.

216. The Inclusivity Ban and Social Transition Ban also limit GSA Network's ability to share resources and information about issues of race, sexual orientation, gender identity, and social transitioning with students through GSA sponsors. The Don't Say LGBTQ+ Ban expressly prohibits GSA Network as a "third party" from providing "instruction, guidance, activities, or programming regarding sexual orientation or gender identity to students."

---

bContent; FNAB (Local), Katy ISD (Oct. 10, 2007), https://pol.tasb.org/PolicyOnline/PolicyDetails?key=594&code=FNAB#localTabContent; FNAB (Local), Plano ISD (Oct. 23,2006), https://pol.tasb.org/PolicyOnline/PolicyDetails?key=312&code=FNAB#localTabContent

217. GSA Network also asserts this claim on behalf of its members, whose right to speak and receive information is impaired by each of these four provisions. Because GSA Network's members have previously been permitted to participate in GSAs and other clubs supportive of LGBTQ+ students, engage in trainings, programs, and activities that reference race, gender identity, and sexual orientation, freely discuss and learn about topics relating to social transitioning, and discuss and learn about gender identity and sexual orientation, S.B. 12's restrictions burden their speech based on viewpoint.

218. SEAT's speech is also burdened by each challenged provision of S.B. 12 based on viewpoint. The GSA Ban and Inclusivity Ban restrict SEAT's ability to partner and co-sponsor events with GSAs and other clubs supportive of LGBTQ+ rights, as SEAT has done in the past, and restrict SEAT's ability to continue holding trainings and events on school property that reference race, gender identity, and sexual orientation. The Social Transition Ban also prevents SEAT from being able to share resources with students about support for transgender students that relate to social transitioning through any school employee; and SEAT as a "third party" is expressly prohibited by the Don't Say LGBTQ+ Ban from providing any "instruction, guidance, activities, or programming regarding sexual orientation or gender identity to students enrolled in prekindergarten through 12th grade." S.B. 12 § 24(a).

219. SEAT also asserts this claim on behalf of its members, who will be denied the ability to participate in GSAs, actively participate in trainings, programs, and activities that reference race, gender identity, or sexual orientation, discuss and learn about topics of social transitioning with school employees, and discuss and learn about gender identity or sexual orientation from any school employee or third party, including SEAT itself, if S.B. 12 is permitted to be enforced against them.

220. Plaintiff Texas AFT also asserts claims of viewpoint discrimination on behalf of its members because they are now prohibited from sponsoring GSAs and engaging with students in limited public forums previously permitted by school districts and authorized by S.B. 12 itself. Texas AFT's members are also barred from "developing or implementing policies, procedures, trainings, activities, or programs that reference race, color, ethnicity, gender identity, or sexual orientation . . . , at, for, or on behalf of the district." *Id.* § 3(b)(2). This provision is not limited to educators' official duties and restricts Texas AFT members' purely private speech on matters of public concern anytime that they are "at" school property or attend conferences or events "for . . . the district." This provision is also so vague and broad that it chills Texas AFT members' purely private conversations with students, parents, fellow educators, or third parties of matters of public concern involving these disfavored topics.

85

221. Similarly, S.B. 12's Social Transition Ban and Don't Say LGBTQ+ Ban are not limited to school property, during school hours, or within the scope of educators' official job duties. Instead, the plain text of the statute suppresses Texas AFT members' speech even in their purely private capacity, including at night or on weekends, and categorically prohibits school employees from "assisting" any student's "social transition" or providing any "instruction, guidance, activities, or programming regarding sexual orientation or gender identity to students enrolled in prekindergarten through 12th grade." *Id.* §§ 7(b) and 24(a). Because Texas AFT members speak about these topics in their own private capacity—and they are issues of public concern—these provisions of S.B. 12 censor at least some of Texas AFT members' constitutionally protected speech based on viewpoint.

222. Plaintiff Rebecca Roe also challenges these restrictions of S.B. 12 as suppressing her speech and right to receive information based on viewpoint. Roe seeks the ability to continue participating in a GSA or other clubs supportive of LGBTQ+ students in the future; she wants to actively engage in her school's diversity programs that explicitly reference race, gender identity, and sexual orientation; she seeks to learn about and actively discuss issues of social transitioning with school employees; and she wants to learn about and discuss issues of gender identity and sexual orientation. S.B. 12 restricts Roe's ability to speak and learn about these topics based on viewpoint.

223. Plaintiff Adrian Moore similarly seeks the ability to continue participating in a Pride/Diversity Club that is now specifically prohibited by S.B. 12 based on viewpoint and wants to engage in programs and activities in and surrounding school that reference race, gender identity, and sexual orientation. Adrian is also now prohibited by S.B. 12 from being called by his chosen name of Adrian, while cisgender students are still permitted by Katy ISD to use nicknames. This exemplifies the viewpoint discrimination inherent in the Social Transition Ban in particular, since transgender students' voices and viewpoints are directly suppressed by the law while other students retain the freedom to express themselves and decide what they want to be called.

224. Plaintiff Polly Poe also brings claims of viewpoint discrimination based on the challenged provisions of S.B. 12. As a member of Texas AFT, she is injured by the viewpoint discrimination inherent in S.B. 12 in the same way as other Texas AFT members, since she is now prohibited from being the sponsor of her school's GSA in a limited public forum previously established by Plano ISD, and her speech on matters of public concern in her private capacity is facially restricted by S.B. 12's Inclusivity Ban, Social Transition Ban, and Don't Say LGBTQ+ Ban. S.B. 12 therefore censors at least some of Poe's constitutionally protected speech based on viewpoint.

## B. S.B. 12 Is Viewpoint-Based

225. The challenged provisions of S.B. 12 discriminate based on viewpoint because they have the purpose and effect of suppressing non-majoritarian views regarding race, gender identity, and sexual orientation. By censoring activities, programs, trainings, clubs, and conversations solely on these topics, the law discriminates against students, parents, educators, and third parties who want to discuss issues of race, gender identity, and sexual orientation. This silencing only of these specific topics entrenches majoritarian views, especially of colorblindness and cisheteronormativity,[56] while suppressing the perspectives of anyone who wishes to challenge the status quo or question dominant narratives. This is impermissible viewpoint discrimination in which the government "'effectively drives certain ideas or viewpoints from the marketplace.'" *R.A.V. v. City of St. Paul*, 505 U.S. 377, 387 (1992) (quotation and additional citations omitted).

---

[56]     "Colorblindness" is a racial ideology that diminishes the existence of race, which intrinsically erases the history of racism and ignores enduring racial inequalities in the world today. *See* Helen A Neville, et al., *Color-blind racial ideology: theory, training, and measurement implications in psychology*, J. AM PSYCHOL. (Sept. 2013), https://pubmed.ncbi.nlm.nih.gov/24016116/.

"Cisheteronormativity" refers to the systemic belief and social framework that cisgender and heterosexual identities are the default, normal, or preferred human experience. It centers and normalizes the alignment of gender identity with sex assigned at birth (cisnormativity) and assumes heterosexuality as the normative or default sexual orientation (heteronormativity), thereby marginalizing and erasing LGBTQ+ identities and experiences. *See Cisheteronormativity*, Glossary, GENDER & SEXUALITY CAMPUS CTR., MICHIGAN STATE UNIV., https://gscc.msu.edu/education/glossary.html (last visited Aug. 28, 2025).

226. These restrictions are not viewpoint-neutral because they silence the specific views of people who want to raise these topics and speak about them—particularly students of diverse racial and ethnic backgrounds and students who are LGBTQ+.

## C. S.B. 12's Speech Restrictions Cannot Survive Strict Scrutiny

227. Because S.B. 12 burdens Plaintiffs' speech based on viewpoint, these restrictions are "presumptively unconstitutional" and can only be salvaged if they are narrowly tailored to serve compelling state interests. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (citations omitted). The burden to satisfy this test rests on the government and is "demanding," such that "'[i]t is rare that a regulation restricting speech because of its content will ever be permissible.'" *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799 (2011) (quotation omitted).

228. Each of the challenged provisions of S.B. 12 fails this test. The GSA Ban does not serve a legitimate governmental purpose, let alone one that is compelling, and broadly banning all clubs "based on sexual orientation or gender identity" is not narrowly tailored even to an abstract or hypothesized governmental interest. S.B. 12 § 27(b).

229. The Inclusivity Ban is also not closely tied towards furthering any legitimate, let alone compelling, governmental interest, and it could be

much more narrowly drawn in a number of ways, such as by more precisely defining its terms, only applying to official school curricula, or providing an exception for parental consent. *See id.* § 3(a).

230. The Social Transition Ban is also not narrowly tailored to any compelling governmental interest and is so broadly and vaguely worded that it proscribes "any information" being shared with students about social transitioning, even when such speech is constitutionally protected. *Id.* § 7(b).

231. The Don't Say LGBTQ+ Ban is also not narrowly tailored to any compelling governmental interest. There is no legitimate governmental interest in banning all "instruction, guidance, activities, or programming regarding sexual orientation or gender identity," *id.* § 24(a), particularly where human sexuality instruction and other topics are still permitted by the law itself. And even if there were a legitimate or compelling governmental interest, there would be far narrower means of achieving it than to broadly prohibit speech in this area by school employees and third parties.

232. Even if intermediate scrutiny or rational basis review applied to this law, the targeted provisions of S.B. 12 would still be unconstitutional because the challenged provisions are not based on important governmental interests, are directly related to the suppression of free speech, and burden far more speech than necessary to advance any governmental interest.

**Count Two: Vagueness in Violation of the First and Fourteenth Amendments, via 42 U.S.C. § 1983**

233. Plaintiff GSA Network asserts claims against the Commissioner and Plano ISD on behalf of itself and its members because the challenged provisions of S.B. 12 and their threatened enforcement are unconstitutionally vague.

234. Plaintiff SEAT brings claims against the Commissioner, Houston ISD, and Katy ISD on behalf of itself and its members because the challenged provisions of S.B. 12 and their threatened enforcement are unconstitutionally vague.

235. Plaintiff Texas AFT asserts claims against the Commissioner, Houston ISD, Katy ISD, and Plano ISD on behalf of its members because the challenged provisions of S.B. 12 and their threatened enforcement are unconstitutionally vague.

236. Plaintiff Rebecca Roe brings claims against the Commissioner and Houston ISD because the challenged provisions of S.B. 12 and their threatened enforcement are unconstitutionally vague.

237. Plaintiff Adrian Moore asserts claims against the Commissioner and Katy ISD because the challenged provisions of S.B. 12 and their threatened enforcement are unconstitutionally vague.

238. Plaintiff Polly Poe brings claims against the Commissioner and Plano ISD because the challenged provisions of S.B. 12 and their threatened enforcement are unconstitutionally vague.

239. The First and Fourteenth Amendments to the United States Constitution prohibit the government from limiting speech if the restriction is too vague to be enforced. A law is unconstitutionally vague when it (1) fails to provide a "person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly," or (2) fails to provide "explicit standards" for applying the law "to avoid arbitrary and discriminatory applications." *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 551 (5th Cir. 2008) (citation omitted). A "more stringent vagueness test" applies where a statute "interferes with the right of free speech. . .." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982) (citations omitted).

240. Each challenged provision of S.B. 12 fails these requirements because it relies on a litany of terms that are vague, open-ended, and "so standardless that it invites arbitrary enforcement," *Johnson v. U.S.*, 576 U.S. 591, 595 (2015) (citation omitted), especially when used in combination with each other. Because this law leaves significant uncertainty about what kind of speech is proscribed—and impermissibly chills significant amounts of constitutionally protected speech—the challenged provisions are impermissibly void for vagueness.

### A. GSA Ban

241. S.B. 12's GSA Ban states that a "school district or open-enrollment charter school may not authorize or sponsor a student club based on sexual orientation or gender identity." S.B. 12 § 27(b). This prohibition is substantially vague because it lacks clear standards and invites arbitrary and discriminatory enforcement.

242. Despite S.B. 12's legislative history demonstrating an attempt to target GSAs and even mentioning Plaintiff GSA Network, the actual text of the GSA Ban does not provide guidance on how a school district or charter school can determine whether a club is "based on sexual orientation or gender identity." The term "based on" is undefined and gives insufficient notice to school administrators about what types of clubs are prohibited, or how to make that determination.

243. The term "gender identity" is also undefined by S.B. 12 and Texas law, and it is impermissibly vague in this specific context. While "gender identity" can mean "a person's internal sense of being male, female, some combination of male and female, or neither male nor female,"[57] its use in the GSA Ban provides inadequate guidance on what kind of clubs are prohibited.

---

[57] Gender identity is characterized as "a person's internal sense of being male, female, some combination of male and female, or neither male nor female." *Gender identity*, MERRIAM-WEBSTER ONLINE, https://www.merriam-webster.com/dictionary/gender%20identity (last accessed Aug. 26, 2025).

Because this provision does not distinguish between transgender or cisgender identities, it could reasonably be interpreted to bar any type of gender-based club. Indeed, some legislators recognized this concern with the law potentially inhibiting gender-based clubs,[58] which led to the creation of an exception to the Don't Say LGBTQ+ Ban permitting organizations to exist "whose membership is restricted to one sex and whose mission does not advance a political or social agenda. . . ." S.B. 12 § 24(b)(3). But because this exception is neither incorporated into nor referenced in the GSA Ban, the prohibition on all student organizations "based on . . . gender identity" in this section remains unconstitutionally vague.

### B. Inclusivity Ban

244. The Inclusivity Ban requires school districts and charter schools to prevent every "employee, contractor, or volunteer from engaging in diversity, equity, and inclusion duties at, for, or on behalf of the district." *Id.* § 3(b)(2). The Ban defines these "duties" to include "developing or implementing policies, procedures, trainings, activities, or programs that reference race, color, ethnicity, gender identity, or sexual orientation," and these restrictions apply "at, for, on behalf of the district." *Id.* §§ 3(a)(3) and 3(b)(2). This section is impermissibly vague because it fails to give sufficient

---

[58]    *See supra* note 16.

94

guidance as to what is prohibited and will lead to arbitrary and discriminatory enforcement.

245. The Inclusivity Ban provides no guidance to schools, educators, and third parties about what it means to "develop[]" or "implement[]" a policy, procedure, training, activity, or program, and it is unclear what all is encompassed by the broad category of "duties." These words are undefined in S.B. 12 and elsewhere in Texas law and have an ordinary meaning so sweeping that they apply to any participation whatsoever in any kind of policy, procedure, training, activity, or program that even briefly mentions race, color, ethnicity, gender identity, or sexual orientation—even outside of school hours or an employee's official duties.

246. The terms "policies, procedures, trainings, activities, or programs" are also undefined by S.B. 12 and elsewhere in Texas law. Nearly everything that educators, contractors, and volunteers do in schools falls within the plain meaning of these terms, and they are not limited only to in-school activities or within a school employee's official duties.

247. The Inclusivity Ban also fails to define the term "reference" or give any guidance as to the scope of speech that it restricts. While the ordinary

definition of "reference" includes "the act of referring or consulting,"[59] it also means "a bearing on a matter"[60] or "relation."[61] Thus, even if Plaintiffs avoid specifically mentioning the Inclusivity Ban's disfavored topics, they could still be accused of violating this section if their speech "bears on" or "relates" to these topics.

248. The term "volunteer" further exacerbates this section's vagueness. Because so many educators, parents, and students themselves "volunteer" in schools in so many capacities, there is a substantial gray area as to who is swept up by the Inclusivity Ban or subject to its restrictions.

249. The phrase "at, for, or on behalf of" a school or charter school is also vague and encompasses many programs and activities where individuals or groups, including Plaintiffs, rent or access school facilities while engaging in private speech, or where students may represent their schools at non-school-sponsored events.

250. Individually and collectively, the terms in the Inclusivity Ban are so vague that they fail to provide the minimum guidance required by the First Amendment and Due Process Clause as to what kind of speech and activities

---

[59]    Reference is defined as "the act of referring or consulting." *Reference*, MERRIAM-WEBSTER ONLINE, https://www.merriam-webster.com/dictionary/reference, (last accessed Aug. 26, 2025).

[60]    *Id.*

[61]    *Id.*

are prohibited. As a result, this section will be applied in standardless and arbitrary ways to chill huge swaths of constitutionally protected speech.

251. Even the exceptions to the Inclusivity Ban do not mitigate the Ban's vagueness. The exception permitting school districts (and not school employees, contractors, or volunteers) to "acknowledg[e] or teach[] the significance of state and federal holidays or commemorative months . . . in accordance with the essential knowledge and skills adopted under Subchapter A, Chapter 28," S.B. 12 § 3(e)(2), provides insufficient guidance or shelter from the Inclusivity Ban's breadth because this section of Texas law does not mention specific holidays or commemorative months and invites competing interpretations about which holidays or months might align with Texas's educational standards.

252. Similarly, the Inclusivity Ban's exception for "classroom instruction that is consistent with the essential knowledge and skills adopted by the State Board of Education," *id.* § 3(e)(5)(A), does not give any indication about what it means for something to be "consistent" with Texas's educational standards.

253. The Inclusivity Ban's exception that purports to not "affect a student's rights under the First Amendment to the United States Constitution or Section 8, Article I, Texas Constitution," S.B. 12 § 3(e)(2), is also vague and incompatible with the rest of the Inclusivity Ban. Under the interpretative

97

canon *lex specialis*, if two legal provisions govern the same factual situation, the more specific overrides the general. *Sambrano v. United Airlines, Inc.*, 707 F. Supp. 3d 652, 670 (N.D. Tex. 2023) (citation omitted). Thus, the specific restrictions of the Inclusivity Ban that infringe on student speech override this much broader and generalized exception, which is so broad and vague as to be meaningless.

254. The Inclusivity Ban is therefore so ambiguous and will lead to such arbitrary and discriminatory enforcement such that it is void for vagueness.

### C. Social Transition Ban

255. S.B. 12's Social Transition Ban requires school districts to prohibit employees from "assisting a student . . . with social transitioning, including by providing any information about social transitioning or providing guidelines intended to assist a person with social transitioning." S.B. 12 § 7(b). The law defines "social transitioning" as "a person's transition from the person's biological sex at birth to the opposite biological sex through the adoption of a different name, different pronouns, or other expressions of gender that deny or encourage a denial of the person's biological sex at birth." *Id.* § 7(a). There is no definition given for the words "assisting" or "assist."

256. This section is substantially vague because it fails to give sufficient guidance as to what is prohibited and invites arbitrary and

discriminatory enforcement. The prohibition on "providing any information about social transitioning" is particularly vague and open-ended. On its face, this section prevents any mention of topics remotely related to "social transitioning," which itself is broadly and vaguely defined.

257. The fact that the Social Transition Ban is not limited to curricula or speech within school employees' official duties further amplifies its vagueness and suppresses school employees' speech on matters of public concern far beyond their official duties.

258. Other terms in the Social Transition Ban are also undefined and fail to give sufficient guidance as to what is proscribed. The entire definition of "social transitioning" does not define its key terms, and S.B. 12 gives no guidance as to how a student's "biological sex" may be determined, through what criteria, or by whom. Plaintiff Poe, for example, does not know the "biological sex" of all of her students, nor could she determine such information without invading their private medical information. Katy ISD has also implemented this section arbitrarily by permitting cisgender, but not transgender students, to continue going by their chosen names and nicknames.

259. The Social Transition Ban invites such arbitrary and discriminatory enforcement by vaguely defining "social transitioning" to include "the adoption of a different name, different pronouns, or other expressions of gender that deny or encourage a denial of the person's biological

sex at birth." S.B. 12 § 7(a). The law gives no guidance as to how schools or educators can determine whether a student's "different name" either denies or encourages a denial of their biological sex. This ambiguous wording invites school employees to police students' gender to try to determine if their haircut, the clothes they're wearing, or how they like to play at recess might "deny or encourage a denial" of the student's sex assigned at birth. This is not only inherently vague but also compels Plaintiffs and others to engage in impermissible sex stereotyping.

260. Even the word "assisting" a student's social transition is vague and undefined. While "assisting" can mean "to give support or aid,"[62] it can also mean "to be present as a spectator."[63] Under either definition, S.B. 12 gives school employees insufficient guidance as to what is prohibited.

261. The Social Transition Ban is therefore facially vague under the First and Fourteenth Amendments because it does not clearly delineate what speech is prohibited and invites rampantly discriminatory and arbitrary enforcement.

---

[62]    *Assist*, MERRIAM-WEBSTER ONLINE, https://www.merriam-webster.com/dictionary/assist (last accessed Aug. 27, 2025).

[63]    *Id.*

### C. Don't Say LGBTQ+ Ban

262. The Don't Say LGBTQ+ Ban requires that a school district, charter school, or school employee "may not provide or allow a third party to provide instruction, guidance, activities, or programming regarding sexual orientation or gender identity to students enrolled in prekindergarten through 12th grade." S.B. 12 § 24(a).

263. This section of S.B. 12 is substantially vague because it fails to sufficiently define any of its terms, including "instruction, guidance, activities, or programming." As with the Inclusivity Ban, the terms "activities" and "programming" are so open-ended that they apply to the entire universe of anything that school employees or third parties do at or outside of schools.

264. While the Legislature could have limited the term "instruction" to classroom or extracurricular instruction, it declined to do so. This prohibition therefore applies to any kind "instruction" beyond the classroom or outside of a school employee's official duties, as well as by any third party. Similarly, "guidance" is not limited to formal guidance, such as from a school guidance counselor. It is instead undefined and has an ordinary meaning that includes "advice on vocational or educational problems given to students."[64]

---

[64] *Guidance*, MERRIAM-WEBSTER ONLINE, https://www.merriam-webster.com/dictionary/guidance (last accessed Aug. 27, 2025).

265. The law also fails to provide adequate notice as to what it means for any instruction, guidance, activities, and programming to be "regarding" sexual orientation or gender identity. The dictionary definition of this term is "with respect to"[65] or "concerning,"[66] but that is so broad that it could apply to nearly any type of human sexuality instruction, which is specifically authorized by S.B. 12 to continue.

266. Even the term "gender identity" itself is not defined by S.B. 12 or elsewhere in Texas law. A literal reading of the Don't Say LGBTQ+ Ban seems to prohibit any mention of gender in Texas schools, since gender is the quintessential part of "gender identity." This leads to an absurdity that some Texas lawmakers recognized when adding an amendment to the Don't Say LGBTQ+ Section to allow "organization[s] whose membership is restricted to one sex and whose mission does not advance a political or social agenda" to still "meet[] on a school district or open-enrollment charter school campus." S.B. 12 § 24(b)(3).

267. This exception amplifies, rather than mitigates, this section's vagueness, because it seems to acknowledge that many single-sex clubs and activities *are* impacted by S.B. 12's prohibitions while also creating a vague

---

[65]    *Regarding*, MERRIAM-WEBSTER ONLINE, https://www.merriam-webster.com/dictionary/regarding (last accessed Aug. 27, 2025).
[66]    *Id.*

and poorly worded exception. The exception provides no guidance as to what kind of mission "does not advance a political or social agenda," *id.*, nor does it explain who may make this determination. Absent clearer definitions, this section gives school and state officials arbitrary and unfettered discretion to determine which single-sex organizations might "advance a political or social agenda."

268. Such "[u]nbridled discretion runs afoul of the First Amendment because it risks self-censorship," *Freedom From Religion Found. v. Abbott*, 955 F.3d 417, 427 (5th Cir. 2020) (citation omitted), and "[l]aws which vest public officials with unlimited discretion are void for vagueness." *Beckerman v. City of Tupelo, Miss.*, 664 F.2d 502, 511 (5th Cir. 1981) (citations omitted). Like the other challenged provisions of S.B. 12, the Don't Say LGBTQ+ Ban is impermissibly vague.

## Count Three: Overbreadth in Violation of the First Amendment, via 42 U.S.C. § 1983

269. Plaintiff GSA Network brings claims against the Commissioner and Plano ISD on behalf of itself and its members because the GSA Ban, Inclusivity Ban, Social Transition Ban, and Don't Say LGBTQ+ Ban are facially overbroad in violation of the First Amendment.

270. SEAT asserts claims against the Commissioner, Houston ISD, and Katy ISD on behalf of itself and its members because the GSA Ban,

Inclusivity Ban, Social Transition Ban, and Don't Say LGBTQ+ Ban are facially overbroad in violation of the First Amendment.

271. Texas AFT brings claims against the Commissioner, Houston ISD, Katy ISD, and Plano ISD on behalf of its members because the GSA Ban, Inclusivity Ban, Social Transition Ban, and Don't Say LGBTQ+ Ban are facially overbroad in violation of the First Amendment.

272. Rebecca Roe asserts claims against the Commissioner and Houston ISD because the GSA Ban, Inclusivity Ban, Social Transition Ban, and Don't Say LGBTQ+ Ban are facially overbroad in violation of the First Amendment.

273. Adrian Moore brings claims against the Commissioner and Katy ISD because the GSA Ban, Inclusivity Ban, Social Transition Ban, and Don't Say LGBTQ+ Ban are facially overbroad in violation of the First Amendment.

274. Polly Poe asserts claims against the Commissioner and Plano ISD because the GSA Ban, Inclusivity Ban, Social Transition Ban, and Don't Say LGBTQ+ Ban are facially overbroad in violation of the First Amendment.

275. These challenged provisions are facially overbroad due to their disproportionate chilling of entire categories of speech in relation to any speech within the legitimate power of the government to suppress.

276. The GSA Ban is overbroad because it reaches and restricts constitutionally protected speech. It prohibits all student clubs "based on

sexual orientation or gender identity" in any public or charter school in Texas that authorizes or sponsors student clubs. S.B. 12 § 27(a)-(b). While the law does not define what it means for a club to be "based on sexual orientation or gender identity," the lawmakers who crafted this provision explained that it was intentionally created to target GSAs and other student clubs that provide support and resources to LGBTQ+ students. Such student organizations have long been recognized as engaging in speech protected by the First Amendment.

277. Because the GSA Ban silences constitutionally protected speech, it is facially overbroad unless the suppression of speech is outweighed by legitimate or constitutional applications. Here, there is no legitimate or constitutional application of this section. The government is prohibited by the First Amendment and Equal Access Act from banning student organizations based on viewpoint and content. On its face, the GSA Ban cannot be reconciled with these requirements because it discriminates against clubs based on viewpoint and content, even without student organizations causing any disruption or any other legitimate pedagogical concern. Thus, the ratio of speech silenced by the GSA Ban is as "lopsided" as it gets, *U.S. v. Hansen*, 599 U.S. 762, 770 (2023), because there is no legitimate or constitutional application of this provision. The GSA Ban is therefore facially overbroad and void.

278. The Inclusivity Ban also restricts large amounts of constitutionally protected speech through its plain meaning and application. The Ban requires school districts and charter schools to prevent any "employee, contractor, or volunteer from engaging in diversity, equity, and inclusion duties at, for, or on behalf of the district." S.B. 12 § 3(b)(2). The Ban defines these "duties" to include "developing or implementing policies, procedures, trainings, activities, or programs that reference race, color, ethnicity, gender identity, or sexual orientation. . . ." *Id.* § 3(a)(3). Thus, the Ban broadly prohibits any type of policy, procedure, training, activity, or program that even mentions race, color, ethnicity, gender identity, or sexual orientation. These words are not defined by S.B. 12 or elsewhere in Texas law, and their ordinary meaning is capacious and open-ended.

279. Because the Inclusivity Ban discriminates based on viewpoint and is aimed at suppressing freedom of expression, there are no constitutionally permissible applications of this section. While the Legislature may enact laws that prohibit discrimination based on race, ethnicity, gender identity, and sexual orientation, banning all discussion of these topics has no legitimate governmental or pedagogical purpose. There are thus no constitutionally permissible applications of the Inclusivity Ban as currently written, such that it is facially overbroad.

280. The Social Transition Ban is similarly overbroad in that it chills and silences constitutionally protected speech of students, parents, educators, and third parties. While students have a constitutional right to receive information about matters of public concern like social transitioning, they also have a right to actively discuss these issues and engage in conversation. But the Social Transition Ban prevents any school employee from "assisting" a student's social transition, including "by providing *any information* about social transitioning." S.B. 12 § 7(b) (emphasis added). This restricts school employees' ability to engage in conversations with students on matters of public concern even after school, on weekends, or over summer break, and beyond employees' official work duties at traditional public forums like online or at public parks.

281. The Social Transition Ban is therefore impermissibly overbroad in how it limits educators' speech. The Ban also inhibits students' freedom of speech by preventing them from freely discussing these topics with school employees. Because the Ban defines "social transitioning" expansively to include using "a different name, different pronouns, or other expressions of gender," S.B. 12 § 7(a), this section chills school employees' ability to respect students' freedom of speech in choosing what to call themselves or how they express their gender.

282. As currently written, there are no constitutionally permissible applications of this blanket ban on school employees "assisting" a student's social transition, including by providing "any information" about this topic. Instead, the Social Transition Ban categorically suppresses and silences viewpoints supportive of transgender students while infringing on the free speech rights of students, parents, and educators.

283. The Don't Say LGBTQ+ Ban is also facially overbroad because it prohibits vast amounts of constitutionally protected speech. This restriction prevents any school employee **or third party** from providing "instruction, guidance, activities, or programming regarding sexual orientation or gender identity to students enrolled in prekindergarten through 12th grade," regardless of whether such instruction or activities take place during school hours or on school property. S.B. 12 § 24(a). This implicates a wide array of speech shielded by the First Amendment.

284. There is no constitutionally permissible application of the Don't Say LGBTQ+ Ban because its purpose and effect is to suppress speech that the government has no authority to proscribe. This provision, like the other three targeted by this lawsuit, are aimed at chilling and dampening expressive activity and forcing "would-be speakers [to] remain silent." *U.S. v. Hansen*, 599 U.S. 762, 770 (2023) (citation omitted). This section is therefore

unconstitutionally overbroad and risks forcing "society [to] lose [valuable] contributions to the 'marketplace of ideas.'" *Id.* (internal quotations omitted).

### Count Four: Violations of the Equal Access Act, 20 U.S.C. § 4071(a)

285. Plaintiff GSA Network brings an Equal Access Act claim against Defendant Plano ISD on behalf of its members in the district.

286. Plaintiff Rebecca Roe asserts an Equal Access Act claim against Houston ISD.

287. Plaintiff Adrian Moore brings an Equal Access Act claim against Katy ISD.

288. The Equal Access Act makes it "unlawful for any public secondary school which receives Federal financial assistance and which has a limited open forum to deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings." 20 U.S.C. § 4071(a).

289. S.B. 12 authorizes student clubs and establishes limited open forums across Texas while denying equal access to any student club "based on sexual orientation or gender identity." S.B. 12 § 27(a)-(b). Houston ISD, Katy ISD, and Plano ISD have all adopted formal policies establishing all secondary school campuses in their districts as limited open forums for purposes of the

Equal Access Act.[67] This GSA Ban therefore facially violates the Equal Access Act because it denies equal treatment to student organizations in these districts based on "the basis of the religious, political, philosophical, or other content of the speech at such meetings." 20 U.S.C. § 4071(a).

290. Because Plano ISD, Katy ISD, and Houston ISD receive federal funding, the Equal Access Act requires them to provide equal access in secondary schools to all non-curricular clubs. But Plano ISD has already shut down a GSA Network member GSA because of S.B. 12; Katy ISD has already stopped allowing a Pride Club/Diversity Club to continue meeting; and Houston ISD is likewise required by the law to prohibit Plaintiff Roe from joining or creating any student organization "based on sexual orientation or gender identity." This deprives the GSA Network members, Adrian Moore, and Rebecca Roe of their right to equal access mandated by Congress.

---

[67] FNAB (Local), Houston ISD (April 1, 2005), https://pol.tasb.org/PolicyOnline/PolicyDetails?key=592&code=FNAB#localTabContent; FNAB (Local), Katy ISD (Oct. 10, 2007), https://pol.tasb.org/PolicyOnline/PolicyDetails?key=594&code=FNAB#localTabContent; FNAB (Local), Plano ISD (Oct. 23,2006), https://pol.tasb.org/PolicyOnline/PolicyDetails?key=312&code=FNAB#localTabContent.

**Count Five: Violations of the First Amendment Right to Associate, via 42 U.S.C. § 1983**

291. Plaintiff GSA Network brings a First Amendment claim against the Commissioner and Plano ISD because S.B. 12's GSA Ban infringes the freedom of association of the GSA Network and its members.

292. Plaintiff SEAT asserts this claim against the Commissioner, Houston ISD, and Katy ISD because S.B. 12's GSA Ban infringes the freedom of association of SEAT and its members.

293. Plaintiff Texas AFT brings this claim against the Commissioner, Houston ISD, Katy ISD, and Plano ISD because S.B. 12's GSA Ban infringes the freedom of association of its members.

294. Plaintiff Rebecca Roe asserts this claim against the Commissioner and Houston ISD because S.B. 12's GSA Ban infringes her freedom of association.

295. Plaintiff Adrian Moore brings this claim against the Commissioner and Katy ISD because S.B. 12's GSA Ban infringes his freedom of association.

296. Plaintiff Polly Poe asserts this claim against the Commissioner and Plano ISD because S.B. 12's GSA Ban infringes her freedom of association.

297. S.B. 12's GSA Ban unconstitutionally abridges Plaintiffs' freedom of association. The First Amendment protects the freedom of

expressive association. These protections apply to students who wish to join together in noncurricular clubs such as GSAs in school settings for purposes of social networking, political advocacy, mutual support, and public education, and it also applies to educators and nonprofit organizations that seek to associate with students and support them.

298. Because S.B. 12 entirely prohibits Plaintiffs' ability to create, participate in, and engage with GSAs, it violates their right to freedom of association. The Supreme Court has explained that "[t]he same ground rules must govern both speech and association challenges in the limited-public-forum context. . . ." *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 681 (2010). Thus, public and charter schools are required to allow "reasonable, viewpoint-neutral . . . access to [any] student-organization forum." *Id.* at 669.

299. It is not "reasonable" to arbitrarily deny GSAs and other LGBTQ+ student groups from the same equal access that all other groups enjoy, and it discriminates based on viewpoint to prohibit clubs supportive of LGBTQIA+ students. S.B. 12's GSA Ban therefore violates Plaintiffs' freedom of association, and the Commissioner and School District Defendants should both be enjoined from enforcing it.

### Count Six: Violations of the First Amendment's Prohibition of Prior Restraints, via 42 U.S.C. § 1983

300. Plaintiff GSA Network brings a claim on behalf of itself and its members against the Commissioner and Plano ISD because each of S.B 12's prohibitions operate as an unconstitutional prior restraint.

301. Plaintiff SEAT asserts a claim on behalf of itself and its members against the Commissioner, Houston ISD, and Katy ISD because each of S.B 12's challenged prohibitions operate as an unconstitutional prior restraint.

302. Plaintiff Texas AFT brings a claim against the Commissioner, Houston ISD, Katy ISD, and Plano ISD because each of S.B. 12's challenged prohibitions operate as an unconstitutional prior restraint.

303. Plaintiff Rebecca Roe asserts a claim against the Commissioner and Houston ISD because each of S.B 12's challenged prohibitions operate as an unconstitutional prior restraint.

304. Plaintiff Adrian Moore brings a claim against the Commissioner and Katy ISD because each of S.B. 12's challenged prohibitions operate as an unconstitutional prior restraint.

305. Plaintiff Polly Poe asserts a claim against the Commissioner and Plano ISD because each of S.B 12's challenged prohibitions operate as an unconstitutional prior restraint.

306. The provisions of S.B. 12 at issue in this lawsuit impose prior restraints on speech because they shut down entire forums of speech and censor discussions on disfavored topics before they occur and allow for "too much discretion" by government officials in the suppression of speech. *Cath. Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 437 (5th Cir. 2014) (citations omitted).

307. "[T]he Supreme Court has consistently found that prior restraints on free speech are presumptively invalid" and the "Fifth Circuit has routinely applied this clear principle to hold such prior restraints unconstitutional, including in the school setting." *Bennett v. Prosper ISD Police Dep't*, 719 F. Supp. 3d 606, 615 (E.D. Tex. 2022) (citations omitted).

308. To avoid facial invalidity, a law preemptively restraining speech must have "narrowly drawn, reasonable and definite standards" and avoid "unbridled discretion" that might allow government officials to "encourag[e] some views and discourag[e] others through the arbitrary application" of the law. *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 133 (1992).

309. The challenged aspects of S.B. 12 fail these standards and unconstitutionally suppress speech before it occurs. The GSA Ban shuts down any student organization "based on sexual orientation or gender identity," S.B. 12 § 27(b), which entirely blocks an entire forum for speech before students, educators, and nonprofits can engage in constitutionally protected speech.

114

310. The other challenged aspects of S.B. 12 are also prior restraints because they preemptively chill speech on certain topics based on viewpoint discrimination and "unfettered discretion" given to schools tasked with enforcing these prohibitions. *Forsyth Cnty.*, 505 U.S. at 133. The Inclusivity Ban, Social Transition Ban, and Don't Say LGBTQ+ Ban impose prior restraints on speech because they forbid disfavored topics before they are even discussed, and they fail to give adequate guidance to schools or the Commissioner about how to enforce S.B. 12's requirements in ways that are not viewpoint discriminatory.

311. A prior restraint such as this one bears a "heavy presumption against its constitutional validity" and can only survive facial First Amendment scrutiny if it has "narrow, objective, and definite standards," *Chiu v. Plano Indep. Sch. Dist.*, 339 F.3d 273, 281 (5th Cir. 2003) (citations omitted), and is (1) limited to a specified, brief period of time during which the status quo is maintained; (2) allows for prompt judicial review; and (3) imposes on the censor the burdens of going to court and providing the basis to suppress the speech. *N.W. Enters. v. City of Houston*, 352 F.3d 162, 193–94 (5th Cir. 2003). Here, S.B. 12 does none of these things. Its prohibitions are incurably vague; its ban on disfavored speech extends indefinitely into the future; it makes no allowance for judicial (or even administrative) review of proscribed speech; and its burdens fall on individuals seeking to engage in constitutionally protected

speech. The challenged provisions are therefore facially invalid as a prior restraint in violation of the First Amendment.

## V. Prayer for Relief

Plaintiffs respectfully ask this Court to:

312. Exercise its jurisdiction over this matter;

313. Enter a preliminary injunction and permanent injunction to stop Defendants[68] from enforcing four challenged aspects of S.B. 12—Sections 27(b) (amending Tex. Educ. Code § 33.0815(b) (GSA Ban)); 3(a)(3) (amending Tex. Educ. Code § 11.005(a)(3) (Inclusivity Ban)); 7 (amending Tex. Educ. Code § 11.401 (Social Transition Ban)); 24 (amending Tex. Educ. Code § 28.0043 (Don't Say LGBTQ+ Ban))—and other provisions of the law requiring enforcement of these sections;

314. Declare that these provisions of S.B. 12 are facially unconstitutional, void, and of no effect;

315. In the alternative, declare that these provisions of S.B. 12 are unconstitutional, void, and of no effect as applied to Plaintiffs;

316. Award nominal damages to Plaintiff Adrian Moore against Defendant Katy ISD;

---

[68] "Defendants" includes their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive notice of the injunction.

317. Award reasonable costs and attorneys' fees under 42 U.S.C. § 1988(b), and any other applicable statute or regulation; and

318. Grant such further relief as the Court may deem proper.

Respectfully submitted,

*/s/ Brian Klosterboer*

Shawn Thomas Meerkamper**
California State Bar No. 296964
Megan Z. F. Noor**
California Bar No. 359480
Dale Melchert**
California Bar No. 362885
New York Bar No. 5366554
TRANSGENDER LAW CENTER
P.O. Box 70976
Oakland, CA 94612
Tel: 510-587-9696
shawn@transgenderlawcenter.org
megan@transgenderlawcenter.org
dale@transgenderlawcenter.org

Brian Klosterboer, attorney-in-charge
TX Bar No. 24107833, SDTX No. 3314357
Charelle Lett
TX Bar No. 24139900, SDTX No. 3908204
Ashley Harris
TX Bar No. 24123238, SDTX No. 3879706
Sarah Corning
TX Bar No. 24144442, SDTX No. 3904827
Chloe Kempf
TX Bar No. 24127325, SDTX No. 3852674
Thomas Buser-Clancy
TX Bar No. 24078344, SDTX No. 1671940
Edgar Saldivar
TX Bar No. 24038188, SDTX No. 618958
Adriana Piñon
TX Bar No. 24089768, SDTX No. 1829959
ACLU FOUNDATION OF TEXAS, INC.
P.O. Box 8306
Houston, TX 77288
Tel. (713) 942-8146
Fax. (713) 942-8966

bklosterboer@aclutx.org
clett@aclutx.org
aharris@aclutx.org
scorning@aclutx.org
ckempf@aclutx.org
tbuser-clancy@aclutx.org
esaldivar@aclutx.org
apinon@aclutx.org


BAKER MCKENZIE LLP

Nicholas O. Kennedy
Texas Bar No. 24087841
M. Michelle Hartmann
Texas Bar No. 24032402
1900 N. Pearl, Suite 1500
Dallas, TX 75201
Tel: (214) 978-3000
nicholas.kennedy@bakermckenzie.com
michelle.hartmann@bakermckenzie.com

Angela C. Vigil*
Florida Bar No. 38627
830 Brickell Plaza, Suite 310
Miami, FL 33131
Tel: (305) 789-8900
angela.vigil@bakermkenzie.com

Andrew P. Crousore*
California Bar #202195
600 Hansen Way
Palo Alto, CA 94304
Tel: (650) 856-5508
drew.crousore@bakermckenzie.com

John Treat*
California Bar #5696778
1025 Constellation Blvd., Suite 1850

118

Los Angeles, CA 90067
Tel: (310) 201-4728
john.treat@bakermckenzie.com

James A. Gilmore*
DC Bar #1736415
815 Connecticut Avenue, NW
Washington, DC 20006
Tel: (22)452-7000
james.gilmore@bakermckenzie.com

*Motion for *pro hac vice* forthcoming
** Motion for *pro hac vice* pending

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 16th day of September, 2025, a true and correct copy of the above document was served via the CM/ECF system to all counsel of record and will be promptly shared with Defendants who have not yet appeared.

*/s/ Brian Klosterboer*
Brian Klosterboer