## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |
|---|---|
| GSA Network, Students Engaged in Advancing Texas, Texas AFT, Rebecca Roe, by and through her next friend, Ruth Roe, Adrian Moore, by and through his next friend, Julie Johnson, and Polly Poe,<br><br>        Plaintiffs,<br><br>v.<br><br>Mike Morath, in an official capacity as Commissioner of the Texas Education Agency, Houston Independent School District, Katy Independent School District, and Plano Independent School District,<br><br><br>        Defendants. | Civil Action No. 4:25-cv-4090 |

## PLAINTIFFS' AMENDED MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

NATURE AND STAGE OF PROCEEDING ..................................................... 6

STATEMENT OF FACTS .................................................................................. 6

    I.    SENATE BILL 12 .................................................................................. 6

        A.   GSA Ban ........................................................................................ 6

        B.   Inclusivity Ban ............................................................................ 7

        C.   Social Transition Ban .................................................................. 8

        D.   Don't Say LGBTQ+ Ban ............................................................. 9

    II.   LEGISLATIVE HISTORY OF S.B. 12 ................................................ 9

    III.   PLAINTIFFS ........................................................................................ 14

        A.   GSA Network ................................................................................ 14

        B.   SEAT ............................................................................................ 15

        C.   Texas AFT .................................................................................... 16

        D.   Rebecca Roe ................................................................................ 17

        E.   Adrian Moore ............................................................................... 17

        F.   Polly Poe ...................................................................................... 18

STATEMENT OF ISSUES ................................................................................ 19

SUMMARY OF ARGUMENT .......................................................................... 19

ARGUMENT ....................................................................................................... 23

    I.    PLAINTIFFS HAVE STANDING TO CHALLENGE S.B. 12 ............ 23

        A.   GSA Network ................................................................................ 25

        B.   SEAT ............................................................................................ 29

        C.   Texas AFT .................................................................................... 32

        D.   Rebecca Roe ................................................................................ 36

        E.   Adrian Moore ............................................................................... 38

        F.   Polly Poe ...................................................................................... 42

    II.   DEFENDANTS ARE PROPERLY SUBJECT TO SUIT FOR INJUNCTIVE AND DECLARATORY RELIEF AND ARE NOT IMMUNE ................................... 48

A.    The Commissioner ............................................................. 48

B.    School District Defendants ................................................ 51

III.    PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO PREVAIL ON THE
MERITS ............................................................................................ 53

A.    S.B. 12 Impermissibly Discriminates Based on Viewpoint .............................. 53

B.    S.B. 12 Is Unconstitutionally Vague .................................. 66

C.    S.B. 12 Is Impermissibly Overbroad ................................ 88

D.    S.B. 12 Violates the Equal Access Act .............................. 98

E.    S.B. 12 Violates Plaintiffs' Freedom of Association ........................................ 101

F.    S.B. 12 Imposes an Impermissible Prior Restraint on Speech ......................... 102

IV.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT
INJUNCTIVE RELIEF ..................................................................... 107

V.   THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST WEIGH IN
FAVOR OF GRANTING INJUNCTIVE RELIEF ................................. 109

VI.    NO BOND SHOULD BE REQUIRED .......................................... 109

CONCLUSION .................................................................................... 110

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                                          **Page(s)**

*Alexander v. U.S.*,
   509 U.S. 544 (1993) ............................................................................................................ 105

*A.M. ex rel. McAllum v. Cash*,
   585 F.3d 214 (5th Cir. 2009) ............................................................................................... 28

*Ass'n of Cmty. Orgs. for Reform Now v. Fowler*,
   178 F.3d 350 (5th Cir. 1999) ............................................................................................... 24

*Bd. of Educ. of Westside Cmty. Sch. v. Mergens*,
   496 U.S. 226 (1990) ............................................................................................... 38, 53, 99

*Beckerman v. City of Tupelo, Miss.*,
   664 F.2d 502 (5th Cir. 1981) ............................................................................................... 88

*Bennett v. Prosper ISD Police Dep't*,
   719 F. Supp. 3d 606 (E.D. Tex. 2022) ......................................................................... 103, 105

*Book People, Inc. v. Wong*,
   692 F. Supp. 3d 660 (W.D. Tex. 2023), *aff'd in part and vacated in part on other grounds*, 91 F.4th 318 (5th Cir. 2024) ...................................................... 106

*Book People, Inc. v. Wong*,
   91 F.4th 318 (5th Cir. 2024) ......................................................................................... 20, 49

*Bostock v. Clayton County, Georgia*,
   590 U.S. 644 (2020) ............................................................................................................ 82

*Boy Scouts of Am. v. Dale*,
   530 U.S. 640 (2000) .......................................................................................................... 102

*Boyd Cnty. High Sch. Gay Straight All. v. Bd. of Educ. of Boyd Cnty., KY*,
   258 F. Supp. 2d 667 (E.D. Ky. 2003) ................................................................................. 101

*Brown v. Entm't Merchs. Ass'n*,
   564 U.S. 786 (2011) (Alito, J., concurring) ..................................................................... 4, 63

*Butler v. State of Mich.*,
   352 U.S. 380 (1957) ............................................................................................................ 64

*Canady v. Bossier Parish School Board*,
   240 F.3d 437 (5th Cir. 2001) ................................................................................... 55, 56, 96

*Carver Middle Sch. Gay-Straight All. v. Sch. Bd. of Lake Cnty., Fla.*,
   249 F. Supp. 3d 1286 (M.D. Fla. 2017) ....................................................................... 12, 101

iv

*Cath. Leadership Coal. of Tex. v. Reisman*,
　764 F.3d 409 (5th Cir. 2014) ................................................................103

*CheckPoint Fluidic Sys. Int'l, Ltd. v. Guccione*,
　888 F. Supp. 2d 780 (E.D. La. 2012) ......................................................70

*Chiras v. Miller*,
　432 F.3d 606 (5th Cir. 2005) ..................................................................57

*Chiu v. Plano Indep. Sch. Dist.*,
　260 F.3d 330 (5th Cir. 2001) ..................................................................56

*Chiu v. Plano Indep. Sch. Dist.*,
　339 F.3d 273 (5th Cir. 2003) ..........................................................21, 107

*Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*,
　561 U.S. 661 (2010)..........................................................................55, 102

*Colin ex rel. Colin v. Orange Unified Sch. Dist.*,
　83 F. Supp. 2d 1135 (C.D. Cal. 2000) ...................................................101

*Cramp v. Bd. of Pub. Instruction of Orange Cnty., Fla.*,
　368 U.S. 278 (1961)..................................................................................45

*Davis v. E. Baton Rouge Par. Sch. Bd.*,
　78 F.3d 920 (5th Cir. 1996) ..................................................................105

*Doe on Behalf of Doe v. Dallas Indep. Sch. Dist.*,
　153 F.3d 211 (5th Cir. 1998) ..................................................................74

*Dorian W. v. Berryhill*,
　No. 17 CV 50327, 2019 WL 1572560 (N.D. Ill. Apr. 11, 2019)...........69

*E. High Gay/Straight All. v. Bd. of Educ. of Salt Lake City Sch. Dist.*,
　81 F. Supp. 2d 1166 (D. Utah 1999)......................................................101

*E.E.O.C. v. Boh Bros. Const. Co.*,
　731 F.3d 444 (5th Cir. 2013) ............................................................84, 85

*Elrod v. Burns*,
　427 U.S. 347 (1976)..................................................................................22

*Erznoznik v. City of Jacksonville*,
　422 U.S. 205 (1975)..................................................................................63

*F.C.C. v. Fox Television Stations, Inc.*,
　567 U.S. 239 (2012)............................................................................67, 78

*Foote v. Town of Ludlow*,
    No. CV 22-30041-MGM, 2022 WL 18356421 (D. Mass. Dec. 14, 2022) ............................ 81

*Forsyth Cnty., Ga. v. Nationalist Movement*,
    505 U.S. 123 (1992) ..................................................................................................... 104, 106

*Free Speech Coal., Inc. v. Paxton*,
    145 S. Ct. 2291 (2025) .............................................................................................................. 66

*Freedom From Religion Found. v. Abbott*,
    955 F.3d 417 (5th Cir. 2020) ........................................................................... 87, 105, 106

*FW/PBS, Inc. v. City of Dallas*,
    493 U.S. 215 (1990) ............................................................................................................... 103

*Gay & Lesbian Students Ass'n v. Gohn*,
    850 F.2d 361 (8th Cir. 1988) .............................................................................................. 102

*Gay Lib v. Univ. of Mo.*,
    558 F.2d 848 (8th Cir. 1977) .............................................................................................. 102

*Gay Student Servs. v. Tex. A&M Univ.*,
    737 F.2d 1317 (5th Cir. 1984) .............................................................................................. 90

*Gay Students Org. of Univ. of N.H. v. Bonner*,
    509 F.2d 652 (1st Cir. 1974) ............................................................................................... 102

*Gay-Straight All. of Yulee High Sch. v. Sch. Bd. of Nassau Cnty.*,
    602 F. Supp. 2d 1233 (M.D. Fla. 2009) .......................................................................... 101

*Good News Club v. Milford Cent. Sch.*,
    533 U.S. 98 (2001) ................................................................................................................... 54

*Green Valley Special Util. Dist. v. City of Schertz, Tex.*,
    969 F.3d 460 (5th Cir. 2020) (en banc) ............................................................................ 49

*H.R. by & through Roe v. Cunico*,
    745 F. Supp. 3d 842 (D. Ariz. 2024) .......................................................................... 46, 83

*Harris v. Noxubee Cnty., Miss.*,
    350 F. Supp. 3d 592 (S.D. Miss. 2018) ........................................................................... 103

*Hecox v. Little*,
    104 F.4th 1061 (9th Cir. 2024), *as amended* June 14, 2024, *cert. granted*, No.
    24-38, 2025 WL 1829165 (U.S. July 3, 2025) ................................................................ 83

*Hoffman Estates v. Flipside*,
    455 U.S. 489 (1982) ................................................................................................................. 67

*Iowa Safe Sch. v. Reynolds*,
No. 4:23-CV-00474, 2025 WL 1834140 (S.D. Iowa May 15, 2025) ............................ *passim*

*Jackson Fed'n of Tchrs. v. Fitch*,
No. 3:25-CV-417-HTW-LGI, 2025 WL 2394037 (S.D. Miss. Aug. 18, 2025) .......................4

*Jefferson v. Ysleta Indep. Sch. Dist.*,
817 F.2d 303 (5th Cir. 1987) ...............................................................................46

*Jett v. Dallas Indep. Sch. Dist.*,
491 U.S. 701 (1989)...........................................................................................52

*Johnson v. U.S.*,
576 U.S. 591 (2015)...........................................................................................68

*Justice v. Hosemann*,
771 F.3d 285 (5th Cir. 2014) ...............................................................................23

*Kaepa, Inc. v. Achilles Corp.*,
76 F.3d 624 (5th Cir. 1996) ...............................................................................109

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022)........................................................................................4, 47

*Kolender v. Lawson*,
461 U.S. 352 (1983)...........................................................................................72

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*,
508 U.S. 384 (1993)...........................................................................................59

*Lane v. Franks*,
573 U.S. 228 (2014)...........................................................................................47

*Loc. 8027, AFT-N.H., AFL-CIO v. Edelblut*,
651 F. Supp. 3d 444 (D.N.H. 2023)...................................................................86, 87

*Matal v. Tam*,
582 U.S. 218 (2017)...............................................................................21, 55, 58

*Mirkin v. XOOM Energy, LLC*,
No. 18-CV-2949 (ARR) (RER), 2023 WL 5200294 (E.D.N.Y. Aug. 14, 2023) ...................70

*Miss. Ass'n of Educators v. Bd. of Trs. of State Institutions of Higher Learning*,
No. 3:25-CV-00417-HTW-LGI, 2025 WL 2142676 (S.D. Miss. July 20,
2025) .............................................................................................................68

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024)...........................................................................................89

*Moore v. City of Kilgore, Tex.*,
    877 F.2d 364 (5th Cir. 1989) ................................................................105

*Moore v. La. Bd. of Elementary & Secondary Educ.*,
    743 F.3d 959 (5th Cir. 2014) ................................................................49

*Morgan v. Swanson*,
    659 F.3d 359 (5th Cir. 2011) (en banc) ..............................................79

*N.W. Enters. v. City of Houston*,
    352 F.3d 162 (5th Cir. 2003), *abrogated on other grounds*, *Reagan Nat'l
    Advert. of Austin, Inc. v. City of Austin*, 972 F.3d 696 (5th Cir. 2020).........................104, 107

*NAACP v. Button*,
    371 U.S. 415 (1963).............................................................................67

*NAACP v. State of Ala. ex rel. Patterson*,
    357 U.S. 449 (1958).............................................................................101

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*,
    767 F. Supp. 3d 243 (D. Md. 2025), *opinion clarified*, 769 F. Supp. 3d 465
    (D. Md. 2025) ........................................................................................5

*Nat'l Press Photographers Ass'n v. McCraw*,
    90 F.4th 770 (5th Cir. 2024) ................................................................67

*NetChoice, L.L.C. v. Fitch*,
    134 F.4th 799 (5th Cir. 2025) ..............................................................25

*Opulent Life Church v. City of Holly Springs, Miss.*,
    697 F.3d 279 (5th Cir. 2012) ..............................................23, 107, 109

*Ostrewich v. Tatum*,
    72 F.4th 94 (5th Cir. 2023) ..................................................................24

*Palmer ex rel. Palmer v. Waxahachie Indep. Sch. Dist.*,
    579 F.3d 502 (5th Cir. 2009) ..........................................................54, 56

*Pernell v. Fla. Bd. of Governors of State Univ. Sys.*,
    641 F. Supp. 3d 1218 .............................................................................68

*Planned Parenthood of Gulf Coast, Inc. v. Gee*,
    862 F.3d 445 (5th Cir. 2017) ..............................................................109

*Porter v. Ascension Par. Sch. Bd.*,
    393 F.3d 608 (5th Cir. 2004) ................................................................53

*R.A.V. v. City of St. Paul*,
  505 U.S. 377 (1992) .................................................................................... 22, 58

*Reed v. Town of Gilbert, Ariz.*,
  576 U.S. 155 (2015) ............................................................................................ 62

*Roark & Hardee LP v. City of Austin*,
  522 F.3d 533 (5th Cir. 2008) ........................................................................... 67

*Roberts v. U.S. Jaycees*,
  468 U.S. 609 (1984) ......................................................................................... 101

*Robinson v. Hunt Cnty.*,
  921 F.3d 440 (5th Cir. 2019) ........................................................................... 58

*Rohrbough v. Univ. of Colo. Hosp. Auth.*,
  596 F.3d 741 (10th Cir. 2010) ......................................................................... 48

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
  592 U.S. 14 (2020) .................................................................................... 22, 107

*Romer v. Evans*,
  517 U.S. 620 (1996) ......................................................................................... 66

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
  515 U.S. 819 (1995) .................................................................................. *passim*

*Sambrano v. United Airlines, Inc.*,
  707 F. Supp. 3d 652 (N.D. Tex. 2023) ........................................................... 80

*Serv. Employees Int'l Union v. City of Houston*,
  542 F.Supp.2d 617 (S.D. Tex. 2008), *aff'd in part, rev'd in part*, 595 F.3d 588
  (5th Cir. 2010) ................................................................................................ 103

*Shurtleff v. City of Boston, Mass.*,
  596 U.S. 243 (2022) ............................................................................. 56, 57, 95

*Smith v. Acevedo*,
  No. A-09-CA-620-SS, 2010 WL 11512363 (W.D. Tex. Sept. 20, 2010) ........... 104

*Snyder v. Phelps*,
  562 U.S. 443 (2011) ......................................................................................... 47

*Speech First, Inc. v. Fenves*,
  979 F.3d 319 (5th Cir. 2020) ................................................................ 19, 23, 24

*Stanley v. Ga.*,
  394 U.S. 557 (1969) .................................................................................... 53, 79

*Straights & Gays for Equal. v. Osseo Area Sch.-Dist. No. 279*,
    540 F.3d 911 (8th Cir. 2008) ................................................101

*Sweezy v. N.H.*,
    354 U.S. 234 (1957)................................................................1

*Texans for Free Enter. v. Tex. Ethics Comm'n*,
    732 F.3d 535 (5th Cir. 2013) ..............................................23

*Thornhill v. Ala.*,
    310 U.S. 88 (1940)..............................................................91

*Tinker v. Des Moines Indep. Cmty. School Dist.*,
    393 U.S. 503 (1969)............................................................53

*Total Recall Techs. v. Luckey*,
    No. C 15-02281 WHA, 2021 WL 2590149 (N.D. Cal. June 24, 2021)................................70

*Turtle Island Foods, S.P.C. v. Strain*,
    65 F.4th 211 (5th Cir. 2023) ..............................................48

*U.S. v. Hansen*,
    599 U.S. 762 (2023)......................................................88, 89, 91

*U.S. v. Jubert*,
    139 F.4th 484 (5th Cir. 2025) ............................................89

*U.S. v. Nat'l Treasury Emps. Union*,
    513 U.S. 454 (1995)..........................................................106

*U.S. v. Playboy Entm't Grp., Inc.*,
    529 U.S. 803 (2000)..........................................................63

*U.S. v. Skrmetti*,
    145 S. Ct. 1816 (2025)......................................................84

*Va. v. Hicks*,
    539 U.S. 113 (2003)..........................................................98

*Victor v. McElveen*,
    150 F.3d 451 (5th Cir. 1998) ..............................................47

*Vidal v. Elster*,
    602 U.S. 286 (2024)..........................................................59

*W. Va. State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943)..........................................................54

*White Hat v. Murrill,*
   141 F.4th 590 (5th Cir. 2025) ...............................................................89

*Women's Med. Ctr. of Nw. Houston. v. Bell,*
   248 F.3d 411 (5th Cir. 2001) .................................................................67

*Ex parte Young. Healthy Vision Ass'n v. Abbott,*
   138 F.4th 385 (5th Cir. 2025) ...............................................................51

*Ex parte Young,*
   209 U.S. 123 (1908) ........................................................................19, 49

**Statutes**

20 U.S.C. § 1232g(b)(1) .............................................................................47

20 U.S.C. § 4071(a) ....................................................................................99

42 U.S.C. § 1983 ....................................................................19, 20, 51, 52

Tex. Admin. Code § 247.2 ..........................................................................46

Tex. Educ. Code § 1.007 .........................................................................1, 52

Tex. Educ. Code § 11.005 ...................................................................2, 7, 50

Tex. Educ. Code § 11.401(b) ........................................................................3

Tex. Educ. Code § 12.1162(a)(3) ................................................................50

Tex. Educ. Code § 28.002(h) .......................................................................78

Tex. Educ. Code § 28.0043(a) .......................................................................3

Tex. Educ. Code § 33.0815 ...............................................................2, 8, 50

Tex. Educ. Code § 39.001 ...........................................................................50

Tex. Family Code § 101.028 ......................................................................100

Tex. Gov't Code § 311.032(c) .......................................................................6

Tex. Health & Safety Code § 481.134(5) ...................................................100

**Other Authorities**

89th Leg., R.S. (2025),
   https://capitol.texas.gov/BillLookup/History.aspx?LegSess=89R&Bill=SB12
   (last visited Aug. 27, 2025).................................................................9, 10

xi

89th Leg., R.S. (2025),
https://capitol.texas.gov/tlodocs/89R/billtext/pdf/SB00012I.pdf#navpanes=0 ...................10

*Activity*, BLACK'S LAW DICTIONARY (12th ed. 2024)...................................................75

*Activity*, MERRIAM-WEBSTER (2025)...................................................................75

*America's Most Respected Black Trans Journalists*, THEM (Feb. 28, 2020),
https://www.them.us/story/monica-roberts-transgriot-profile; ...............................79

*Assist*, MERRIAM-WEBSTER (2025)....................................................................81

*Aug. 2025 Back to School 89th Legislative Requirements for Board of Trustees –
FINAL,* PLANO ISD, available at
https://pisd.diligent.community/document/b96cb0a3-23c5-4889-a7bd-
2464e905969a/ ...............................................................................44

*Base*, BLACK'S LAW DICTIONARY (12th ed. 2024) ...................................................70

Blake Paterson, *The "Grandmother" of the Trans Rights Movement Is Optimistic
About the Future*, TEX. MONTHLY (March 31, 2025),
https://www.texasmonthly.com/being-texan/phyllis-randolph-frye-transgender-rights-
houston-judge/...............................................................................79

*Board Policy Manual*, HOUSTON ISD (2025),
https://pol.tasb.org/PolicyOnline/PolicyDetails?key=592&code=FNAB#legal
TabContent (last visited Aug. 27, 2025)....................................................21

*Board Policy Manual*, KATY ISD (2025),
https://pol.tasb.org/PolicyOnline/PolicyDetails?key=594&code=FNAB#legal
TabContent (last visited Aug. 27, 2025)....................................................21

*Board Policy Manual*, PLANO ISD (2025),
https://pol.tasb.org/PolicyOnline/PolicyDetails?key=312&code=FNAB#legal
TabContent (last visited Aug. 27, 2025)....................................................21

*Cisgender*, APA DICTIONARY OF PSYCHOLOGY, AM. PSYCHOLOGICAL ASS'N
(Nov. 15, 2023), https://dictionary.apa.org/cisgender ......................................12

Conference Committee Report Form, 89th Leg., R.S. (2025) at 8,
https://lrl.texas.gov/scanned/89ccrs/sb0012.pdf#navpanes=0. ...............................11

*Develop*, MERRIAM-WEBSTER (2025)...................................................................73

*Duty*, BLACK'S LAW DICTIONARY (12th ed. 2024) ...................................................72

*Duty*, DICTIONARY.COM UNABRIDGED (2023) ..........................................................73

*Duty*, MERRIAM-WEBSTER (2025) .....................................................................72

*Educator Misconduct & Investigations*, TEX. EDUC. AGENCY,
    https://tea.texas.gov/texas-educators/investigations/educator-misconduct-
    investigations (last visited Aug. 27, 2025)......................................................45

Fed. Programs Overview, PLANO ISD, https://www.pisd.edu/departments-
    66/federal-programs (last accessed Aug. 27, 2025)...........................................100

*Fed. Title Programs*, HOUSTON ISD, https://www.houstonisd.org/directory-
    2a/research-accountability/reports/federal-title-programs (last accessed Aug.
    27, 2025) .......................................................................................................100

*FNAB—Student Expression: Use of School Facilities for Nonschool Purposes*,
    PLANO ISD (Oct. 23, 2006),
    https://pol.tasb.org/PolicyOnline/PolicyDetails?key=312&code=FNAB#local
    TabContent....................................................................................................99

*FNAB (Local), Katy ISD* (Oct. 10, 2007),
    https://pol.tasb.org/PolicyOnline/PolicyDetails?key=594&code=FNAB#local
    TabContent....................................................................................................99

*Future*, TEX. MONTHLY (March 31, 2025), https://www.texasmonthly.com/being-
    texan/phyllis-randolph-frye-transgender-rights-houston-judge/;...........................79

*Gender Identity*, APA DICTIONARY OF PSYCHOLOGY, AM. PSYCHOLOGICAL ASS'N
    (Nov. 15, 2023), https://dictionary.apa.org/gender-identity ..................................71

Greg Abbott, THE OFFICE OF THE TEX. GOVERNOR (Jun. 21, 2025),
    https://gov.texas.gov/news/post/governor-abbott-signs-over-600-critical-bills-
    passed-during-89th-regular-legislative-session (last visited Aug. 27, 2025)............6

*Guidance*, MERRIAM-WEBSTER (2025)...............................................................85

Hearing on S.B. 12, 89th Leg, R.S. (Tex. May 13, 2025),
    https://house.texas.gov/videos/22103 .................................................................10

*Heterosexuality*, APA DICTIONARY OF PSYCHOLOGY, AM. PSYCHOLOGICAL ASS'N
    (Nov. 15, 2023), https://dictionary.apa.org/heterosexuality ..................................12

*Implement*, MERRIAM-WEBSTER (2025) ..............................................................73

INTERSEX SOC'Y OF N. AM., https://isna.org/faq/what_is_intersex/ (last visited
    Aug. 27, 2025) ...............................................................................................28

Katy ISD Official Budget, KATY ISD (2025-2026),
    https://resources.finalsite.net/images/v1756214641/katyisdorg/x5uaxjl0qcespg
    uiccj5/1-Book_2025-2026.pdf ..........................................................................100

*Leg. Updates*, TEX. ED. AGENCY (2025), https://tea.texas.gov/about-tea/government-relations-and-legal/government-relations/89th-legislature-updates (last visited Sept. 14, 2025) ...............................................................................20

*Leg. Updates*, TEX. EDUC. AGENCY (2025), https://tea.texas.gov/about-tea/government-relations-and-legal/government-relations/89th-legislature-updates (last visited Aug. 27, 2025)......................................................................49, 51

*Legislature Updates*, TEX. EDUC. AGENCY (Jun. 26, 2025), https://tea.texas.gov/texas-educators/superintendents/89th-legislature-updates.pdf (last visited Aug. 27, 2025) ........................................................51

*LGBTQ*, APA DICTIONARY OF PSYCH., AM. PSYCH. ASS'N (last updated Nov. 15, 2023), https://dictionary.apa.org/lgbtq....................................................................3

*Policy*, MERRIAM-WEBSTER (2025) ............................................................................74

*Prior Restraint*, BLACK'S LAW DICTIONARY (12TH ed.2024) ................................103

*Procedure*, BLACK'S LAW DICTIONARY (12th ed. 2024) ........................................74

*Program*, BLACK'S LAW DICTIONARY (12th ed. 2024)...........................................75

*Program*, MERRIAM-WEBSTER (2025) .....................................................................75

*Reference*, MERRIAM-WEBSTER (2025) ...................................................................76

Regarding, MERRIAM-WEBSTER (2025) .....................................................................86

*Resolution Regarding Senate Bill 12 & Parent Rights*, THE BOARD OF TRUSTEES OF KATY ISD (Aug. 25, 2025), https://resources.finalsite.net/images/v1756235888/katyisdorg/jsevscsdsfl20ei5bw5v/SB12RESOLUTION.pdf (last visited Aug. 27, 2025) ..........................52, 54

*Schools In Transition: A Guide for Supporting Transgender Students in K-12 Schools* (2015), https://hrc-prod-requests.s3-us-west-2.amazonaws.com/welcoming-schools/documents/HRCF-Schools-In-Transition.pdf.......................................................................................................61

Senate Committee Report, 89th Leg., R.S. (2025), at 13, https://capitol.texas.gov/tlodocs/89R/billtext/pdf/SB00012S.pdf#navpanes=0 .....................10

Sponsor's Statement of Intent, https://legiscan.com/TX/supplement/SB12/id/547781 ....................................10, 11

xiv

*Student Expression: Use of School Facilities for Nonschool Purposes*, HOUSTON
ISD (Apr. 1, 2005),
https://pol.tasb.org/PolicyOnline/PolicyDetails?key=592&code=FNAB#local
TabContent ............................................................................................................99

*Training*, MERRIAM-WEBSTER (2025) ........................................................................75

*Trains*, MERRIAM-WEBSTER (2025) ...........................................................................75

*Trans Latinx Liberation: Ana Andrea Molina Headlines Gender Infinity
Conference*, SPECTRUM SOUTH (Sept. 27, 2018),
https://www.spectrumsouth.com/gender-infinity-ana-andrea-molina/ .................79

*Volunteer*, BLACK'S LAW DICTIONARY (12th ed. 2024) ...............................................77

*Volunteer*, MERRIAM-WEBSTER (2025) .......................................................................77

*What It Means to Be Non-Binary*, LGBT FOUNDATION (last updated Jan. 9, 2024),
https://lgbt.foundation/help/what-it-means-to-be-non-binary/ (last visited Aug.
27, 2025) ..............................................................................................................28

Plaintiffs GSA Network, Students Engaged Across Texas ("SEAT"), Texas American Federation of Teachers ("Texas AFT"), Rebecca Roe, by and through her next friend, Ruth Roe, Adrian Moore,[1] by and through his next friend, Julie Johnson, and Polly Poe[2] bring this Amended Motion for a Preliminary Injunction to enjoin the enforcement of four provisions of Senate Bill 12 ("S.B. 12").[3] Defendants are statutorily tasked with enforcing the law's unconstitutional and unlawful provisions challenged in this litigation and include Mike Morath, in an official capacity as Commissioner of the Texas Education Agency ("Commissioner"), Houston Independent School District ("Houston ISD"), Katy Independent School District ("Katy ISD"), and Plano Independent School District ("Plano ISD") (collectively, "Defendants").

## INTRODUCTION

The First Amendment prohibits government officials from censoring disfavored speech or preventing people from associating together to discuss chosen topics. "Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy v. N.H.*, 354 U.S. 234, 250 (1957). Senate Bill 12 ("S.B. 12") violates these bedrock principles

---

[1]    Adrian Moore's legal name is known by Katy ISD and will be shared with other Defendants pursuant to the Court's forthcoming protective order. *See* Declaration of Julie Johnson ("Johnson Decl."), attached as **Exhibit 7**.

[2]    Rebecca Roe, Ruth Roe, and Polly Poe are all pseudonyms. *See* Declaration of Rebecca Roe ("Roe Decl."), attached as **Exhibit 4**; Declaration of Polly Poe ("Poe Decl."), attached as **Exhibit 5**. They filed an unopposed motion to proceed pseudonymously to protect themselves from reprisal or retaliation in connection with this lawsuit. *See* Dkt. Dkt. 27 (Unopposed Motion to Proceed Pseudonymously).

[3]    Tex. S.B. 12, 88th Leg., Reg. Sess. (2025), is codified in numerous places in the Texas Education Code, including Tex. Educ. Code §§ 1.007, 11.005, 11.401, 28.0043, and 33.0815. It is attached as **Exhibit 1**.

by barring Plaintiffs and many others like them from engaging in countless programs, activities, and conversations involving race, ethnicity, gender identity, and sexual orientation in *every public and charter school in Texas* from pre-kindergarten through twelfth grade, and *even beyond school activities and school grounds*.

Plaintiffs seek to enjoin Defendants from enforcing four unconstitutional aspects of S.B. 12. First, Plaintiffs challenge the law's prohibition that a "school district or open-enrollment charter school may not authorize or sponsor a student club based on sexual orientation or gender identity." S.B. 12 § 27(b) (amending Tex. Educ. Code § 33.0815). Because this section's purpose and effect is to ban Genders and Sexualities Alliances (formerly called Gay-Straight Alliances) in Texas, Plaintiffs refer to this section as the "**GSA Ban**." The GSA Ban clearly violates the federal Equal Access Act, as well as the First Amendment's prohibition against viewpoint discrimination. It is also vague, overbroad, an unconstitutional prior restraint on speech, and it violates Plaintiffs' First Amendment freedom of expressive association.

Second, S.B. 12 prohibits any school employee, contractor, or volunteer from "developing or implementing policies, procedures, trainings, activities, or programs *that reference* race, color, ethnicity, gender identity, or sexual orientation . . . *at, for, or on behalf of*" a school district or charter school. *Id.* §§ 3(a)(3)-(b)(2) (amending Tex. Educ. Code § 11.005) (emphases added). This "**Inclusivity Ban**" abridges the First Amendment's prohibition against viewpoint discrimination, and it is vague, overbroad, and an impermissible prior restraint.

Third, Plaintiffs challenge the law's "**Social Transition Ban**," which prohibits all school employees "from assisting a student enrolled in the district with social transitioning, including by providing ***any information*** about social transitioning or providing guidelines intended to assist a person with social transitioning." *Id.* § 7(b) (amending Tex. Educ. Code § 11.401(b)) (emphasis added). This section violates the First Amendment's prohibition against viewpoint discrimination and is vague, overbroad, and an unconstitutional prior restraint.

Fourth, Plaintiffs challenge the law's "**Don't Say LGBTQ+ Ban**,"[4] which states that school districts and charter schools "may not provide ***or allow a third party to provide*** instruction, guidance, activities, or programming regarding sexual orientation or gender identity to students enrolled in prekindergarten through twelfth grade." *Id.* § 24(a) (amending Tex. Educ. Code § 28.0043(a)) (emphasis added). This section runs afoul of the First Amendment's prohibition against viewpoint discrimination and is vague, overbroad, and an impermissible prior restraint.

Collectively, these four provisions suppress huge swaths of constitutionally protected private speech, including programs and trainings in limited public forums merely referencing race or ethnicity, informal conversations between teachers and students about gender identity or sexual orientation, and all LGBTQ+-focused student organizations in the state. The First Amendment does not permit such sweeping suppression of disfavored

---

[4]      LGBTQ+ is an "acronym for lesbian, gay, bisexual, transgender, and questioning or queer: an inclusive term used to refer to the diverse forms of gender identity and sexual orientation, and to those whose gender identity differs from the culturally and socially determined gender roles for their assigned sex." *LGBTQ*, APA DICTIONARY OF PSYCH., AM. PSYCH. ASS'N (last updated Nov. 15, 2023), https://dictionary.apa.org/lgbtq.

speech, nor allow government officials to erase any mention of race or LGBTQ+ identities in Texas schools. These prohibitions suppress speech and association *far beyond* Texas classrooms and outside of school hours, since they apply to all programs and activities "at, for, or on behalf of" a school district or charter school, *id.* § 3(b)(2), and they silence the speech of educators *and third parties* even in their private capacity far removed from any official job duties. *See id.* §§ 7, 24. The law therefore suppresses vast amounts of constitutionally protected private speech, well past what the Texas Legislature may permissibly restrict. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 527 (2022) ("[T]he First Amendment's protections extend to 'teachers and students,' neither of whom 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate[.]'") (quoting *Tinker v. Des Moines Indep. Cmty. School Dist.*, 393 U.S. 503, 506 (1969)). And because these challenged restrictions of S.B. 12 are impermissibly vague, they provide constitutionally inadequate notice for how Plaintiffs and others can comply with the law's restrictions, which harms the entire marketplace of ideas in and surrounding Texas schools. *See Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 807 (2011) (Alito, J., concurring) ("Vague laws force potential speakers to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked.") (cleaned up, citation omitted).

Recent court decisions from within the Fifth Circuit and across the country have recognized Plaintiffs' likelihood of success on the merits by blocking similar governmental attempts to ban or restrict discussions of race, sexual orientation, and gender identity in and surrounding K-12 schools. *See, e.g.*, *Jackson Fed'n of Tchrs. v. Fitch*, No. 3:25-CV-

417-HTW-LGI, 2025 WL 2394037, at *10 (S.D. Miss. Aug. 18, 2025) (holding that a recent law attempting to prohibit DEI initiatives, "diversity training," and "divisive concepts" in Mississippi schools, including those relating to race, sexual orientation, and gender identity, is "unconstitutionally vague, fails to treat speech in a viewpoint-neutral manner, and carries with it serious risks of terrible consequences with respect to the chilling of expression and academic freedom"); *Iowa Safe Sch. v. Reynolds*, No. 4:23-CV-00474, 2025 WL 1834140, at *1 (S.D. Iowa May 15, 2025) (finding that prohibiting all "'program[s]' and 'promotion' relating to gender identity and sexual orientation [in kindergarten through sixth grade] cannot reasonably be interpreted in a manner consistent with the First Amendment"); *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243, 286 (D. Md. 2025), *opinion clarified*, 769 F. Supp. 3d 465 (D. Md. 2025) (finding implementation of federal executive orders purporting to ban "DEI programs" in higher education were likely unconstitutionally vague and viewpoint-discriminatory, among other infirmities).

For the reasons explained below, Plaintiffs have standing to challenge Defendants' threatened enforcement of S.B. 12's GSA Ban, Inclusivity Ban, Social Transition Ban, and Don't Say LGBTQ+ Ban and Defendants may be properly enjoined from enforcing these provisions. Plaintiffs are likely to prevail on the merits and will suffer irreparable harm absent injunctive relief, while both the equities and public interest weigh in favor of granting a preliminary injunction to stop Defendants from enforcing the challenged provisions of S.B. 12.

## NATURE AND STAGE OF PROCEEDING

Plaintiffs filed this action on August 28, 2025. Dkt. 1. That same day, Plaintiffs filed a Motion for Preliminary Injunction. Dkt. 10. This Court entered a scheduling order, permitting amendment of the complaint and this Motion for Preliminary Injunction. *See* Dkt. 30. Plaintiffs have also sought leave to extend the word limit for this Amended Motion for Preliminary Injunction. *See* Dkt. 29 (Unopposed Motion to Exceed Word Limit).

## STATEMENT OF FACTS

### I.    SENATE BILL 12

S.B. 12 was signed by Governor Abbott on June 20, 2025, and took effect on September 1, 2025.[5] At 37 pages long, the law contains 31 sections that amend various sections of the Texas Education Code. Plaintiffs here challenge only four unconstitutional and unlawful provisions of S.B. 12 and their related enforcement: (1) the GSA Ban, (2) the Inclusivity Ban, (3) the Social Transition Ban, and (4) the Don't Say LGBTQ+ Ban.[6]

### A.    GSA Ban

Section 27 of S.B. 12 states that school districts and charter schools in Texas "***may*** authorize or sponsor a student club" but "***may not*** authorize or sponsor a student club based

---

[5]    *Governor Abbott Signs Over 600 Critical Bills Passed During 89th Legislative Session*, Greg Abbott, THE OFFICE OF THE TEX. GOVERNOR (Jun. 21, 2025), https://gov.texas.gov/news/post/governor-abbott-signs-over-600-critical-bills-passed-during-89th-regular-legislative-session (last visited Aug. 27, 2025); Tex. S.B. 12 § 31, 89th Leg. (2025).

[6]    Even though S.B. 12 contains no severability clause, the Court may enjoin these specific provisions of S.B. 12 and declare them unconstitutional and unlawful without altering the rest of the statute. *See* Tex. Gov't Code § 311.032(c) (even "[i]n a statute that does not contain a provision for severability or nonseverability, if any provision of the statute or its application to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of the statute that can be given effect without the invalid provision or application").

on sexual orientation or gender identity." S.B. 12 § 27(a)-(b) (amending Tex. Educ. Code § 33.0815(a)-(b)) (emphasis added). Through this section, the Legislature authorizes student clubs to be formed in all public and charter schools from pre-kindergarten through twelfth grade. But no clubs are permitted if they are "based on sexual orientation or gender identity." *Id.* § 27(b).

### B.    Inclusivity Ban

Section 3 is entitled "Prohibition on Diversity, Equity, and Inclusion Duties." *Id.* § 3 (amending Tex. Educ. Code § 11.005). This section prevents school districts and charter schools from "assign[ing] diversity, equity, and inclusion duties to any person" and requires them to "prohibit a district employee, contractor, or volunteer from engaging in diversity, equity, and inclusion duties at, for, or on behalf of the district," except "as required by state or federal law." *Id.* § 3(b). The section defines "diversity, equity, and inclusion duties" to include "developing or implementing policies, procedures, trainings, activities, or programs that reference race, color, ethnicity, gender identity, or sexual orientation." *Id.* § 3(a)(3). This Inclusivity Ban contains several exceptions, including: "acknowledging or teaching the significance of state and federal holidays or commemorative months and how those holidays or months fit into the themes of history and the stories of this state and the United States of America in accordance with the essential knowledge and skills adopted under Subchapter A, Chapter 28." *Id.* § 3(e)(2). This section also does not apply to:

- "[C]lassroom instruction that is consistent with the essential knowledge and skills adopted by the State Board of Education;

- [T]he collection, monitoring, or reporting of data;

7

- [A] policy, practice, procedure, program, or activity intended to enhance student academic achievement or postgraduate outcomes that is designed and implemented without regard to race, sex, color, or ethnicity; or

- [A] student club that is in compliance with the requirements of Section 33.0815 [the GSA Ban]." *Id.* § 3(e)(5).

Through this last exception, the Inclusivity Ban explicitly incorporates the GSA Ban to ensure that any student organization based on gender identity or sexual orientation remains prohibited. The Inclusivity Ban also contains a clause purporting that "[n]othing in this section may be construed to . . . affect a student's rights under the First Amendment to the United States Constitution or Section 8, Article I, Texas Constitution." *Id.* § 3(e)(3); *see also infra* Argument, Section III.B (Vagueness).

### C.    Social Transition Ban

Section 7 of S.B. 12 is entitled "Assistance with Social Transitioning Prohibited." *Id.* § 7. It amends Section 11.401 of the Texas Education Code to require every school district to "adopt a policy prohibiting an employee of the district from assisting a student enrolled in the district with social transitioning, including by providing any information about social transitioning or providing guidelines intended to assist a person with social transitioning." *Id.* § 7(b). This section defines "social transitioning" as "a person's transition from the biological sex at birth to the opposite biological sex through the adoption of a different name, different pronouns, or other expressions of gender that deny or encourage a denial of the person's biological sex at birth." *Id.* § 7(a).

### D.     Don't Say LGBTQ+ Ban

Section 24 of S.B. 12 states that a "school district, open-enrollment charter school, or district or charter school employee may not provide or allow a third party to provide instruction, guidance, activities, or programming regarding sexual orientation or gender identity to students enrolled in prekindergarten through 12th grade." *Id.* § 24(a).

This section contains an exception that it "may not be construed to . . . limit a student's ability to engage in speech or expressive conduct protected by the First Amendment of the United States Constitution or by Section 8, Article I, Texas Constitution, that does not result in material disruption to school activities." *Id.* § 24(b)(1); *see also infra* Argument, Section III.B (Vagueness).

This Don't Say LGBTQ+ Ban also states that it does not "limit the ability of a person who is authorized by the district to provide physical or mental health-related services to provide the services to a student, subject to any required parental consent," and it does not "prohibit an organization whose membership is restricted to one sex and whose mission does not advance a political or social agenda from meeting on a school district or open-enrollment charter school campus." *Id.* § 24(b)(2)-(3).

## II.     LEGISLATIVE HISTORY OF S.B. 12

Senator Brandon Creighton filed S.B. 12 in the Texas Senate on February 24, 2025.[7] Senator Creighton's original statement of legislative intent stated that the goals of the bill were to: (1) strengthen parental rights; (2) eliminate DEI in public schools; and (3) prohibit

---

[7]     S.B. 12 Bill Analysis, 89th Leg., R.S. (2025), https://capitol.texas.gov/BillLookup/History.aspx?LegSess=89R&Bill=SB12 (last visited Aug. 27, 2025).

instruction on sexual orientation and gender identity from pre-K through twelfth grade; among other provisions.[8]

The original version of the bill included the Inclusivity Ban and Don't Say LGBTQ+ Ban but did not include the GSA Ban or Social Transition Ban.[9] On March 17, 2025, the Senate Committee on Education K-16 amended S.B. 12 to add the GSA Ban.[10] The bill then passed the Senate on March 19, 2025.[11] Following concerns from lawmakers about whether S.B. 12's restrictions on programs and activities referencing "gender identity" would hinder same-gender schools or programs,[12] the House Committee amended the bill to include an exception only to the Don't Say LGBTQ+ Ban stating that "[t]his section may not be construed to . . . prohibit an organization whose membership is restricted to one sex and whose mission does not advance a political or social agenda from meeting on a school district or open-enrollment charter school campus."[13] The Social Transition Ban was added

---

[8]     Author's / Sponsor's Statement of Intent, https://legiscan.com/TX/supplement/SB12/id/547781 (last visited Aug. 27, 2025).

[9]     S.B. 12 (Introduced version), 89th Leg., R.S. (2025), https://capitol.texas.gov/tlodocs/89R/billtext/pdf/SB00012I.pdf#navpanes=0.

[10]    S.B. 12, Senate Committee Report, 89th Leg., R.S. (2025), at 13, https://capitol.texas.gov/tlodocs/89R/billtext/pdf/SB00012S.pdf#navpanes=0.

[11]    S.B. 12 Bill Analysis, 89th Leg., R.S. (2025) https://capitol.texas.gov/BillLookup/History.aspx?LegSess=89R&Bill=SB12 (last visited Aug. 27, 2025).

[12]    During the House committee hearing, Representative James Talarico said, "We do have all boys' and all girls' schools. I want to make sure that those that don't fall under a prohibition of programs based on gender or sex." Representative Leach responded, "I think those are fair points as well, Representative Talarico, and I'm happy to work on clarifying language with you." Tex. House, Public Educ. Comm. Hearing on S.B. 12, 89th Leg, R.S. (Tex. May 13, 2025), https://house.texas.gov/videos/22103, at 47:39-48:26.

[13]    S.B. 12 (House Comm. Report version), 89th Leg., R.S. (2025), at 32, https://capitol.texas.gov/tlodocs/89R/billtext/pdf/SB00012H.pdf#navpanes=0.

to the bill at the very end of the legislative process—in conference committee before S.B. 12 secured final passage from both the House and Senate.[14]

The bill author's statement of intent in the final engrossed passage of the law claims that the goals of S.B. 12 are to "[p]rohibit[] clubs based on sexual orientation and gender identity" and that "[f]or student clubs related to sex, race, color and ethnicity, teachers may only supervise the club and cannot provide instruction." According to this official statement of legislative intent, the law's aim is "[e]liminating Diversity, Equity, and Inclusion (DEI) in Public Schools," including by "broaden[ing]" the "DEI duties definition [] to include all activities and programs."[15] The statement explains that "[s]chool districts must implement local discipline policies for violations, including termination for employees engaging in prohibited DEI activities" and "certify compliance" with the Inclusivity Ban "at a public meeting," and it also requires that "[c]harter schools must comply with these prohibitions."[16]

The legislative debate on S.B. 12 confirms that the law is aimed at suppressing views involving race, sexual orientation, and gender identity. During the Senate floor debate, S.B. 12's author, Senator Creighton, stated that the goal of the law "right off the bat" is to "prohibit[] clubs related to sexual orientation or sexual identity if they're solely based on those tenets."[17] Senator Creighton added that he believes that diversity, equity, and

---

[14]    S.B. 12 Conference Committee Report Form, 89th Leg., R.S. (2025) at 8, https://lrl.texas.gov/scanned/89ccrs/sb0012.pdf#navpanes=0.
[15]    Author's / Sponsor's Statement of Intent, https://legiscan.com/TX/supplement/SB12/id/547781 (last visited Aug. 27, 2025).
[16]    Id.
[17]    Tex. Senate, Floor Debate on S.B. 12, 89th Leg, R.S. (Mar. 19, 2025), at 3:50:20–3:50:32, https://senate.texas.gov/videoplayer.php?vid=21397&lang=en.

inclusion efforts are discriminatory.[18] Senator Creighton also confirmed that the law's numerous prohibitions relating to gender identity or sexual orientation specifically target LGBTQ+ and transgender students and their identities, as opposed to ***all*** gender identities and sexual orientations, including cisgender[19] or heterosexual[20] identities.[21] In response to questions about the GSA Ban, Senator Creighton dismissed concerns about the rights of LGBTQ+ students to associate and the benefits of those students being able to build community and mutual support in light of their shared identities.[22] He also implied that LGBTQ+ identities are so inappropriate that they should only be discussed outside of school campuses.[23] When asked for examples of objectionable programs and activities that would be prohibited by this law, Senator Creighton only named programs meant to discuss and ensure the wellbeing of students from diverse LGBTQ+, racial, and religious backgrounds.[24]

---

[18]     *Id.* at 4:00:17–4:00:25.

[19]     Cisgender refers to "an individual whose gender identity aligns with their sex assigned at birth." The majority of people in society are cisgender, which means that their "internal gender identity matches, and presents itself in accordance with, the externally determined cultural expectations of the behavior and roles considered appropriate for one's assigned sex as male or female." *Cisgender*, APA DICTIONARY OF PSYCHOLOGY, AM. PSYCHOLOGICAL ASS'N (Nov. 15, 2023), https://dictionary.apa.org/cisgender.

[20]     Heterosexuality is characterized by "sexual, romantic, or emotional attraction or activity between members of the opposite sex." *Heterosexuality*, APA DICTIONARY OF PSYCHOLOGY, AM. PSYCHOLOGICAL ASS'N (Nov. 15, 2023), https://dictionary.apa.org/heterosexuality. The majority of people in society identify as heterosexual.

[21]     *Senator West*: "And when you use gender identity . . . and also sexual orientation, that deals with someone being LGBTQ or transgender, is that correct?" *Senator Creighton*: "That's correct. That's a reference other than biology, biological sex. In other words, how a particular student identifies." Tex. Senate, Floor Debate on S.B. 12, 89th Leg, R.S. (Mar. 19, 2025), at 3:39:08–3:39:40, https://senate.texas.gov/videoplayer.php?vid=21397&lang=en.

[22]     *Id.* at 4:50:16–4:51:19.

[23]     *Id.* (LGBTQ+ students "can join the [] republican or democrat club, they can join a math club, or they can meet after school together, if they want to go down the street to a Whataburger and get together.").

[24]     *Id.* at 4:35:55–4:36:58.

The House sponsor of S.B. 12, Representative Jeff Leach, explained in a committee hearing that one goal of the law is to "get away from . . . some of the more toxic social issues, or indoctrinational issues."[25] On the House floor, Representative Leach called GSAs "school-sponsored and school-sanctioned sex clubs" and "sexual in nature."[26] He explained, "We're not going to allow gay clubs and we're not going to allow straight clubs. We shouldn't be sexualizing our kids in public schools, period. And we shouldn't have clubs based on sex."[27] He added that schools seem to be "hypersexualized," and that he has "listened . . . to members . . . debate about library books and I've been repulsed at some of the things that I've heard, and some of the things that I've seen."[28] Representative Leach also called GSA clubs sources of "indoctrinat[ion]."[29]

Representative Alan Schoolcraft, who introduced the amendment banning GSAs, expressed disdain for GSAs and other clubs supportive of LGBTQ+ students and his intention to censor the speech they facilitate. He stated, "sexual orientation and gender identity, they're difficult issues, they're confusing issues . . . These issues are also extremely controversial and divisive."[30] Representative Schoolcraft explained, "I define gender identity as male or female. However, there seems to be some confusion over that .

---

[25]    Hearing before the Tex. House of Representatives, 89th Leg., R.S. (Tex.), at 18:35-19:08, https://house.texas.gov/videos/22103.

[26]    Hearing before the Tex. House of Representatives, 89th Leg., R.S. (May 24, 2025), at 2:24:30–2:26:00, https://house.texas.gov/videos/22353.

[27]    *Id.* at 2:25:09–2:25:21.

[28]    *Id.* at 2:28:15–2:28:33.

[29]    *Id.* at 4:56:29–4:56:38.

[30]    Hearing before the Tex. H. of Representatives, 89th Leg., R.S. (Tex. ), at 11:07:01–11:07:20, https://house.texas.gov/videos/22257.

. . The whole gender thing has gotten very, very complex."[31] Representative Schoolcraft

specifically mentioned Plaintiff GSA Network, blaming GSA Network for "pushing some

of these clubs in our schools."[32] He criticized the GSA Network for listing a number of

different pronouns on its website as a reason to support S.B. 12's GSA Ban.[33] He called

many of the things he encountered on the GSA Network's website "lunacy."[34] He stated

that, in his determination, clubs like GSAs "should not exist on campus,"[35] since in his

view, GSAs "are not about social clubs, they're about efforts to fundamentally change our

social structure and the moral fiber of this country."[36]

Representative Brad Buckley, the chair of the House committee that advanced the

bill, characterized GSAs as not "community minded" and "based on a characteristic this

bill does not allow."[37] When asked about any specific problems or concerns he knew about

regarding GSAs, Representative Buckley said that he did not know about or recall any.[38]

## III.    PLAINTIFFS

### A.    GSA Network

Plaintiff GSA Network is a national 501(c)(3) nonprofit organization whose mission

is to empower and train queer, trans, and allied youth leaders to advocate, organize, and

---

[31]    *Id.* at 11:10:13–11:10:32.
[32]    *Id.* at 11:10:32–11:10:44.
[33]    *Id.* at 11:10:32–11:11:40.
[34]    Hearing before the Tex. House of Representatives, 89th Leg., R.S. (May 31, 2025), at 4:00:43–4:03:13, https://house.texas.gov/videos/22353.
[35]    Hearing before the Tex. H. of Representatives, 89th Leg., R.S. (Tex. ), at 11:15:08–11:15:18, https://house.texas.gov/videos/22257.
[36]    Hearing before the Tex. House of Representatives, 89th Leg., R.S. (May 31, 2025), at 4:03:40–4:03:57, https://house.texas.gov/videos/22353.
[37]    *Id.* at 3:46:16–3:46:31.
[38]    *Id.* at 3:47:00–3:47:22.

mobilize an intersectional movement for safer schools and healthier communities. *See* Declaration of Maya LaFlamme Washington ("**GSA Network Decl.**") ¶ 2, attached as **Exhibit 2**. GSA Network has a core belief that trans, queer, and two-spirit youth (TQ2S+)[39] exist, belong, and have the right to self-determination. *Id.* Racial justice and LGBTQ+ rights are at the heart of GSA Network's activities and those of the Genders and Sexualities Alliance clubs ("GSA clubs") in its network. *Id.* ¶ 3.

GSA Network brings claims in this lawsuit on behalf of itself and the members of its registered GSA clubs in Texas against the Commissioner and Plano ISD to enjoin their enforcement of S.B. 12's four unconstitutional provisions, which prevent GSA Network from being able to support GSA clubs and their activities in Texas, forbid student members from being able to form or join GSA clubs in Texas, likely force existing GSA clubs to disband, and prohibit or drastically limit many of the activities that GSA Network and GSA clubs engage in at and beyond schools. *Id.* ¶¶ 5, 24-33. This harms the freedom of speech and expressive association of GSA clubs that are members of GSA Network, and the students who are involved in those GSA clubs, in ways that also impede GSA Network's mission and operations. *Id.* ¶¶ 34-41.

### B.    SEAT

SEAT is a nonpartisan, nonprofit grassroots civic organization whose mission is to empower youth through hands-on civic engagement, advocacy, and leadership

---

[39]    "Trans, Queer and Two-Spirit+" is the term GSA Network uses to describe the core community it serves. *See* GSA Network Decl., Ex. 2 ¶ 2 n.1. The terms "TQ2S+" and "LGBTQ+" are used interchangeably in Plaintiffs' Complaint.

development to address systemic inequities and drive change in Texas communities. *See* Declaration of Cameron Samuels ("**SEAT Decl.**") ¶ 2, attached as **Exhibit 3**. This requires SEAT and its members to engage in free and robust debate, including by discussing race, ethnicity, gender identity, and sexual orientation in Texas schools and at school-sponsored events. *Id.* ¶¶ 3, 5-6. SEAT is comprised of approximately 282 members, including many high school students in at least 30 school districts and charter schools throughout Texas, including Houston ISD and Katy ISD. *Id.* ¶¶ 9-13.

SEAT brings claims in this lawsuit on behalf of itself and its members against the Commissioner, Houston ISD, and Katy ISD to enjoin their enforcement of S.B. 12's unconstitutional provisions because these provisions of S.B. 12 burden the speech of SEAT and its members, and impair the organization's ability to continue working with schools, educators, student organizations, and students across Texas to advance its mission. *Id.* ¶¶ 4, 51-71.

### C. Texas AFT

Texas AFT is a statewide labor union representing over 66,000 employees throughout Texas, including teachers, librarians, counselors, nurses, teaching assistants, and other school employees. *See* Declaration of Zeph Capo ("**Texas AFT Decl.**") ¶ 2, attached as **Exhibit 6**. Texas AFT has members in Houston ISD, Katy ISD, and Plano ISD, and in many other public school districts and charter school systems across the state. *Id.* ¶ 3.

Texas AFT brings claims on behalf of its members against the Commissioner, Houston ISD, Katy ISD, and Plano ISD because S.B. 12's GSA Ban, Inclusivity Ban,

Social Transition Ban, and Don't Say LGBTQ+ Ban are unconstitutionally vague and violate educators' due process rights, and they also interfere with Texas AFT members' free speech rights on matters of public concern far beyond their official duties. *Id.* ¶¶ 10-25.

### D.    Rebecca Roe

Rebecca is a first-year high school student in Houston ISD. *See* Roe Decl., Ex. 4 ¶ 2. She identifies as queer and lesbian and actively participated in her middle school's GSA, where she was able to expressively associate with other students and learn from and speak with the GSA's faculty sponsor and guest speakers about topics relating to sexual orientation, gender identity, and social transitioning. *Id.* ¶¶ 3-6. Rebecca hopes to join or start a GSA in high school and actively engage in her school's diversity programs that explicitly reference race, sexual orientation, and gender identity, but S.B. 12's restrictions interfere with her freedom of speech and association and due process rights. *Id.* ¶¶ 7, 13-14.

Rebecca brings claims against the Commissioner and Houston ISD to enjoin their enforcement of S.B. 12's unconstitutional provisions because these restrictions interfere with her constitutional rights.

### E.    Adrian Moore

Adrian Moore is a high school senior in Katy ISD. Johnson Decl., Ex. 7 ¶ 2. Adrian is a gay, transgender boy who has gone by the name Adrian in Katy ISD schools for nearly the past five years. *Id.* ¶¶ 3, 5. Because of Katy ISD's implementation of S.B. 12, Adrian's teachers are now prohibited from calling him "Adrian," even with his parent's explicit

consent, and from discussing any topics relating to his social transition, gender identity, or sexual orientation. *Id.* ¶¶ 15, 19-22. This has caused Adrian immense harm and derailed his relationships with his teachers and peers. *Id.* ¶¶ 23-24. Adrian is also an active member of his school's Pride Club/Diversity Club, which has now been banned due to S.B. 12, and he fears that programs and activities at his school referencing race and ethnicity may also be curtailed by the law. *Id.* ¶¶ 11-13, 18, 29.

Adrian asserts claims against the Commissioner and Katy ISD to enjoin their enforcement of S.B. 12's unconstitutional provisions because these restrictions interfere with his constitutional rights.

### F.    Polly Poe

Polly Poe is a high school teacher in Plano ISD and a member of Texas AFT. Poe Decl., Ex. 5 ¶ 1; Texas AFT Decl., Ex. 6 ¶ 9. Last school year, she served as the GSA club advisor at the school where she teaches, and her GSA is a registered member of the GSA Network. Poe Decl., Ex. 5 ¶¶ 2-3. Before S.B. 12 was enacted, Poe was able to share information and resources with her students from the GSA Network and other nonprofits explicitly referencing topics of race, sexual orientation, gender identity, and social transitioning. *Id.* ¶¶ 4-8. But now, Plano ISD has shut down her GSA and is preventing her from speaking with students about these topics—even outside the GSA and beyond Poe's official duties—while also subjecting her to impermissibly vague requirements about how to implement each of the challenged provisions. *Id.* ¶¶ 11-24, 30-36. Poe brings claims against the Commissioner and Plano ISD to enjoin their enforcement of S.B. 12's

unconstitutional provisions because these restrictions violate her due process and First Amendment rights.

## STATEMENT OF ISSUES

1. Whether Plaintiffs have standing to sue the Defendants they assert claims against to enjoin their enforcement of the challenged provisions of S.B. 12;

2. Whether Defendants may be properly enjoined under *Ex parte Young*, Section 1983, and the Equal Access Act;

3. Whether Plaintiffs are substantially likely to prevail on the merits that S.B. 12's challenged provisions impermissibly discriminate based on viewpoint without meeting strict scrutiny; are unconstitutionally vague; are facially overbroad; violate the Equal Access Act; abridge the freedom of expressive association; and are an unconstitutional prior restraint;

4. Whether Plaintiffs will suffer irreparable harm absent injunctive relief;

5. Whether the balance of equities and public interest are served by preliminarily enjoining Defendants from enforcing the challenged provisions of S.B. 12.

## SUMMARY OF ARGUMENT

Plaintiffs here meet every element for injunctive relief. First, Plaintiffs have standing to bring this pre-enforcement, facial challenge. "It is not hard to sustain standing for a pre-enforcement challenge in the highly sensitive area of public regulations governing bedrock political speech." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 331 (5th Cir. 2020). Plaintiffs here demonstrate "(1) they have an intention to engage in a course of conduct arguably affected with a constitutional interest, (2) their intended future conduct is arguably

proscribed by the policy in question, and (3) the threat of future enforcement of the challenged policies is substantial." *Book People, Inc. v. Wong*, 91 F.4th 318, 335 (5th Cir. 2024) (internal citation omitted). Indeed, Defendants have already begun implementing S.B. 12's challenged provisions, causing Plaintiffs immediate concrete and constitutional harms.

Second, Defendants in this case are statutorily tasked with enforcing S.B. 12 and are properly subject to injunctive and declaratory relief. All Plaintiffs assert claims against the Commissioner, who has already posted publicly on the Texas Education Agency ("TEA") website that he will enforce this law by requiring and publishing compliance reports from every school district and charter school in Texas.[40] The individual student Plaintiffs, Rebecca Roe and Adrian Moore, also assert claims against the school districts they attend, Houston ISD and Katy ISD; and the individual educator Plaintiff, Polly Poe, brings claims against the school district where she teaches, Plano ISD. The GSA Network also brings claims against Plano ISD on behalf of itself and its members, and SEAT brings claims against Houston ISD and Katy ISD on behalf of itself and its members. Each Defendant school district is statutorily required to enforce the challenged provisions of S.B. 12 and has no immunity under the Equal Access Act or for constitutional claims via 42 U.S.C. § 1983.

Third, Plaintiffs are substantially likely to succeed on the merits. All four provisions targeted by this lawsuit impermissibly censor speech based on viewpoint. Most clubs,

---

[40] *89th Leg. Updates*, TEX. ED. AGENCY (2025), https://tea.texas.gov/about-tea/government-relations-and-legal/government-relations/89th-legislature-updates (last visited Sept. 14, 2025).

programs, and activities targeted by S.B. 12 occur in limited public forums, where viewpoint discrimination triggers strict scrutiny. *See Chiu v. Plano Indep. Sch. Dist.*, 339 F.3d 273, 280 (5th Cir. 2003). On their face, S.B. 12's restrictions also apply in every type of forum—including traditional and designated public forums—and the law itself explicitly authorizes all non-disfavored student clubs and activities to continue in limited public forums throughout Texas.[41] Moreover, S.B. 12 suppresses the private speech of students, parents, and third parties while also limiting the speech of educators far outside the scope of their official duties about matters of public concern. S.B. 12's censorship of this private speech, including in limited public forums, subjects the law's viewpoint-discriminatory provisions to strict scrutiny.

The Supreme Court interprets "the term 'viewpoint' discrimination in a broad sense. . . ." *Matal v. Tam*, 582 U.S. 218, 243 (2017) (citations omitted). Just as prohibiting any discussion of religion in schools "discriminate[s] against an entire class of viewpoints," *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 831 (1995), so too does S.B. 12's banning of discussions on race, gender identity, and sexual orientation. Through

---

[41] While local school districts and charter schools typically decide whether to allow certain programs and activities, thereby creating limited or designated public forums, S.B. 12 itself contemplates and authorizes these forums for views not prohibited by the law. *See* S.B. 12 § 27(a) (providing that a "school district or open-enrollment charter school may authorize or sponsor a student club"); S.B. 12 § 3(a)(3) (providing no limitation on "policies, procedures, trainings, activities, or programs" that do not "reference race, color, ethnicity, gender identity, or sexual orientation"). Houston ISD, Katy ISD, and Plano ISD have also all created limited open forums for student clubs and activities through official school board policies. *See Board Policy Manual*, HOUSTON ISD (2025), https://pol.tasb.org/PolicyOnline/PolicyDetails?key=592&code=FNAB#legalTabContent (last visited Aug. 27, 2025); *Board Policy Manual*, KATY ISD (2025), https://pol.tasb.org/PolicyOnline/PolicyDetails?key=594&code=FNAB#legalTabContent (last visited Aug. 27, 2025); and *Board Policy Manual*, PLANO ISD (2025), https://pol.tasb.org/PolicyOnline/PolicyDetails?key=312&code=FNAB#legalTabContent (last visited Aug. 27, 2025).

the law's text and legislative history, S.B. 12 suppresses the speech of students, parents, educators, and others who wish to speak about race, gender identity, or sexual orientation. By censoring speech on these specific topics, S.B. 12's restrictions entrench majoritarian views on race, gender identity, and sexual orientation and "drive [contrary] ideas or viewpoints from the marketplace." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 387 (1992) (citations omitted). Under the appropriate lens of strict scrutiny, the law's speech restrictions whither because they do not come close to being narrowly tailored to any legitimate, let alone compelling, governmental interest.

All four challenged provisions of S.B. 12 are also impermissibly vague in violation of the First and Fourteenth Amendments because they fail to provide constitutionally adequate notice of what kind of speech or expressive activities are prohibited, while inviting arbitrary and discriminatory enforcement. These sections are also overbroad since they suppress large swaths of constitutionally protected speech that far outweigh what the government may legitimately restrict. The GSA Ban also plainly violates the Equal Access Act of 1984, 20 U.S.C. § § 4071-4074, as well as the First Amendment's freedom of association. And all four challenged provisions create unconstitutional prior restraints on Plaintiffs' speech by prohibiting it before it occurs, without the guardrails required by the Supreme Court.

Absent injunctive relief, Plaintiffs will suffer irreparable harm, including "[t]he loss of First Amendment freedom." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (quotation omitted). Because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*,

427 U.S. 347, 373 (1976), a preliminary injunction is needed to protect Plaintiffs' constitutional and statutory rights. The balance of the equities also tips in Plaintiffs' favor since "injunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) (quotation omitted).

## ARGUMENT

This motion seeks a preliminary injunction under Federal Rule of Civil Procedure 65(a). Plaintiffs are entitled to a preliminary injunction if they establish four elements: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any harm that the injunction might cause to the defendant; and (4) that the injunction will not disserve the public interest." *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 288 (5th Cir. 2012) (citation omitted). Plaintiffs here satisfy each element.

## I.    PLAINTIFFS HAVE STANDING TO CHALLENGE S.B. 12

Plaintiffs challenge S.B. 12 because they have already been concretely impacted by this law and intend to engage in constitutionally protected speech that is proscribed by this law. "[S]tanding rules are relaxed for First Amendment cases so that citizens whose speech might otherwise be chilled by fear of sanction can prospectively seek relief." *Justice v. Hosemann*, 771 F.3d 285, 294 (5th Cir. 2014).

To establish Article III standing, a plaintiff "must (1) have suffered an injury in fact, (2) that is fairly traceable to the challenged action of the defendant, and (3) that will likely be redressed by a favorable decision." *Speech First*, 979 F.3d at 330 (citing *Lujan v. Defs.*

*of Wildlife*, 504 U.S. 555, 560–61 (1992)). In the context of a pre-enforcement challenge, the Fifth Circuit "has repeatedly held that chilling a plaintiff's speech is a constitutional harm adequate to satisfy the injury-in-fact requirement." *Ostrewich v. Tatum*, 72 F.4th 94, 102 (5th Cir. 2023) (citing *Speech First*, 979 F.3d at 330–31 (collecting cases)).

A plaintiff has standing to bring a pre-enforcement challenge when the plaintiff "'(1) has an intention to engage in a course of conduct arguably affected with a constitutional interest, (2) her intended future conduct is arguably proscribed by the policy in question, and (3) the threat of future enforcement of the challenged policies is substantial.'" *Id.* (quoting *Speech First*, 979 F.3d at 330). "It is not hard to sustain standing for a pre-enforcement challenge in the highly sensitive area of public regulations governing bedrock political speech." *Speech First*, 979 F.3d at 331. And, "'when dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict expressive activity by the class to which the plaintiff belongs, ***courts will assume a credible threat of prosecution in the absence of compelling contrary evidence.***" *Id.* at 335 (quoting *N.H. Right to Life PAC v. Gardner*, 99 F.3d 8, 15 (1st Cir. 1996); additional citations omitted) (emphasis added). Here, Plaintiffs GSA Network, SEAT, Rebecca Roe, Adrian Moore, and Polly Poe meet these requirements to have standing to enjoin Defendants, because the credible threat of enforcement suppresses Plaintiffs' freedom of speech, association, and due process rights.

GSA Network, SEAT, and Texas AFT also have standing through their members. Organizations can challenge newly enacted laws that burden their own speech and association if they "meet[] the same standing test that applies to individuals." *Ass'n of*

*Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 356 (5th Cir. 1999) (citations omitted). In addition, they may also sue on behalf of their members. "An association has standing to bring claims on behalf of its members when it meets three requirements: (1) its individual members would have standing to bring the suit; (2) the association seeks to vindicate interests germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the individual members' participation." *NetChoice, L.L.C. v. Fitch*, 134 F.4th 799, 804 (5th Cir. 2025). Here, these elements are met for GSA Network, SEAT, and Texas AFT to sue on behalf of their members.

### A.     GSA Network

GSA Network brings constitutional claims on behalf of itself and its members against the Commissioner, Houston ISD, and Plano ISD, and an Equal Access Act claim on behalf of its members against Plano ISD. GSA Network engages in constitutionally protected speech by communicating with students, parents, and teachers in GSAs about issues of racial justice and support for LGBTQ+ students—including by mailing and emailing resources and information explicitly referencing these topics directly to clubs in schools. GSA Network Decl., Ex. 2 ¶¶ 14, 35. The GSA Network associates with students, parents, and educators about topics of race, gender identity, and sexual orientation through its GSA clubs. *Id.* ¶¶ 3, 5, 26.

Each of the challenged provisions in this lawsuit directly chill and suppress GSA Network's own freedom of speech and association, as well as that of its members. S.B. 12's GSA Ban prohibits all clubs "based on sexual orientation or gender identity" in all public and charter schools in Texas (S.B. 12 § 27(b)), which has already led to GSA

25

Network member clubs being completely shut down in Plano ISD. GSA Network Decl., Ex. 2 ¶ 24; Poe Decl., Ex. 5 ¶¶ 12, 21. Banning GSA Network's member clubs from existing, and its member students from congregating at school, directly infringes GSA Network's speech and association. With its member clubs shut down, the GSA Network's own speech is suppressed because it can no longer share information and resources with students and educators through GSAs. GSA Network Decl., Ex. 2 ¶¶ 29, 35. The various resources that the GSA Network provides to its member GSAs—including a monthly newsletter, toolkits for virtual organizing, and virtual Youth General Assemblies—can no longer be shared with GSAs or their members if GSAs are shut down. *Id.* ¶¶ 14-15. While some students or teachers could try to obtain these resources from the GSA Network outside of school, the GSA Ban burdens GSA Network's speech by forcing them to expend more resources to connect with students and educators individually, rather than as cohesive student clubs. *Id.* ¶¶ 35-36.

The GSA Ban also substantially harms GSA Network's student members by infringing their freedom of speech and association. *Id.* ¶¶ 24-26. GSA Network members will also suffer concrete harms in addition to these constitutional injuries. Students without access to a GSA club often report facing anxiety, depression, isolation, and bullying in schools, but these struggles have been alleviated when they are able to join a GSA club. *Id.* ¶¶26, 33.

Other challenged provisions of S.B. 12 also harm GSA Network and its members. *Id.* ¶¶27-31. GSA Network prioritizes racial and LGBTQ+ justice, and many of the materials the organization distributes explicitly reference race, color, ethnicity, gender

identity, and sexual orientation. *Id.* ¶¶ 14, 28. But S.B. 12 bans distributing these materials through GSA sponsors—which GSA Network routinely does, *id.* ¶¶ 14, 23—since the Inclusivity Ban would prohibit any school employee, contractor, or volunteer from "implementing policies, procedures, trainings, activities, or programs that reference race, color, ethnicity, gender identity, or sexual orientation." S.B. 12 § 3(a)(3). The Inclusivity Ban therefore burdens GSA Network's speech by prohibiting educators from sharing these resources with students, while also prohibiting any club sponsor from helping students participate in GSA Network events, such as its Day for Racial Justice. GSA Network Decl., Ex. 2 ¶¶ 14, 22-23, 28-29, 35-36. The Inclusivity Ban also harms GSA Network's members by making it more difficult for them to receive these materials or actively engage in speech about race, gender identity, and sexual orientation without any support or facilitation by GSA sponsors. *Id.*

S.B. 12's Social Transition Ban also harms GSA Network and its members because GSAs frequently discuss, and the GSA Network often distributes, information about supporting transgender students, including on topics related to social transitioning as broadly and vaguely defined by S.B. 12. *Id.* ¶ 31. If all school employees, including GSA sponsors, are prohibited from "providing any information about social transitioning" to GSA members, S.B. 12 § 7(b), this prohibits the GSA Network from sharing its resources with students through faculty sponsors and makes GSA members less likely to engage in discussions on this topic for fear of having their teachers disciplined under the law. GSA Network Decl., Ex. 2 ¶ 31. This provision especially harms GSA Network's transgender,

non-binary,[42] intersex,[43] and two-spirit members who will suffer arbitrary and discriminatory enforcement of this section and will have their own free speech and expression restricted. *Id.* ¶¶ 31, 33. These students already face disproportionate rates of bullying, harassment, and discrimination, and the Social Transition Ban will expose them to increased stigma, marginalization, and isolation. The vagueness of the Social Transition Ban and other challenged provisions of S.B. 12 also injure GSA Network's members, who are now subject to vague and arbitrary restrictions. *See A.M. ex rel. McAllum v. Cash*, 585 F.3d 214, 225 (5th Cir. 2009) ("Students may challenge school policies based on their alleged vagueness").

The law's Don't Say LGBTQ+ Ban also expressly prohibits GSA Network, as a "third party," from "provid[ing] instruction, guidance, activities, or programming regarding sexual orientation or gender identity to students. . . ." S.B. 12 § 24(a). Under this provision, all of GSA Network's materials that provide instruction, guidance, activities, and programming regarding sexual orientation and gender identity are explicitly banned in all Texas public and charter schools from pre-kindergarten through twelfth grade. GSA Network Decl., Ex. 2 ¶¶ 29, 31. This directly infringes GSA Network's freedom of speech, as well as the rights of its members, to learn about and engage in discussion on these topics

---

[42]    "Intersex is a general term used for a variety of conditions in which a person is born with a reproductive or sexual anatomy that doesn't seem to fit the typical definitions of female or male." *What is intersex?*, INTERSEX SOC'Y OF N. AM., https://isna.org/faq/what_is_intersex/ (last visited Aug. 27, 2025).
[43]    "Non-binary people feel their gender identity cannot be defined within the margins of gender binary. Instead, they understand their gender in a way that goes beyond simply identifying as either a man or woman." *What It Means to Be Non-Binary*, LGBT FOUNDATION (last updated Jan. 9, 2024), https://lgbt.foundation/help/what-it-means-to-be-non-binary/ (last visited Aug. 27, 2025).

with the support of GSA sponsors or other school employees and third parties. *Id.* ¶¶ 29-31, 35-36.

While GSA Network is directly harmed by S.B. 12's suppression of its speech, it has also had to divert considerable time and resources from its regular operations to help GSA members and sponsors across Texas navigate the impacts of S.B. 12. *Id.* ¶¶ 36, 38. If the law's challenged provisions are not enjoined, the GSA Network anticipates having to continue expending additional resources to support its GSA student members and sponsors outside of schools. *Id.* ¶¶ 38-41.

In addition to suing on its own behalf, the GSA Network also meets every element required for associational standing. GSA Network's club and student members have standing to challenge S.B. 12's restrictions in their own right, and neither the claims asserted nor relief requested require their individual participation. Moreover, participating in this lawsuit is germane to GSA Network's purpose. *See id.* ¶ 2.

### B.    SEAT

SEAT also brings constitutional claims on behalf of itself and its members against the Commissioner, Houston ISD, and Katy ISD. Like GSA Network, SEAT's own constitutionally protected speech is burdened and suppressed by each challenged provision of S.B. 12. SEAT collaborates with schools, educators, student organizations, and students across Texas in a variety of ways to advance its mission, including by providing information and resources to GSAs and other clubs that are now banned in Texas schools. SEAT Decl., Ex. 3 ¶¶ 3, 20-23, 27-34, 52. In the past two years, SEAT has partnered with GSAs in several school districts to hold trainings and events on school property, and

distribute books to students that explicitly reference race, gender identity, and sexual orientation. *Id.* ¶¶ 30-34, 38-39. SEAT has engaged in similar activities and programs on school property in Houston ISD and Katy ISD, and intends to keep holding such events in the future. *Id.* ¶¶ 35, 38-39.

In order to advance its mission to empower youth through hands-on civic engagement, advocacy, and leadership development to address systemic inequities and drive change in Texas communities, SEAT shares know-your-rights resources and other information explicitly referencing race, gender identity, and sexual orientation with students, parents, and teachers. *Id.* ¶¶ 2, 20-23. SEAT often shares information with teachers to distribute to students, including LGBTQ+ mental health resource fliers, guides on fighting the banning of books related to LGBTQ+ and racial diversity issues, and information about gender identity that could be seen as relating to "social transitioning," as that term is broadly and vaguely defined by S.B. 12. *Id.* ¶¶ 23, 27-29. SEAT also hosts advocacy days and an annual summit with student-led workshops about issues involving race, gender identity, and sexual orientation. *Id.* ¶¶ 41-48. As part of the most recent SEAT Summit in April 2025, a student club from Houston ISD attended the event with teacher chaperones and transportation provided by the school district. *Id.* ¶ 46. Although the workshops at the Summit were student-led, teacher chaperones still helped students attend SEAT's event and engaged with students in discussions on race, gender identity, and sexual orientation. *Id.* ¶ 45.

Because SEAT intends to keep engaging in similar speech and association in the future, the challenged provisions of S.B. 12 directly burden and interfere with SEAT's

speech, programs, and activities. *Id.* ¶¶ 40, 48. The GSA Ban will make it impossible for SEAT to partner with GSAs, co-host events with them, and distribute resources to students through GSAs, as SEAT has done in the past with GSAs in Katy ISD and hopes to continue in the future. *Id.* ¶¶ 38-39, 52. The Inclusivity Ban will make it more difficult for districts like Houston ISD to sponsor field trips and send students with teacher chaperones to SEAT events where race, gender identity, and sexual orientation are explicitly discussed. *Id.* ¶¶ 57-59. Because SEAT itself is a nonprofit whose members are often volunteers, the Inclusivity Ban arguably proscribes the organization itself from holding trainings, activities, and events on school property that reference race, gender identity, and sexual orientation, which the organization has done in the past and hopes to continue in the future. *Id.* ¶¶ 34, 39, 57. The Social Transition Ban also prevents SEAT from being able to share resources with students about social transitioning and support for transgender students through any school employee. *Id.* ¶ 55. Because the recent SEAT Summit featured a transgender keynote speaker who spoke about social transitioning, the vague and broad terms of the Social Transition Ban could even prevent teachers from being able to chaperone SEAT events in the future, for fear that they may be "assisting" students' social transitions. *Id.* ¶¶ 55-56. As a third party, SEAT itself is also prohibited by S.B. 12 from providing any "instruction, guidance, activities, or programming regarding sexual orientation or gender identity to students enrolled in prekindergarten through 12th grade." S.B. 12 § 24(a). Because most of the resources SEAT shares with students mention these topics, this provision directly censors SEAT's speech about these matters of public concern. SEAT Decl., Ex. 3 ¶¶ 53-54. If S.B. 12's challenged provisions are not enjoined,

they will make it much harder for SEAT to fulfill its mission, and SEAT will have to divert significant resources to still contact and work with students without being able to partner directly with schools and school employees. *Id.* ¶¶ 67-71.

In addition to these harms to SEAT directly, SEAT also brings claims on behalf of its members. Individual SEAT members who are students in Houston ISD, Katy ISD, and other districts and charter schools across Texas will have their freedom of speech and association abridged if the challenged provisions of S.B. 12 are not enjoined. *Id.* ¶ 63. The vagueness of the Social Transition Ban and other challenged provisions of S.B. 12 injure SEAT's members, who are now subject to vague and arbitrary restrictions. *Id.* ¶ 66. SEAT's members will also lose their right to access information on topics that S.B. 12 suppresses, while having their own speech rights curtailed by not being allowed to form and participate in GSAs and other clubs supportive of LGBTQ+ students. *Id.* ¶¶ 63-64. SEAT's members will not be able to actively participate in trainings, programs, and activities that reference race, gender identity, and sexual orientation, or discuss the topics of social transition, gender identity, or sexual orientation with school employes and third parties like SEAT. *Id.* ¶¶ 63-66. SEAT can assert constitutional claims on behalf of its members because they would have standing to bring these claims themselves, their interests are germane to SEAT's mission, and individual member participation is not required.

### C.    Texas AFT

Texas AFT is a statewide labor union that represents over 66,000 employees throughout Texas, including teachers, librarians, counselors, nurses, teaching assistants, and other public and charter school employees. Texas AFT Decl., Ex. 6 ¶ 2. Texas AFT

believes that education is the path to a just and democratic society and that the only way to give students a quality education is through the dedicated work of empowered public educators. *Id.* ¶ 6. Texas AFT has members in over 480 public school districts in Texas, including Houston ISD, Katy ISD, and Plano ISD (where Plaintiff Polly Poe is a member). *Id.* ¶¶ 3, 9. It also has members in various charter school systems across Texas. *Id.* ¶ 3.

Racial justice and LGBTQ+ justice are both critical to Texas AFT's mission of supporting its members and public education in Texas. *Id.* ¶ 7. If the challenged aspects of S.B. 12 are not enjoined, Texas AFT's members will be subject to vague, arbitrary, and discriminatory provisions that impair their free speech and due process rights, and members will be blocked from discussing topics of race, ethnicity, gender identity, and sexual orientation with students, parents, third parties, and other educators in and surrounding Texas schools. *Id.* ¶¶ 8, 17.

Texas AFT's members are harmed by every aspect of S.B. 12 challenged in this case. Texas AFT members are injured by S.B. 12's GSA Ban, which provides no guidance to educators about how to determine whether a club is "based on sexual orientation or gender identity." *Id.* ¶ 21. This section also conflicts with Texas AFT members' legal and ethical requirements that educators may not discriminate against their students or shut down student clubs based on content. *Id.*

S.B. 12's Inclusivity Ban also provides insufficient guidance as to what is actually prohibited and bars Texas AFT members from being able to engage in policies, procedures, trainings, programs, and activities by schools previously approved and established as appropriate forums for free and open discussion of race and other topics. *Id.* ¶ 21. For

33

example, many schools in Texas have student newspapers, literary magazines, or debate clubs where students speak with teachers about current events, including topics of race, gender identity, and sexual orientation. *Id.* Under S.B. 12, Texas AFT members are now prohibited from "implementing" any of those programs that even "reference" race or other disfavored topics. *Id.* When Texas AFT members chaperone field trips or speak with students about these issues even outside of school, their speech on any topic relating to race, gender identity, or sexual orientation is chilled and suppressed by S.B. 12, and the law seems to require schools to discipline any teacher who violates these vague and ambiguous provisions. *Id.*

Texas AFT's members are harmed by S.B. 12's Social Transition Ban, since this section is so vague and broad that it fails to give educators notice as to what is prohibited by the law. *Id.* ¶ 11. Texas AFT members who are accused of violating this section of S.B. 12 can be reported to the Commissioner and have an "investigative warning" placed on their teaching certificates, even without a finding of guilt. *Id.* ¶ 12. The harsh consequences that flow from this section can be triggered without a clear burden of proof or sufficient due process rights, which puts Texas AFT members' licenses at risk, even if they do not seek or intend to violate the law. *Id.* ¶ 13.

Given the detrimental consequences of violating S.B. 12, and the vague and ambiguous rules, Texas AFT's members are now afraid to fully support their students, which threatens the bonds and relationships between members and the communities they serve. *Id.* ¶ 14. On its face, the Social Transition Ban is not limited only to curricula, in-class discussions, or school employees' official duties. *Id.* ¶ 16. Because it applies to Texas

34

AFT members' private speech far removed from their official duties—such as when educators encounter students on the weekend or at a community event—this section restricts Texas AFT members' constitutionally protected speech. *Id.*

S.B. 12's requirement that no district or charter school employee may "provide or allow a third party to provide instruction, guidance, activities, or programming regarding sexual orientation or gender identity to students enrolled in prekindergarten through 12th grade" also harms Texas AFT members. *Id.* ¶ 18. This provision is vague since it does not define its key terms or give any indication as to what kind of "instruction, guidance, activities, or programming" would or would not violate the law. *Id.*

Because Texas AFT members cannot even "allow" any third party to address these topics, S.B. 12 puts educators in an impossible situation of having to predict what any guest speaker or third party might say before they say it. *Id.* ¶ 19. This requires Texas AFT members to act as censors in all types of programs and activities related to schools and puts them in an untenable dilemma where they may face legal liability for violating the constitutional rights of third parties and being forced to suppress other people's free speech. *Id.* Because public school employees can be sued if they violate someone's constitutional rights, S.B. 12 creates a legal risk for Texas AFT's members and puts them in an unenviable position of having to dictate or determine how to enforce this law. *Id.*

Like the Social Transition Ban, the Don't Say LGBTQ+ prohibition is not limited to the curriculum or educators' official duties and threatens to suppress Texas AFT members' speech in their own private capacity, including if educators encounter students on the weekend or at community events. *Id.* ¶ 20.

Each of these challenged provisions also creates an irreconcilable conflict with the Texas Educator Code of Ethics, which many of Texas AFT's members are required to adhere to as certified educators in Texas. *Id.* ¶¶ 22-23. If these members are accused of violating the Texas Educators' Code of Ethics, they may face threats to their certifications or other disciplinary sanctions imposed by the State Board for Educator Certification (SBEC). *Id.* ¶ 23.

Many Texas AFT members are also parents or guardians of children in Texas schools in pre-kindergarten through twelfth grade who will be negatively impacted by this law. *Id.* ¶ 24. Texas AFT members with kids in public or charter schools are in a particularly tenuous position under this law, because S.B. 12's prohibitions are not limited to in-school discussions, curricula, or educators' official duties. *Id.* As a result, Texas AFT members worry that they could be accused of violating S.B. 12's restrictions even when speaking with their own children or their children's friends in their role as a parent. *Id.*

Texas AFT meets every element required for associational standing to sue on behalf of its members because these members, including Plaintiff Polly Poe, have standing to challenge S.B. 12's restrictions in their own right, and neither the claims asserted nor relief requested require their individual participation. Moreover, participating in this lawsuit is germane to Texas AFT's purpose. *Id.* ¶¶ 2, 6-7.

### D.    Rebecca Roe

Rebecca Roe brings constitutional claims against the Commissioner and Houston ISD and an Equal Access Act claim against Houston ISD. Rebecca is a current high school freshman in Houston ISD. Roe Decl., Ex. 4 ¶ 2. While in middle school, she actively

participated in her school's GSA and she seeks to participate in a GSA or other student group focused on supporting LGBTQ+ students in high school too. *Id.* ¶¶ 4, 7, 10. As a student who is lesbian and queer, Rebecca appreciated being part of a GSA that allowed students to come together and discuss their experiences with gender identity and sexual orientation, while also learning from teachers and guest speakers about these topics. *Id.* ¶¶ 3-4. Rebecca identifies as cisgender and appreciated learning about gender identity and information related to social transitioning, while also learning about race through various programs and activities at her middle school. *Id.* ¶¶ 5-6.

Rebecca hopes to have these same experiences in high school, where she can freely engage in trainings, programs, and activities on topics relating to race, gender identity, and sexual orientation, including with the support and participation of her school, teachers, and third parties. *Id.* ¶¶ 7, 9-11. Rebecca's high school is known for being diverse and inclusive, and in past years has had an active GSA and several diversity programs, including a (1) Carnaval: Hispanic Heritage & History Festival; (2) Alphabet Soup: LGBTQ+ Festival; (3) Koffee House: African American Heritage Festival; (4) VenUS: Women's History Festival; and (5) 790 Night Market: Asian American Heritage Festival. *Id.* ¶ 11. Rebecca seeks to attend and actively participate in these programs, but S.B. 12 could arguably prohibit her school from allowing a GSA or diversity programming to continue. *Id.* ¶¶ 10, 13-14. Rebecca is injured by the GSA Ban, Inclusivity Ban, and Don't Say LGBTQ+ Ban because her right to learn and receive information on these topics is prohibited, while her own speech is also curtailed since she is not able to actively participate in discussions and activities of a GSA or her school's diversity programs. *Id.* Rebecca is also adversely

affected by the Social Transition Ban, since she is prohibited from learning about or discussing issues relating to social transitioning as that term is vaguely and broadly defined by S.B. 12, including within the limited public forum of a GSA. *Id.* ¶¶ 5, 14. Because S.B. 12 prohibits Rebecca from being able to join and participate in a GSA on the same equal terms as other non-curricular clubs at her school—and her school receives federal funding—Rebecca also has standing to bring a claim under the Equal Access Act. *See Bd. of Educ. of Westside Cmty. Sch. v. Mergens*, 496 U.S. 226, 233–34 (1990) (recognizing students' ability to bring Equal Access Act claims by and through their next friends after being denied the ability to form a student organization on equal terms as other non-curricular clubs).

### E.    Adrian Moore

Adrian Moore brings constitutional claims against the Commissioner and Katy ISD and an Equal Access Act claim against Katy ISD. Adrian is a high school senior in Katy ISD who is 17 years old. Johnson Decl., Ex. 7 ¶ 2. Adrian is a gay, transgender boy who uses the pronouns he, him, and his, and he has been known by all of his teachers and friends by his chosen name, Adrian, since seventh grade. *Id.* ¶¶ 3, 5-7. In all classroom discussions, extracurricular activities, and school-related or adjacent events, Katy ISD's teachers and staff have referred to Adrian by this name for nearly the past five years, even though his legal name still appears in the school's electronic records. *Id.* ¶ 5.

Adrian has thrived in Katy ISD schools while being recognized as his true and authentic self. *Id.* ¶ 7. He excels in school, takes Advanced Placement and honors classes, and is active in a number of activities, including choir, theater, and his school's

Pride/Diversity Club. *Id.* As a member of his school's varsity and jazz choirs, Adrian sings as both Alto and Tenor and wears a suit at concerts with other boys, while the girls in choir wear dresses. *Id.* ¶ 9. Throughout his years at Katy ISD, Adrian's choir directors have been supportive of his social transition and have allowed him to sing and dress in accordance with his gender identity. *Id.* Adrian also loves to act and perform in musical theater, and his school regularly lists his name as Adrian in theatrical programs. *Id.* ¶ 10.

Adrian has also been an active member of his school's Pride Club since the start of his sophomore year. *Id.* ¶ 11. Participating in the Pride Club gave Adrian a chance to connect with other LGBTQ+ students and be himself in a safe and supportive space. *Id.* Students in Pride Club supported each other's LGBTQ+ identities and discussed topics of gender identity and sexual orientation, while also hanging out, playing board games, doing karaoke, and engaging in activities like making bracelets. *Id.*

During Adrian's sophomore year, school administrators in Katy ISD required the Pride Club to change its name to the "Diversity Club." *Id.* ¶ 12. To Adrian's knowledge, they did this to comply with Katy ISD's anti-LGBTQ+ policy enacted in August 2023 that prohibits certain concepts of "gender identity." *Id.* Despite this name change, the Diversity Club was able to continue the same activities that took place in Pride club, and Adrian was still able to congregate with his friends and discuss topics relating to gender identity and sexual orientation with his friends throughout his junior year. *Id.*

Adrian's school regularly has spirit days and special events that sometimes reference topics of race and ethnicity. *Id.* ¶ 13. For example, his school had a "Cultural Night" last school year that included performances by an African Ghanaian Drums and

39

Dance group, a French Circque or Zouk team, a Japanese Contemporary Dance group, a Mexican Ballet Folklorico, a Mariachi band, and a Spanish Flamenco ensemble. *Id.* These same groups explicitly referencing race and ethnicity also performed at a Cultural Night during Adrian's freshman year, and he hopes to continue being able to watch and participate in similar events in the future that celebrate the rich racial, ethnic, and cultural heritage of his school and the entire Katy community. *Id.*

Right before the start of the 2025-2026 school year, one of Adrian's school administrators told his mom that Katy ISD would soon begin implementing S.B. 12. *Id.* ¶ 17. The district did so by instructing Adrian's teachers that they could no longer use his chosen name when referring to him inside or outside of class. *Id.* ¶ 19. Even though Adrian has gone by this name in Katy ISD for nearly the past five years, his teachers were told that they could only call him by the name given to him at birth, his last name, or no name at all. *Id.* ¶ 22. Many of Adrian's teachers have taken this last option and no longer use any name for him whatsoever, but this makes him feel nameless and dehumanized at school. *Id.* ¶¶ 20, 22. Because he can no longer be called by his name at school, Adrian told his mom after the second day of school that he "didn't feel like I was a human being" at school. *Id.* ¶ 20. His mom then cried harder than she ever had in her life as a parent. *Id.*

Adrian feels isolated and hurt by Katy ISD's refusal to use his name due to S.B. 12, and he feels especially targeted since teachers and staff have continued using nicknames and shortened names for Adrian's cisgender peers. *Id.* ¶ 21. At first, Adrian thought his school district would ban all nicknames, but now all cisgender students at his school seem to be able to go by their chosen or shortened names, whereas he cannot. *Id.*

Before S.B. 12 started being enforced against him, Adrian was an active class participant and engaged in class discussions while relying on teachers to support and facilitate group formations and discussions. *Id.* ¶ 24. When teachers do not address Adrian by his name, it creates a barrier not only between teachers and Adrian but also between Adrian and other students, which harms his educational inclusion and success. *Id.* Being nameless at school is not an option for Adrian, and neither is using the name assigned to him at birth. *Id.* ¶ 22. He has not gone by that name since seventh grade and having anyone use it aggravates his gender dysphoria and anxiety. *Id.*

This aspect of S.B. 12, as well as the other sections challenged by this lawsuit, have irreparably harmed the ties and relationships that Adrian previously had with his teachers. *Id.* ¶¶ 23-25. Despite previously being so close to them, Adrian now he feels like he has to walk on eggshells and he worries that his teachers could get fired if they support or "assist" him being his authentic self in any way. *Id.* ¶ 25. Even small gestures of decency and respect—like his choir directors allowing him to wear masculine clothing or his theater directors assigning him male roles—could arguably be considered to "assist" Adrian's social transition as that term is vague and undefined. *Id. Id.* ¶ 25. The Inclusivity Ban and Don't Say LGBTQ+ Ban also prohibit Adrian's teachers, as well as third parties and volunteers, from speaking with him about race, gender identity, and sexual orientation, and they threaten the cultural events that Adrian has come to appreciate and participate in at school. *Id.* ¶ 29.

Katy ISD has also completely shut down the Pride Club/Diversity Club that Adrian has actively participated in for the past two years due to S.B. 12's GSA Ban. *Id.* ¶ 18.

41

Adrian seeks the ability to continue participating in this club and building the community and camaraderie that the club previously provided without it being shut down due to S.B. 12. *Id.* ¶ 29.

Adrian and his mom have repeatedly asked Katy ISD not to implement S.B. 12 in ways that erase his identity and discriminate against him and other students—including by emailing the superintendent and school board members, giving public comment at school board meetings, speaking to the media, and requesting meetings and phone calls with school officials—but their requests have been rejected or ignored. *Id.* ¶ 26.

Adrian brings this lawsuit so that he can continue to go by the name that he has been known as by all of his teachers and friends in Katy ISD for nearly the past five years, and so that he can continue participating in clubs, programs, activities, and conversations that he did previously without his freedom of speech and due process rights being interfered with by S.B. 12's GSA  Ban, Inclusivity Ban, Social Transition Ban, and Don't Say LGBTQ+ Ban. *Id.* ¶¶ 29, 31.

F.     **Polly Poe**

Polly Poe is a high school teacher in Plano ISD and a member of Texas AFT. Poe Decl., Ex. 5 ¶ 1; Texas AFT Decl., Ex. 6, ¶ 9. She brings claims on her own behalf against the Commissioner and Plano ISD to enjoin their enforcement of the GSA Ban, Inclusivity Ban, Social Transition Ban, and Don't Say LGBTQ+ Ban because these provisions are unconstitutionally vague and violate her rights under the First and Fourteenth Amendments.

42

Last school year, Poe was the club sponsor of her school's GSA, where LGBTQ+ student members and allies found community and collectively supported each other. Poe Decl., Ex. 5 ¶ 2. The GSA at Poe's school was a registered member of the GSA Network but has now been shut down due to S.B. 12. *Id.* ¶¶ 3, 21. As the faculty sponsor of a GSA Network-registered club, Poe received newsletters and other information from GSA Network on her school email address that referenced topics of race, sexual orientation, gender identity, and social transitioning (as that term is broadly and vaguely defined by S.B. 12), and she shared this information with her students in the limited public forum for student activities created by Plano ISD. *Id.* ¶¶ 3-4, 6.

Plano ISD has actively started implementing S.B. 12, including by presenting new policies to the school board. *Id.* ¶ 15. The district stated, "In response to SB 12, Plano ISD will:

- Review curriculum documents to ensure no prohibited content is included.
- Reinforce policies and practices to support educators in delivering TEKS-aligned content and restrict topics deemed politically or socially controversial.
- Prohibit instruction or programming related to sexual orientation, DEI practices or gender identity.
- Not use different names or pronouns inconsistent with the student's biological sex.
- Apply these standards across classrooms, clubs, events, guest speakers, and all instructional-day activities."

*Id.* ¶ 16. The district also stated, "In response to SB 12, Plano ISD will:

- Continue to require the annual approval of student clubs.

43

- Require annual parental or guardian consent for all student club participation.

- Define role for staff sponsors of student clubs.

- Provide targeted staff training to ensure understanding and enforcement of these requirements annually.

- Prohibit clubs and organizations based on sexual orientation or gender identity."

*Id.* ¶ 17.[44] Poe also received additional guidance regarding student groups, which instructed her that "SB 12 bans student clubs 'based on sexual orientation or gender identity.' Schools may not authorize or support such groups, and staff may not lead or facilitate them." *Id.* ¶ 19 (quoting *SB 12 – Student Groups and Organizations Guidelines 2025,* Plano ISD (Aug. 6, 2025), at 2 (attached as Exhibit 5-B)). This same document states that "Non-Curricular, Interest-Based & Religious Clubs" are still permitted as long as students receive parental permission to participate" and that "Sponsors must ensure the group's compliance with SB 12 and prevent engagement in prohibited DEI duties." *Id.* Poe was also asked to sign an attestation form, instructing her to "not sponsor or lead clubs centered on sexual orientation or gender identity," and stating, "I will not teach or promote content prohibited under SB 12 or other applicable legislation." *Id.* ¶ 20 (quoting *Legislative Guidance for Plano ISD Staff (2025-2026)*, Plano ISD, at 1, 5 (attached as Exhibit 5-C)).

Even though there are no clear guidelines for how Plano ISD will determine whether a club is "based on sexual orientation or gender identity," the district has nevertheless shut down the GSA at Poe's school. *Id.* ¶ 30. As an educator, Poe finds it difficult to interpret

---

[44]     *See Aug. 2025 Back to School 89th Legislative Requirements for Board of Trustees – FINAL,* PLANO ISD, at 16, available at https://pisd.diligent.community/document/b96cb0a3-23c5-4889-a7bd-2464e905969a/, attached as Exhibit 5-A.

or implement S.B. 12's requirements, and she finds the GSA Ban, Inclusivity Ban, Social Transition Ban, and Don't Say LGBTQ+ Ban to be so vague that she cannot comply with them without implementing them arbitrarily or discriminatorily. *Id.* ¶¶ 31-35; *see also Cramp v. Bd. of Pub. Instruction of Orange Cnty., Fla*., 368 U.S. 278, 284 (1961) (finding that a teacher had standing to challenge a Florida statute "so vague and indefinite that others could with reason interpret it differently"). For example, Poe has no idea what it means to "assist" a student's "social transitioning," but Plano ISD has instructed her not to "use different names or pronouns inconsistent with [a] student's biological sex." Poe Decl., Ex. 5 ¶ 32. The implementation of this provision is particularly confusing, since Poe's district told her that student nicknames are still permitted as long as they match a student's biological sex—but she has no way of determining a student's biological sex. *Id.* ¶¶ 32-33. And the punishments for violating S.B. 12 or Plano ISD's implementation of it are harsh, as being accused of violating the law would threaten Poe's livelihood and teaching certification.[45]

S.B. 12's challenged requirements create a culture of fear and discrimination at Poe's school. *Id.* ¶¶ 37-39. They also place her in legal jeopardy by authorizing her to

---

[45]    S.B. 12 authorizes any parent to "report to the board of trustees of the district a suspected violation" of the Social Transition Ban. S.B. 12 § 7(c). While most complaints against an educator are investigated first by the campus or district, S.B. 12 requires "[t]he board" itself to investigate and "determine whether the violation occurred." *Id.* Although the law does not delineate any burden of proof or due process rights that Poe or other educators could rely on in responding to these allegations, it requires the board to "immediately report the violation to the commissioner" if the board determines that a violation occurred. *Id.* Being reported to the TEA Commissioner can lead to an "investigative warning" being placed on the educator's teaching certificate and that person immediately being "listed on the Do Not Hire Registry," even without a finding of guilt, simply because TEA initiates a formal investigation. *See Educator Misconduct & Investigations*, TEX. EDUC. AGENCY, https://tea.texas.gov/texas-educators/investigations/educator-misconduct-investigations (last visited Aug. 27, 2025).

discriminate against her students and/or violate their First Amendment rights. Because government employees can be sued for damages in their individual capacity, *see, e.g.*, *Jefferson v. Ysleta Indep. Sch. Dist.*, 817 F.2d 303, 305 (5th Cir. 1987) (affirming denial of qualified immunity for a Texas teacher sued for damages in an individual capacity for violating a student's clearly established constitutional rights), Poe and other Texas educators face legal risks if they comply with S.B. 12's requirements to suppress students' First Amendment rights, shut down clubs based on viewpoint, or cease constitutionally protected activities or events. Poe Decl., Ex. 5 ¶ 42.

S.B. 12's challenged provisions also conflict with Poe's obligations under the Texas Educator Code of Ethics, which requires Poe and other certified teachers to not "reveal confidential information concerning students unless disclosure serves lawful professional purposes or is required by law"; "not intentionally, knowingly, or recklessly treat a student or minor in a manner that adversely affects or endangers the learning, physical health, mental health, or safety of the student or minor"; and not "exclude a student from participation in a program, deny benefits to a student, or grant an advantage to a student on the basis of race, color, gender, disability, national origin, religion, family status, or sexual orientation." 19 Tex. Admin. Code § 247. 2(2)(A), 247.2(3)(B), 247.2(3)(D) (respectively); *see also* Poe Decl., Ex. 5 ¶¶ 38-39. S.B. 12's Social Transition Ban conflicts directly with these requirements because it prohibits Poe from "assisting" any student's social transition, even if such assistance is necessary for the student's mental health and physical safety. Requiring Poe to potentially disclose a student's sex assigned at birth could also make her unlawfully and unethically reveal students' private and confidential information. *See H.R.*

46

*by & through Roe v. Cunico*, 745 F. Supp. 3d 842, 847 (D. Ariz. 2024) (treating the disclosure of whether someone is transgender as "private medical information"); 20 U.S.C. § 1232g(b)(1) (requiring parental consent before a school employee may release any "personally identifiable information" about a student).

S.B. 12's challenged provisions also abridge Poe's free speech on matters of public concern outside of her official duties because the law's challenged provisions are not limited to educators' speech within the school day or any curricular or extracurricular activity. Poe Decl., Ex. 5 ¶ 35. Under recent Supreme Court precedent, a school employee's speech on matters of public concern outside the scope of their official duties is constitutionally protected, *Kennedy*, 597 U.S. at 529, unless "the government had 'an adequate justification for treating the employee differently from any other member of the public' based on the government's needs as an employer." *Lane v. Franks*, 573 U.S. 228, 242 (2014) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006)). Here, the challenged provisions of S.B. 12 facially restrict Poe's speech on matters of public concern—including topics of race, sexual orientation, gender identity, and "any information" relating to social transitions.[46] These provisions also limit Poe's speech beyond her official job duties, since the Social Transition Ban and Don't Say LGBTQ+ Ban apply even outside the school day to anywhere that Poe might encounter students, even at community events or on weekends.

---

[46]    Speech involves matters "of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" *Snyder v. Phelps,* 562 U.S. 443, 453 (2011) (citations omitted). The topics prohibited by S.B. 12's challenged provisions readily meet this test. *See, e.g.*, *Victor v. McElveen*, 150 F.3d 451, 456 (5th Cir. 1998) (discussions of race discrimination are "inherently of public concern").

*Poe* Decl., Ex. 5 ¶ 35; *see also Rohrbough v. Univ. of Colo. Hosp. Auth.*, 596 F.3d 741, 747 (10th Cir. 2010) (noting that teacher speech occurring "outside the school, after hours, and with 'ordinary citizens and parents'" is typically not within the scope of the teacher's "official duties") (citation omitted). The Inclusivity Ban likewise interferes with Poe's private speech because it applies to any kind of policy, procedure, training, activity, or program that "reference[s] race, color, ethnicity, gender identity, or sexual orientation . . . at, for, or on behalf of" the school district. S.B. 12 §§ 3(a)(3), (b)(2). Thus, Poe's speech on these topics outside of her official work duties is arguably proscribed by this section as long as the speech occurs on school property, "for" the benefit of the school or its students, or "on behalf of" the school while Poe attends a conference or off-site event. *See Turtle Island Foods, S.P.C. v. Strain*, 65 F.4th 211, 218 (5th Cir. 2023) (plaintiffs have standing to assert pre-enforcement First Amendment challenges to a law if their "intended conduct is '***arguably proscribed***' by the challenged statute" even if that reading of the statute "may not be the ***best*** interpretation") (citations omitted). Because S.B. 12's restrictions are profoundly vague and interfere with Poe's private speech on matters of public concern, she has standing to challenge them.

## II.    DEFENDANTS ARE PROPERLY SUBJECT TO SUIT FOR INJUNCTIVE AND DECLARATORY RELIEF AND ARE NOT IMMUNE

### A.    The Commissioner

The Commissioner is statutorily tasked with enforcing the targeted provisions of S.B. 12 and properly subject to suit for injunctive and declaratory relief. Federal courts "may enjoin a state official in his official capacity from taking future actions in furtherance

48

of a state law that offends federal law or the federal Constitution." *Moore v. La. Bd. of Elementary & Secondary Educ.*, 743 F.3d 959, 963 (5th Cir. 2014) (citing *Ex parte Young*, 209 U.S. 123 (1908); additional citation omitted). For a suit against a state official to proceed under *Ex parte Young*, "three criteria must be satisfied: (1) A 'plaintiff must name individual state officials as defendants in their official capacities'; (2) the plaintiff must 'allege an ongoing violation of federal law'; and (3) the relief sought must be 'properly characterized as prospective.'" *Green Valley Special Util. Dist. v. City of Schertz, Tex.*, 969 F.3d 460, 471 (5th Cir. 2020) (en banc) (citations omitted). Here, these three criteria are satisfied because (1) the Commissioner is named in his official capacity; (2) Plaintiffs allege that his enforcement of S.B. 12's challenged provisions violates federal law; and (3) the relief sought is purely prospective.

Here, the Commissioner has "'the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty.'" *Book People*, 91 F.4th at 335 (citation omitted) (affirming injunctive relief against the Commissioner to stop his enforcement of a newly enacted Texas law curtailing private speech where the Commissioner was statutorily obligated to make certain postings on TEA's website and enforced the law vis-à-vis school districts). First, the Commissioner is required to receive and publish on TEA's website certifications of compliance from every school district and charter school in the state. S.B. 12 § 28(a)-(c). The Commissioner has already announced that he will implement this provision and that certifications will be due in 2026.[47] As part

---

[47]     *89th Leg. Updates*, TEX. EDUC. AGENCY (2025), https://tea.texas.gov/about-tea/government-relations-and-legal/government-relations/89th-legislature-updates (last visited Aug. 27, 2025).

of this certification process, a majority of the board of trustees of each school district or the governing body of each charter school must take a record vote to affirm that they are in compliance with the GSA Ban, Inclusivity Ban, and Don't Say LGBTQ+ Ban.[48] If a "board determines that a district employee has assisted a student enrolled at the district with social transitioning, the board shall immediately report the violation ***to the commissioner***." *Id.* § 7(c) (emphasis added).

Although S.B. 12 does not delineate specific penalties that the Commissioner must impose for a violation of the Social Transition Ban, GSA Ban, Inclusivity Ban, or Don't Say LGBTQ+ Ban, the Commissioner is "the educational leader of the state." Tex. Educ. Code § 7.055(b)(1). As such, the Commissioner "may authorize special investigations to be conducted" in response to complaints and "as the commissioner [] determines necessary." Tex. Educ. Code § 39.001. The Commissioner may then decide whether to impose sanctions against a school district, including by forcing school districts into conservatorship. *See* Tex. Educ. Code § 39A.003.[49]

---

[48]    *See* S.B. 12 § 28(a) (requiring certification "that the district or school is in compliance with this section and Sections 11.005 and 28.002."), 38(b)(1)(A) (requiring that the certification be "approved by a majority vote of the board of trustees of the school district or the governing body of the open-enrollment charter school"). Those sections refer to the Inclusivity Ban (Section 11.005) and the Don't Say LGBTQ+ Ban (Section 28.002). Because the Inclusivity Ban explicitly incorporates the GSA Ban, S.B. 12 § 3(e)(5)(d) (permitting only student clubs "in compliance with the requirements of Section 33.0815 [the GSA Ban]"), this certification of compliance necessarily incorporates the GSA Ban too.

[49]    While the Commissioner asserts powerful authority over school districts, he has even more control over charter schools. Chapter 12 of the Texas Education Code, which governs charter schools, mandates that the Commissioner "***shall revoke*** the charter of an open-enrollment charter school or reconstitute the governing body of the charter holder if the commissioner determines that the charter holder . . . failed to comply with this ***subchapter or another applicable law or rule***." Tex. Educ. Code § 12.115(a)(1)(4) (emphases added). The Commissioner is also required to audit charter schools, withhold funding, and impose other sanctions "if an open-enrollment charter school, as determined by a report issued under Section 39.004(b) . . . fails to comply with this subchapter or another applicable rule or law." Tex. Educ. Code § 12.1162(a)(3).

The Commissioner has already demonstrated a willingness to enforce S.B. 12. In addition to posting publicly on the TEA website that the agency will require certifications of compliance from all school districts and charter schools in the state in 2026,[50] the Commissioner warned school districts and charter schools that: (1) "Sexual Orientation and Gender Identity instruction and student clubs are prohibited"; (2) "DEI is prohibited in school districts"; (3) "Boards must annually certify compliance with DEI and CRT prohibitions"; and (4) "Gender Transitioning support from school districts is prohibited."[51] This demonstrated willingness of enforcement exceeds the "scintilla of affirmative action" required by the Commissioner to be a proper defendant under *Ex parte Young*. *Healthy Vision Ass'n v. Abbott*, 138 F.4th 385, 398 (5th Cir. 2025) (quotation omitted) ("A plaintiff thus has only to provide 'some scintilla' of an indication that a defendant official is willing to enforce the challenged statute in order that such ultra vires action may be reasonably anticipated and restrained.").

### B.    School District Defendants

Defendant School Districts Houston ISD, Katy ISD, and Plano ISD are also tasked with enforcing each of the challenged provisions of S.B. 12 and are properly subject to suits for injunctive and declaratory relief under 42 U.S.C. § 1983 and the Equal Access Act. Section 1 of S.B. 12 states that a "public elementary or secondary school, the school's governing body, and the school's employees ***shall implement and comply*** with each policy

---

[50]    *89th Leg. Updates*, TEX. EDUC. AGENCY (2025), https://tea.texas.gov/about-tea/government-relations-and-legal/government-relations/89th-legislature-updates (last visited Aug. 27, 2025).

[51]    *TEA Monthly Superintendent Call 89th Legislature Updates*, TEX. EDUC. AGENCY, at 27 (Jun. 26, 2025), https://tea.texas.gov/texas-educators/superintendents/89th-legislature-updates.pdf (last visited Aug. 27, 2025).

the school is required to adopt under this code or other law." S.B. 12 § 1(b) (amending Tex. Educ. Code § 1.007) (emphasis added). In that section, "public elementary or secondary schools" is defined as "a school district and a district, campus, program, or school operating under a charter." *Id.* § 1(a). Thus, Section 1 mandates that every school district and charter school implement and comply with every provision of S.B. 12, including the four challenged provisions here. Each section that Plaintiffs challenge also independently requires school districts and charter schools to implement and enforce the law through their governing bodies. *See, e.g.*, S.B. 12 § 3(c), 7(b)-(c), 8(b)(3)(Z), 24(a), 27(b).

Based on the law's plain text, Houston ISD, Katy ISD, and Plano ISD are statutorily and mandatorily tasked with enforcing every challenged provision of S.B. 12. As municipal entities, these school districts are also "persons" under 42 U.S.C. § 1983 and are not immune from suit when they "cause[] the particular constitutional or statutory violation at issue." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989). Here, the Defendant school districts have also taken concrete steps to adopt and implement policies enforcing S.B. 12. As discussed above, *see supra* Argument, Section I.F (Plaintiff Poe's Standing), Plano ISD's school board has already taken affirmative steps to implement S.B. 12's challenged requirements. Katy ISD's school board also adopted a formal policy on August 25, 2025, specifically requiring all school employees and contractors to comply with each of the law's challenged provisions.[52] The Defendant school districts are also properly

---

[52]     *Resolution Regarding Senate Bill 12 & Parent Rights*, THE BOARD OF TRUSTEES OF KATY ISD (Aug. 25, 2025), https://resources.finalsite.net/images/v1756235888/katyisdorg/jsevscsdsfl20ei5bw5v/SB12RESOLUTION.pdf (last visited Aug. 27, 2025).

subject to injunctive relief under the Equal Access Act. *See Bd. of Educ. of Westside Cmty. Sch. v. Mergens By & Through Mergens*, 496 U.S. 226, 253 (1990) (affirming issuance of injunctive and declaratory relief under the Equal Access Act).

## III.   PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO PREVAIL ON THE MERITS

### A.   S.B. 12 Impermissibly Discriminates Based on Viewpoint

The First Amendment protects both freedom of speech as well as the "right to receive information and ideas, regardless of their social worth." *Stanley v. Ga.*, 394 U.S. 557, 564 (1969) (citation omitted). "As a general rule, the First Amendment prohibits government actors from 'dictating what we see or read or speak or hear.'" *Porter v. Ascension Par. Sch. Bd.*, 393 F.3d 608, 616 (5th Cir. 2004) (quoting *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245 (2002)). S.B. 12 violates these fundamental precepts by dictating what students see, read, speak, and hear in countless programs and activities that have long been established as forums of free speech. Because S.B. 12's provisions discriminate against constitutionally protected speech based on viewpoint, these provisions are subject to strict scrutiny, which they cannot withstand.

#### 1.   S.B. 12's Provisions Restrict Constitutionally Protected Speech

The Supreme Court has long reiterated that "First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students. It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker*, 393 U.S. at 506. When the West Virginia State Board of Education tried to require all public school students

53

and teachers in the state to salute the flag, the Supreme Court enjoined that policy and declared, "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

S.B. 12 similarly seeks to establish what is orthodox in Texas schools by censoring and silencing disfavored topics and views. The Fifth Circuit has explained that school regulation of student speech can be justified on the following grounds: "If the speech is disruptive[,] lewd[,] school-sponsored[,]or promoting drug use. . . ." *Palmer ex rel. Palmer v. Waxahachie Indep. Sch. Dist*., 579 F.3d 502, 509 (5th Cir. 2009). "Student speech can also be regulated so long as the regulation is viewpoint- and content-neutral." *Id.* (citing *Canady v. Bossier Parish School Board*, 240 F.3d 437, 441 (5th Cir. 2001))."

S.B. 12 limits constitutionally protected speech in at least two ways. First, it applies to student clubs, programs, activities, and trainings that have long been established by school districts and charter schools as limited public forums. *See Rosenberger*, 515 U.S. at 829 (considering limited public forums as those otherwise nonpublic places that the government has opened and reserved "for certain groups or the discussion of certain topics"); *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001) (assuming without deciding that opening school district's facilities after school for social, civic, and recreational purposes created a limited public forum).[53] Second, the law also restricts large

---

[53]     As discussed above, *supra* note 41, S.B. 12 itself reinforces student clubs and school-related activities as limited public forums under Texas law. Houston ISD, Katy ISD, and Plano ISD have also adopted school board policies establishing limited public forums on each of their secondary school campuses. *See id.*

swaths of private speech by students, parents, third parties (including Plaintiff nonprofits GSA Network and SEAT), and educators outside of their official duties when speaking on matters of public concern. Because S.B. 12's challenged provisions restrict substantial amounts of private speech while also shutting down or censoring disfavored topics in limited public forums, the government cannot discriminate based on viewpoint without satisfying strict scrutiny. *See Matal*, 582 U.S. at 243 (citations omitted) (when a government "creates a limited public forum for private speech . . . in either a literal or 'metaphysical' sense . . . some content- and speaker-based restrictions may be allowed . . . [but] 'viewpoint discrimination' is forbidden."); *Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 669 (2010) (governmental regulations must be "reasonable" and "viewpoint-neutral" in a limited public forum).

The Fifth Circuit has repeatedly applied First Amendment scrutiny to prohibit viewpoint discrimination in the school environment when governmental restrictions impact private speech, as S.B. 12's restrictions do here. In two cases concerning school district dress codes and uniforms, the Fifth Circuit held that policies limited to the school environment require constitutional scrutiny to guard against impermissible viewpoint discrimination. In *Canady*, the court reviewed dress code policies that applied only to students in K-12 schools to determine whether they abridged students' freedom of speech. 240 F.3d at 441. Because the uniform policy was "viewpoint-neutral," the court applied intermediate scrutiny and upheld the regulation if it "furthers an important or substantial government interest; if the interest is unrelated to the suppression of student expression; and if the incidental restrictions on First Amendment activities are no more than is

55

necessary to facilitate that interest." *Id.* at 443 (citing *U.S. v. O'Brien*, 391 U.S. 367, 377 (1968)). The Fifth Circuit applied this same standard in *Palmer* after determining that the dress code at issue "was in no way attempting to suppress any student's expression." 579 F.3d at 510. If the policy had instead "suppress[ed] unpopular viewpoints," then strict scrutiny would be required. *Id.*

Under established case law, strict scrutiny is required for any school policy limiting the speech of students, parents, third parties, and educators outside of their official work duties based on viewpoint. *Rosenberger*, 515 U.S. at 828–29 (citations omitted). Strict scrutiny is also required even in non-public government forums in schools anytime that viewpoint discrimination occurs. *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 347 (5th Cir. 2001) ("A nonpublic forum [] is not a private forum, and because it is a government-sponsored medium of communication, it is still subject to First Amendment constraints.").

Here, the challenged provisions of S.B. 12 apply in every type of forum, and viewpoint discrimination triggers strict scrutiny in each context. For example, the GSA Ban creates a blanket prohibition of all student clubs based on "sexual orientation or gender identity." S.B. 12 § 27(b). That restriction bars students from holding meetings and events on school property (either a limited or non-public forum), but it also prevents GSAs from using school resources to attend community events in public parks or at the Texas Capitol (traditional public forums). "When the government encourages diverse expression—say, by creating a forum for debate—the First Amendment prevents it from discriminating against speakers based on their viewpoint." *Shurtleff v. City of Boston, Mass.*, 596 U.S.

243, 247 (2022) (citing *Rosenberger*, 515 U.S. at 828–30).[54] Even in the context of school activities, the government is subject to the requirements of the First Amendment when it creates "forum[s] for student expression." *Chiras v. Miller*, 432 F.3d 606, 616 (5th Cir. 2005). Because S.B. 12's restrictions apply in every type of forum for speech and discriminate against private speech based on viewpoint, they are subject to strict scrutiny.

### 2. S.B. 12 Is Viewpoint-Based

The challenged provisions of S.B. 12 discriminate based on viewpoint because they have the purpose and effect of suppressing non-majoritarian views regarding race, gender identity, and sexual orientation. By censoring activities, programs, trainings, clubs, and conversations solely on these topics, the law discriminates against students, parents, educators, and third parties who wish to discuss issues of race, gender identity, and sexual orientation. This silencing of these particular topics entrenches majoritarian views while silencing the perspectives of anyone who wishes to challenge the status quo or question

---

[54]    Under the Supreme Court's test for government speech in *Shurtleff*, S.B. 12 cannot be viewed as government speech because (1) there is no history of the Texas Legislature speaking through all possible policies, procedures, trainings, programs, and activities relating to K-12 schools, or imposing restrictions on content and viewpoint like in S.B. 12; (2) no member of the public would perceive the Legislature as speaking through every school-related activity or program in the state; and (3) the Legislature has not previously "actively shaped or controlled" the expression of students, educators, and others in all of the policies, procedures, trainings, programs, and activities that S.B. 12 targets. 596 U.S. at 252. The government speech doctrine therefore cannot exempt S.B. 12's new and unprecedented mandates from constitutional scrutiny.

    Even if specific programs and activities of some schools could be considered government speech *of those specific schools*, no court has ever extended the government speech doctrine to insulate an entire law from judicial review that suppresses huge swaths of private speech engaged in by students, parents, educators, and third parties. Thus, even to the extent that S.B. 12 could possibly apply to some types of government speech, the Texas Legislature that crafted the bill is not speaking through every single program and activity that the law suppresses, nor can it use the government speech doctrine as "a cover for censorship." *Shurtleff*, 596 U.S. at 263 (Alito, J., concurring).

dominant narratives. This is impermissible viewpoint discrimination in which the government is "effectively driv[ing] certain ideas or viewpoints from the marketplace. . . ." *R.A.V.*, 505 U.S. at 387 (citations omitted).

The Fifth Circuit has explained that "censorship based on a state actor's subjective judgment that the content of protected speech is offensive or inappropriate is viewpoint discrimination." *Robinson v. Hunt Cnty.*, 921 F.3d 440, 447 (5th Cir. 2019) (citations omitted). Viewpoint discrimination exists even when the government "discriminate[s] against an entire class of viewpoints." *Rosenberger*, 515 U.S. at 831. The Supreme Court interprets "the term 'viewpoint' discrimination in a broad sense." *Matal*, 582 U.S. at 243 (citing *Rosenberger*, 515 U.S. at 831). In *Matal*, the Supreme Court held that a federal law allowing the Patent and Trademark Office to deny trademarks that may "disparage" any person constituted viewpoint discrimination. *Id.* at 223. Even though the law "evenhandedly prohibit[ed] disparagement of all groups" and "applie[d] equally to marks that damn Democrats and Republicans, capitalists and socialists, and those arrayed on both sides of every possible issue," it was still impermissible viewpoint discrimination because it burdened an entire class of "offensive" and disparaging views. *Id.* at 243.

Similarly, the Supreme Court has explained that a hypothetical law proscribing all conversations about race would discriminate based on viewpoint, even if it prohibits a range of voices on this topic. *Rosenberger*, 515 U.S. at 831 ("If the topic of debate is, for example, racism, then exclusion of several views on that problem is just as offensive to the First Amendment as exclusion of only one."). The Supreme Court has found repeatedly that restrictions on all "religious" speech constituted viewpoint discrimination, even

though the prohibitions targeted every form of religious speech and not particularized viewpoints, since these prohibitions suppressed speech only from people who wanted to speak about religion and thereby discriminated against an entire class of viewpoints. *See id.*; *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 393 (1993)).

Here, too, the targeted provisions of S.B. 12 restrict speech ***only*** on topics pertaining to race, color, ethnicity, gender identity, and sexual orientation. These restrictions are not viewpoint-neutral because they silence the specific views of people who want to raise these topics and speak about them—particularly students of diverse racial and ethnic backgrounds and students who are LGBTQ+. Just as a ban on religious speech favors the views of people who prefer for religion not to be discussed, so too does a ban on speech referencing race, gender identity, or sexual orientation discriminate against "an entire class of viewpoints" in ways that favor a race-neutral or color-blind perspective and a heterosexual and cisgender majority. *Rosenberger*, 515 U.S. at 831; *see also Vidal v. Elster*, 602 U.S. 286, 294 (2024) ("This Court has found that a law can discriminate based on viewpoint in its practical operation.").

Each challenged section of S.B. 12 explicitly discriminates based on viewpoint. The GSA Ban prohibits all student organizations "based on sexual orientation or gender identity," while allowing clubs of all other views to still exist. *Compare* S.B. 12 § 27(a) *with* § 27(b). The fact that there are no equivalent student groups created to support students who are primarily heterosexual or cisgender amplifies the viewpoint discrimination of this GSA Ban. *See, e.g.*, Poe Decl., Ex. 5 ¶ 8. A federal court in Iowa recently emphasized this point when enjoining a law banning educators from providing any program or promotion

59

"relating to gender identity or sexual orientation to students in kindergarten through grade six" as viewpoint-discriminatory:

> As *Rosenberger* explained, the "exclusion of several views on a problem is just as offensive to the First Amendment as exclusion of only one . . . The dissent's declaration that debate is not skewed so long as multiple voices are silenced is simply wrong; the debate is skewed in multiple ways." [] So it is here: absent a compelling governmental interest, the State cannot categorically prohibit clubs that express views on sexual orientation—particularly when it appears that the only such clubs promote the acceptance of same-sex relationships.

*Iowa Safe Sch.*, 2025 WL 1834140, at *18. Similarly, the GSA Ban here suppresses **only** the views and perspectives of students who seek to form clubs that support LGBTQ+ students.

The Inclusivity Ban also discriminates based on viewpoint by prohibiting all "policies, procedures, trainings, activities, or programs that reference race, color, ethnicity, gender identity, or sexual orientation." S.B. 12 § 3(a)(1)(3). This explicitly suppresses the voices of Plaintiffs like SEAT—whose members volunteer on school property and hold trainings and activities referencing these topics (*see* SEAT Decl., Ex. 3 ¶¶ 20, 34, 39)—and the GSA Network, which distributes trainings and programs about racial justice and LGBTQ+ rights to students through GSA sponsors (*see* GSA Network Decl., Ex. 2 ¶¶ 14, 28-29, 35). Likewise, the Social Transition Ban is explicitly viewpoint-discriminatory because it prohibits specific classes of views supportive of transgender students. *See* Poe Decl., Ex. 5 ¶¶ 23-24 (providing examples of harms unique to transgender students). This section of S.B. 12 defines "social transitioning" as "a person's transition from the person's biological sex at birth to the opposite biological sex through the adoption of a different

60

name, different pronouns, or other expressions of gender that deny or encourage a denial of the person's biological sex at birth." S.B. 12 § 7(a). By barring any school employee from "assisting" a student with social transitioning or "providing any information" about this topic, S.B. 12 suppresses specific views supportive of transgender students. This restriction goes beyond mere content discrimination, since not all "different name[s], different pronouns, or other expressions of gender" are banned—only those that "deny or encourage a denial of the person's biological sex" are prohibited. *Id.*; *see also* Johnson Decl., Ex. 7 ¶¶ 20-22 (describing Social Transition Ban only preventing transgender students, and not cisgender students, from using chosen names). This limitation suppresses only one class of viewpoints on this topic—namely, those supportive of transgender students' ability to live in accordance with their gender identity in Texas schools.[55]

The Don't Say LGBTQ+ Ban similarly restricts a class of views by prohibiting any school employee or third party from "provid[ing] instruction, guidance, activities, or programming regarding sexual orientation or gender identity." S.B. 12 § 24(a). Because heterosexual and cisgender identities are the norm, this provision suppresses the views of anyone who seeks to raise non-majoritarian perspectives on these topics, particularly members of the LGBTQ+ community. *See, e.g.*, GSA Network Decl., Ex. 2 ¶ 33 (explaining the "heavy toll on the mental, emotional, social, and spiritual wellbeing of the GSA Network's members and clubs" by being denied the ability to discuss and learn about

---

[55]     This class of views is also held by many educators, healthcare providers, and professional organizations. *See, e.g.*, Asaf Orr et al., *Schools In Transition: A Guide for Supporting Transgender Students in K-12 Schools*, at 9 (2015), https://hrc-prod-requests.s3-us-west-2.amazonaws.com/welcoming-schools/documents/HRCF-Schools-In-Transition.pdf.

these topics). This Don't Say LGBTQ+ Ban cannot be interpreted to be viewpoint-neutral since the law does not burden all mention of sexuality evenhandedly—indeed, another section of the bill explicitly authorizes sexual education courses to continue. *See* S.B. 12 § 23(i-2). Since other programs and discussions involving human sexuality are expressly permitted while topics related to sexual orientation are banned, the law is specifically aimed at suppressing LGBTQ+-supportive viewpoints. *See, e.g.*, *Rosenberger*, 515 U.S. at 828–29 (citations omitted). Similarly, the Don't Say LGBTQ+ Ban allows organizations to exist "whose membership is restricted to one sex" while burdening any speech "regarding . . . gender identity." S.B. 12 § 24(a), 24(b)(3). This too is viewpoint-discriminatory, since some discussion or acknowledgment of gender is permitted—just not an aspect of it (gender identity) that the government dislikes.

While these four provisions of S.B. 12 facially discriminate based on viewpoint, the legislative record underscores that S.B. 12 targets and suppresses certain viewpoints. Lawmakers called out and criticized Plaintiff GSA Network by name, while making clear their goal of censoring clubs, programs, activities, and discussions supportive of racial diversity and LGBTQ+ students. *See supra* Factual Background, Section II (Legislative History).

### 3. S.B. 12 Fails Strict Scrutiny

Because viewpoint discrimination triggers heightened scrutiny in any forum, the challenged provisions of S.B. 12 are "presumptively unconstitutional" and can only be salvaged if they are narrowly tailored to a compelling government interest. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). The burden to satisfy this test rests on the

government and is "demanding." *Brown*, 564 U.S. at 799 ("It is rare that a regulation restricting speech because of its content will ever be permissible.") (quotation omitted).

A regulation is narrowly tailored if it is the least restrictive means to serve a compelling governmental purpose. *U.S. v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000) (citing *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 874 (1997)). The challenged provisions of S.B. 12 fail this test because they are not narrowly tailored to any compelling governmental purpose. First, the GSA Ban does not serve a legitimate governmental purpose, let alone one that is compelling. In enacting a ban on all clubs "based on sexual orientation or gender identity" (S.B. 12 § 27(b)) the Legislature did not hear nor consider any evidence that GSAs or other clubs supportive of LGBTQ+ students are engaging in any speech or activities that is legitimately proscribable by the government. *See supra* Factual Background, Section II (Legislative History). Instead, the legislative history only shows governmental disfavor for the topics and views expressed by GSAs and a general concern to prevent students from hearing these views. *Id.* But "[s]peech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213–14 (1975). The Legislature does not have "a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794. To meet strict scrutiny, "[t]he State must specifically identify an 'actual problem' in need of solving . . . and the curtailment of free speech must be actually necessary to the solution," which "is a demanding standard." *Id.* at 799 (citation omitted).

The GSA Ban falls far short of meeting this standard. Even if the Legislature could identify some legitimate interest to regulate the speech of GSAs differently from all other clubs, S.B. 12 uses a wrecking ball to advance any hypothetical governmental interest by banning these clubs entirely. Any purported legislative interest could be addressed in far less restrictive ways, such as by requiring parental permission for GSAs (as S.B. 12 requires for all other clubs, S.B. 12 § 27(c)), providing training or guidance for club sponsors on how to avoid topics that are obscene or legitimately proscribable by the government, or requiring that GSAs and other clubs cause no material disruption to the school environment. But instead of addressing any actual problem through narrow means, the GSA Ban "burn[s] the house to roast the pig." *Butler v. State of Mich.*, 352 U.S. 380, 383 (1957).

Similarly, the Inclusivity Ban legislates by sledgehammer instead of scalpel— censoring any mention of race, color, ethnicity, gender identity, or sexual orientation in countless policies, procedures, trainings, programs, and activities that sweep in private speech expressed by students, parents, third parties, and educators beyond their official duties in ways that the state government has historically not regulated. Even if the Legislature had a compelling interest in promulgating this section—such as attempting to root out discrimination—the Inclusivity Ban wildly misses the mark. Though it could have targeted specific trainings or policies of schools themselves, it broadly prohibits any "employee, contractor, or volunteer" from referencing the prohibited topics in any policy, procedure, training, activity, or program "at, for, or on behalf of the district." S.B. 12 §§ 3(a)(3), (b)(2). Such capacious language sweeps in speech within educators' purely

64

private capacity on matters of public concern, while also directly suppressing students, parents, and third parties as "volunteers" from engaging in constitutionally protected speech, which goes far beyond furthering any legitimate or compelling governmental interest.

The Social Transition Ban likewise is not narrowly tailored to any compelling interest. The legislative record does not indicate that there is even a legitimate governmental interest—let alone a compelling one—in prohibiting school employees from supporting transgender students. Even if there were a legitimate or compelling governmental interest behind this section, it is so broadly and vaguely worded that it proscribes "any information" being shared with students about "social transitioning," even when such speech occurs in a teacher's purely private capacity and touches on matters of public concern. *Id.* § 7(b).

The Don't Say LGBTQ+ Ban also infringes on constitutionally protected speech and is not narrowly tailored to any compelling governmental interest. There is no legitimate governmental interest in banning all "instruction, guidance, activities, or programming regarding sexual orientation or gender identity," particularly where human sexuality instruction and other topics are still permitted by the law. *Compare id.* § 24(a) *with* 23(i-2). And even if there were a legitimate or compelling governmental interest, there would be far narrower means of achieving it than to broadly prohibit speech in this area by school employees and third parties. This provision's application to "third parties" could be removed, it could be more narrowly limited only to speech within school employees' official duties, and it could adequately define terms like "instruction, guidance, activities,

65

or programming" instead of leaving them vague and open-ended. *Id.* § 24(a). As written, the Don't Say LGBTQ+ Ban, as well as the other challenged provisions, falls far short of the narrow tailoring the First Amendment requires.

Further, even if intermediate scrutiny or rational basis review applied to this law, the challenged provisions of S.B. 12 would still be unconstitutional. "Intermediate scrutiny, which is deferential but not toothless, plays an important role in ensuring that legislatures do not use ostensibly legitimate purposes to disguise efforts to suppress fundamental rights." *Free Speech Coal., Inc. v. Paxton*, 145 S. Ct. 2291, 2316 (2025). "A statute survives intermediate scrutiny if it 'advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests.'" *Id.* at 2317 (quoting *Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 189 (1997)). Here, the challenged provisions fail this test because they are not based on important governmental interests, they are directly related to the suppression of free speech, and they burden far more speech than necessary to advance any governmental interest.[56]

## B.    S.B. 12 Is Unconstitutionally Vague

The challenged provisions of S.B. 12 are unconstitutionally vague because they fail to give adequate notice of the speech the law proscribes versus what it allows, and they invite arbitrary and discriminatory enforcement. This vagueness harms Plaintiffs, whose

---

[56]    The challenged provisions would likely fail even rational basis review since they "lack[] a rational relationship to legitimate state interests" and "a bare desire to harm a politically unpopular group cannot constitute a ***legitimate*** governmental interest." *Romer v. Evans*, 517 U.S. 620, 632, 634 (1996) (emphasis in original).

own speech is burdened or censored by these restrictions, and will also inhibit students, parents, third parties, and educators from speaking and collaborating with Plaintiffs for fear that even constitutionally protected speech is proscribed. *See supra* Argument, Section I (Standing). A law is impermissibly vague when it (1) fails to provide a "person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly," or (2) fails to provide "explicit standards" for applying the law "to avoid arbitrary and discriminatory applications." *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 551 (5th Cir. 2008) (citation omitted). A "more stringent vagueness test" applies where a statute "interferes with the right of free speech. . . ." *Hoffman Estates v. Flipside*, 455 U.S. 489, 499 (1982).

Even before a newly enacted law has been fully enforced, "vagueness may be grounds for a pre-enforcement challenge insofar as it chills protected speech under the First Amendment." *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 782 n.32 (5th Cir. 2024) (citation omitted). "Due Process proscribes laws so vague that persons 'of common intelligence must necessarily guess at their meaning and differ as to their application.'" *Women's Med. Ctr. of Nw. Houston. v. Bell*, 248 F.3d 411, 421 (5th Cir. 2001) (quoting *Smith v. Goguen*, 415 U.S. 566, 572 n.8 (1974)). The government may regulate conduct that affects speech "only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963) (citation omitted). A law is vague if it does not provide "fair notice of conduct that is forbidden or required." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (citations omitted).

67

Each challenged provision of S.B. 12 fails these requirements because they all rely on a litany of terms that are vague, open-ended, and "so standardless that [they] invite[] arbitrary enforcement." *Johnson v. U.S.*, 576 U.S. 591, 595 (2015) (citation omitted). Because this law leaves "grave uncertainty" about what kind of speech is proscribed—and impermissibly chills significant amounts of constitutionally protected speech—the challenged provisions are impermissibly void for vagueness. *Id.* at 597.

Other courts both within the Fifth Circuit and across the country have relied on the vagueness doctrine to block similar attempts to prohibit speech. In Mississippi, a federal court enjoined the enforcement of a law prohibiting "the dissemination, endorsement, or engagement with 'divisive concepts' and 'gender identity'" because "[t]hese terms are not given precise definitions within the statutory text, nor . . . do they have established legal meanings that would guide educators, administrators, or students in conforming their conduct." *Miss. Ass'n of Educators v. Bd. of Trs. of State Institutions of Higher Learning*, No. 3:25-CV-00417-HTW-LGI, 2025 WL 2142676, at *4 (S.D. Miss. July 20, 2025). In Iowa, a court found that a law prohibiting any school district or teacher from providing a "program" or "promotion . . . relating to gender identity or sexual orientation to any students in kindergarten through grade six" was "likely to be unconstitutional under void-for-vagueness principles." *Iowa Safe Schools*, 2025 WL 1834140, at *9, *18. Similarly, a ban in Florida on any "training or instruction that espouses, promotes, advances, inculcates, or compels . . . students or employees to believe" eight concepts was found to be "impermissibly vague on its face." *Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218, 1231, 1286 (N.D. Fla. 2022).

### 1. GSA Ban

S.B. 12's GSA Ban is substantially vague under the First and Fourteenth Amendments. This section states that a "school district or open-enrollment charter school may not authorize or sponsor a student club based on sexual orientation or gender identity." S.B. 12 § 27(b). This prohibition lacks clear standards, and thus invites arbitrary and discriminatory enforcement.

First, despite legislative history evincing an intent to target GSAs and lawmakers expressing disdain for Plaintiff GSA Network itself, *see supra* Factual Background, Section II (Legislative History), the actual text of the GSA Ban does not provide any standard for how a school district or charter school can determine whether a club is "based on sexual orientation or gender identity." *Id.* The term "based on" is undefined, and therefore gives insufficient notice to school administrators about what types of clubs are prohibited, or how to make that determination. S.B. 12 provides no guidance as to whether clubs must be formed exclusively to focus on sexual orientation and gender identity, or whether providing any support for LGBTQ+ students could be grounds for prohibition. *Cf. Dorian W. v. Berryhill*, No. 17 CV 50327, 2019 WL 1572560, at *2 (N.D. Ill. Apr. 11, 2019) ("the phrase 'based on' could mean partially based on or solely based on").

Indeed, many GSAs in Texas, including members of GSA Network, might not consider themselves to be "based on" sexual orientation or gender identity since they have broader missions of supporting LGBTQ+ students and their allies, and providing safe spaces in schools from bullying, discrimination, and harassment. *See* GSA Network Decl., Ex. 2 ¶ 8 (the GSA Network includes "clubs which advocate for other social justice issues"

beyond just LGBTQ+-related topics). The activities and discussions of GSAs also extend far beyond topics of sexual orientation and gender identity. *See id.* ¶¶ 3, 8, 18-22. The GSA Ban is therefore vague since it provides no guidance to schools on how to determine if a club is "based on" sexual orientation or gender identity.

Multiple courts have found that the term "based on" can be impermissibly vague when devoid of critical context establishing what kind of nexus is required. *See, e.g.*, *Total Recall Techs. v. Luckey*, No. C 15-02281 WHA, 2021 WL 2590149, at *8 (N.D. Cal. June 24, 2021) ("The phrase 'based on' is vague as can be and thus inherently overbroad and uncertain."); *CheckPoint Fluidic Sys. Int'l, Ltd. v. Guccione*, 888 F. Supp. 2d 780, 804 (E.D. La. 2012) ("The Court has previously held that the term 'based on' is vague and ambiguous"). Even where the term "based on" has a plain linguistic meaning as "[t]o make, form, or serve as a foundation for," *Base*, BLACK'S LAW DICTIONARY (12th ed. 2024), courts have still found it vague where, as here with the GSA Ban, "it is not clear what effect the phrase has on the legal operation" of a law or contract. *Mirkin v. XOOM Energy, LLC*, No. 18-CV-2949 (ARR) (RER), 2023 WL 5200294, at *5 (E.D.N.Y. Aug. 14, 2023).

The term "gender identity" is also undefined by S.B. 12 and Texas law, and it is impermissibly vague in this specific context. While "gender identity" can mean "a person's psychological sense of self in relation to their gender" and "a deeply felt, inherent sense of being a boy, a man, or male; a girl, a woman, or female; or a nonbinary gender (e.g., genderqueer, gender-neutral, agender, gender-fluid, transgender) that may or may not

correspond to a person's sex assigned at birth,"[57] its use in the GSA Ban provides inadequate guidance on what kind of clubs must be prohibited. Because this provision does not distinguish between transgender or cisgender identities, it could be reasonably interpreted to bar any type of gender-based club. A Women in STEM, Girl Scouts, or Boy Scouts group is arguably "based on . . . gender identity" because the gender identity of its members forms a foundational aspect of the club. Indeed, Texas legislators recognized this concern with the law potentially inhibiting gender-based clubs, *see supra* Factual Background, Section II (Legislative History), which led to the creation of an exception to the Don't Say LGBTQ+ Ban permitting organizations to exist "whose membership is restricted to one sex and whose mission does not advance a political or social agenda." S.B. 12 § 24(b)(3). But because this exception is neither incorporated into nor referenced in the GSA Ban, the prohibition on all student organizations "based on . . . gender identity" in this section remains unconstitutionally vague.

As a federal court recently noted in Iowa, a law's prohibition on any "program" or "promotion . . . relating to gender identity or sexual orientation" was both viewpoint-discriminatory and inherently vague, since the absurdity doctrine would prohibit it from being "literally interpreted to forbid ***any*** reference to gender identity or sexual orientation." *Iowa Safe Sch.*, 2025 WL 1834140, at *15 (citation omitted; emphasis in original). As the court explained:

> [T]he only plausible way to interpret the restriction on "programs" and "promotion" as non-viewpoint-based is to conclude that school districts are

---

[57]    *Gender identity*, APA DICTIONARY OF PSYCHOLOGY, AM. PSYCHOLOGICAL ASS'N (Nov. 15, 2023), https://dictionary.apa.org/gender-identity.

forbidden from providing programs or promotion relating to **any** gender identity or **any** sexual orientation. But this gets back to the absurdity problem because it would mean the law bans "girls" and "boys" sports teams and any other classroom or extracurricular activity that recognizes and endorses gender identity. By insisting this is not how the Gender Identity/Sexual Orientation Restriction should be interpreted, the State Defendants are basically guaranteeing that state officials will "determine on an 'ad hoc and subjective basis'" which speech is permitted and which is not.

*Id.* at *19. If literally interpreted to prohibit any club even partially "based on . . . gender identity," S.B. 12 would block programs like Big Brothers, Big Sisters, Girls on the Run, the girls' volleyball team—indeed, ***all gender-based clubs or sports teams***. Because school administrators will presumably not ban all of these organizations in implementing S.B. 12—an absurd result, as warned the court in *Iowa Safe Sch.*—the GSA Ban necessarily "encourage[s] arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (citations omitted). And even a non-literal or narrower interpretation of this provision would not cure the "harsh and discriminatory enforcement by local [] officials," since the GSA Ban gives schools insufficient guidance as to which clubs are prohibited or how to make that determination. *Id.* at 360 (quotation omitted).

## 2. Inclusivity Ban

The Inclusivity Ban requires school districts and charter schools to prevent every "employee, contractor, or volunteer from engaging in diversity, equity, and inclusion duties at, for, or on behalf of the district." S.B. 12 § 3(b) (2). The Ban defines these "duties"[58] to

---

[58]    The term "duties" does not narrow the Inclusivity Ban's inherent vagueness since it is not defined by S.B. 12 and has multiple vague and open-ended ordinary definitions that censor and suppress even non-official acts and speech in an employee, contractor, or volunteer's purely private capacity. *See, e.g., Duty*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining "duty" as a "legal obligation that is owed or due to another and that needs to be satisfied."); *Duty*, MERRIAM-WEBSTER (2025) (defining "duty" as

include "developing or implementing policies, procedures, trainings, activities, or programs *that reference* race, color, ethnicity, gender identity, or sexual orientation." *Id.* § 3(a)(3) (emphasis added). This section is impermissibly vague because it fails to give sufficient guidance as to what is prohibited and will inevitably lead to arbitrary and discriminatory enforcement.

The Inclusivity Ban gives no guidance to schools, educators, and third parties about what it means to "develop[]" or "implement[]" a policy, procedure, training, activity, or program. These words are undefined in S.B. 12 and elsewhere in Texas law and have an ordinary meaning so broad that they apply to any participation whatsoever in any kind of policy, procedure, training, activity, or program that even briefly mentions race, color, ethnicity, gender identity, or sexual orientation. *See Develop*, MERRIAM-WEBSTER (2025) ("to make visible or manifest"; "to make available or usable"; "to expand by a process of growth"); *Implement*, MERRIAM-WEBSTER (2025) ("carry out, accomplish"; "to provide instruments or means of expression for"). The ordinary meaning of "develop" and "implement" could result in educators, contractors, and volunteers being prohibited from simply making their classrooms available or usable for a student-run club or providing instruments or materials for student activities. The Inclusivity Ban thus fails to provide sufficient guidance as to how educators and others can avoid being disciplined while still

---

"conduct due to parents and superiors" and also as "obligatory tasks, conduct, service, or functions that arise from one's position (as in life or in a group)."); *Duty*, DICTIONARY.COM UNABRIDGED (2023) (defining "duty" as "something that one is expected or required to do by moral or legal obligation" but also "an act or expression of respect.").

chaperoning or supervising students in activities designated as limited public forums or when exercising their own private speech.

The terms "policies, procedures, trainings, activities, or programs" are also undefined by S.B. 12 and elsewhere in Texas law. "Policy" sometimes refers to official school district policies adopted by the school board. *See, e.g.*, *Doe on Behalf of Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 216 (5th Cir. 1998) ("under Texas law, policymaking authority in an independent school district rests with the board of trustees") (citation omitted). But it can also refer to any "prudence or wisdom in the management of affairs" or any "definite course or method of action selected from among alternatives." *Policy*, MERRIAM-WEBSTER (2025). Thus, if an educator, contractor, or volunteer has a "policy" of asking boys and girls to room separately on school field trips, that person could be accused of having a "policy" that references "gender identity" and is prohibited by the Inclusivity Ban.

Similarly, the words "procedures, trainings, activities, or programs" are undefined and open-ended. The ordinary meaning of "procedure" is a "specific method or course of action." *Procedure*, BLACK'S LAW DICTIONARY (12th ed. 2024). But this captures nearly everything that educators, contractors, or volunteers would do in school. If the teacher sponsor of a club distributes a survey that has a space for students to fill out demographic information, including their race or ethnicity, that person could be accused of implementing a "procedure" referencing race and ethnicity. Similarly, simply asking boys or girls to divide into groups would be a "procedure" referencing gender identity.

74

S.B. 12's open-ended use of the term "trainings" also renders this term impermissibly vague. While "trainings" are sometimes formalized and approved by a school district or charter school, the ordinary meaning of the term also includes "the act, process, or method of one that trains," "to teach so as to make fit, qualified, or proficient," and "to form by instruction, discipline, or drill." *Training*, MERRIAM-WEBSTER (2025); *Trains*, MERRIAM-WEBSTER (2025). Thus, nearly everything that educators, contractors, and volunteers do in and surrounding pre-K-12 schools falls within the ordinary meaning of "training." If a volunteer holds a practice session to help a kindergartener prepare for a geography tournament and mentions that most people from Japan are Japanese, that person would arguably violate the Inclusivity Ban by "referenc[ing]" ethnicity in a "training."

"Activities" and "programs" fare no better because they are undefined by S.B. 12, and their plain meaning similarly reaches the entire universe of anything that educators, contractors, and volunteers might do in schools. *See Activity*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("A state of action; the quality of being active"); *Activity*, MERRIAM-WEBSTER (2025) ("a form of organized, supervised, often extracurricular recreation"; "vigorous or energetic action"; "natural or normal function"); *Program*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("An agenda for a meeting or convention, listing the order of business and possibly including educational or social events"); *Program*, MERRIAM-WEBSTER (2025) ("a public notice"; "the performance of a program especially: a performance broadcast on radio or television"; "a plan or system under which action may be taken toward a goal"). A school employee that helps a union organize a training on school property that references race or ethnicity could be accused of helping "implement"

the training, even when the training occurs outside of the employee's official work duties. And a GSA sponsor that shares information from the GSA Network about how to hold a "GSA Day for Racial Justice" could be accused of helping "develop" that activity. *See* GSA Network Decl., Ex. 2 ¶ 22.

The Inclusivity Ban also fails to define the term "reference" or give any guidance as to the scope of speech that it restricts. While the ordinary definition of "reference" includes "the act of referring or consulting," it also means "a bearing on a matter", "relation", or "a source of information (such as a book or passage) to which a reader or consulter is referred." *Reference*, MERRIAM-WEBSTER (2025). Thus, the Inclusivity Ban prohibits any explicit mention of "race, color, ethnicity, gender identity, or sexual orientation" in any policy, procedure, training, program, or activity—no matter how small or fleeting the reference. S.B. 12 § 3(a)(3). This chills huge amounts of discussions in schools, from a first-grade teacher explaining to a student after school that most French people speak French, to a parent on a high school field trip asking a student to stop using an anti-gay slur. And worse, the definition of "reference" as "bearing on a matter" or "relation" means that even if educators, contractors, and volunteers try to avoid explicitly using words that reference "race, color, ethnicity, gender identity, or sexual orientation," they could still be punished for speaking on topics that "relate" to these prohibited concepts. *See, e.g.*, Poe Decl., Ex. 5-A at 16 (interpreting the Inclusivity Ban beyond explicitly referencing these specific terms to "restrict [all] topics deemed politically or socially controversial . . . across classrooms, clubs, events, guest speakers, and all instructional-day activities").

76

While the inherent vagueness of the word "reference" is itself sufficient to render the Inclusivity Ban unconstitutional, the terms "volunteer" and "at, for, or on behalf of" a school or charter school further exacerbate this section's vagueness. "Volunteer" is not defined by S.B. 12 or elsewhere in the Texas Education Code. While its ordinary meaning is a "voluntary actor or agent in a transaction" (*Volunteer*, BLACK'S LAW DICTIONARY (12th ed. 2024) or "a person who voluntarily undertakes or expresses a willingness to undertake a service" (*Volunteer*, MERRIAM-WEBSTER (2025)), this provides insufficient notice as to who may be punished under the Inclusivity Ban. If a parent helps set up chairs for a school orchestra performance after school and mentions their affinity for German composers, that parent could be accused of being a "volunteer" who violated the Inclusivity Ban by referencing ethnicity. Because so many educators, parents, and students themselves—including SEAT and its members—"volunteer" in schools in so many capacities, there is a substantial gray area as to who is swept up by the Inclusivity Ban or subject to its restrictions.

This inherent vagueness is further amplified by the term "at, for, or on behalf of" a school or charter school. Even activities that are almost entirely run by students, parents, or third parties, are still held "for" the benefit of a school and its students and staff. The inclusion of the word "at" in this section burdens SEAT and other organizations (including religious organizations) that hold events, trainings, and activities on school property. And the term "on behalf of" is particularly unclear, since students often claim to represent their schools even when competing in privately run tournaments or competitions. While some field trips are officially school-sponsored—including SEAT's Advocacy Days attended by

many Texas students (*see* SEAT Decl., Ex. 3 ¶¶ 41-48)—others are less formal, and S.B. 12 provides no guidance as to which programs and activities are "for" or "on behalf of" a school or charter school.

Individually and collectively, the terms comprising the Inclusivity Ban are so vague that they fail to provide the minimum guidance required by the First Amendment and Due Process Clause as to what kind of speech and activities are prohibited. *See, e.g.*, *Fox Television Stations, Inc.*, 567 U.S. at 253 ("A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required.") (citations omitted). Because of these infirmities, this section can only be applied in standardless and arbitrary ways that chill huge swaths of constitutionally protected speech.

Even the exceptions to the Inclusivity Ban only highlight this provision's vagueness. One of these exceptions only permits school districts (though ***not*** school employees, contractors, or volunteers) to "acknowledg[e] or teach[] the significance of state and federal holidays or commemorative months . . . in accordance with the essential knowledge and skills adopted under Subchapter A, Chapter 28." S.B. 12 § 3(e)(2). But that section of the Texas Essential Knowledge and Skills ("TEKS") does not delineate any specific holidays or commemorative months that may be celebrated. It instead states at a very high level, "The State Board of Education and each school district shall require the teaching of informed American patriotism, Texas history, and the free enterprise system in the adoption of instructional materials for kindergarten through grade 12, including the founding documents of the United States." Tex. Educ. Code § 28.002(h). While some

78

schools might think that Transgender Awareness Week is a critical holiday to commemorate given the central role of the transgender rights movement to Texas history, with leaders like Monica Roberts, Phyllis Frye, and Anandrea Molina,[59] other districts might disagree and think this holiday does not align with the TEKS, thereby banning all reference to it.

The Inclusivity Ban's exception that purports to not "affect a student's rights under the First Amendment to the United States Constitution or Section 8, Article I, Texas Constitution," S.B. 12 § 3(e)(3), is also vague and incompatible with the rest of this section's provisions. It is not possible to implement the operative provisions of this section of S.B. 12 without interfering with students' First Amendment rights, since students both have a right to learn about topics of race, color, ethnicity, gender identity, and sexual orientation, as well as a right to speak themselves when actively participating in trainings, activities, and programs that reference these prohibited topics. *Stanley*, 394 U.S. at 564 ("the Constitution protects the right to receive information and ideas") (citation omitted); *Morgan v. Swanson*, 659 F.3d 359, 412 (5th Cir. 2011) (en banc) ("what one says to another child is within the protection of the First Amendment").

Under established canons of construction, the Inclusivity Ban's exception for student free speech rights is so broad as to be meaningless. "The interpretive canon [*sic*]

---

[59] *See* Ashia Ajani, *How Monica Roberts Became One of America's Most Respected Black Trans Journalists*, THEM (Feb. 28, 2020), https://www.them.us/story/monica-roberts-transgriot-profile; Blake Paterson, *The "Grandmother" of the Trans Rights Movement Is Optimistic About the Future*, TEX. MONTHLY (March 31, 2025), https://www.texasmonthly.com/being-texan/phyllis-randolph-frye-transgender-rights-houston-judge/; Kelly M. Marshall, *Trans Latinx Liberation: Ana Andrea Molina Headlines Gender Infinity Conference*, SPECTRUM SOUTH (Sept. 27, 2018), https://www.spectrumsouth.com/gender-infinity-ana-andrea-molina/.

*lex specialis* dictates that if two legal provisions govern the same factual situation, the specific provision overrides the general." *Sambrano v. United Airlines, Inc.*, 707 F. Supp. 3d 652, 670 (N.D. Tex. 2023) (citing Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012) ("If there is a conflict between a general provision and a specific provision, the specific provision prevails.")). In this particular statute, the specific provisions of the Inclusivity Ban prevail over the much broader and vague exception purporting to protect students' free speech rights. It would be impossible for the Inclusivity Ban to be in effect and not diminish students' free speech rights, because students often speak with educators, contractors, and volunteers about topics referencing race, sexual orientation, and gender identity—and prohibiting adults from responding to students or from participating in any policy, procedure, training, program, or activity that even fleetingly references these concepts necessarily infringes on students' free speech rights. Thus, this exception does not ameliorate the Inclusivity Ban's constitutional infirmities but only amplifies its vagueness.

The Inclusivity Ban is void for vagueness because it lacks the minimal guidance the Constitution requires and provides inadequate information as to how Plaintiffs as educators, volunteers, and nonprofits can avoid violating the law, or how students and parents can navigate and still benefit from programs, activities, and discussions that the Ban suppresses.

### 3.  Social Transition Ban

S.B. 12's Social Transition Ban requires school districts to prohibit employees from "assisting a student . . . with social transitioning, including by providing any information

about social transitioning or providing guidelines intended to assist a person with social transitioning." S.B. 12 § 7(b). The law defines "social transitioning" as "a person's transition from the person's biological sex at birth to the opposite biological sex through the adoption of a different name, different pronouns, or other expressions of gender that deny or encourage a denial of the person's biological sex at birth." *Id.* § 7(a).

This section is substantially vague because it fails to give sufficient guidance as to what is prohibited and invites arbitrary and discriminatory enforcement. Most concerningly, the word "assistance" is undefined. Because this term has competing definitions, school employees do not know how to conform their speech and actions to follow this provision's commands. "Assisting" can mean "to give support or aid," but it can also mean "to be present as a spectator" (*Assist*, MERRIAM-WEBSTER (2025)) or "to be associated with as an assistant or helper" (*Assist*, DICTIONARY.COM UNABRIDGED (2025)). Under the ordinary meaning of this term, school employees have no guidance about how or whether they can support transgender students and what they can say. Defendants Plano ISD and Katy ISD have already interpreted this restriction to prohibit Plaintiff Poe and other school employees from simply "us[ing] different names or pronouns inconsistent with the student's biological sex." Poe Decl., Ex. 5 ¶ 16; Johnson Decl., Ex. 7 ¶ 19. While this interpretation arguably goes beyond the text of the Social Transition Ban itself,[60] it

---

[60]    While the Social Transition Ban on its face does not prohibit teachers from respecting transgender students' names and pronouns—especially when those students' parents explicitly request it—school employees that do so could still be accused of "assisting" a student's social transition by honoring this basic request for respect and human decency. *See Foote v. Town of Ludlow*, No. CV 22-30041-MGM, 2022 WL 18356421, at *5 (D. Mass. Dec. 14, 2022) ("Addressing a person using their preferred name and pronouns simply accords the person the basic level of respect expected in a civil society").

highlights the profound vagueness of a blanket ban on "assisting" any student's social transition.

S.B. 12's additional restriction on "providing any information about social transitioning" is also irredeemably vague. S.B. 12 § 7(b). This open-ended definition purports to ban any mention of topics remotely related to "social transitioning," as that term is broadly and vaguely defined. This could result in school employees being punished for showing a news broadcast to students about a transgender actor like Elliot Page or sharing information about transgender plaintiff Aimee Stephen's decision to socially transition in the U.S. Supreme Court decision *Bostock v. Clayton County, Georgia*, 590 U.S. 644, 654 (2020). If a student asks a school employee about famous transgender historical figures like Marsha P. Johnson or Sylvia Rivera, that employee would likely be unable to answer without imparting "any information about social transitioning." The Social Transition Ban's vague and sweeping provisions thus operate to encourage the erasure of transgender people and silence any discussion or recognition of their identities in and surrounding schools. *See* Poe Decl., Ex. 5 ¶ 24 (transgender students have already been singled out and referred to only by their last name due to this vague restriction); Johnson Decl., Ex 7 ¶ 21 (describing cisgender students still being allowed to use nicknames, whereas transgender students cannot).

The fact that the Social Transition Ban is not limited to curricula or speech within school employees' official duties further amplifies its vagueness. This section facially prevents school employees from "assisting" students' social transitions, regardless of where or when such assistance occurs or if the students' parents are supportive. If a teacher

82

sees a student at an LGBTQ+ Pride event on a weekend and wants to share information about transgender rights, the Social Transition Ban on its face still purports to reach that purely private speech about a matter of public concern.

Other terms in the Social Transition Ban are also undefined and fail to give sufficient guidance as to what is proscribed. The entire definition of "social transitioning" does not define its key terms, nor does it explain who may determine someone's "biological sex" or how it can be determined. S.B. 12 § 7(a); *see* Poe Decl., Ex. 5 ¶ 32 (teachers have no way of determining a student's "biological sex" and have not been given adequate guidance on this topic in Plano ISD). Courts have explained that the "definition of 'biological sex' is likely an oversimplification of the complicated biological reality of sex and gender." *Hecox v. Little*, 104 F.4th 1061, 1076 (9th Cir. 2024), *as amended* June 14, 2024, *cert. granted*, No. 24-38, 2025 WL 1829165 (U.S. July 3, 2025) (a "person's sex encompasses the sum of several biological attributes, including sex chromosomes, certain genes, gonads, sex hormone levels, internal and external genitalia, other secondary sex characteristics, and gender identity"). S.B. 12 gives no guidance as to how a student's "biological sex" may be determined, through what criteria, or by whom. This inherent vagueness could lead school employees to ask students private and invasive questions about their private medical information, including their sex assigned at birth, genetic information, or genitalia. *See Cunico*, 745 F. Supp. 3d at 847 (treating the disclosure of whether someone is transgender as "private medical information").

This provision also invites arbitrary and discriminatory enforcement by vaguely defining "social transitioning" to include "the adoption of a different name, different

pronouns, or other expressions of gender that deny or encourage a denial of the person's biological sex at birth." S.B. 12 § 7(a). Critically, the law gives no guidelines as to how schools or educators can determine whether a student's "different name" either denies or encourages a denial of their biological sex. Many names have no clear nexus to a particular biological sex (*i.e.*, Jordan or Taylor), and students in schools frequently go by nicknames and shorten or modify the names assigned to them at birth—some of which are also gender ambiguous (*i.e.*, Alex or Chris). *See also* Poe Decl., Ex. 5 ¶¶ 13; 33.

The Social Transition Ban's use of the term "other expressions of gender" amplifies the section's vagueness. S.B. 12 § 7(a). This ambiguous wording invites school employees to police students' gender to try to determine if their haircut, the clothes they wear, or how they like to play at recess might "deny or encourage a denial" of the student's sex assigned at birth. This is not only inherently vague but also compels government employees to engage in impermissible sex stereotyping. *Cf. U.S. v. Skrmetti*, 145 S. Ct. 1816, 1832 (2025) ("a law that classifies on the basis of sex may fail heightened scrutiny if the classifications rest on impermissible stereotypes") (citation omitted); *E.E.O.C. v. Boh Bros. Const. Co.*, 731 F.3d 444, 454 (5th Cir. 2013) (sex stereotyping is impermissible sex discrimination for purposes of Title VII). The fact that the Social Transition Ban imposes steep penalties on school employees while simultaneously pushing them to stereotype their students highlights the vagueness of this section.

### 4. Don't Say LGBTQ+ Ban

For many of the same reasons as the sections above, the Don't Say LGBTQ+ Ban is also unconstitutionally vague. This section creates a "restriction on instruction regarding

84

sexual orientation and gender identity" such that a school district, charter school, or school employee "may not provide or allow a third party to provide instruction, guidance, activities, or programming regarding sexual orientation or gender identity to students enrolled in prekindergarten through 12th grade." S.B. 12 § 24(a).

This aspect of S.B. 12 is substantially vague because it fails to sufficiently define any of its terms, including "instruction, guidance, activities, or programming." *Id.* As with the Inclusivity Ban, the term "activities" is so open-ended that it applies to the entire universe of activities that school employees or third parties do at or outside of schools. *See supra* Argument, Section III.B.2 (Inclusivity Ban). While the Legislature could have limited the term "instruction" to classroom or extracurricular instruction, it declined to do so. On its face, this prohibition therefore applies to any kind "instruction" beyond the classroom or outside of a school employee's official duties, as well as by any third party. Similarly, "guidance" is not limited to formal guidance, such as from a school guidance counselor.[61] It is instead undefined and has an ordinary meaning that includes "advice on vocational or educational problems given to students." *Guidance*, MERRIAM-WEBSTER (2025). Thus, if a student asks a parent volunteer about Harvey Milk for a debate project, the parent as a third party is prohibited from giving "advice . . . regarding" Milk's place in history as a gay political leader. Likewise, the ordinary definition of "programming" is so

---

[61] The Don't Say LGBTQ+ section includes an exception that does not "limit the ability of a person who is authorized by the district to provide physical or mental health-related services to provide the services to a student, subject to any required parental consent." S.B. 12 § 24(b)(2).

broad that it could lead to any kind of book, event, movie, or theater production that features a lesbian or transgender character from being swept up by this Ban.

The law also gives no context as to what it means for any instruction, guidance, activities, and programming to be "regarding" sexual orientation or gender identity. The dictionary definition of this term is "with respect to" or "concerning," Regarding, MERRIAM-WEBSTER (2025), but that creates a broad and indecipherable nexus between topics that are prohibited. For example, a science club sponsor might briefly mention that many species engage in same-sex sexual activity, which could be a violation of this prohibition. If that same sponsor tries to self-censor and says only that different species engage in "many types" of sexual activity, that instruction or guidance could still lead to accusations of violating the Don't Say LGBTQ+ Ban because it still relates to or concerns sexual orientation, even if not explicitly.

The lack of scienter or *mens rea* requirement also deepens this section's vagueness, especially since educators cannot control the speech of third parties. By mandating that educators "may not allow" third parties to discuss topics of gender identity or sexual orientation, S.B. 12 § 24(a), the Don't Say LGBTQ+ Ban makes it impossible for them to avoid unintentionally violating the statute, since a parent volunteer or other third party could address these topics even without a school employee's permission. But by inviting a guest speaker or asking a parent to help chaperone a field trip, the teacher could be accused of "allow[ing]" a third party to provide information or guidance on these issues. *Cf. Loc. 8027, AFT-N.H., AFL-CIO v. Edelblut*, 651 F. Supp. 3d 444, 460 (D.N.H. 2023) ("[T]he Supreme Court 'has long recognized that the constitutionality of a vague statutory standard

is closely related to whether that standard incorporates a requirement of *mens rea*.'"
(quoting *Colautti v. Franklin*, 439 U.S. 379, 395 (1979)).

Even the term "gender identity" itself is not defined by S.B. 12 or elsewhere in
Texas law. As discussed above, *see supra* Argument, Section III.B.1 (GSA Ban), a literal
reading of the Don't Say LGBTQ+ Ban seems to prohibit ***any mention of gender in Texas
schools***, since gender is the quintessential part of "gender identity." This leads to an
absurdity that some Texas lawmakers recognized when adding an amendment to the Don't
Say LGBTQ+ Section to allow "organization[s] whose membership is restricted to one sex
and whose mission does not advance a political or social agenda" to still "meet[] on a
school district or open-enrollment charter school campus." S.B. 12 § 24(b)(3). But this
exception amplifies, rather than mitigates, this section's vagueness, because it seems to
acknowledge that many single-sex clubs and activities ***are*** impacted by S.B. 12's
prohibitions while also creating a vague and poorly worded exception. The exception
provides no indication as to what kind of mission "does not advance a political or social
agenda," nor does it explain who may make this determination. For example, it is not clear
whether certain activities of the Boy Scouts and Girl Scouts could be defined as
"advanc[ing] a political or social agenda."

Absent clearer definitions, this section—especially the above-stated exception—
gives school officials an enormous amount of arbitrary and unfettered discretion to
determine which single-sex organizations might "advance a political or social agenda" and
are banned, and which are permitted. *Id.* Such "[u]nbridled discretion runs afoul of the First
Amendment because it risks self-censorship. . . ." *Freedom From Religion Found. v.*

87

*Abbott*, 955 F.3d 417, 427 (5th Cir. 2020). Plus, "[l]aws which vest public officials with unlimited discretion are void for vagueness." *Beckerman v. City of Tupelo, Miss*., 664 F.2d 502, 511 (5th Cir. 1981) (citations omitted). This vagueness is particularly problematic for educators like Texas AFT members and Plaintiff Poe, who are left to guess—at risk of losing their jobs and licenses—how to comply with the law while also fulfilling their ethical and legal obligations. *See* Texas AFT Decl., Ex. 6 ¶¶ 18-19; Poe Decl., Ex. 5 ¶¶ 31-42. Like the other challenged provisions of S.B. 12, the Don't Say LGBTQ+ Ban is impermissibly vague.[62]

## C.    S.B. 12 Is Impermissibly Overbroad

The challenged provisions of S.B. 12 are also facially unconstitutional due to their disproportionate overbreadth and chilling of entire categories of speech. The "overbreadth doctrine instructs a court to hold a statute facially unconstitutional even though it has lawful applications. . . ." *U.S. v. Hansen*, 599 U.S. 762, 769 (2023). Although this doctrine is "strong medicine," it is justified "on the ground that it provides breathing room for free expression." *Id.* at 769–70. "Overbroad laws 'may deter or chill constitutionally protected speech,' and if would-be speakers remain silent, society will lose their contributions to the 'marketplace of ideas.'" *Id.* (quoting *Va. v. Hicks*, 539 U.S. 113, 119 (2003)). "To guard against those harms, the overbreadth doctrine allows a litigant (even an undeserving one) to vindicate the rights of the silenced, as well as society's broader interest in hearing them

---

[62]      For the same reasons as for the Inclusivity Ban above, *see supra* Argument, Section III.B.2, the Don't Say LGBTQ+ Ban's exception for student "speech or expressive conduct protected by the First Amendment or by Section 8, Article I, Texas Constitution" is also vague and provides no shelter from this section's vague and overbroad provisions clearly suppressing student speech. S.B. 12 § 24(b)(1).

speak." *Id.* at 770 (citing *U.S. v. Williams*, 553 U.S. 285, 292 (2008)). "The First Amendment protects speech that provokes, disturbs, or even offends." *U.S. v. Jubert*, 139 F.4th 484, 487 (5th Cir. 2025). The overbreadth doctrine is therefore vital to protecting "the 'breathing space' the First Amendment requires to function in practice." *Id.* at 493 (citing *Broadrick v. Okla.*, 413 U.S. 601, 611 (1973)).

"The first step in the proper facial analysis is to assess the state laws' scope." *Moody v. NetChoice, LLC*, 603 U.S. 707, 724 (2024). In other words, "[w]hat activities, by what actors, do the laws prohibit or otherwise regulate?" *Id.* "The next order of business is to decide which of the laws' applications violate the First Amendment, and to measure them against the rest." *Id.* at 725. "If the challenger demonstrates that the statute 'prohibits a substantial amount of protected speech' relative to its 'plainly legitimate sweep,' then society's interest in free expression outweighs its interest in the statute's lawful applications, and a court will hold the law facially invalid." *Hansen*, 599 U.S. at 770 (quoting *Williams*, 553 U.S. at 292).

Here, the Court may rely on the same construction of S.B. 12's provisions that it uses in its vagueness analysis to ascertain the breadth of what S.B. 12 prohibits. *See White Hat v. Murrill*, 141 F.4th 590, 609 (5th Cir. 2025) (applying the same construction to terms in overbreadth analysis as vagueness). Based on the law's lack of precise definitions and the capacious scope of the plain meaning of their terms, Defendants' enforcement of S.B. 12's challenged provisions should be enjoined because these aspects of the law suppress Plaintiffs' speech and expressive association, as well as huge swaths of constitutionally protected speech by students, parents, educators, and others across Texas.

### 1. GSA Ban

First, the GSA Ban reaches and restricts constitutionally protected speech. It prohibits all student clubs "based on sexual orientation or gender identity" in any public or charter school in Texas that authorizes or sponsors student clubs. S.B. 12 § 27(b). While the law does not define what it means for a club to be "based on sexual orientation or gender identity," *see supra* Argument, Section III.B.1 (GSA Ban), the lawmakers who crafted this provision explained that it was intentionally created to target GSAs and other student clubs that provide support and resources to LGBTQ+ students, *see supra* Factual Background, Section II (Legislative History). Such student organizations have long been recognized as engaging in speech protected by the First Amendment. *See, e.g.*, *Gay Student Servs. v. Tex. A&M Univ.*, 737 F.2d 1317, 1330 (5th Cir. 1984) (rejecting governmental justifications for banning a GSA at a public university, finding that it "smacks of penalizing persons for their status as homosexuals rather than their conduct, which is constitutionally impermissible") (quotation omitted). Although the bill's House sponsor derogatorily referred to GSAs as "sex clubs," he did not point to any evidence that any GSA or other club targeted by this law engages in any speech that is not constitutionally protected. *See supra* Factual Background, Section II (Legislative History). The law's proponents did not point to any speech by GSAs that could possibly be considered obscene or obscene for minors. *See id.* To the contrary, GSAs provide places for students to congregate and discuss countless topics that are neither sexual nor obscene, from the history of the LGBTQ+ rights movements to political or social topics unrelated to gender identity and sexual orientation.

*See* GSA Network Decl., Ex. 2 ¶¶ 18-22; Roe Decl., Ex. 4 ¶¶ 4, 6, 11; Poe Decl., Ex. 5 ¶¶ 6-7; Johnson Decl., Ex. 7 ¶ 11.

Because the GSA Ban silences constitutionally protected speech, it is facially overbroad unless the suppression of speech is outweighed by legitimate or constitutional applications. *See Thornhill v. Ala.*, 310 U.S. 88, 97 (1940) (a law is facially overbroad if it "does not aim specifically at the evils within the allowable area of [government] control" but "sweeps within its ambit other activities that constitute an exercise" of constitutionally protected rights). But here, there is no legitimate or constitutional application of this section. The government is prohibited by the First Amendment and Equal Access Act from banning student organizations based on viewpoint and content. *See infra* Argument, Sections III.D (Equal Access Act), III.D.E (Freedom of Association). On its face, the GSA Ban cannot be reconciled with these requirements because it discriminates against clubs based on viewpoint and content, even without student organizations causing any disruption or any other legitimate pedagogical concern. Thus, the ratio of speech silenced by the GSA Ban is as "lopsided" as it gets, because there is no legitimate or constitutional application of this provision. *Hansen*, 599 U.S. at 770. The GSA Ban is therefore facially overbroad and void.

## 2. Inclusivity Ban

The Inclusivity Ban also restricts large amounts of constitutionally protected speech through its plain meaning and application. The Ban prohibits school districts and charter schools from allowing any "employee, contractor, or volunteer [to] engag[e] in diversity, equity, and inclusion duties at, for, on behalf of the district." S.B. 12 § 3(b)(2). The Ban

defines these "duties" to include "developing or implementing policies, procedures, trainings, activities, or programs that reference race, color, ethnicity, gender identity, or sexual orientation." *Id.* § 3(a)(3). Thus, the Ban broadly prohibits any type of policy, procedure, training, activity, or program that even mentions race, color, ethnicity, gender identity, or sexual orientation. As discussed above, *see supra* Argument, Section III.B.2 (Inclusivity Ban), these words are not defined by S.B. 12 or elsewhere in Texas law, so they can only be construed based on their ordinary meaning, which is capacious and open-ended.

Under the plain meaning of these terms, the Inclusivity Ban is starkly overbroad. While it is undisputed that school districts and charter schools typically have broad discretion to establish their own policies, procedures, trainings, programs, and activities, S.B. 12 strips away this local control and categorically suppresses any mention disfavored topics. This impacts large swaths of constitutionally protected speech, including, for example:

- Policies explicitly allowing students to discuss issues of race, gender identity, and sexual orientation in class assignments;

- Policies permitting students and parent volunteers to celebrate their cultural and ethnic heritage during programs and events;

- Policies affirming the rights of students to form or join student clubs based on shared identity, such as LGBTQ+ alliances or cultural affinity groups;

- Procedures for students who require foreign language interpretation services to report their ethnicity or regional dialect;

- Procedures for students to identify their gender identity before school field trips;

- Procedures permitting student organizations to celebrate commemorative months or holidays that reference race, as exempted by the Inclusivity Ban itself;

- Trainings led primarily by students but supervised by teachers that discuss issues of implicit bias, including race and racism;

- Trainings conducted by LGBTQ+ parent volunteers where they mention their own gender identity or sexual orientation;

- Trainings supporting college preparation for students from historically excluded communities, such as Black and Latino honor societies or info sessions for Historically Black Colleges and Universities (HBCUs);

- Programs like book talks where an author explicitly mentions race and racism;

- Programs where students of various racial backgrounds can celebrate their achievements and successes (like the National Hispanic Honor Society);

- Programs that allow LGBTQ+ students to share resources and celebrate Pride;

- Programs recognizing historical contributions of diverse racial or ethnic communities;

- Programs where students from immigrant backgrounds are invited to share stories about their heritage and language in school-wide multicultural fairs;

- Activities where students write personal essays or conduct interviews exploring their family's cultural or migration story;

- Activities where students learn and talk about existing racial disparities in society;

- Activities where students interact with LGBTQ+ professionals and learn about their lives and careers;

- Activities involving student-led campaigns promoting kindness, respect, and inclusion that acknowledge the existence of racism, homophobia, or transphobia;

- Activities where students learn about landmark court cases involving civil rights and LGBTQ+ rights, such as *Brown v. Board of Education* or *Obergefell v. Hodges*.

The list could go on and on. Through its plain language, S.B. 12 burdens or silences vast amounts of constitutionally protected speech. Even through the law only purports to prevent any school employee, contractor, or volunteer from "developing or implementing"[63] any activity or program that references the forbidden concepts (S.B. 12 § 3(a)(3)), this restriction also inherently infringes on students' right to free speech— including their right to receive information and their right to actively participate in programs and activities on these topics. Students, as well as parents and nonprofit organizations like SEAT, are also "volunteers" in most Texas schools since they do not receive any money for their services, and this term is undefined by S.B. 12. *See supra* Argument, Section III.B.2 (Inclusivity Ban).

Especially in prekindergarten through twelfth grade, students rely on school employees, contractors, and volunteers to "develop[]" and "implement[]" activities and programs. Although the Inclusivity Ban purports to still allow student clubs to discuss forbidden concepts (except for those censored by the GSA Ban), students' free speech rights are irrevocably chilled if teachers, contractors, and volunteers are forbidden from creating or supervising activities and programs that mention race, ethnicity, gender identity, or sexual orientation. S.B. 12 § 3(e)(5)(D).

Because the Inclusivity Ban discriminates based on viewpoint and is aimed at suppressing the freedom of expression, there are no constitutionally permissible

---

[63]     As discussed above, these terms are vague and undefined. *See supra* Argument, Section III.B.2 (Inclusivity Ban).

applications of this section. *See supra* Argument, Section III.A (Viewpoint Discrimination). While the Legislature may enact laws that prohibit discrimination based on race, ethnicity, gender identity, and sexual orientation, banning all discussion of these topics has no legitimate governmental or pedagogical purpose. Even where local school programs may be considered governmental speech, that doctrine does not permit the state to engage in censorship or silence disfavored views. *See Shurtleff*, 596 U.S. at 262 (Alito, J., concurring). There are therefore no constitutionally permissible applications of the Inclusivity Ban as currently written, and thus it is facially overbroad.

### 3. Social Transition Ban

The Social Transition Ban is similarly overbroad in that it chills and burdens constitutionally protected speech of students, parents, educators, and third parties, as well as discussions of student clubs in limited public forums. While students have a constitutional right to receive information about matters of public concern like social transitioning, they also have a right to actively discuss these issues and engage in conversation. But the Social Transition Ban prevents any school employee from "assisting" a student's social transition, including "by providing ***any information*** about social transitioning," S.B. 12 § 7(b) (emphasis added), as this term is broadly and vaguely defined. *See supra* Argument, Section III.B.3 (Social Transition Ban). This restricts school employees' ability to share information with any pre-kindergarten through twelfth grade student, even those enrolled in a school where the school employee does not work, after school, on weekends, over summer break, and at traditional public forums like online or at public parks.

95

The Social Transition Ban is therefore impermissibly overbroad in how it limits teachers' speech far beyond their official job duties. The Ban also inhibits students' own freedom of speech by preventing them from freely discussing these topics with teachers, counselors, or nurses in two-way conversations. Because the Ban defines "social transitioning" to include using "a different name, different pronouns, or other expressions of gender" (S.B. 12 § 7(a)), this section chills school employees' ability to respect students' freedom of speech in choosing what to call themselves or how they express their gender. *See Canady*, 240 F.3d at 440 (a student's "choice of attire also may be endowed with sufficient levels of intentional expression to elicit First Amendment shelter"). Students like Plaintiff Adrian Moore will therefore have their own free speech rights suppressed by this prohibition, since they are no longer able to communicate with school employees about these topics or express themselves at school. Johnson Decl., Ex. 7 ¶¶ 21-25.

As currently written, there are no constitutionally permissible applications of a blanket ban on school employees "assisting" a student's social transition, including by providing "any information" about this topic. The Social Transition Ban infringes on the rights of students, parents, and educators by categorically suppressing and silencing viewpoints supportive of transgender students.

### 4. Don't Say LGBTQ+ Ban

The Don't Say LGBTQ+ Ban is also facially overbroad because it prohibits vast amounts of constitutionally protected speech. This restriction prevents any school employee *or third party* from providing "instruction, guidance, activities, or programming regarding sexual orientation or gender identity to students enrolled in prekindergarten

through 12th grade"—regardless of whether such instruction or activities take place during school hours or on school property. S.B. 12 § 24(a). As with the Inclusivity Ban, this implicates a wide array of speech shielded by the First Amendment, including:

- Allowing students to hold events with guest speakers who discuss their LGBTQ+ identities;

- Student-organized Day of Silence programs recognizing anti-LGBTQ+ bullying, if supported by a faculty advisor;

- Assemblies or school-wide events that feature queer performers, activists, or educators sharing lived experiences or artistic work;

- Allowing students to receive resources from nonprofit organizations about LGBTQ+ awareness days like Trans Day of Visibility or National Coming Out Day, even if students ask for this information in advance;

- Holding a queer or trans prom to create a space for LGBTQ+ students to express themselves in a safe and affirming environment;

- Allowing parent volunteers to provide guidance or support to students about bullying and harassment against LGBTQ+ students or those perceived to be LGBTQ+;

- Discussions or activities during school-sponsored trips, retreats, or camps where students and LGBTQ+ chaperones share personal experiences involving their gender identity or sexual orientation;

- Booths or tables during campus events such as culture fairs or "club days" that include LGBTQ+ advocacy groups sharing information and resources;

- Participation in community-sponsored Pride parades or LGBTQ+ service projects under school sponsorship or supervision;

- School employees participating in or volunteering at community-sponsored Pride events or resource fairs, if students enrolled in Texas schools are present;

- School employees discussing gender identity or sexual orientation at home with their own children enrolled in Texas schools.

As before, this is just a sampling of what the Don't Say LGBTQ+ Ban prohibits. As with the Inclusivity Ban, the Legislature did not point to any constitutionally permissible application of the Don't Say LGBTQ+ Ban because its purpose and effect is to burden and suppress speech that the government has no authority to proscribe. This provision, like the other three targeted by this lawsuit, are aimed at chilling and dampening expressive activity and forcing would-be speakers "to abstain from protected speech. . . ." *Hicks*, 539 U.S. at 119 (citation omitted). If there are any legitimate applications of this provision, they would likely be based only on the actual curriculum in schools or speech within an educator's official job duties. But because this prohibition explicitly extends beyond that—and even specifically sweeps in third parties to proscribe their speech too—it defies any plausible application of the government speech doctrine. This section is therefore unconstitutionally overbroad, depriving society "of an uninhibited marketplace of ideas." *Id.*

### D. S.B. 12 Violates the Equal Access Act

The GSA Ban in S.B. 12 facially violates the federal Equal Access Act because it prevents Plaintiffs from creating, supporting, and participating in student organizations on the same terms as other groups in all Texas secondary public and charter schools. Plaintiff Rebecca Roe asserts this claim against Houston ISD, Plaintiff Adrian Moore brings this claim against Katy ISD, and Plaintiff GSA Network asserts this claim on behalf of its members against Plano ISD.

The Equal Access Act makes it "unlawful for any public secondary school which receives Federal financial assistance and which has a limited open forum to deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a

meeting within that limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings." 20 U.S.C. § 4071(a). Congress passed the Equal Access Act to prevent schools or states from discriminating against certain types of student organizations. "[E]ven if a public secondary school allows only one 'noncurriculum related student group' to meet, the Act's obligations are triggered and the school may not deny other clubs, on the basis of the content of their speech, equal access to meet on school premises during noninstructional time." *Bd. of Educ. of Westside Cmty. Sch.*, 496 U.S. at 236. Houston ISD has adopted an explicit board policy, stating, "For purposes of the Equal Access Act, the District has established a limited open forum for secondary school students enrolled in the District. Each District secondary school campus shall offer an opportunity for noncurriculum-related student groups to meet on school premises during noninstructional time."[64] Katy ISD and Plano ISD have adopted this same policy to establish a limited open forum for all "noncurriculum-related student groups."[65]

On its face, the GSA Ban permits school districts and charter schools to authorize or sponsor any student club other than one "based on sexual orientation or gender identity." S.B. 12 § 27(a)-(b). While the law explicitly authorizes secondary schools to have student

---

[64]      *FNAB—Student Expression: Use of School Facilities for Nonschool Purposes*, Houston ISD (Apr. 1, 2005), https://pol.tasb.org/PolicyOnline/PolicyDetails?key=592&code=FNAB#localTabContent.
[65]      *FNAB (Local), Katy ISD* (Oct. 10, 2007), https://pol.tasb.org/PolicyOnline/PolicyDetails?key=594&code=FNAB#localTabContent; *FNAB— Student Expression: Use of School Facilities for Nonschool Purposes*, Plano ISD (Oct. 23, 2006), https://pol.tasb.org/PolicyOnline/PolicyDetails?key=312&code=FNAB#localTabContent.

organizations,[66] it prevents them from having any that focus on LGBTQ+ issues, including GSAs. S.B. 12 therefore facially violates the Equal Access Act because it denies equal treatment of student organizations anywhere that a limited public forum exists to permit non-curricular groups. Houston ISD, Katy ISD, and Plano ISD may each be properly enjoined from enforcing the GSA Ban because they each control public secondary schools that receive federal funding and have established limited public forums for other non-curricular student groups to meet on school property.[67]

Because the Equal Access Act's threshold requirements are met, it is unlawful for any secondary school in Houston ISD, Katy ISD, or Plano ISD "to deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings." 20 U.S.C. § 4071(a). Under S.B. 12's GSA Ban, however, Defendant School Districts are barred from allowing student clubs to access limited open forums if they are "based on sexual orientation or gender identity." S.B. 12 § 27(b). This restriction plainly discriminates based on content in violation of the Equal Access Act. As courts have repeatedly held across the country, the Equal Access Act

---

[66]    Both middle and high schools are considered secondary schools under Texas law. *See, e.g.*, Tex. Health & Safety Code § 481.134(5) ("'School' means a private or public elementary or secondary school"); Tex. Family Code § 101.028 ("'School' means an elementary or secondary school in which a child is enrolled").

[67]    Houston ISD actively participates in federal programs and receives federal funding. *See Fed. Title Programs*, HOUSTON ISD, https://www.houstonisd.org/directory-2a/research-accountability/reports/federal-title-programs (last accessed Aug. 27, 2025). As do Katy ISD and Plano ISD. *See* Katy ISD Official Budget, KATY ISD (2025-2026), https://resources.finalsite.net/images/v1756214641/katyisdorg/x5uaxjl0qcespguiccj5/1-Book_2025-2026.pdf; Fed. Programs Overview, PLANO ISD, https://www.pisd.edu/departments-66/federal-programs (last accessed Aug. 27, 2025).

forbids secondary schools from denying access or discriminating against clubs based on content, including expressing their support for LGBTQ+ students. *See, e.g.*, *Straights & Gays for Equal. v. Osseo Area Sch.-Dist. No. 279*, 540 F.3d 911, 916 (8th Cir. 2008); *Carver Middle Sch. Gay-Straight All. v. Sch. Bd. of Lake Cnty., Fla.*, 249 F. Supp. 3d 1286, 1290 (M.D. Fla. 2017); *Gay-Straight All. of Yulee High Sch. v. Sch. Bd. of Nassau Cnty.*, 602 F. Supp. 2d 1233, 1238 (M.D. Fla. 2009); *Boyd Cnty. High Sch. Gay Straight All. v. Bd. of Educ. of Boyd Cnty., KY*, 258 F. Supp. 2d 667, 691 (E.D. Ky. 2003); *Colin ex rel. Colin v. Orange Unified Sch. Dist.*, 83 F. Supp. 2d 1135, 1149 (C.D. Cal. 2000); *E. High Gay/Straight All. v. Bd. of Educ. of Salt Lake City Sch. Dist.*, 81 F. Supp. 2d 1166, 1198 (D. Utah 1999).

### E.    S.B. 12 Violates Plaintiffs' Freedom of Association

S.B. 12's GSA Ban also unconstitutionally abridges Plaintiffs' freedom of association, and all Plaintiffs bring this claim against their respective Defendants.[68] The First Amendment not only protects speech but also expressive association. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617–18 (1984). The "freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." *NAACP v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 460 (1958) (citations omitted). These protections apply to students who wish to join together in noncurricular clubs such as GSAs in school settings for purposes of social networking, political advocacy, mutual

---

[68]    While Equal Access Act claims may only be brought against schools receiving federal funding, Plaintiffs' constitutional injuries are also attributable to the Commissioner, who enforces the GSA Ban through S.B. 12's certification process. *See supra* Argument, Section II (Defendants).

support, and public education. *See, e.g.*, *Gay & Lesbian Students Ass'n v. Gohn*, 850 F.2d 361, 367–68 (8th Cir. 1988); *Gay Lib v. Univ. of Mo.*, 558 F.2d 848, 856 (8th Cir. 1977); *Gay Students Org. of Univ. of N.H. v. Bonner*, 509 F.2d 652, 660 (1st Cir. 1974). Because S.B. 12 entirely prohibits Plaintiffs' ability to create, participate in, and engage with GSAs, it facially violates their right to freedom of association. *See Boy Scouts of Am. v. Dale*, 530 U.S. 640, 655 (2000) ("An association must merely engage in expressive activity that could be impaired in order to be entitled to protection.").

The Supreme Court has explained that "[t]he same ground rules must govern both speech and association challenges in the limited-public-forum context. . . ." *Martinez*, 561 U.S. at 681 (citation omitted). Thus, government officials are required to allow "reasonable, viewpoint-neutral . . . access to [any] student-organization forum." *Id.* at 669. Under S.B. 12, it is not reasonable to arbitrarily deny GSAs and other LGBTQ+ student groups from the same equal access that everyone else enjoys, and it discriminates based on viewpoint to prohibit clubs supportive of LGBTQ+ students. *See supra* Argument, Section III.A (Viewpoint Discrimination).

S.B. 12's GSA Ban therefore violates Plaintiffs' freedom of association, and the Commissioner, Houston ISD, Katy ISD, and Plano ISD should all be enjoined from enforcing it.

### F.    S.B. 12 Imposes an Impermissible Prior Restraint on Speech

The challenged provisions of S.B. 12 also impose prior restraints on speech because they shut down entire forums of speech and censor discussions on disfavored topics before they occur. All Plaintiffs bring this claim against the Defendants they are suing, including

the Commissioner tasked with enforcing S.B. 12's restrictions statewide. Because the GSA Ban, Inclusivity Ban, Social Transition Ban, and Don't Say LGBTQ+ Ban each restrict Plaintiffs' constitutionally protected speech without meeting any of the guardrails required by the Supreme Court, the prior restraint doctrine renders these sections facially unconstitutional under the First Amendment.

A prior restraint is a prohibition on speech or expression before it occurs, which bears a "heavy presumption against its constitutional validity." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225 (1990) (citations omitted); *see also Prior Restraint*, BLACK'S LAW DICTIONARY (12TH ED.2024) (defining "prior restraint" as a "governmental restriction on speech or publication before its actual expression"). A law regulating speech imposes a prior restraint when it either blocks certain communications before they occur or allows for excessive discretion in regulating speech. *Cath. Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 437 (5th Cir. 2014) (citations omitted). "[T]he Supreme Court has consistently found that prior restraints on free speech are presumptively invalid" and "[t]he Fifth Circuit has routinely applied this clear principle to hold such prior restraints unconstitutional, including in the school setting." *Bennett v. Prosper ISD Police Dep't*, 719 F. Supp. 3d 606, 615 (E.D. Tex. 2022) (citations omitted).

"Alleging a prior restraint is a facial constitutional challenge." *Harris v. Noxubee Cnty., Miss.*, 350 F. Supp. 3d 592, 597 (S.D. Miss. 2018). "Since every challenge based on prior restraint is a facial challenge, the remedy is always complete invalidation." S*erv. Employees Int'l Union v. City of Houston*, 542 F.Supp.2d 617, 629 (S.D. Tex. 2008), *aff'd in part, rev'd in part*, 595 F.3d 588 (5th Cir. 2010) (citation omitted). A facial challenge

under the prior restraint doctrine only requires "that a statute or regulation 'might operate unconstitutionally under some conceivable set of circumstances.'" *Smith v. Acevedo*, No. A-09-CA-620-SS, 2010 WL 11512363, at *3 (W.D. Tex. Sept. 20, 2010) (quoting *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 662 (5th Cir. 2006)).

In order to avoid facial invalidity, a law preemptively restraining speech must have "narrowly drawn, reasonable and definite standards" and avoid "unbridled discretion" that might allow government officials to "encourag[e] some views and discourag[e] others through the arbitrary application" of the law. *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 133 (1992) (quotation omitted). Prior restraints must contain adequate procedural safeguards, including: (1) being limited to a specified, brief period of time during which the status quo is maintained; (2) allowing for prompt judicial review; and (3) imposing on the censor the burdens of going to court and providing the basis to suppress the speech. *See N.W. Enters. v. City of Houston*, 352 F.3d 162, 193–94 (5th Cir. 2003), *abrogated on other grounds*, *Reagan Nat'l Advert. of Austin, Inc. v. City of Austin*, 972 F.3d 696 (5th Cir. 2020) (citation omitted).

The challenged aspects of S.B. 12 fail these standards and unconstitutionally suppress speech before it occurs. The GSA Ban is a particularly stark prior restraint. It shuts down any student organization "based on sexual orientation or gender identity"— regardless of what students want to say or hear. Well before any prospective GSA member can speak or attend a meeting, S.B. 12 requires schools to shutter GSAs and prevent them from forming. *See, e.g.*, Poe Decl., Ex. 5 ¶¶ 12, 21; Johnson Decl., Ex. 7, ¶ 18; Roe Decl., Ex. 4 ¶ 10. GSA members, including Plaintiffs, are thus preemptively "gagged" from

104

speaking—"analogous to shutting down the presses" and embodying "[t]he great evil of a prior restraint. . . ." *Moore v. City of Kilgore, Tex.*, 877 F.2d 364, 392 (5th Cir. 1989). Because the GSA Ban "forbid[s] certain communications when issued in advance of the time that such communications are to occur," it is a quintessential prior restraint. *See Alexander v. U.S.*, 509 U.S. 544, 550 (1993) (quotation omitted; emphasis removed). The GSA Ban's complete prohibition on GSAs' speech and activities echoes prior restraints that the Fifth Circuit and other courts have recognized as facially unconstitutional. *See, e.g.*, *Davis v. E. Baton Rouge Par. Sch. Bd.*, 78 F.3d 920, 928–29 (5th Cir. 1996) (a court order prohibiting school employees from making any comments about a school desegregation plan was an impermissible prior restraint); *Bennett*, 719 F. Supp. 3d at 615–16 (striking down a criminal trespass warning barring a member of the public fromspeaking at school board meetings).

While the GSA Ban plainly silences all GSA speech before it occurs, the other challenged aspects of S.B. 12 are also prior restraints because they preemptively chill speech on certain topics based on viewpoint discrimination and give "unfettered discretion" to schools tasked with enforcing these prohibitions. "Unbridled discretion runs afoul of the First Amendment because it risks self-censorship and creates proof problems in as-applied challenges." *Freedom From Religion Found.*, 955 F.3d at 427. Among federal circuit courts, "there is broad agreement that, even in limited and nonpublic forums, investing governmental officials with boundless discretion over access to the forum violates the First Amendment." *Id.* (citations omitted).

The guiding principle of the prior restraint doctrine is that government officials may not engage in viewpoint discrimination, including in hidden or subtle ways. *Id.* at 429 ("the possibility of viewpoint discrimination is key to deciding unbridled discretion claims"). Even where a prior restraint is content-neutral and imposed solely on government employees, the Supreme Court has not hesitated to facially invalidate a law that "unquestionably imposes a significant burden on expressive activity." *U.S. v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 468 (1995) (citations omitted).

The Inclusivity Ban, Social Transition Ban, and Don't Say LGBTQ+ Ban each are explicitly viewpoint-discriminatory, *see supra* Argument, Section III.A, and also fail to provide "narrowly drawn, reasonable and definite standards" required to avoid "unbridled discretion." *Forsyth Cnty.*, 505 U.S. at 133 (quotation omitted). These provisions therefore impose prior restraints on speech because they forbid disfavored topics before they are even discussed, and they fail to give adequate guidance to schools or TEA about how to enforce S.B. 12's requirements in ways that are not viewpoint discriminatory.

These prohibitions are similar to the prior restraint imposed in another Texas law, discussed in *Book People, Inc. v. Wong*, 692 F. Supp. 3d 660, 700 (W.D. Tex. 2023), *aff'd in part and vacated in part on other grounds*, 91 F.4th 318 (5th Cir. 2024). In that case, Texas H.B. 900 stated that book vendors "may not sell library material" deemed to be sexually explicit but not obscene. Tex. Educ. Code Tex. § 35.002(b). The district court held that this constituted a prior restraint because it "forbid[] certain communications" before they occurred and prevented the plaintiffs in that case from communicating with students and educators in schools by selling books. *Book People*, 692 F. Supp. 3d at 700. Similarly,

the rights of Plaintiffs GSA Network and SEAT to speak about topics of race, gender identity, and sexual orientation in Texas schools are preemptively prohibited by the challenged provisions of S.B. 12, which establishes a prior restraint.

This prior restraint bears a "heavy presumption against its unconstitutional validity" and can only survive facial First Amendment scrutiny if it has "narrow, objective, and definite standards," *Chiu*, 339 F.3d at 281, and is (1) limited to a specified, brief period of time during which the status quo is maintained; (2) allows for prompt judicial review; and (3) imposes on the censor the burdens of going to court and providing the basis to suppress the speech. *See N.W. Enters.*, 352 F.3d at 193–94. Here, S.B. 12 does none of these things. Its prohibitions are incurably vague; its ban on disfavored speech extends indefinitely into the future; it makes no allowance for judicial (or even administrative) review of proscribed speech; and its burdens fall on individuals seeking to engage in constitutionally protected speech. The challenged provisions are therefore facially invalid as a prior restraint in violation of the First Amendment.

## IV.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF

Without injunctive relief, Plaintiffs will suffer irreparable harm. As explained above, the challenged provisions of S.B. 12 violate Plaintiffs' constitutional rights under the First and Fourteenth Amendments, which constitutes an irreparable injury in and of itself. *See Roman Cath. Diocese of Brooklyn*, 592 U.S. at 19 ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.") (quotation omitted); *Opulent Life Church*, 697 F.3d at 295 ("When an alleged

deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.").

If S.B. 12's GSA Ban, Inclusivity Ban, Social Transition Ban, and Don't Say LGBTQ+ Ban are not enjoined, GSA Network will be unable to support GSA clubs and their activities in Texas, and will be prohibited or drastically limited in many of the activities that the organization, its clubs, and student members engage in at Texas schools. *See* GSA Network Decl., Ex. 2 ¶¶ 5, 24-33. This irreparably harms the freedom of speech and expressive association of GSA Network's members, including GSA Network's student members who have already had their registered GSA shut down by Plano ISD. *Id.* ¶¶ 24, 34-41; *see also* Poe Decl., Ex. 5 ¶¶ 12, 21. Similarly, S.B. 12's prohibitions threaten to inhibit SEAT's freedom of speech and association, as well as that of its members, and will subject SEAT and its members to vague and arbitrary policies. *See* SEAT Decl., Ex. 3 ¶¶ 4, 51-66. Texas AFT's members will also be subject to unconstitutionally vague restrictions that subject them to harsh penalties and threaten their bonds with students, and their private speech on matters of public concern will be curtailed if the challenged provisions of S.B. 12 are not enjoined. *See* Texas AFT Decl., Ex. 6, ¶¶ 10-25. Rebecca Roe will also have her freedom of speech and association curtailed if S.B. 12's challenged provisions are not enjoined. *See* Roe Decl., Ex. 4 ¶ 10. Adrian Moore has already suffered irreparable harm due to S.B. 12's enforcement against him and will continue to have his First Amendment and due process rights infringed if a preliminary injunction is not issued. *See* Johnson Decl., Ex. 7 ¶¶ 17-31. Polly Poe will also suffer from the law's vague requirements and have her private speech on matters of public concern censored if

Defendants are not enjoined from enforcing the GSA Ban, Inclusivity Ban, Social Transition Ban, and Don't Say LGBTQ+ Ban. *See* Poe Decl., Ex. 5 ¶¶ 11-25, 30-36.

## V.    THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST WEIGH IN FAVOR OF GRANTING INJUNCTIVE RELIEF

Both the balance of the equities and the public interest favor enjoining the challenged provisions of S.B. 12 because the First and Fourteenth Amendment rights of Plaintiffs and others will be infringed if the law is not enjoined. *See Opulent Life Church*, 697 F.3d at 298 ("Injunctions protecting First Amendment freedoms are always in the public interest.") (quotation omitted). By contrast, neither Defendants nor the public have a legitimate interest in the enforcement of unconstitutional provisions of a law. *See Planned Parenthood of Gulf Coast, Inc. v. Gee*, 862 F.3d 445, 471 (5th Cir. 2017) (the government "can never have a legitimate interest in administering [a statute] in a manner that violates federal law").

## VI.    NO BOND SHOULD BE REQUIRED

"[T]he amount of security required pursuant to Rule 65(c) 'is a matter for the discretion of the trial court,'" and the court "'may elect to require no security at all.'" *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (citations omitted). Because this case concerns constitutional freedoms and Defendants will not suffer monetary harm from the Court's preliminary injunction, Plaintiffs respectfully request that the Court require no bond.

## CONCLUSION

Plaintiffs ask the Court to enjoin Defendants from enforcing the four challenged provisions of S.B. 12, declare the GSA Ban, Inclusivity Ban, Social Transition Ban, and Don't Say LGBTQ+ Ban to have a substantial likelihood of being unconstitutional and unlawful, and grant Plaintiffs' Amended Motion for Preliminary Injunction.

Respectfully submitted,

*/s/Brian Klosterboer*

Shawn Thomas Meerkamper**
California State Bar No. 296964
Megan Z. F. Noor**
California Bar No. 359480
Dale Melchert**
California Bar No. 362885
New York Bar No. 5366554
TRANSGENDER LAW CENTER
P.O. Box 70976
Oakland, CA 94612
Tel: 510-587-9696
shawn@transgenderlawcenter.org
megan@transgenderlawcenter.org
dale@transgenderlawcenter.org

Brian Klosterboer, attorney-in-charge
TX Bar No. 24107833, SDTX No.
3314357
Charelle Lett
TX Bar No. 24139900, SDTX No.
3908204
Ashley Harris
TX Bar No. 24123238, SDTX No.
3879706
Sarah Corning
TX Bar No. 24144442, SDTX No.
3904827
Chloe Kempf
TX Bar No. 24127325, SDTX No.
3852674
Thomas Buser-Clancy
TX Bar No. 24078344, SDTX No.
1671940
Edgar Saldivar
TX Bar No. 24038188, SDTX No. 618958
Adriana Piñon
TX Bar No. 24089768, SDTX No.
1829959
ACLU FOUNDATION OF TEXAS, INC.
P.O. Box 8306
Houston, TX 77288
Tel. (713) 942-8146
Fax. (713) 942-8966
bklosterboer@aclutx.org
clett@aclutx.org
aharris@aclutx.org
scorning@aclutx.org
ckempf@aclutx.org
tbuser-clancy@aclutx.org
esaldivar@aclutx.org
apinon@aclutx.org

111

BAKER MCKENZIE LLP

Nicholas O. Kennedy
Texas Bar No. 24087841
M. Michelle Hartmann
Texas Bar No. 24032402
1900 N. Pearl, Suite 1500
Dallas, TX 75201
Tel: (214) 978-3000
nicholas.kennedy@bakermckenzie.com
michelle.hartmann@bakermckenzie.com

Angela C. Vigil*
Florida Bar No. 38627
830 Brickell Plaza, Suite 310
Miami, FL 33131
Tel: (305) 789-8900
angela.vigil@bakermkenzie.com

Andrew P. Crousore*
California Bar #202195
600 Hansen Way
Palo Alto, CA 94304
Tel: (650) 856-5508
drew.crousore@bakermckenzie.com

John Treat*
California Bar #5696778
1025 Constellation Blvd., Suite 1850
Los Angeles, CA 90067
Tel: (310) 201-4728
john.treat@bakermckenzie.com

James A. Gilmore*
DC Bar #1736415
815 Connecticut Avenue, NW
Washington, DC 20006
Tel: (22)452-7000
james.gilmore@bakermckenzie.com

        *Motion for pro hac vice forthcoming
          ** Motion for pro hac vice pending

## CERTIFICATE OF CONFERENCE

Plaintiffs conferred or attempted to confer with each Defendant about the relief requested in this Motion. The Commissioner and Katy ISD are opposed to the requested relief. Defendant Plano ISD takes no position on whether SB 12 complies with federal law and the US Constitution and therefore takes no position with respect to the Plaintiffs' entitlement to a preliminary injunction. Defendant Houston ISD did not indicate a position by the time of this filing.

*/s/Brian Klosterboer*
Brian Klosterboer

## CERTIFICATE OF WORD COUNT

Pending before the Court is Plaintiffs' Unopposed Motion to Exceed Word Count. (Dkt. 29). The undersigned counsel certifies that the total number of words in Plaintiffs' Motion for Preliminary Injunction, exclusive of the matters designated for omission, is 31,236 words as counted by Microsoft Word Software.

*/s/Brian Klosterboer*
Brian Klosterboer

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 16th day of September, 2025, a true and correct copy of the above document was served via the CM/ECF system to all counsel of record and will be promptly shared with Defendants who have not yet appeared.

*/s/Brian Klosterboer*
Brian Klosterboer