**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |
|---|---|
| GSA Network, Students Engaged in Advancing Texas, Texas AFT, Rebecca Roe, by and through her next friend, Ruth Roe, Adrian Moore, by and through his next friend, Julie Johnson, and Polly Poe, <br><br>      Plaintiffs, <br><br>      v. <br><br> Mike Morath, in an official capacity as Commissioner of the Texas Education Agency, Houston Independent School District, Katy Independent School District, and Plano Independent School District, <br><br><br>      Defendants. | Civil Action No. 4:25-cv-4090 <br><br><br> Judge Charles Eskridge |

**PLAINTIFFS' RESPONSE TO DEFENDANT MORATH AND KATY ISD'S
MOTIONS TO DISMISS AND REPLY IN SUPPORT OF THE AMENDED
MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

ARGUMENT .............................................................................................................. 5

I.   Plaintiffs Have Standing ................................................................................. 5

   A.   All Plaintiffs Engage in Constitutionally Protected Speech Proscribed by S.B. 12 ........................................................................................................... 5

      1.   GSA Network ................................................................................... 6

      2.   SEAT ............................................................................................... 7

      3.   Texas AFT ...................................................................................... 8

      4.   Rebecca Roe .................................................................................... 9

      5.   Adrian Moore ................................................................................ 10

      6.   Polly Poe ....................................................................................... 11

   B.   Plaintiffs' Injuries Are Traceable to Defendants ................................. 11

   C.   Plaintiffs' Injuries Are Redressable ................................................... 12

   D.   Plaintiffs' Claims Are Ripe ................................................................ 13

II.   Defendants Are Properly Subject to Suit and Not Immune ...................... 14

   A.   The Commissioner Is Not Immune Under *Ex parte Young* ................ 14

   B.   Katy ISD, Houston ISD, and Plano ISD Are Proper Defendants Under Section 1983 ....................................................................................... 17

III.   Plaintiffs Are Substantially Likely to Prevail on the Merits ................... 19

   A.   S.B. 12 Burdens Plaintiffs' Speech Far Beyond Government Speech ... 19

      1.   GSA Ban ........................................................................................ 22

      2.   Inclusivity Ban .............................................................................. 24

      3.   Social Transition Ban .................................................................... 24

      4.   Don't Say LGBTQ+ Ban .............................................................. 25

   B.   S.B. 12's Challenged Provisions Are Viewpoint-Discriminatory ...... 26

   C.   S.B. 12's Challenged Provisions Are Vague ...................................... 26

   D.   S.B. 12's Challenged Provisions Are Properly Subject to a Facial Overbreadth Challenge ...................................................................................... 28

   E.   S.B. 12's Challenged Provisions Violate Plaintiffs' Freedom of Association and Operate as an Impermissible Prior Restraint ........................................ 29

ii

F.   No Defendant Disputes that S.B. 12's GSA Ban Facially Violates the Equal Access Act .................................................................................. 31

IV.   Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief ...................... 32

V.   The Balance of the Equities and Public Interest Tip in Plaintiffs' Favor ............ 32

VI.   Defendant Morath May Be Properly Enjoined From Enforcing S.B. 12's Challenged Provisions Statewide ........................................................................... 33

CONCLUSION ................................................................................................ 36

## TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*Bigford v. Taylor,*
    834 F.2d 1213 (5th Cir. 1988) ................................................................... 18

*Book People, Inc. v. Wong,*
    91 F.4th 318 (2024) ..................................................................................*passim*

*Braidwood Mgmt., Inc. v. Equal Emp't Opportunity Comm'n,*
    70 F.4th 914 (5th Cir. 2023) .................................................................... 13

*Brown v. Entm't Merchs. Ass'n,*
    564 U.S. 786 (2011) .................................................................................. 24

*Chiras v. Miller,*
    432 F.3d 606 (5th Cir. 2005) ................................................................... 22

*Christian Legal Soc'y v. Martinez,*
    561 U.S. 661 (2010) ................................................................................*passim*

*City of Austin v. Paxton,*
    943 F.3d 993 (5th Cir. 2019) ................................................................... 14

*Cooper v. Dillon,*
    403 F.3d 1208 (11th Cir. 2005) ............................................................... 19

*E.T. v. Paxton,*
    19 F.4th 760 (5th Cir. 2021) .................................................................... 32

*Elrod v. Burns,*
    427 U.S. 347 (1976) .................................................................................. 33

*Familias Unidas v. Briscoe,*
    619 F.2d 391 (5th Cir. 1980) ............................................................. 18, 19

*Garcetti v. Ceballos,*
    547 U.S. 410 (2006) .................................................................................... 8

*Good News Club v. Milford Cent. Sch.,*
    533 U.S. 98 (2001) .................................................................................... 10

*Hazelwood Sch. Dist. v. Kuhlmeier,*
    484 U.S. 260 (1988) ...................................................................... 10, 20, 23

*Healthy Vision Ass'n v. Abbott*,
    138 F.4th 385 (5th Cir. 2025) ................................................................. 16

*Hill v. Colo.*,
    530 U.S. 703 (2000) ................................................................................ 27

*Jackson Fed'n of Tchrs. v. Fitch*,
    No. 3:25-CV-417-HTW-LGI, 2025 WL 2394037 (S.D. Miss. Aug. 18,
    2025) ........................................................................................................ 35

*Jones v. City of Hutto*,
    154 F.4th 332 (5th Cir. 2025) ................................................................. 17

*K.P. v. LeBlanc*,
    627 F.3d 115 (5th Cir. 2010) .................................................................. 12

*Kennedy v. Bremerton Sch. Dist.*,
    597 U.S. 507 (2022) ............................................................................. 3, 8

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*,
    508 U.S. 384 (1993) .................................................................................. 6

*Larson v. Valente*,
    456 U.S. 228 (1982) ................................................................................ 13

*Local 8027, AFT-N.H., AFL-CIO v. Edelblut*,
    651 F. Supp. 3d 444 (D.N.H. 2023) .......................................................... 9

*Matal v. Tam*,
    582 U.S. 218 (2017) ........................................................................... 21, 26

*Mitchum v. Foster*,
    407 U.S. 225 (1972) ................................................................................ 17

*Monell v. Dep't of Soc. Servs. of City of N.Y.*,
    436 U.S. 658 (1978) ............................................................................. 3, 17

*Moody v. Netchoice, LLC*,
    603 U.S. 707 (2024) ......................................................................28, 29, 32, 33

*Morgan v. Swanson*,
    659 F.3d 359 (5th Cir. 2011) .................................................................. 23

*Morse v. Frederick*,
    551 U.S. 393 (2007) ................................................................................ 20

*N.W. Enters. v. City of Houston*,
    352 F.3d 162 (5th Cir. 2003) ................................................................. 31

*Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*,
    779 F. Supp. 3d 149 (D.N.H. 2025).................................................20, 34

*Netchoice, L.L.C. v. Paxton*,
    49 F.4th 439 (5th Cir. 2022) ................................................................. 28

*N.N. ex rel. S.S. v. Madison Metro. Sch. Dist.*,
    670 F. Supp. 2d 927 (W.D. Wis. 2009) ................................................. 19

*Opulent Life Church v. City of Holly Springs Miss.*,
    697 F.3d 279 (5th Cir. 2012) ................................................................. 32

*Ostrewich v. Tatum*,
    72 F.4th 94 (5th Cir. 2023) ..................................................................... 5

*Owen v. City of Indep., Mo.*,
    445 U.S. 622 (1980)............................................................................... 18

*Pernell v. Fla. Bd. of Governors of State Univ. Sys.*,
    641 F. Supp. 3d 1218 (N.D. Fla. 2022).................................................... 9

*R.I. Latino Arts v. Nat'l Endowment for the Arts*,
    No. 25-79 WES, 2025 WL 2689296 (D.R.I. Sept. 19, 2025) .................... 20

*Richardson v. Tex. Sec'y of State*,
    978 F.3d 220 (5th Cir. 2020) ................................................................. 16

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984)............................................................................... 30

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995)........................................................................... 4, 22

*S. W. v. Evers*,
    No. 14-CV-792-WMC, 2017 WL 4417721 (W.D. Wis. Oct. 3, 2017) ...... 19

*Satanic Temple Inc. v. Young*,
    681 F. Supp. 3d 685 (S.D. Tex. 2023) .................................................. 32

*Shurtleff v. City of Bos., Mass.*,
    596 U.S. 243 (2022)........................................................................... 3, 21

*Speech First, Inc. v. Fenves*,
  979 F.3d 319 (5th Cir. 2020) ................................................................. 5

*Texas All. for Retired Ams. v. Scott*,
  28 F.4th 669 (5th Cir. 2022) ................................................................ 16

*Texas v. Equal Emp. Opportunity Comm'n*,
  933 F.3d 433 (5th Cir. 2019) ............................................................... 10

*Trump v. CASA, Inc.*,
  606 U.S. 831 (2025) ................................................................. 4, 33, 34

*Turtle Island Foods, S.P.C. v. Strain*,
  65 F.4th 211 (5th Cir. 2023) ............................................................ 5, 10

*U.S. v. Playboy Entm't Grp., Inc.*,
  529 U.S. 803 (2000) ........................................................................ 6, 30

*U.S. v. Skrmetti*,
  145 S. Ct. 1816 (2025) ........................................................................ 24

*Wash. v. Trump*,
  145 F.4th 1013 (9th Cir. 2025) ............................................................ 33

*Waters v. Churchill*,
  511 U.S. 661 (1994) ............................................................................... 8

*Welty v. Dunaway*,
  No. 3-24-CV-768, 2025 WL 2015454 (M.D. Tenn. July 18, 2025) ............ 34

*Ex parte Young*,
  209 U.S. 123 (1908) ..................................................................... 2, 14, 15, 16

**Statutes**

42 U.S.C. § 1983 .................................................................. 3, 17, 18, 19

Tex. Educ. Code § 39.003 ..................................................................... 15

Tex. Educ. Code § 39A.003 ................................................................... 15

**Other Authorities**

*89th Leg. Updates*, TEX. EDUC. AGENCY (2025),
    https://tea.texas.gov/about-tea/government-relations-and-
    legal/government-relations/89th-legislature-updates (last visited Oct. 29,
    2025) .................................................................................................................. 12

*Legislature Updates*, TEX. EDUC. AGENCY, at 27 (Jun. 26, 2025),
    https://tea.texas.gov/texas-educators/superintendents/89th-legislature-
    updates.pdf (last visited Nov. 3, 2025) ....................................................... 15

*TEA Monthly Superintendent Call 89th Legislature Updates*, TEX. EDUC.
    AGENCY (Jun. 26, 2025), https://tea.texas.gov/texas-
    educators/superintendents/89th-legislature-updates.pdf (last visited Oct.
    29, 2025) ........................................................................................................ 12

Plaintiffs GSA Network, SEAT, Texas AFT, Rebecca Roe, Adrian Moore, and Polly Poe submit this Omnibus Reply Brief in Support of their Amended Motion for a Preliminary Injunction (Dkt. 33) and Response to Motions to Dismiss by Defendants Morath (Dkt. 57) and Katy ISD (Dkt. 53).

## INTRODUCTION

Plaintiffs meet every element required for the Court to enjoin Defendants from enforcing S.B. 12's GSA Ban, Inclusivity Ban, Social Transition Ban, and Don't Say LGBTQ+ Ban. Each of these provisions suppresses Plaintiffs' constitutionally protected speech based on viewpoint without satisfying strict scrutiny, is impermissibly vague, is facially overbroad, and operates as an unconstitutional prior restraint. The GSA Ban also abridges Plaintiffs' freedom of association, and it facially violates the Equal Access Act— a claim that no Defendant contests.

The facts at this stage of the case are undisputed. Defendants agree that each allegation in Plaintiffs' declarations may be entered into evidence without objection for purposes of the preliminary injunction. Dkt. 60. Plaintiffs allege numerous concrete ways that S.B. 12's challenged provisions censor their constitutionally protected speech. To highlight just a few: GSA Network has a member club in Plano ISD that is now banned due to S.B. 12, Dkt. 33-2 ¶ 24, and Katy ISD completely shut down the Diversity Club of which Adrian Moore is a member, Dkt. 33-7 ¶ 18. Both GSA Network and SEAT now face significant burdens in sharing resources and information with student organizations in Texas about matters of public concern, including race, gender identity, and sexual orientation, and their members' speech is suppressed by every challenged aspect of S.B.

12. Dkt. 33-2 ¶¶ 27-33; Dkt. 33-3 ¶¶ 51-66. Texas AFT's members, including Polly Poe, are now subject to vague restrictions that suppress their speech even outside of their official job duties and far removed from the classroom, Dkt. 33-5 ¶¶ 34-35, 40; Dkt. 33-6 ¶¶ 16, 20, and Rebecca Roe is subject to the law's limitations on programs, activities, and discussions in which she seeks to participate, Dkt. 33-4 ¶¶ 7-9. In addition to completely shuttering Adrian Moore's Diversity Club, Katy ISD has refused to use his chosen name—even with parental consent—which has caused him concrete and lasting harm. Dkt. 33-7 ¶¶ 19-25, 29. Plaintiffs' injuries are not "hypothetical" or "contingent on future events," as the Commissioner contends. Dkt. 57 at 25. They are real and happening now.

The suppression of Plaintiffs' speech, associational, and due process rights establishes injury-in-fact, which is directly traceable to Defendants. The Commissioner's arguments on traceability, redressability, ripeness, and *Ex parte Young* are nearly identical to those recently considered and rejected by the Fifth Circuit in a challenge to another Texas law. In *Book People, Inc. v. Wong*, the Commissioner's statutory obligation to receive book ratings from vendors and post them online, accompanied by his general authority to investigate and sanction school districts, was sufficient for the plaintiffs' claims to be ripe, traceable to the Commissioner, redressable through injunctive relief, and for the Commissioner to be a proper defendant under *Ex parte Young*. 91 F.4th 318, 332-36 (5th Cir. 2024). As with that statute, S.B. 12 requires the Commissioner to receive and post certificates of compliance from every school district and charter school in the state, over which he exercises significant control. *See* Dkt. 33 at 63-66. Even though the Commissioner enforces S.B. 12's provisions "through the school districts . . . [he] has a

sufficient connection to the statute's enforcement" and is properly subject to injunctive relief. *Book People*, 91 F.4th at 336.

Katy ISD makes the additional argument that it should be dismissed because it cannot be sued for enforcing state law under the requirements of *Monell*. Dkt. 53 at 10. But this argument misconstrues the relevant case law and defies the text of Section 1983. Because municipalities are persons under Section 1983, acting "under color of" state law is no defense. Katy ISD's final policymaker—the board of trustees—voted to adopt a formal policy to interpret and implement S.B. 12 in ways that violate Plaintiffs' constitutional rights, which subjects Katy ISD to municipal liability.

On the merits, only the Commissioner defends the constitutionality of S.B. 12's challenged provisions. He does so primarily by rewriting the statute and trying to shoehorn it into the government speech and government employee speech doctrines. But the text of each challenged provision plainly extends far beyond government/curricular speech, which cannot be "used as a cover for censorship," *Shurtleff v. City of Bos., Mass.*, 596 U.S. 243, 263 (2022) (Alito, J., concurring), and government employee speech, which remains constitutionally protected when employees speak on matters of public concern outside of their official duties, *see Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 529 (2022). The Inclusivity Ban and Don't Say LGBTQ+ Ban facially apply to every "volunteer" and "third party," and they and the Social Transition Ban are not limited to curricula or educators' official duties. *See* S.B. 12 §§ 3(a)(3), 3(b)(2), 7(b), 24(a).

Defendants do not dispute that Plaintiffs GSA Network and SEAT are themselves "third parties" whose speech is directly restricted by the Don't Say LGBTQ+ Ban, nor do

they contest that each Defendant School District and S.B. 12 itself have established limited public forums for all student organizations other than those barred by the GSA Ban. *See* Dkt. 33 at 36 n.41. Because S.B. 12 continues to allow clubs, programs, and activities that are unrelated to race, gender identity, and sexual orientation to continue without restriction, its challenged provisions impermissibly discriminate "against an entire class of viewpoints." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 831 (1995).

The Commissioner does not distinguish Plaintiffs' arguments demonstrating that S.B. 12 discriminates based on viewpoint, nor does he attempt to satisfy strict or even intermediate scrutiny. He also fails to rebut the numerous ways that Plaintiffs have shown that the challenged provisions are vague, are overbroad, and operate as an impermissible prior restraint. The GSA Ban additionally infringes on Plaintiffs' freedom of association, and no Defendant disputes that it facially violates the Equal Access Act. Plaintiffs are therefore substantially likely to prevail on the merits, they will continue to suffer irreparable harm absent injunctive relief, and the balance of the equities and public interest tip in their favor.

An injunction prohibiting the Commissioner from enforcing S.B. 12 against every school district and charter school in Texas is the narrowest possible injunction that can afford Plaintiffs "complete relief" in accordance with *Trump v. CASA, Inc*., 606 U.S. 831, 861 (2025), because Plaintiffs operate statewide and have members in hundreds of school districts and charter school systems, with more joining every day and seeking to participate in numerous programs and activities across Texas that are censored by S.B. 12. Enjoining

4

the Commissioner from enforcing S.B. 12's challenged provisions statewide is therefore necessary to afford Plaintiffs complete relief.

## ARGUMENT

## I.    PLAINTIFFS HAVE STANDING

### A.    All Plaintiffs Engage in Constitutionally Protected Speech Proscribed by S.B. 12

As established at length in Plaintiffs' declarations and the Amended Motion for Preliminary Injunction, Plaintiffs have standing to sue Defendants for each challenged aspect of S.B. 12. Plaintiffs' declarations do not merely "invok[e] the First Amendment[,]" as the Commissioner claims, Dkt. 57 at 17, but readily meet the standards required for injury-in-fact since Plaintiffs "(1) intend[] to engage in a course of conduct arguably affected with a constitutional interest; (2) [] the course of action is arguably proscribed by statute; and (3) [] there exists a credible threat of prosecution under the statute." *Turtle Island Foods, S.P.C. v. Strain*, 65 F.4th 211, 215-16 (5th Cir. 2023) (citation omitted). "It is not hard to sustain standing for a pre-enforcement challenge in the highly sensitive area of public regulations governing bedrock political speech[,]" and "when dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 331, 335 (5th Cir. 2020) (quotation omitted). The Fifth Circuit "has repeatedly held that chilling a plaintiff's speech is a constitutional harm adequate to satisfy the injury-in-fact requirement." *Ostrewich v. Tatum*, 72 F.4th 94,

102 (5th Cir. 2023) (citation omitted). Here, that harm has already occurred and will continue to worsen absent injunctive relief.

### 1.    GSA Network

GSA Network has standing against Defendants Morath and Plano ISD because GSA Network and its members intend to engage in constitutionally protected speech and association proscribed by S.B. 12. The GSA Ban has already led to a GSA Network member club being completely shut down in Plano ISD, which directly infringes the speech and associational rights of GSA Network and its members. Dkt. 32-2 ¶ 24; Dkt. 32-5 ¶¶ 12, 21. The Inclusivity Ban, Social Transition Ban, and Don't Say LGBTQ+ Ban also impair GSA Network's ability to speak, associate with, and share resources with students, parents, and educators about topics relating to race, gender identity, and sexual orientation. Dkt. 32-2 ¶¶ 27-32. Although the Commissioner contends that GSA Network can still communicate with students, parents, and educators entirely outside of schools, Dkt. 57 at 20, he fails to recognize that the government burdening someone's speech (without completely silencing it) still establishes injury-in-fact. *See U.S. v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 812 (2000) ("It is of no moment that the statute does not impose a complete prohibition. The distinction between laws burdening and laws banning speech is but a matter of degree."). Depriving an organization of access to a limited public forum based on viewpoint is also a constitutional injury. *See Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 393-95 (1993) (prohibiting a group from showing a religious film at a public school violated the First Amendment, despite the group being able to show the film off-campus).

6

GSA Network does not "demand independent parties disseminate information on school campuses." *Contra* Dkt. 57 at 20. It is simply asking that the viewpoint discriminatory, vague, and otherwise unconstitutional burdens on its speech be enjoined so that it has the same ability to communicate and associate with students, parents, and educators in Texas schools as everyone else. *See* Dkt. 32 at 116. Moreover, no Defendant challenges that GSA Network satisfies every element for associational standing to sue on behalf of its members, *see* Dkt. 33 at 44, or that GSA Network's members are independently harmed by each aspect of S.B. 12, *see* Dkt. 33-2 ¶¶ 24-33.

### 2.    SEAT

Similarly, the Commissioner does not contest that SEAT meets the requirements of associational standing to sue on behalf of its members, or that its members suffer concrete harm through each aspect of S.B. 12. *See* Dkt. 33-3 ¶¶ 63-66. SEAT has standing against Defendants Morath, Houston ISD, and Katy ISD because SEAT and its members intend to engage in speech and association arguably proscribed by S.B. 12. The Commissioner argues that SEAT's collaboration and sharing of resources with teachers, students, and student organizations (including GSAs) is not "proscribed by S.B. 12." Dkt. 57 at 20. But the Inclusivity Ban and Don't Say LGBTQ+ Ban facially restrict the speech of "volunteers" and "third parties" and do not limit those terms to "teachers," who face separate restrictions as "school employees." *See* S.B. 12 §§ 3(a)(3), 3(b)(2), 7(b), 24(a). The Commissioner does not cite any authority for how SEAT and its members could be excluded from the ordinary meaning of "volunteers" or "third parties," or how their speech and activities in Texas schools are not directly burdened by S.B. 12. *See* Dkt. 57

at 20. Moreover, even if SEAT were somehow not directly regulated by S.B. 12, it still "affect[s] the speech or activity of SEAT," *contra id.*, when teachers are prohibited from partnering with SEAT and implementing any program or activity that references race, gender identity, sexual orientation, or social transitioning. It is uncontested that SEAT relies on teachers to chaperone its events where these topics are discussed and to share materials with its members and audiences. *See* Dkt. 33-3 ¶¶ 43-46, 48, 58, 65.

### 3.    Texas AFT

Texas AFT has standing against the Commissioner, Houston ISD, Katy ISD, and Plano ISD because Texas AFT's members intend to engage in speech proscribed by S.B. 12 and because they are subject to the law's unconstitutionally vague restrictions. The Commissioner does not contest that Texas AFT meets the requirements for associational standing. Instead, he wrongly contends that S.B. 12 does not implicate the free speech rights of ***any*** Texas AFT member simply because they are "public and charter school ***employees***." Dkt. 57 at 21. In making this argument, the Commissioner overlooks the most recent Supreme Court case on government employee speech, *Kennedy v. Bremerton Sch. Dist.*, which confirms that government employees retain free speech rights when speaking on matters of public concern outside of their official duties. 597 U.S. 507, 527 (2022). The cases the Commissioner cites do not alter this analysis, Dkt. 57 at 21, since the Supreme Court's holdings turn on the distinction between speech made pursuant to public employees' official duties, *see Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006), and speech made outside of those duties. *See Kennedy*, 597 U.S. at 529; *see also Waters v. Churchill*, 511 U.S. 661, 674 (1994) ("[A] government employee, like any citizen, may

have a strong, legitimate interest in speaking out on public matters"). This distinction forms the basis of Texas AFT's free speech claims on behalf of its members since Texas AFT contends that the challenged provisions of S.B. 12 suppress its members speech "about matters of public concern even in their own private capacity." Dkt. 33-6 ¶ 16; *accord Local 8027, AFT-N.H., AFL-CIO v. Edelblut*, 651 F. Supp. 3d 444, 453 (D.N.H. 2023) (denying motion to dismiss teacher claims where a statute could "plausibly be read to cover interactions with pupils outside of the classroom and even beyond the school grounds").

Moreover, the Commissioner does not contest that government employees also have standing to challenge laws that are unconstitutionally vague, even where those restrictions may apply to government speech. *See* Dkt. 33 at 60 (citing *Cramp v. Bd. of Pub. Instruction of Orange Cnty., Fla*., 368 U.S. 278, 284 (1961) (finding that a teacher had standing to challenge a Florida statute "so vague and indefinite that others could with reason interpret it differently")); *accord Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218, 1267 (N.D. Fla. 2022) (recognizing standing of public university professors to challenge vague law). Texas AFT's members are injured by the vagueness of S.B. 12 and its threatened penalties against them, Dkt. 33 ¶¶ 11-25, which independently gives them standing beyond the law's suppression of speech on matters of public concern beyond their official duties.

### 4.    Rebecca Roe

Rebecca Roe has standing against Defendants Morath and Houston ISD because she intends to engage in speech and association arguably proscribed by S.B. 12. The

Commissioner argues that Rebecca's injuries are too "hypothetical" to confer standing, Dkt. 57 at 22, but that is incorrect. Rebecca must only show that the programs and activities she seeks to participate in are "arguably proscribed" by S.B. 12. *Turtle Island Foods*, 65 F.4th at 215-16. The Commissioner also contends that any restrictions on Rebecca's speech should be subject to the test from *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 272 (1988), or a limited public forum analysis. Dkt. 57 at 22-23. This argument goes to the merits, not standing. *See Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 447 (5th Cir. 2019) (explaining that courts must "assume, for purposes of the standing analysis, that [Plaintiffs are] correct on the merits"); *see also infra* Section III.A.

### 5.    Adrian Moore

Adrian Moore has standing against Defendants Morath and Katy ISD because he intends to engage in speech and association arguably proscribed by S.B. 12 and has already experienced concrete harm. No Defendant contests Adrian's claim that he is no longer able to participate in his school's Diversity Club due to S.B. 12. *See* Dkt. 33-7 ¶ 18. The Supreme Court has repeatedly held that being denied access to a limited public forum through a student organization is sufficient to confer injury-in-fact. *See Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 120 (2001) (holding that a school violated a club's right to free speech by denying access to a limited public forum).

The Commissioner also ignores the concrete ways that Adrian's speech is directly chilled by S.B. 12, since he can no longer speak with his teachers about issues of race, gender identity, or sexual orientation, or be supported in his social transition. Dkt. 33-7

¶¶ 25, 29. Even though Adrian socially transitioned in seventh grade and has been known as "Adrian" by all his teachers and peers for the past five years, Katy ISD has instructed all teachers and staff to refuse to use his chosen name. *Id.* ¶¶ 5, 19. This has caused Adrian severe stress and anxiety and singles him out for discrimination, especially since his non-transgender peers are still able to freely use nicknames and chosen names without any burden from S.B. 12. *Id.* ¶¶ 20-24. While the Commissioner contends without citation that Adrian has no "constitutional right to be called any name other than that on the birth certificate," Dkt. 57 at 23, that argument again goes to the merits—not injury-in-fact. The vagueness of S.B. 12, its suppression of Adrian's own ability to speak and express himself, and the dignitary and stigmatic harms the law imposes all firmly establish his standing to challenge each aspect of S.B. 12.

### 6.    Polly Poe

As with Texas AFT, the Commissioner attempts to reduce Poe's injuries to speech within her official duties. But Poe has standing against the Commissioner and Plano ISD because S.B. 12 facially restricts her speech beyond her official duties on matters of public concern. Dkt. 33-5 ¶¶ 34-35. The Commissioner also does not contest that Poe independently has standing to challenge vague provisions of a law enforced against her. *See* Dkt. 33 at 60.

### B.    Plaintiffs' Injuries Are Traceable to Defendants

Plaintiffs' injuries are directly traceable to all Defendants, who confirm they must actively implement the law's requirements. *See* Dkt. 54 at 3; Dkt. 56 at 2; Dkt. 57 at 14; Dkt. 59 at 2. The Commissioner contends that "Plaintiffs' alleged harms remain unaffected

by Defendant's posting of certifications and 'depend[] on several layers of decisions by third parties,'" Dkt. 57 at 17-18 (citation omitted), but he admits to being statutorily required to receive and post certificates of compliance and to already publishing guidance to school districts and charter schools on how they should implement S.B. 12. *Id.* at 17-18.[1] Plaintiffs' injuries are thus directly traceable to the Commissioner because "[t]racing an injury is not the same as seeking its proximate cause." *K.P. v. LeBlanc*, 627 F.3d 115, 123 (5th Cir. 2010). If a defendant's role in a statutory scheme causes third parties to "react in predictable ways" such that it "contribute[s] to Plaintiffs' harm, Plaintiffs' injuries can be traced to the Commissioner's enforcement." *Book People, Inc. v. Wong*, 91 F.4th 318, 332-33 (5th Cir. 2024) (citations omitted). Even if the Commissioner enforces the law "through the school districts," the "determinative or coercive effect" of his actions on school districts makes Plaintiffs' injuries traceable against him. *Id.* at 331, 336.

### C.    Plaintiffs' Injuries Are Redressable

Plaintiffs' injuries are also redressable through an injunction against Defendants, despite the Commissioner's contention that "the implementation of S.B. 12 is driven by individual school districts, not the [Commissioner]." Dkt. 57 at 18. In *Book People*, the Fifth Circuit rejected a similar argument on redressability. 91 F.4th at 333. Although the Commissioner enforced that law "through the school districts," enjoining him from

---

[1]    *89th Leg. Updates*, TEX. EDUC. AGENCY (2025), https://tea.texas.gov/about-tea/government-relations-and-legal/government-relations/89th-legislature-updates (last visited Oct. 29, 2025); *TEA Monthly Superintendent Call 89th Legislature Updates*, TEX. EDUC. AGENCY, at 27 (Jun. 26, 2025), https://tea.texas.gov/texas-educators/superintendents/89th-legislature-updates.pdf (last visited Oct. 29, 2025).

enforcing the law's challenged provisions provided the plaintiffs with at least some relief, which is all that Article III requires. *Id.* at 333, 336; *accord Larson v. Valente*, 456 U.S. 228, 243 n. 15 (1982) (plaintiff "need not show that a favorable decision will relieve his *every* injury.").

### D.    Plaintiffs' Claims Are Ripe

As with traceability and redressability, the Commissioner contends that Plaintiffs' claims are not ripe because Plaintiffs only suffer hypothetical injuries contingent on future events—namely, that the Commissioner "may adopt rules regarding the reporting requirements" for S.B. 12. Dkt. 57 at 25. Regardless of any future rulemaking, Plaintiffs' claims here are clearly ripe.

When evaluating ripeness, courts consider (1) "the fitness of the issues for judicial decision" and (2) "the hardship to the parties of withholding court consideration." *Braidwood Mgmt.*, *Inc. v. Equal Emp't Opportunity Comm'n*, 70 F.4th 914, 930 (5th Cir. 2023) (quotation omitted). "A claim is 'fit for judicial decision' if it presents a pure question of law that needs no further factual development." *Id.* (citation omitted). A claim is not ripe if it is "contingent [on] future events that may not occur as anticipated, or indeed may not occur at all." *Id.* (citation omitted).

First, the issues here are fit for judicial review. Plaintiffs' constitutional challenge involves pure questions of law that need no further factual development, especially where the chilling of speech alone constitutes injury-in-fact. In *Book People*, the Fifth Circuit rejected a similar ripeness argument to the one the Commissioner makes here. 91 F.4th at 334. Though the Commissioner claimed there that plaintiffs' injuries were contingent on

future rulemaking, the court noted the law's "immediate" injury on Plaintiffs from the statute itself while finding that the case involved "'pure question[s] of law' that need no further factual or legal development." *Id.* (citation omitted). Here, too, S.B. 12's challenged provisions are already in effect and directly causing Plaintiffs harm, regardless of future rulemaking.

Second, Plaintiffs will suffer significant hardship if judicial review is delayed. Under the rule language the Commissioner cites, "the harm of being force[d] . . . to modify [one's] behavior in order to avoid future adverse consequences" is a sufficient hardship for Plaintiffs' claims to be ripe. Dkt. 57 at 25 (quoting *Choice Inv. of Tex. v. Greenstein*, 691 F.3d 710, 715 (5th Cir. 2012)). Here, this standard is met, since each Plaintiff has had their speech concretely chilled, including having GSAs in Plano ISD and the diversity club in Katy ISD completely shut down. *See, e.g.,* Dkt. 33-2 ¶ 24; Dkt. 33-7 ¶ 18. These are not "possible, future injuries" to Plaintiffs' constitutional rights, *contra* Dkt. 57 at 26—they are already happening now. Plaintiffs' claims are ripe.

## II.    DEFENDANTS ARE PROPERLY SUBJECT TO SUIT AND NOT IMMUNE

### A.  The Commissioner Is Not Immune Under *Ex parte Young*

Defendant Morath is not shielded by sovereign immunity in this case because *Ex parte Young* applies. The Commissioner does not challenge the central inquiries of the *Ex parte Young* analysis—that Plaintiffs are seeking prospective injunctive relief against him and have properly alleged that he is an "individual state official[] acting in violation of federal law." *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019) (citation omitted). Instead, the Commissioner asserts that Plaintiffs have not shown a sufficient connection

14

with his enforcement of S.B. 12 and that Plaintiffs' requests for relief improperly "seek to control" his exercise of discretion. Dkt. 57 at 26-27. Both arguments lack merit.

First, Plaintiffs assert that the Commissioner has "the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *Book People*, 91 F.4th at 335 (quotation omitted). For example, the Commissioner is required by S.B. 12 to receive and publish certifications of compliance from school districts and charter schools, and to receive complaints against school employees accused of violating the statute.[2] Once the Commissioner is made aware of non-compliance, he "may authorize special investigations to be conducted," Tex. Educ. Code § 39.003, and impose sanctions, Tex. Educ. Code § 39A.003. This specific statutory enforcement, accompanied by the Commissioner's general powers over school district and charter schools, constitutes a "sufficient connection" for purposes of *Ex parte Young*, even where the Commissioner "enforces the law through the school districts." *See Book People*, 91 F.4th at 336. The

---

[2] These compliance reports specifically require each school district and charter school to "certify to the agency that the district or school is in compliance with this section and Sections 11.005 and 28.0022," S.B. 12 § 28(a). Section 11.005 refers to the Inclusivity Ban, which explicitly incorporates the GSA Ban. S.B. 12 § 3(e)(5)(d).

Plaintiffs' Amended Motion for Preliminary Injunction contains a typographical error conflating Section 28.0022 with Section 28.002, which references the Don't Say LGBTQ+ Ban. Dkt. 33 at 65 n.48. Although the certificates of compliance do not specifically reference the Don't Say LGBTQ+ Ban, the Commissioner's published guidance still commands school districts to comply with this section. *TEA Monthly Superintendent Call 89th Legislature Updates*, TEX. EDUC. AGENCY, at 27 (Jun. 26, 2025), https://tea.texas.gov/texas-educators/superintendents/89th-legislature-updates.pdf (last visited Nov. 3, 2025) ("Sexual Orientation and Gender Identity instruction and student clubs are prohibited"). Thus, the Commissioner has already taken affirmative steps to enforce the Don't Say LGBTQ+ Ban as well as every other provision of S.B. 12 challenged in this case.

Commissioner does not contest that he has already demonstrated a willingness to enforce the statute and has published guidance explaining the law's requirements.[3] The fact that certifications are due next year does not diminish the Commissioner's power to "compel or constrain" school districts, since the law is effective now and the Commissioner has taken affirmative steps to ensure compliance. *See Texas All. for Retired Ams. v. Scott*, 28 F.4th 669, 672 (5th Cir. 2022) (citation omitted).

The Commissioner's argument that *Ex parte Young* does not apply to "discretionary" actions by the Commissioner under *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 242 (5th Cir. 2020), is inapposite. Dkt. 57 at 26-27. In *Richardson*, the Fifth Circuit considered the grant of an ***affirmative*** injunction that imposed various requirements on officials' use of discretion. 978 F.3d at 227. Here, as in *Ex parte Young* and its progeny, Plaintiffs seek a ***negative*** injunction to prohibit the Commissioner from enforcing unconstitutional provisions of S.B. 12. *See Ex parte Young*, 209 U.S. 123, 159 (1908) ("The general discretion regarding the enforcement of the laws when and as he deems appropriate is not interfered with by an injunction which restrains the state officer from taking any steps towards the enforcement of an unconstitutional enactment, to the injury of complainant."). Indeed, courts routinely enjoin state officials from enforcing unconstitutional state laws. *See, e.g.*, *Healthy Vision Ass'n v. Abbott*, 138 F.4th 385, 397 (5th Cir. 2025) (Texas state official's discretion on how to enforce statute did not foreclose the application of *Ex parte Young*).

---

[3]     *See supra* note 1.

**B.**    **Katy ISD, Houston ISD, and Plano ISD Are Proper Defendants Under Section 1983**

Only Katy ISD contests the viability of municipal liability, and it is notable that neither Houston ISD nor Plano ISD raises this argument. While Katy ISD admits that its school board adopted a formal resolution interpreting and implementing S.B. 12, Dkt. 53 at 9, it seeks dismissal by arguing that municipalities cannot be sued for enforcing state law, *id.* at 8. This argument fails for multiple reasons.

First, "written policy statements, ordinances, [] regulations" and even single decisions by a final policymaker can all "suffice to establish a municipal policy for purposes of liability." *Jones v. City of Hutto*, 154 F.4th 332, 337 (5th Cir. 2025) (quotation omitted). The fact that Katy ISD tries to minimize the effect of its decision to implement S.B. 12 by calling it a "resolution," Dkt. 53 at 9, does not diminish its binding effect on all district employees such that it may "fairly be said to represent official policy." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978).

Second, Katy ISD's argument that it cannot be held liable for enforcing state law is foreclosed by the text of section 1983, which states, "Every person who, ***under color of any statute . . . of any State*** . . . subjects . . . any citizen of the United States or other person . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, ***shall be liable*** . . ." 42 U.S.C. § 1983. "The very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action under color of state law, '***whether that action be executive, legislative, or judicial***.'" *Mitchum v. Foster*, 407 U.S.

17

225, 242 (1972) (citation omitted) (emphasis added). Because municipalities are "persons" under Section 1983, acting under color of state law is not a defense, and adopting Katy ISD's argument would contravene the text and purpose of Section 1983. *See Owen v. City of Indep., Mo.*, 445 U.S. 622, 647-48 (1980) ("By including municipalities within the class of 'persons' subject to liability for violations of the Federal Constitution and laws, Congress—the supreme sovereign on matters of federal law—abolished whatever vestige of the State's sovereign immunity the municipality possessed.").

Katy ISD's leading case, *Familias Unidas v. Briscoe*, 619 F.2d 391 (5th Cir. 1980), stands for the opposite conclusion for which the District invokes it and strongly supports a finding of municipal liability. In *Familias Unidas*, the Fifth Circuit noted that "[e]ach defendant in this case simply relied on a state statutory scheme" before holding that the Hondo ISD Board of Trustees voted to implement the statute and "***is liable*** to Torrez for nominal damages based on the implementation of that policy." *Id.* at 403-04 (emphasis added). While conceding that "***the school board was liable***, because it had exercised discretion by voting to . . . implement" the law, Dkt. 53 at 10 (emphasis added), Katy ISD urges this Court to instead follow the Fifth Circuit's analysis of the county judge. Unlike the school district, the Fifth Circuit found that the judge acted for the state, not the county. *See Familias Unidas*, 619 F.2d at 404 (explaining that state officials, unlike municipalities, benefit from sovereign immunity). But this aspect of *Familias Unidas* does not undermine the court's holding that the school district ***was liable*** for implementing state law.

The other case Katy ISD relies on is inapposite because it concerns a state official, rather than a municipality or school district. *See Bigford v. Taylor*, 834 F.2d 1213, 1223

(5th Cir. 1988) (magistrate acts for the state in setting bond). The primary out-of-circuit case that Katy ISD cites acknowledges that "courts have come to varying conclusions on the questions whether and to what extent municipalities may be held liable under § 1983 for following state laws." *N.N. ex rel. S.S. v. Madison Metro. Sch. Dist.*, 670 F. Supp. 2d 927, 933 (W.D. Wis. 2009). Moreover, this case is undermined by other out-of-circuit cases. *See, e.g., Cooper v. Dillon*, 403 F.3d 1208, 1223 (11th Cir. 2005) (finding that a police chief's "decision to enforce an unconstitutional statute [] constituted a 'deliberate choice to follow a course of action . . . made from among various alternatives" satisfied *Monell*'s requirements) (citation omitted); *S. W. v. Evers*, No. 14-CV-792-WMC, 2017 WL 4417721, at *7 (W.D. Wis. Oct. 3, 2017) (finding a school district liable when exercising discretion to enforce state law).

As in *Familias Unidas*, Katy ISD formally voted to enforce state law and made a deliberate choice on how to interpret and implement S.B. 12. Under the text of Section 1983 and binding precedent in this Circuit, Katy ISD is properly subject to suit.

## III.    PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO PREVAIL ON THE MERITS

### A. S.B. 12 Burdens Plaintiffs' Speech Far Beyond Government Speech

Although Defendant Morath sweepingly asserts that "Plaintiffs' First Amendment claims fail out of the gate because S.B. 12 concerns government speech," Dkt. 57 at 28, his own brief invokes at least four different tests that all subject S.B. 12's challenged provisions to First Amendment scrutiny: (1) the government speech doctrine; (2) the government employee speech doctrine; (3) the limited public forum analysis of *Christian*

*Legal Society v. Martinez*, 561 U.S. 661, 686 (2010); and (4) the school-sponsored speech doctrine of *Hazelwood*, 484 U.S. at 272. Because S.B. 12 is so sweeping, its challenged provisions implicate speech in each of these categories while also extending beyond them. S.B. 12's challenged restrictions also "apply in every type of forum—including traditional and designated public forums," Dkt. 33 at 36, 56, which no Defendant contests. Further, the law's restrictions facially burden school employees' speech on matters of public concern beyond their official duties. *Id.* at 62 (citing *Kennedy*, 597 U.S. at 529).

While school-related free speech doctrines are notoriously "complex and often difficult to apply," *Morse v. Frederick*, 551 U.S. 393, 430 (2007) (Breyer, J., concurring), courts across the country routinely subject laws like S.B. 12 to constitutional scrutiny. *See, e.g.*, *Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*, 779 F. Supp. 3d 149 (D.N.H. 2025) ("This is the third in a series of recent lawsuits in this court seeking to enjoin similar laws or executive action targeting 'divisive concepts' or 'DEI' in schools and the classroom . . . Each time, this court has found the at-issue laws unconstitutional because they 'threatened teachers with enforcement on an ad hoc and subjective basis'"); *R.I. Latino Arts v. Nat'l Endowment for the Arts*, No. 25-79 WES, 2025 WL 2689296, at *4 (D.R.I. Sept. 19, 2025) (holding that a ban on funding related to "gender ideology" is "presumptively unconstitutional" as "viewpoint based, because it assigns negative weight to the expression of certain ideas on the issue of gender identity"); *see also* Dkt. 33 at 19-20 (collecting cases).

Far from insulating S.B. 12 from judicial review, the government speech doctrine cannot be "used as a cover for censorship." *Shurtleff v. City of Bos., Mass.*, 596 U.S. 243,

263 (2022) (Alito, J., concurring). Instead, "[w]hen the government encourages diverse expression—say, by creating a forum for debate—the First Amendment prevents it from discriminating against speakers based on their viewpoint." *Id.* at 247 (citing *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828-30 (1995)). "[W]hile the government-speech doctrine is important—indeed, essential—it is a doctrine that is susceptible to dangerous misuse. If private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints." *Matal v. Tam*, 582 U.S. 218, 235 (2017). For that reason, the Supreme Court "exercise[s] great caution before extending [its] government-speech precedents." *Id.*

When determining whether "the government intends to speak for itself or to regulate private expression," the Supreme Court conducts a "holistic inquiry" that analyzes "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Shurtleff*, 596 U.S. at 252 (citation omitted). Here, the Commissioner does not address this test, despite Plaintiffs raising it in their brief, Dkt. 33 at 72 n.54, nor does he attempt to meet it. That is likely because there is no history, perception, or functional state control over *every* program, activity, student organization, and discussion that takes place on and off school property at every public and charter school in Texas and is now subject to censorship through S.B. 12. The Commissioner does not cite any case to support such sweeping and statewide restrictions like those in S.B. 12

falling entirely within the government speech doctrine, nor are Plaintiffs aware of one. Instead, S.B. 12's challenged restrictions are subject to constitutional scrutiny.

### 1. The GSA Ban

It is uncontested that each School District Defendant has established a limited public forum for "all noncurriculum-related student groups" in secondary schools. *See* Dkt. 33 at 36, 114. And no Defendant disputes Plaintiffs' contention that "S.B. 12 itself contemplates and authorizes these forums for views not prohibited by the law." *Id.* at 36 n.41. Because the GSA Ban facially denies Plaintiffs access to a limited public forum still afforded to others, it is subject to constitutional scrutiny even under the cases cited by the Commissioner.

The Commissioner relies heavily on *Martinez*, Dkt. 57 at 31-32, but somehow ignores its central holding that once a government entity creates a limited public forum, "[a]ny access barrier must be reasonable and viewpoint neutral." 561 U.S. at 679 (citation omitted). Similarly, the Fifth Circuit in *Chiras v. Miller* determined that a decision over which textbook to use in state-mandated curriculum was "the state speaking, and not the textbook author," but expressly distinguished that from student programs and activities. 432 F.3d 606, 614-15 (5th Cir. 2005) (citing *Rosenberger*, 515 U.S. at 833). Because Defendant School Districts and S.B. 12 itself explicitly authorize student organizations to continue in limited public forums—except those "based on sexual orientation or gender identity," S.B. 12 § 27(b)—*Rosenberger* and *Martinez* apply, and *Chiras*'s narrow exception for state-sponsored textbooks does not.

Similarly, the discretion afforded to educators by *Hazelwood* does not insulate S.B. 12 from judicial review. In *Hazelwood*, the Supreme Court held that "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." 484 U.S. at 272. The Fifth Circuit has explained that "the *Hazelwood* exception should be construed narrowly. It applies only where the speech is school-sponsored, a determination that turns on whether 'the views of the individual speaker [might be] erroneously attributed to the school.'" *Morgan v. Swanson*, 659 F.3d 359, 408-09 (5th Cir. 2011) (en banc) (citation omitted).

Here, there is no indication that allowing students to participate in GSAs and other clubs "based on sexual orientation or gender identity" raises the same problems that *Hazelwood* sought to address. Even if *Hazelwood* did apply, there are no "legitimate pedagogical concerns" that justify the GSA Ban's sweeping restrictions on speech. 484 U.S. at 272. The Commissioner quotes a lawmaker stating, "we shouldn't have clubs based on sex," Dkt. 57 at 31, but the GSA Ban does not target clubs "based on sex." Instead, it bans clubs "based on sexual orientation or gender identity," S.B. 12 § 27(b), and undisputed evidence in the record demonstrates that this provision targets GSAs, which have now been shuttered due to S.B. 12. *See, e.g.,* Dkt. 33-2 ¶ 24. No Defendant asserts that GSAs engage in any speech or conduct that is constitutionally unprotected or possibly causes any disruption to the school environment. Even if some lawmakers disapprove of the class of viewpoints expressed by GSAs, the government has no "free-floating power to restrict the

ideas to which children may be exposed." *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 794 (2011).

### 2.    Inclusivity Ban

The Commissioner tries to insulate the Inclusivity Ban from First Amendment scrutiny because it applies "only to activities 'at, for or on behalf of the district.'" Dkt. 57 at 33. This argument is unavailing because the Inclusivity Ban still reaches and suppresses enormous swaths of constitutionally protected speech. It defines "diversity, equity and inclusion duties" to include "developing or implementing policies, procedures, trainings, activities or programs that reference race, color, ethnicity, gender identity, or sexual orientation." S.B. 12 § 3(a)(3). Plaintiffs provide multiple concrete and uncontested examples of how the Inclusivity Ban censors and chills their programs, activities, and speech shielded by the First Amendment. *See, e.g.*, Dkt. 33-2 ¶ 27; Dkt. 33-3 ¶¶ 57-61.

### 3.    Social Transition Ban

The Commissioner's primary justification for the Social Transition Ban is that "[p]ublic schools are simply not the appropriate fora to provide instruction to students to enable a 'transition from the person's biological sex at birth to the opposite biological sex.'" Dkt. 57 at 35 (quoting S.B. 12 § 7(a)). This argument reinforces that this section is viewpoint-discriminatory and subject to constitutional scrutiny.

While *U.S. v. Skrmetti*, 145 S. Ct. 1816 (2025), could be relevant if Plaintiffs brought an equal protection claim, it is inapposite to the free speech and vagueness standards that govern this case. Even though the state may control the speech of government employees within the scope of their official duties, *see supra* Section I.A.3,

24

the Social Transition Ban extends well beyond that and is not limited to speech within the classroom or within an educator's official duties. *See* S.B. 12 § 7(a)-(b). While this section facially restricts school employees' speech on matters of public concern within their private capacity and is impermissibly vague, it also burdens the speech of students and organizations that can also no longer engage in discussions with school employees about these topics. *See* Dkt. 33-3 ¶¶ 55-56; Dkt. 33-7 ¶ 25.

### 4.    Don't Say LGBTQ+ Ban

Although the Commissioner argues that the Don't Say LGBTQ+ Ban is "strictly related to in-school curriculum matters," Dkt. 57 at 36, this section plainly states that "[a] school district, open-enrollment charter school, or district or charter school employee may not provide *or allow a third party to provide* instruction, guidance, activities, or programming regarding sexual orientation or gender identity to students enrolled in prekindergarten through 12th grade." S.B. 12 § 24(a) (emphasis added). The Commissioner does not dispute that Plaintiffs like the GSA Network and SEAT are themselves "third parties" directly subject to this restriction, or that they are no longer permitted to provide guidance, activities, or programming related to sexual orientation or gender identity to students in Texas schools. Dkt. 33-2 ¶ 29; Dkt. 33-3 ¶ 53. Because this section is not limited to in-school instruction or even official or school-sponsored activities, it also facially restricts the speech of Texas AFT and its members (including Polly Poe) about matters of public concern in their purely private capacity. Dkt. 33-5 ¶ 35; Dkt. 33-6 ¶¶ 18-20.

**B.      S.B. 12's Challenged Provisions Are Viewpoint-Discriminatory**

Defendants fail to rebut Plaintiffs' specific arguments as to how the challenged provisions of S.B. 12 facially discriminate based on viewpoint. Instead, the Commissioner reiterates his argument that S.B. 12's challenged provisions apply only to government speech while conceding that "[w]hen a student group asks to use school resources—including campus facilities—for its own purposes, the limited-public forum analysis would apply." Dkt. 57 at 37.

This concession dooms the Commissioner's argument, because the cases he cites specifically prohibit the government from discriminating based on viewpoint in a limited public forum without satisfying strict scrutiny. *See Matal*, 582 U.S. at 243 (when government creates a limited public forum, "some content- and speaker-based restrictions may be allowed," but "even in such cases, *what we have termed 'viewpoint discrimination' is forbidden*") (emphasis added); *accord Martinez*, 561 U.S. at 679 (viewpoint discrimination is forbidden in a limited public forum).

The Commissioner does not argue—and certainly does not establish—how S.B. 12's challenged provisions are viewpoint-neutral, nor does he attempt to satisfy strict or even intermediate scrutiny. Plaintiffs have therefore established a likelihood of success that each challenged provision of S.B. 12 impermissibly discriminates based on viewpoint. *See* Dkt. 33 at 72-77.

**C.      S.B. 12's Challenged Provisions Are Vague**

The Commissioner also does not rebut Plaintiffs' detailed arguments for how the challenged provisions of S.B. 12 are unconstitutionally vague. *Contrast* Dkt. 57 at 38-39

*with* Dkt. 33 at 81-103. Importantly, the Commissioner does not contest Plaintiffs' allegation that the term "based on" in the GSA Ban is impermissibly vague, Dkt. 33 at 84-85; or that the terms "develop," "implement," "policies," "procedures," "trainings," "activities," "program," "reference," and "volunteer" in the Inclusivity Ban are "[i]ndividually and collectively . . . so vague that they fail to provide the minimum guidance required by the First Amendment and Due Process Clause as to what kind of speech and activities are prohibited," *id.* at 88-93. Similarly, the Commissioner does not dispute that the exception for student free speech in both the Inclusivity Ban and Don't Say LGBTQ+ Ban is so broad "as to be meaningless" under the interpretive canon of *lex specialis*, *id.* at 94-95, or that critical terms in the Social Transition Ban "fail[] to give sufficient guidance as to what is prohibited and invite[] arbitrary and discriminatory enforcement," *id.* at 96. The Commissioner also does not challenge that S.B. 12's lack of scienter exacerbates its vagueness, *id.* at 86-87, which distinguishes this challenge from the key case the Commissioner cites, *Hill v. Colo.*, 530 U.S. 703, 732 (2000), where the inclusion of *mens rea* helped salvage a law's constitutionality. The Commissioner also does not dispute that the exception to the Don't Say LGBTQ+ Ban for single-sex clubs "amplifies, rather than mitigates, this section's vagueness, because it seems to acknowledge that many single-sex clubs and activities *are* impacted by S.B. 12's prohibitions." Dkt. 33 at 102.

Even for the terms the Commissioner addresses, he relies on conclusory arguments and generalized dictionary definitions that do not save S.B. 12's irredeemably vague provisions. *See* Dkt. 57 at 39. The Commissioner contends that it "strains credibility that public school employees do not understand the word 'assist'" since it is undefined in the

Social Transition Ban, *id.*, but that is exactly what the uncontested record shows. *See* Dkt. 33-5 ¶ 32 ("I [] have no idea what it means to 'assist' a student's 'social transitioning.'"); *see also* Dkt. 33-6 ¶ 11. While the Commissioner argues without support that S.B. 12 does not "encourage[] arbitrary and discriminatory enforcement," Dkt. 57 at 40, he does not rebut Plaintiffs' examples of such arbitrary and discriminatory enforcement already occurring, including through Plano ISD "restrict[ing] topics deemed politically or socially controversial," Dkt. 33-5 ¶ 16, and Katy ISD refusing to use transgender students' chosen names, even with parental consent, Dkt. 33-7 ¶ 19.

### D.    S.B. 12's Challenged Provisions Are Properly Subject to a Facial Overbreadth Challenge

As with vagueness, the Commissioner does not actually dispute Plaintiffs' specific arguments for how each challenged provision of S.B. 12 is facially overbroad. Instead, the Commissioner reiterates his atextual position that these provisions only apply to government speech, while conceding that the statute limits "the speech and conduct of employees, ***volunteers and third parties*** at or on behalf of public schools." Dkt. 57 at 40 (emphasis added). Because S.B. 12's restrictions facially suppress constitutionally protected speech well beyond what the government may permissibly restrict, they are definitionally overbroad and properly subject to being enjoined, even if they may also have some constitutional applications.

The Commissioner's reliance on *Netchoice, L.L.C. v. Paxton*, 49 F.4th 439, 451-52 (5th Cir. 2022), somehow ignores the rule language that the Supreme Court later clarified in the same case, *Moody v. Netchoice, LLC*, 603 U.S. 707 (2024). There, the Court reversed

the Fifth Circuit's overbreadth analysis and demanded a more searching inquiry into "how a law works in all of its applications." *Moody*, 603 U.S. at 744. Rather than addressing Plaintiffs' concrete examples of S.B. 12's numerous applications to constitutionally protected speech, Dkt. 33 at 103-113, the Commissioner only focuses on how the law would apply to curricula and speech by government employees. *See* Dkt. 57 at 40-41. This commits the same error that the Supreme Court corrected in *Moody* by focusing only on some, but not all, of a statute's applications.

"[E]ven a law with 'a plainly legitimate sweep' may be struck down in its entirety . . . if its unconstitutional applications substantially outweigh its constitutional ones." *Moody*, 603 U.S. at 723. So too here. Although S.B. 12's challenged provisions in some instances may apply to curricular speech or speech within government employees' official duties, they sweepingly prohibit vast swaths of constitutionally protected speech by students, student organizations, parents, volunteers, third parties, and government employees in their private capacity. Each challenged section of S.B. 12 is unconstitutionally overbroad and should be enjoined in its entirety to protect the First Amendment rights of students, parents, school employees, and third parties.

### E. S.B. 12's Challenged Provisions Violate Plaintiffs' Freedom of Association and Operate as an Impermissible Prior Restraint

The Commissioner contends that the GSA Ban does not violate Plaintiffs' freedom of expressive association because "S.B. 12 is unrelated to the suppression of ideas" and GSA clubs can conduct their activities off school property. Dkt. 57 at 41-42. Both arguments are unavailing.

Infringements on the right to associate may be justified only by "regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984) (citations omitted). Because the GSA Ban discriminates based on viewpoint and the Commissioner has not articulated any compelling state interest for restricting Plaintiffs from creating, participating in, and collaborating with GSAs, the GSA Ban violates Plaintiffs' right of expressive association. *See* Dkt. 33 at 116-117. The Commissioner's claim that "schools treat all clubs based strictly on sex the same," Dkt. 57 at 42, is not grounded in the record or text of S.B. 12. The GSA Ban only targets clubs "based on sexual orientation and gender identity"—not clubs "based strictly on sex." S.B. 12 § 27(b). The Commissioner's atextual interpretation is amplified by another section of S.B. 12, which specifically authorizes schools to continue teaching sexual education. *See* S.B. 12 § 23(i-2). Instead of being at all related to "sex" (or anything approaching obscenity or obscenity for minors), the GSA Ban specifically targets clubs "based on sexual orientation or gender identity." *Id.* § 27(b). This is directly related to the suppression of ideas and is presumptively unconstitutional under the *Roberts* framework that the Commissioner cites.

It is also irrelevant that Plaintiffs may still be able to associate off campus since laws that burden speech without completely extinguishing it are subject to the same level of constitutional scrutiny. *See, e.g.*, *Playboy*, 529 U.S. at 812; *Martinez*, 561 U.S. at 669 (requiring "reasonable, viewpoint-neutral condition[s] on access to [any] student-organization forum").

30

S.B. 12 is also presumptively unconstitutional because it prohibits speech before it occurs, and the Commissioner fails to rebut Plaintiffs' arguments that each challenged provision of S.B. 12 operates as a prior restraint. *See* Dkt. 33 at 117-22. The Commissioner's primary opposition to this claim is that "S.B. 12 does not prohibit constitutionally protected speech of any kind." Dkt. 57 at 42. But as established *supra*, Section III.A, S.B. 12's challenged provisions suppress constitutionally protected speech in every type of forum, including in traditional public forums and limited public forums for student organizations, which no Defendant contests. *See* Dkt. 33 at 36 n.41.

The Commissioner does not address the requirement that prior restraints must have "narrow, objective, and definite standards" to avoid facial invalidity—much less identify any such standards in S.B. 12's statutory text. *See N.W. Enters. v. City of Houston*, 352 F.3d 162, 193-94 (5th Cir. 2003) (describing requisite procedural safeguards for any prior restraint). Because S.B. 12 unconstitutionally suppresses speech before it occurs and no Defendant identifies any narrowing standards, S.B. 12's challenged provisions are facially invalid as prior restraints.

### F.    No Defendant Disputes that S.B. 12's GSA Ban Facially Violates the Equal Access Act

Plaintiffs assert that the GSA Ban facially violates the federal Equal Access Act because it plainly discriminates based on content in violation of the Act. Dkt. 32 at 109-110; Dkt. 33 at 113-116. No Defendant contests this claim nor opposes the entry of injunctive relief for it. Plaintiffs have therefore established a substantial likelihood of success on this claim, such that preliminary injunctive relief may be entered against

Houston ISD, Katy ISD, and Plano ISD under the Equal Access Act. *Cf. Satanic Temple Inc. v. Young*, 681 F. Supp. 3d 685, 693 (S.D. Tex. 2023) (Eskridge, J.) ("Failure to brief a point forfeits opposition to that point."); S.D. Tex. Local Rule 7.4 ("Failure to respond to a motion will be taken as a representation of no opposition.").

## IV.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF

No Defendant meaningfully contests that Plaintiffs will suffer irreparable harm, including the infringement of their First Amendment rights, absent injunctive relief. The Commissioner only makes the unsupported argument that Plaintiffs' injuries are "hypothetical" and that S.B. 12's restrictions do not burden constitutionally protected speech. *See* Dkt. 57 at 44. Plaintiffs have established that they will suffer irreparable injury because of each provision of S.B. 12, Dkt. 33 at 122-124, and no Defendant contests these allegations at this stage of the case.

## V.    THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST TIP IN PLAINTIFFS' FAVOR

Protecting First Amendment speech always serves the public interest and tilts the balance of the equities in Plaintiffs' favor. *See Opulent Life Church v. City of Holly Springs Miss.*, 697 F.3d 279, 298 (5th Cir. 2012) ("Injunctions protecting First Amendment freedoms are ***always*** in the public interest.") (emphasis added).

None of the cases the Commissioner cites undermines this rule. *E.T. v. Paxton* does not involve a First Amendment challenge, so the court did not weigh the government's interests against First Amendment protections. 19 F.4th 760, 770 (5th Cir. 2021). Even though *Moody* is a First Amendment case, the Court did not address the public interest or

32

balance of the equities. *See* 603 U.S. at 723. It thus remains blackletter law that because Plaintiffs have shown a substantial likelihood of success on their constitutional claims, the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (citation omitted). Here, the balance of the equities and public interest support enjoining each unconstitutional provision of S.B. 12.

## VI.   DEFENDANT MORATH MAY BE PROPERLY ENJOINED FROM ENFORCING S.B. 12'S CHALLENGED PROVISIONS STATEWIDE

The Commissioner contends that if the Court enters preliminary injunctive relief, it would be incompatible with *Trump v. CASA, Inc.* to enjoin him from enforcing S.B. 12's challenged provisions against every school district and charter school in Texas. Dkt. 57 at 45 (citing 606 U.S. 831, 861 (2025)). But enjoining the Commissioner from taking enforcement actions statewide is necessary to provide Plaintiffs with the minimal "complete relief" they are entitled to under *CASA*. 606 U.S. at 852 (requiring that "injunctive relief should be no more burdensome to the defendant than ***necessary to provide complete relief*** to the plaintiffs") (citation omitted) (emphasis added).

Because the Supreme Court's decision in *CASA* is so recent, the Fifth Circuit has not yet opined on its rule language, and the Supreme Court itself expressly declined to rule on which circumstances require "complete relief" to extend state- or nationwide. *Id.* at 853. Critically, the Court recognized that some plaintiffs might be entitled to a universal injunction against the executive order at issue to receive "complete relief," but the Court reserved ruling on the limits of this doctrine. *Id.*; *see also Wash. v. Trump*, 145 F.4th 1013,

1038 (9th Cir. 2025) (determining that a universal injunction **was** necessary to provide state plaintiffs with "complete relief" against the birthright citizenship executive order); *Welty v. Dunaway*, No. 3-24-CV-768, 2025 WL 2015454, at *15–16 (M.D. Tenn. July 18, 2025) (noting that *CASA* did not involve overbreadth claims, which have long permitted plaintiffs to vindicate the rights of third parties).

At least one district court has interpreted *CASA* to still require statewide relief against education officials in New Hampshire tasked with enforcing a law similar to S.B. 12, which prohibits schools and public entities from engaging in any activities "related" to "diversity, equity, and inclusion." *Nat'l Educ. Ass'n-New Hampshire*, 2025 WL 2807652, at *1. The court found that it "must expressly enjoin defendants from enforcing the anti-DEI laws against certain non-parties in order to provide plaintiffs with complete relief" because the plaintiffs "experience harm through the anti-DEI laws' enforcement against regulated entities that employ or work with plaintiffs or their members." *Id.* at *26-27. The court explained that this injunction was as narrow as possible and distinguished it from a "universal injunction" by only ordering the state education officials not to enforce the law against school districts under their purview, while declining to enjoin them from enforcement against the world at large. *Id.*

Similarly, the Plaintiffs here request only that the Court issue an injunction against the Commissioner to stop him from enforcing the challenged provisions of S.B. 12 against school districts and charter schools under his purview that he is tasked with enforcing the statute against—not the world at large. This relief is necessary to afford Plaintiffs with "complete relief" that they remain entitled to under *CASA*.

The Commissioner's proposal that any injunction be limited only to the three named School District Defendants in this case, Dkt. 57 at 45, would plainly deprive Plaintiffs of complete relief. Plaintiff Texas AFT has more than 66,000 members in over 480 public school districts and charter school systems across Texas. Dkt. 33-6 ¶¶ 2-3. SEAT has over 280 members in at least 30 public school districts and charter schools across Texas, Dkt. 33-3 ¶¶ 9, 12; and GSA Network has approximately 22 registered GSA clubs in fourteen school districts and two charter schools across Texas, Dkt. 33-2 ¶¶ 12-13. Critically, each Plaintiff organization operates statewide and constantly seeks new members from every school district and charter school in Texas, while prospective members and partners may also engage in Plaintiffs' programs and activities from every school district and charter school in the state. Dkt. 33-2 ¶¶ 8, 25; Dkt. 33-3 ¶¶ 10, 13-16, 48, 67; Dkt. 33-6 ¶¶ 2-5, 7.

Even if the Commissioner were enjoined from enforcing S.B. 12's challenged provisions against each district or charter school where Plaintiffs currently have members, this would still deprive Plaintiffs of "complete relief," since they would then be barred from recruiting new members and engaging with students, educators, and third parties at other districts and charter schools where they seek to operate in the future. *See, e.g.*, Dkt. 33-3 ¶ 67 (alleging that "SEAT has historically connected with students through clubs focused on LGBTQ+ and racial diversity, including GSAs" and because of S.B. 12, "SEAT will be able to reach fewer students"); *see also Jackson Fed'n of Tchrs. v. Fitch*, No. 3:25-CV-417-HTW-LGI, 2025 WL 2394037, at *10 (S.D. Miss. Aug. 18, 2025) ("[A]n injunction limited to the named plaintiffs would [] be unsatisfying as to granting them complete relief . . . it would be impracticable, if not impossible, to carve out an injunction

35

that is distinctly limited . . . [because] Plaintiff students would be deprived of the opportunity to interact with and learn from their fellow students at schools across the state"). Apart from being administratively unworkable, an injunction stopping the Commissioner from enforcing S.B. 12's challenged provisions only against certain school districts would not alleviate Plaintiffs' injuries because their speech would still be restricted at districts where they do not yet have members—thereby denying them "complete relief."

## CONCLUSION

Plaintiffs ask the Court to enjoin Defendants from enforcing the four challenged provisions of S.B. 12, declare them to be substantially likely to be unconstitutional and unlawful, and grant Plaintiffs' Amended Motion for Preliminary Injunction.

Respectfully submitted,

/s/Brian Klosterboer

Brian Klosterboer, attorney-in-charge
TX Bar No. 24107833, SDTX No. 3314357
Charelle Lett
TX Bar No. 24139900, SDTX No. 3908204
Ashley Harris
TX Bar No. 24123238, SDTX No. 3879706
Sarah Corning
TX Bar No. 24144442, SDTX No. 3904827
Chloe Kempf
TX Bar No. 24127325, SDTX No. 3852674
Thomas Buser-Clancy
TX Bar No. 24078344, SDTX No. 1671940
Edgar Saldivar
TX Bar No. 24038188, SDTX No. 618958
Adriana Piñon
TX Bar No. 24089768, SDTX No. 1829959
ACLU FOUNDATION OF TEXAS, INC.
P.O. Box 8306

Shawn Thomas Meerkamper**
California Bar No. 296964
Megan Z. F. Noor**
California Bar No. 359480
Dale Melchert**
California Bar No. 362885
New York Bar No. 5366554
TRANSGENDER LAW CENTER
P.O. Box 70976
Oakland, CA 94612
Tel: 510-587-9696
shawn@transgenderlawcenter.org
megan@transgenderlawcenter.org
dale@transgenderlawcenter.org

36

*Motion for pro hac vice forthcoming
** Admitted *pro hac vice*

Houston, TX 77288
Tel. (713) 942-8146
Fax. (713) 942-8966
bklosterboer@aclutx.org
clett@aclutx.org
aharris@aclutx.org
scorning@aclutx.org
ckempf@aclutx.org
tbuser-clancy@aclutx.org
esaldivar@aclutx.org
apinon@aclutx.org

BAKER & MCKENZIE LLP

Nicholas O. Kennedy
Texas Bar No. 24087841
M. Michelle Hartmann
Texas Bar No. 24032402
1900 N. Pearl, Suite 1500
Dallas, TX 75201
Tel: (214) 978-3000
nicholas.kennedy@bakermckenzie.com
michelle.hartmann@bakermckenzie.com

Angela C. Vigil*
Florida Bar No. 38627
830 Brickell Plaza, Suite 310
Miami, FL 33131
Tel: (305) 789-8900
angela.vigil@bakermkenzie.com

Andrew P. Crousore*
California Bar #202195
600 Hansen Way
Palo Alto, CA 94304
Tel: (650) 856-5508
drew.crousore@bakermckenzie.com

John Treat*
New York Bar #5696778
1025 Constellation Blvd., Suite 1850
Los Angeles, CA 90067
Tel: (310) 201-4728

37

john.treat@bakermckenzie.com

James A. Gilmore*
DC Bar #1736415
815 Connecticut Avenue, NW
Washington, DC 20006
Tel: (22)452-7000
james.gilmore@bakermckenzie.com

**CERTIFICATE OF WORD COUNT**

Pending before the Court is Plaintiffs' Unopposed Motion to Exceed Word Count. Dkt. 62. The undersigned counsel certifies that the total number of words in this brief, exclusive of the matters designated for omission, is 9,853 words as counted by Microsoft Word Software.

*/s/Brian Klosterboer*
Brian Klosterboer


**CERTIFICATE OF SERVICE**

The undersigned certifies that on the 5th day of November, 2025, a true and correct copy of the above document was served via the CM/ECF system to all counsel of record.

*/s/Brian Klosterboer*
Brian Klosterboer