United States District Court
Southern District of Texas
**ENTERED**
February 20, 2026
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| GSA NETWORK, *et al*, Plaintiffs, | § § § § | CIVIL ACTION NUMBER 4:25-cv-04090 |
| versus | § § § | JUDGE CHARLES ESKRIDGE |
| MIKE MORATH, *et al*, Defendants. | § § § § | |

OPINION AND ORDER DISMISSING
COMMISSIONER OF TEXAS EDUCATION AGENCY
AND GRANTING PRELIMINARY INJUNCTION

The Texas Legislature recently enacted a law passed as Senate Bill 12. Generally stated, it addresses educational policy in Texas and contains four provisions challenged in this action:

- o *The Club Provision*, which prohibits public school clubs "based on sexual orientation or gender identity."
- o *The DEI Provision*, which prohibits assignment and pursuit of "diversity, equity, and inclusion duties" in public schools.
- o *The Social Transition Provision*, which requires school districts to adopt policies prohibiting employees from "assisting" students with "social transitioning."
- o *The LGBT Curriculum Provision*, which prohibits public school employees or third parties from providing "instruction, guidance, activities, or programming regarding sexual orientation or gender identity."

Texas Education Code §§11.005, 11.401, 28.0043, 33.0815.

Plaintiffs are two non-profit organizations with missions promoting youth advocacy, a labor union for Texas school employees, two high school students, and a teacher. They challenge all four provisions under the First Amendment of the United States Constitution. They also challenge the Club Provision as contrary to federal law under the Equal Access Act. See 20 USC §4071(a), (b). See Dkt 32 at ¶¶10–15, 204–311 (amended complaint).

Defendants are Mike Morath, in his capacity as the Commissioner of the Texas Education Agency, and three Texas independent school districts, being Houston, Katy, and Plano ISDs. Id at ¶¶16–19.

The following motions are resolved here.

The motion to dismiss brought by Commissioner Morath is granted. Dkt 57. Plaintiffs lack standing to pursue action against him because they haven't shown that their presently alleged injuries are traceable to him or redressable by enjoining him. Any injury to Plaintiffs instead arises from implementation and enforcement actions by the ISDs, and not by the Commissioner himself.

The motion to dismiss brought by Katy ISD is denied. Dkt 53. As just noted, Katy ISD has implemented and enforced policies pursuant to SB 12 that Plaintiffs allege have resulted in constitutional deprivations. It is thus properly subject to suit under 42 USC §1983.

The motion by Plaintiffs for preliminary injunction is granted as unopposed. Dkt 33. This may seem a curious result, as this is no doubt important litigation with respect to a newly enacted Texas statute. But it is the necessary consequence of the defense strategy in this action.

Houston, Katy, and Plano ISDs specifically decline to take a position as to SB 12 on the merits, even after implementing policies or otherwise taking action to accord with its overall directive. See Dkts 54, 56 & 59. Nor do they challenge the credibility or factual averments of the several declarations submitted by Plaintiffs, which came in by stipulation. See Dkt 60. Principles of party presentation and waiver dictate that it simply isn't the province of a

federal court to muster or consider possible arguments that defendants don't themselves sponsor.

As such, Houston, Katy, and Plano ISDs will be enjoined from enforcing their policies with respect to the Club, DEI, Social Transition, and LGBT Curriculum Provisions. With the dismissal of Commissioner Morath, however, such preliminary injunction cannot extend statewide. Any challenge to implementation of SB 12 in other independent school districts is thus for separate litigation before other federal courts with jurisdiction.

Given their failure to articulate a position on the merits to this point, the ISDs are further ordered to file a statement of position within fourteen days as to whether they intend to defend SB 12 and their actions enforcing it, or whether they will seek representation from the Office of the Attorney General. See Texas Education Code §11.151(e) (allowing school districts to request assistance of Attorney General on legal matters); Texas Government Code §402.010 (establishing procedure for notifying Attorney General of challenge to constitutionality of state law). Or they may identify another course altogether.

### 1. Background

#### a. Senate Bill 12

The parties refer to Senate Bill 12 as *SB 12*. The Texas Legislature described it as a law "relating to parental rights in public education, to certain public school requirements and prohibitions regarding instruction, diversity, equity, and inclusion duties, and social transitioning, and to student clubs at public schools." See SB 12, 89th Legislature, RS (2025). The Governor of Texas signed it into law on June 20, 2025, and it went into effect on September 1, 2025.

Set out next are four substantive provisions of SB 12 challenged by Plaintiffs, followed by other pertinent provisions. Unless otherwise noted, all statutory citations are to sections of the Texas Education Code.

### i. Club Provision

Section 27 of SB 12 places certain eligibility requirements on student clubs in public schools. See §33.0815. It provides in full:

> (a) Subject to Subsection (b), a school district or open-enrollment charter school may authorize or sponsor a student club.

> (b) A school district or open-enrollment charter school may not authorize or sponsor a student club based on sexual orientation or gender identity.

> (c) A school district or open-enrollment charter school must require the written consent of the parent of or person standing in parental relation to a student enrolled in the district or school before the student may participate in a student club authorized or sponsored under Subsection (a) at the district or school.

### ii. DEI Provision

Section 3 of SB 12 prohibits diversity, equity, and inclusion duties in public schools. See §11.005.

Subsection (a) defines as follows:

> In this section, "diversity, equity, and inclusion duties" means:

> (1) influencing hiring or employment practices with respect to race, sex, color, or ethnicity except as necessary to comply with state or federal antidiscrimination laws;

> (2) promoting differential treatment of or providing special benefits to individuals on the basis of race, color, or ethnicity;

> (3) developing or implementing policies, procedures, trainings, activities, or programs that reference race, color, ethnicity,

gender identity, or sexual orientation except:

(A) for the purpose of student recruitment efforts by colleges and universities designated as historically black colleges and universities in collaboration with school districts or open-enrollment charter schools; or

(B) as necessary to comply with state or federal law; and

(4) compelling, requiring, inducing, or soliciting any person to provide a diversity, equity, and inclusion statement or giving preferential consideration to any person based on the provision of a diversity, equity, and inclusion statement.

Subsection (b) then dictates as follows:

Except as required by state or federal law, a school district:

(1) may not assign diversity, equity, and inclusion duties to any person; and

(2) shall prohibit a district employee, contractor, or volunteer from engaging in diversity, equity, and inclusion duties at, for, or on behalf of the district.

Subsection (c) provides for implementation and enforcement of the DEI Provision by school districts as follows:

A school district shall adopt a policy and procedure for the appropriate discipline, including termination, of a district employee or contractor who intentionally or knowingly engages in or assigns to another person diversity, equity, and inclusion duties. . . .

Subsection (d) relatedly provides that any disciplined employee is entitled to due process and an opportunity to appeal any adverse action.

Subsection (e) then contains narrowing exceptions, including:

> Nothing in this section may be construed to:
> . . .
> (3) affect a student's rights under the First Amendment to the United States Constitution or Section 8, Article I, Texas Constitution; . . .
> (5) apply to:
> (A) classroom instruction that is consistent with the essential knowledge and skills adopted by the State Board of Education;
> (B) the collection, monitoring, or reporting of data;
> (C) a policy, practice, procedure, program, or activity intended to enhance student academic achievement or postgraduate outcomes that is designed and implemented without regard to race, sex, color, or ethnicity; or
> (D) a student club that is in compliance with the requirements of [the Club Provision].

SB 12 elsewhere requires that school districts certify compliance with the DEI Provision to the Texas Education Agency annually. See §39.008(a). The agency then "shall post each certification received under Subsection (a) on the agency's Internet website." See §39.008(c).

### iii.   Social Transition Provision

Section 7 of SB 12 requires school districts to adopt policies prohibiting employees from assisting students with social transitioning. See §11.401.

Subsection (a) defines as follows:

> In this subchapter, "social transitioning" means a person's transition from the

6

> person's biological sex at birth to the
> opposite biological sex through the
> adoption of a different name, different
> pronouns, or other expressions of gender
> that deny or encourage a denial of the
> person's biological sex at birth.

Subsection (b) provides for the implementation and enforcement of the Social Transition Provision by school districts:

> The board of trustees of a school district
> shall adopt a policy prohibiting an
> employee of the district from assisting a
> student enrolled in the district with social
> transitioning, including by providing any
> information about social transitioning or
> providing guidelines intended to assist a
> person with social transitioning.

Subsection (c) provides a means by which parents and employees can report suspected violations of such policy, which then requires the school district to investigate:

> A parent of a student enrolled in the
> district or a district employee may report to
> the board of trustees of the district a
> suspected violation of the policy adopted
> under Subsection (b). The board shall
> investigate any suspected violation and
> determine whether the violation occurred.
> If the board determines that a district
> employee has assisted a student enrolled at
> the district with social transitioning, the
> board shall immediately report the
> violation to the commissioner.

SB 12 elsewhere allows parents of enrolled students to seek relief for violation of the Social Transition Provision by filing a grievance to the board of trustees of the school district pursuant to §26.011. See §11.402.

### iv.  LGBT Curriculum Provision

Section 24 of SB 12 restricts instruction regarding sexual orientation and gender identity. See §28.0043. Subsection (a) states:

> A school district, open-enrollment charter school, or district or charter school employee may not provide or allow a third party to provide instruction, guidance, activities, or programming regarding sexual orientation or gender identity to students enrolled in prekindergarten through 12th grade.

Subsection (b) then states exceptions, including:

> This section may not be construed to:

> (1) limit a student's ability to engage in speech or expressive conduct protected by the First Amendment to the United States Constitution or by Section 8, Article I, Texas Constitution, that does not result in material disruption to school activities;

> (2) limit the ability of a person who is authorized by the district to provide physical or mental health-related services to provide the services to a student, subject to any required parental consent; or

> (3) prohibit an organization whose membership is restricted to one sex and whose mission does not advance a political or social agenda from meeting on a school district or open-enrollment charter school campus.

### v.  Other pertinent provisions

The briefing of the parties almost entirely ignores Section 1 of SB 12, which contains an important, threshold provision. Titled *Infringement of Parental Rights Prohibited*, it provides in full:

8

> The fundamental rights granted to parents by their Creator and upheld by the United States Constitution, the Texas Constitution, and the laws of this state, including the right to direct the moral and religious training of the parent's child, make decisions concerning the child's education, and consent to medical, psychiatric, and psychological treatment of the parent's child under Section 151.001, Family Code, may not be infringed on by any public elementary or secondary school or state governmental entity, including the state or a political subdivision of the state, unless the infringement is:
>
> (1) necessary to further a compelling state interest, such as providing life-saving care to a child; and
>
> (2) narrowly tailored using the least restrictive means to achieve that compelling state interest.

§1.009.

Section 11 of SB 12 further provides that compliance with the parental-rights provision is mandatory:

> Unless otherwise provided by law, a board of trustees . . . shall comply with Section 1.009 and may not limit parental rights or withhold information from a parent regarding the parent's child.

§26.001(c).

Another threshold provision of SB 12 charges Texas school districts with implementing and enforcing the entirety of SB 12, as follows:

> (a) In this section, "public elementary or secondary school" means a school district and a district, campus, program, or school operating under a charter under Chapter 12.

> (b) A public elementary or secondary school, the school's governing body, and the school's employees shall implement and comply with each policy the school is required to adopt under this code or other law.

§1.007.

Given the points at issue between the parties below, it is important to note that no direct power or duty is given to the Commissioner with regard to implementation or enforcement as to each of Sections 3, 7, 24, and 27 of SB 12, which set out the terms of the DEI, Social Transition, LGBT Curriculum, and Club Provisions, respectively. By comparison, Sections 2 and 5 specifically state that the Commissioner "may adopt rules as necessary to implement" sections as to facility usage reports and trustee information posted on the TEA website. See §7.0611(e), §11.1518(e).

Preexisting aspects of the Texas Education Code also bear emphasis regarding the extent of oversight and control accorded to school districts. For instance, §11.151(b) articulates a very broad statement of ISD independence and authority, stating with emphasis:

> Except as provided by Sections 39A.201 and 39A.202 [pertaining to circumstances under which TEA Commissioner may act with respect to school districts and scope of such authorized actions], the trustees [of an independent school district] as a body corporate have the *exclusive power and duty* to govern and oversee the management of the public schools of the district. All powers and duties not specifically delegated by statute to the agency or to the State Board of Education are reserved for the trustees, *and the agency may not substitute its judgment for the lawful exercise of those powers and duties by the trustees.*

10

### b.  Implementation by school districts

SB 12 went into effect on September 1, 2025. Houston, Katy, and Plano ISDs don't dispute that they have adopted policies and taken actions in compliance with SB 12 for the 2025/26 school year. See Dkts 54, 56 & 59.

For example, the board of trustees of Katy ISD passed a "Resolution Regarding Senate Bill 12 and Parent Rights" on August 25, 2025. See Dkt 53-1. It states, "All policies shall be implemented and followed." Id at ¶1. It also includes directives addressing each of the challenged SB 12 provisions. See id at ¶¶3, 4, 5, 21 & 23.

The board of trustees for Plano ISD provided similar guidance in August 2025 with a presentation titled "Back to School Legislative Requirements." Dkt 33-5 at 10–30. The presentation states that SB 12 "restricts classroom discussions of politically or socially controversial topics, requiring them to be tied to TEKS and presented neutrally." Id at 25. It also states:

> In response to SB 12, Plano ISD will:
> - Review curriculum documents to ensure no prohibited content is included.
> - Reinforce policies and practices to support educators in delivering TEKS-aligned content and restrict topics deemed politically or socially controversial.
> - Prohibit instruction or programming related to sexual orientation, DEI practices or gender identity.
> - Not use different names or pronouns inconsistent with the student's biological sex.
> - Apply these standards across classrooms, clubs, events, guest speakers, and all instructional-day activities . . .
> - Prohibit clubs and organizations based on sexual orientation or gender identity.

Id at 25–26.

Plano ISD also circulated to its teachers and staff a document titled "Legislative Guidance for Plano ISD Staff (2025–2026)." Id at 38–42. It contains directives as to the four challenged SB 12 provisions. Id at 38–39. The document also stated a requirement that staff sign and attest to compliance with the directives, while further providing, "Violations of these laws may result in disciplinary action, including termination." Id at 41–42.

No actual policy from Houston ISD is presently part of the record. And its answer "denies that its board has adopted policies regarding Senate Bill No. 12." Dkt 58 at ¶48. But it nonetheless agrees that it is taking action in conformance, for example asserting that it "is obviously required to follow state law unless that law is amended or determined by a court with appropriate jurisdiction and authority to be unenforceable." Dkt 59 at 2.

### c.  This litigation

Six Plaintiffs challenge SB 12 in this action—three organizations, two students, and one teacher. Each submitted a declaration, all of which are uncontested for purposes here. See Dkt 60 (joint notice and stipulation).

*GSA Network* is a national 501(c)(3) nonprofit organization whose "mission is to empower and train queer, transgender, and allied youth leaders to advocate, organize, and mobilize an intersectional movement for safer schools and healthier communities." Dkt 33-2 at ¶2. GSA Network is a membership-based organization made up of registered GSA clubs, student leaders organizing registered GSA clubs, and state-level organizational partners. Id at ¶7. It asserts constitutional claims on behalf of itself and its members against Commissioner Morath and Plano ISD, and an Equal Access Act claim on behalf of its members against Plano ISD. Dkt 32 at ¶¶71, 285. Generally stated, GSA Network claims that SB 12 "would prevent [it] from being able to support GSA clubs and their activities in Texas, prevent student members from being able to form or join GSA clubs in Texas, and prohibit or

drastically limit many of the activities that GSA Network and GSA clubs engage in at schools." Dkt 33-2 at ¶5. It maintains that the Club Provision will likely result in elimination of its twenty-two clubs registered in Texas in spring of 2025, as already happened for one GSA club in Plano ISD. Id at ¶24. It further maintains that the other three provisions will limit the ability of school faculty to participate in GSA clubs and share information with students regarding topics frequently discussed in GSA clubs. Id at ¶¶27–32.

*Students Engaged in Advancing Texas* is a "non-partisan and nonprofit grassroots civic organization . . . whose mission is to empower youth through hands-on civic engagement, advocacy, and leadership development to address systemic inequities and drive change in Texas communities." Dkt 33-3 at ¶2. SEAT states that it advances its mission, in part, by "providing information and resources" to clubs in Texas schools and by engaging in "programs and activities that reference race, ethnicity, gender identity, and sexual orientation," and "other topics of public concern." See id at ¶3. It asserts constitutional claims on behalf of itself and its members against Commissioner Morath, Houston ISD, and Katy ISD. Dkt 32 at ¶91.

*Texas American Federation of Teachers* is a labor union that represents over 66,000 employees throughout Texas, including teachers, librarians, counselors, nurses, teaching assistants, and other school employees. Dkt 33-6 at ¶2 (declaration). It states that it "advocates for the employment rights of its members and champions high quality public education, fairness, democracy, and economic opportunity for students, families, and communities." Ibid. Texas AFT asserts claims on behalf of its members against Commissioner Morath, Houston ISD, Katy ISD, and Plano ISD. Id at ¶8. It contends that, if the challenged provisions of SB 12 aren't enjoined, its members will have their free speech and due process rights impaired. Id at ¶7.

*Adrian Moore* is a high school senior in Katy ISD. Moore's mother, Julie Johnson, submitted an explanatory declaration. Dkt 33-7. Johnson says that Moore was born female but now identifies as a "gay, transgender boy" and has used the first name of Adrian at school for the past five years. Dkt 33-7 at ¶¶3, 19. Johnson has requested those at school continue to use that preferred name, but the teachers "have been explicitly instructed" that they can no longer do so. Dkt 33-7 at ¶19. The Diversity Club to which Moore belonged has also been shut down. Id at ¶¶12, 18. Johnson also says that Katy ISD's implementation of SB 12 interferes with her rights as a parent by "prohibit[ing] teachers and staff from supporting and assisting" Moore in the ways that she has requested. Id at ¶30. Johnson, as next friend of Moore, asserts constitutional claims against Commissioner Morath and Katy ISD, and an Equal Access Act claim against Katy ISD. Dkts 32 at ¶14 & 33 at 53.

*Rebecca Roe* is a first-year high school student in Houston ISD. Roe's mother, Ruth Roe, submitted an explanatory declaration. Dkt 33-4. Ruth Roe states that Rebecca Roe "identifies as queer and lesbian." Id at ¶3. She maintains that the Club Provision burdens Rebecca Roe's ability to join or form a school club based on sexual orientation or gender identity, while also prohibiting participation "in activities, programs, and trainings that reference race, color, ethnicity, gender identity, or sexual orientation" in a manner that burdens rights to freedom of speech, expression, and association. Id at ¶¶7, 9. Ruth Roe, as next friend of Rebecca Roe, asserts constitutional claims against Commissioner Morath and Houston ISD, and an Equal Access Act claim against Houston ISD. Id at ¶1; see Dkt 32 at ¶145.

*Polly Poe* is a high school teacher in Plano ISD and a member of Texas AFT. Dkt 33-5 at ¶1. She states that she has served as a GSA club advisor, which was disbanded due to SB 12. Id at ¶¶2, 22–23. She also thinks it difficult as an educator to interpret and implement the requirements of SB 12, believing the provisions to be "so vague and broad" that she doesn't know how to avoid being accused of

14

violating them. Id at ¶31. She also alleges that the provisions encroach on her speech outside of school and her official work duties. Id at ¶35. Poe brings constitutional claims against Commissioner Morath and Plano ISD under the First and Fourteenth Amendments. Dkt 32 at ¶238.

Plaintiffs filed this action on August 28, 2025, and an amended complaint on September 16, 2025. Dkts 1 & 32. The latter states that SB 12 "censors huge swaths of constitutionally protected speech in and surrounding Texas schools." Dkt 32 at ¶1. It asserts six causes of action:

- o *Count One, at ¶¶205–32:* Violation of the First Amendment, upon assertion that all four provisions are viewpoint discriminatory and fail strict scrutiny.

- o *Count Two, at ¶¶233–68:* Violation of the First and Fourteenth Amendments, upon assertion that all four provisions are void for vagueness.

- o *Count Three, at ¶¶269–84:* Violation of the First Amendment, upon assertion that all four provisions are facially overbroad.

- o *Count Four, at ¶¶285–90:* Violation of the Equal Access Act, upon assertion that the Club Provision denies equal treatment to student organizations based on content of speech.

- o *Count Five, at ¶¶291–99:* Violation of the First Amendment, upon assertion that the Club Provision infringes on freedom of association.

- o *Count Six, at ¶¶300–11:* Violation of the First Amendment, upon assertion that all four provisions are a prior restraint on speech.

With their original complaint, Plaintiffs filed a motion for preliminary injunction. See Dkt 10. The parties then agreed to an extended briefing schedule. See Dkt 25; see also Dkt 30 (scheduling order). Plaintiffs thereafter filed their amended complaint along with an amended motion for preliminary injunction. See Dkts 32 & 33. Defendants filed their responses, along with motions to dismiss by

Commissioner Morath and Katy ISD. See Dkts 53–59. Plaintiffs filed a consolidated reply. See Dkt 65.

The amended complaint seeks a preliminary and permanent injunction to prevent Defendants from enforcing the subject provisions of SB 12, along with a declaration finding those provisions facially unconstitutional and void. Dkt 32 at ¶¶313–14. By this, they seek an order enjoining (i) Commissioner Morath from enforcing the challenged provisions statewide, and (ii) Houston, Katy, and Plano ISDs from enforcing any policies or otherwise taking any action to implement those provisions. Dkt 63 at 41, 44. They seek in the alternative a declaration that the provisions are unconstitutional, void, and of no effect "as applied to Plaintiffs." Dkt 32 at ¶315.

A preliminary injunction hearing followed on December 18, 2025. See Dkt 80 (minute entry). No testimony was heard. The parties instead entered into a joint stipulation that the declarations submitted by Plaintiffs with their amended motion for preliminary injunction could "be entered into evidence without objection for the limited purpose of determining the propriety of preliminary injunctive relief." See Dkt 60 at 1. Defendants submitted no declarations of their own.

## 2. Motion to dismiss by TEA Commissioner

The motion to dismiss by Commissioner Morath proceeds under Rule 12(b)(1) of the Federal Rules of Civil Procedure. He asserts that jurisdiction is lacking with respect to standing, sovereign immunity, and ripeness. See Dkt 57 at 2. Because Plaintiffs lack standing as against him, sovereign immunity and ripeness needn't be reached.

Challenge under Rule 12(b)(1) extends to the standing of the plaintiff to assert a claim. *Moore v Bryant*, 853 F3d 245, 248 n 2 (5th Cir 2017). A plaintiff must establish standing because the United States Constitution vests power in the federal courts to adjudicate only "Cases" and "Controversies." Art III, § 2. The burden is squarely upon the party asserting a claim in federal court to establish Article III standing by showing that (i) the party has

suffered an injury in fact, (ii) the injury is fairly traceable to the challenged conduct, and (iii) the injury is likely to be redressed by a favorable decision. *Lujan v Defenders of Wildlife*, 504 US 555, 560–61 (1992); *Spokeo Inc v Robins*, 578 US 330, 338 (2016), citing *FW/PBS, Inc v Dallas*, 493 US 215, 231 (1990).

### a. Injury in fact

"In pre-enforcement free speech challenges, chilled speech or self-censorship is an injury sufficient to confer standing." *Turtle Island Foods, S.P.C. v Strain*, 65 F4th 211, 215 (5th Cir 2023), quoting *Barilla v City of Houston*, 13 F4th 427, 431 (5th Cir 2021). To satisfy the injury-in-fact requirement in this context, a plaintiff must show (i) intention to engage in a course of conduct arguably affected with a constitutional interest, (ii) the course of action is arguably proscribed by statute, and (iii) a credible threat of prosecution under the statute. Id at 215–16. In pre-enforcement challenges "to recently enacted (or, at least, non-moribund) statutes that facially restrict expressive activity," a "credible threat of prosecution" is presumed "in the absence of compelling contrary evidence." *Speech First, Incorporated v Fenves*, 979 F3d 319, 335 (5th Cir 2020). The Fifth Circuit also characterizes the third factor with respect to *a substantial threat of future enforcement*. For example, see id at 334 (point heading).

These three injury-in-fact aspects needn't be closely considered in the present context, although it certainly appears that Plaintiffs fairly demonstrate their intention to engage in conduct of a constitutional dimension that is arguably (and has actually been) proscribed by SB 12. This will be considered more fully below with respect to the enforcement authority provided to Houston, Katy, and Plano ISDs. But as to the Commissioner, the true question is whether any such injury is traceable to him, as addressed next.

### b. Traceability

Plaintiffs maintain that their injuries are traceable to Commissioner Morath for the following four reasons:

- o The TEA is statutorily obligated to post certifications of compliance submitted by school districts as to the DEI Provision;

- o School district boards are obligated to report violations of the Social Transition Provision to him as Commissioner;

- o The TEA published legislative guidance to school districts regarding SB 12; and

- o The Commissioner "may authorize special investigations to be conducted" as he "determines necessary" and may impose sanctions in that regard.

See Dkts 33 at 64–65 & 63 at 20.

In so asserting, Plaintiffs rely on the decision of the Fifth Circuit in *Book People, Incorporated v Wong*, 91 F4th 318 (5th Cir 2024). It there held, "Plaintiffs must allege 'a causal connection between the injury and the conduct complained of.'" Id at 324, quoting *Lujan*, 504 US at 560. Where "a causal relation between injury and challenged action depends upon the decision of an independent third party . . . standing is not precluded, but it is ordinarily substantially more difficult to establish." Ibid (quotation omitted). To meet that burden, Plaintiffs must show "that third parties will likely react in predictable ways." *California v Texas*, 593 US 659, 675 (2021).

Decision in *Book People* concerned the constitutionality of READER, a law that required schoolbook vendors selling to Texas public schools to issue sexual-content ratings for all library materials. The Fifth Circuit held that traceability (and redressability) existed as to the Commissioner, given the enforcement authority that the law itself vested in him. This included his own, direct authority to (i) collect the challenged ratings from vendors to post on the TEA's website, (ii) exercise discretion to review vendor ratings, and if so, to notify vendors of the updated ratings and their duty to conform their rating to the TEA's, and (iii) to post the names of the vendors that didn't accept the TEA's updated ratings on its website. 91 F4th at 332–33. The

Fifth Circuit also noted that the general authority of the Commissioner under Texas law to enforce one challenged provision, which prohibited school districts from purchasing books from noncompliant vendors, through a special investigation and sanctions against school districts. Id at 333, citing §39.003(a), (d). In that context, the Fifth Circuit held that the plaintiffs' injuries were traceable to the Commissioner's own enforcement actions for the very reason that, under that law, he "over[saw] the challenged process" and his actions were "among those that would contribute to Plaintiffs' harm." Ibid (cleaned up).

SB 12 is quite different from READER, with any enforcement authority in the Commissioner under SB 12 being far more attenuated. Indeed, §1.007(b) squarely charges Texas school districts with implementing and enforcing SB 12, as follows: "A public elementary or secondary school, the school's governing body, and the school's employees shall implement and comply with each policy the school is required to adopt under this code or other law." This accords with Texas law more generally, whereby the final policy-making authority for an independent school district typically rests with the school district's board of trustees. *Jett v Dallas Independent School District*, 7 F3d 1241, 1245 (5th Cir 1993).

Even beyond that general charge, the challenged provisions with SB 12 task school districts and not the Commissioner. For example, with emphasis added:

- o *The Club Provision* provides that a "*school district* . . . may not authorize or sponsor a student club based on sexual orientation or gender." §33.0815(b).

- o *The DEI Provision* states that a "*school district* shall adopt a policy and procedure for the appropriate discipline, including termination, of a district employee or contractor who intentionally or knowingly engages in or assigns to another person diversity, equity, and inclusion duties." §11.005(c).

19

- o *The Social Transition Provision* states that the "*board of trustees of a school district* shall adopt a policy prohibiting an employee of the district from assisting a student enrolled in the district with social transitioning." It also provides that parents and employees may report suspected violations to the "*board of trustees of the district*," who then "shall investigate any suspected violation and determine whether the violation occurred," and, if so, "the board shall immediately report the violation to the commissioner." §11.401(b), (c).

- o *The LGBT Curriculum Provision* states that a "*school district*, open-enrollment charter school, or district or charter school employee may not provide or allow a third party to provide instruction, guidance, activities, or programming regarding sexual orientation or gender identity to students enrolled in prekindergarten through 12th grade." §28.0043(a).

The four challenged provisions stand in contrast to other provisions within SB 12 indicating that, where the legislature intended to place enforcement authority beyond the hands of a particular board of trustees, it knew how to do so. For example, Sections 2 and 5 of SB 12 specifically state that the Commissioner "may adopt rules as necessary to implement" sections as to facility usage reports and trustee information posted on the TEA website. See §7.0611(e), §11.1518(e).

Other laws passed during the same legislative session as SB 12 also indicate that the legislature knows how to specifically designate a statewide official for purposes of implementation and enforcement.

Most pertinent is SB 571, which regulates the reporting and investigation of school employee and educator misconduct. It authorizes the Commissioner (i) to "refer an educator who fails to report to the [State Board for Educator Certification]" for potential sanctions, (ii) to

"review records of an educational entity to ensure compliance," and (iii) to "adopt rules as necessary to implement this section." §22A.052(b), (i), (l)–(m).

Other clear specification appears in SB 17, which regulates the acquisition of real property interests in Texas by individuals and entities aligned with designated countries. It directs the Attorney General to (i) establish procedures to consider whether an investigation is warranted, (ii) investigate any purchase or acquisition of real estate that is suspect under SB 17, and (iii) upon any determination that a violation has occurred, either personally bring an *in rem* action against the property or refer the matter to the appropriate local, state, or federal law enforcement agency. *Wang v Paxton*, 2025 WL 2402324, *2 (SD Tex), aff'd, 161 F4th 357 (5th Cir 2025), citing Texas Property Code §§5.255(a)–(c).

By contrast, enforcement authority under SB 12 isn't delegated to the Commissioner but instead remains with the trustees of independent school districts under §11.151(b), which specifically states that "the agency may not substitute its judgment for the lawful exercise of those powers and duties by the trustees." With this in mind, the four aspects of SB 12 argued by Plaintiffs don't indicate that pertinent implementation or enforcement authority rests with Commissioner Morath.

*As to certificates of compliance,* it pertains solely to the DEI Provision. It requires the TEA to post on its website certifications otherwise created and provided by the "superintendent of a school district or open-enrollment charter school." §39.008(a). This directs action solely by school districts. Beyond this posting of a school district's *own* certification under SB 12, Plaintiffs don't point to any action tasked to the Commissioner as to the DEI Provision. This stands in contrast to *Book People*, where the Commissioner played an active role in the challenged statutory scheme, collecting and reviewing the schoolbook ratings.

*As to the reporting requirement,* it pertains to the Social Transition Provision. It provides that if a parent or

employee reports a suspected violation of a school district's policy created under the provision, the "board [of trustees of the school district] shall investigate . . . and determine whether the violation occurred." §11.401(c). If it finds a violation has occurred, "the board shall immediately report the violation to the commissioner." Ibid. But the statute is silent as to what, if anything, follows from that report. Nothing suggests that Commissioner Morath or the TEA may then implement his or its own statement of policy in accord with SB 12. It's also notable in this context that Plaintiffs allege that the ISDs have adopted and implemented policies in accord with SB 12. See Dkt 32 at ¶48. This means that any injuries at present don't trace to action taken by the Commissioner.

*As to the legislative guidance posted by the TEA,* it included guidance with respect to SB 12 generally, including the challenged provisions. The record establishes that it was an informational advisory summarizing over thirty-five new education-related laws passed by the state legislature. See Texas Education Agency, TEA Monthly Superintendent Call 89th Legislature Updates (September 18, 2025), at 27. The guidance isn't akin to administrative regulation. And it neither purports to supplement, expand, or alter SB 12, nor discloses any ability vested in Commissioner Morath to enforce the challenged provisions.

*As to investigative and sanction authority,* it pertains to the general authority of the Commissioner as head of the TEA. §§39.003(a), (d). Such authority permits the Commissioner to "authorize special investigations" in specified circumstances or, more broadly, "as the commissioner otherwise determines necessary." See §§39.003(a), (a)(17). Following such an investigation, the Commissioner may take "appropriate action under Chapter 39A," which provides "interventions and sanctions for school districts." See §§39.003(d)(1), 39A.001. Such sanctions may include, for example, issuing a "public notice of the deficiency to the board of trustees of the district," arranging "a monitoring review of the district," or appointing "a conservator to oversee the operations of the

district." §§39A.002(1), (5), (7). But any such sanctions are directed at out-of-compliance school districts alone. While any such board or board members might be replaced, the authority given doesn't allow the TEA or the Commissioner to then directly promulgate and implement the challenged provisions in that school district. And again, the allegation at present is that the ISDs are *not* out of compliance with SB 12—meaning that any present injury is traceable to them and not to Commissioner Morath.

The burden to establish standing is upon the plaintiff initiating litigation. *Spokeo*, 578 US at 338. This includes traceability. Plaintiffs haven't pointed to any action that Commissioner Morath has taken or may take that is causing or has caused their alleged injuries. "Because the plaintiffs have pointed to nothing that outlines a relevant enforcement role for [Commissioner Morath], the plaintiffs' injuries likely cannot be fairly traced to him." *Texas Democratic Party v Abbott*, 961 F3d 389, 400 (5th Cir 2020).

### c.  Redressability

The Supreme Court recently noted that causation and redressability are often "flip sides of the same coin.*" FDA v Alliance for Hippocratic Medicine*, 602 US 367, 380 (2024). The Fifth Circuit observes that this is so because "the former examines the causal connection between the assertedly unlawful conduct and the alleged injury, whereas the latter examines the causal connection between the alleged injury and the judicial relief requested." *Environment Texas Citizen Lobby, Incorporated v ExxonMobil Corporation*, 123 F4th 309, 346 n 1 (5th Cir 2024). And typically, "the maladies as to causation show why redressability also is missing." *Inclusive Communities Project, Inc v Department of Treasury*, 946 F3d 649, 660 (5th Cir 2019).

Plaintiffs haven't identified any enforcement authority or action by Commissioner Morath that presently contributes to their alleged injuries under SB 12. Given that he played no role in causing such injuries, he isn't part of the remedy.

*   *   *

The motion to dismiss by Commissioner Morath will be granted as to lack of standing. In sum, Plaintiffs haven't established that their purported injuries are traceable to him or redressable by enjoining him because SB 12 vests both implementation and enforcement authority with respect to the four challenged provisions in *school districts*, not in the *Commissioner of the TEA*. As such, he will be dismissed from this action.

### 3.    Motion to dismiss by Katy ISD

Katy ISD seeks dismissal for failure to state a claim under Rule 12(b)(6). See Dkt 53. It contends that it can't be sued under §1983 because the policies at issue are legally attributable to the State of Texas, not itself.

Houston and Plano ISDs don't join in this argument. And it stands in notable contrast with the motion just considered by Commissioner Morath, where he disclaimed any responsibility for action and conduct implementing the various provisions of SB 12.

"Under §1983, a municipality or local governmental entity such as an independent school district may be held liable only for acts for which it is actually responsible." *Doe on Behalf of Doe v Dallas Independent School District*, 153 F3d 211, 215 (5th Cir 1998). A school district may be held liable under §1983 when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Ibid.

The amended complaint alleges:

> Through their final policymakers—i.e., their school boards—Defendants Houston ISD, Katy ISD, and Plano ISD either already have or are required to adopt policies formally implementing S.B. 12 and enforcing each of the law's challenged provisions.

Dkt 32 at ¶48. The record supports this statement as to Katy ISD, as it has indisputably adopted a policy to imple-

ment SB 12 and enforce each of its challenged provisions, starting with the 2025/26 school year. See Dkt 53-1 (Katy ISD board resolution).

Katy ISD suggests that it had no choice in this regard, as it was simply complying with the mandatory dictates of state law. See Dkt 53 at 13. But curiously unnoted is the articulation in §11.151(b), as indicated above, of a very broad statement of ISD independence and authority, with the TEA unable to "substitute its judgment for the lawful exercise of those powers and duties by the trustees."

In accord, the text of SB 12 itself assumes that independent school districts have discretion and may, indeed, act independently in some respects. For example, consider the certification requirements related to the DEI Provision. See §39.008(a). The very existence of such provision itself recognizes the potential for *noncompliance* by independent school districts with state law—thus requiring an affirmative certification of compliance. But even more broadly, any action taken by Katy ISD when implementing SB 12 as to each of the challenged provisions comes with its own imprimatur that such action wholly accords with the United States Constitution and federal law, if for no other reason than that the Supremacy Clause isn't a dead letter.

Katy ISD primarily relies on decision in *Familias Unidas v Briscoe*, 619 F2d 391 (5th Cir 1980). Plaintiffs there challenged a Texas statute requiring disclosure of the membership of organizations engaged in activities interfering with the operation of public schools. Id at 394. After a school boycott, the school board requested that the county judge invoke the statute to compel disclosure of members of the organization supporting the boycott. Plaintiffs sued a number of individuals and entities under §1983, including the county judge and the school district. Id at 394–95. After holding that a First Amendment violation occurred, the Fifth Circuit turned to the question of who was liable for damages. As relevant here, it determined that the school board's request for implementation of the statute "certainly represent[ed the]

official policy of the [school district]," rendering it liable for damages. By contrast, the county judge wasn't found liable because his compliance with the school board's request didn't represent an official *county* policy, but rather, was mere effectuation of *state* policy for which the county didn't bear responsibility. Id at 404.

Katy ISD argues under *Familias Unidas* that it is somehow akin to the county judge, rather than the school board, asserting that it exercised no discretion here and only followed state law. This stretches the decision too far. The Fifth Circuit acknowledged that *each* defendant "simply relied on a state statutory scheme." Id at 403. Even so, the school district was found liable. This plainly means that it isn't a complete defense to point to state law alone and argue action taken was in accord. For liability under §1983, what matters instead is whether the constitutional injury was *caused by* an official policy or custom promulgated by the pertinent government officials with final policymaking authority. See *Collins v City of Harker Heights*, 503 US 115, 120–22 (1992). The county judge in *Familias Unidas* was *not* liable because he didn't act pursuant to county policy, but instead simply complied with the school board's own request, as he was obligated to do by Texas law. See 619 F2d at 404. By contrast, the school district *was* liable because its board of trustees held policymaking authority and took action that resulted in the constitutional violation—even though such action was taken pursuant to a state statute. Id at 403–04.

The same is true here. Katy ISD in fact acknowledges that a Texas school board is normally considered to be the policymaker for a school district for purposes of liability under §1983. See Dkt 53 at 13, citing *Jett*, 7 F3d at 1245. It plainly exercised such authority here when passing the resolution alleged by Plaintiffs to violate the Constitution and federal law. The fact that state law mandated promulgation of such policies doesn't shield Katy ISD from accountability for its own actions.

Katy ISD also acknowledges that "if a school district exercises discretion in how it implements or applies a state

statute, then it could still be held liable under *Monell* for making its own policy decisions." Dkt 65 at 2, citing *Bigford v Taylor*, 834 F2d 1213, 1222 (5th Cir 1988), in turn citing *Familias Unidas*, 619 F2d at 404. It thus bears mention that SB 12 doesn't dictate the exact form or particulars of policies to be individually adopted by independent school districts. Such policies can, instead, vary—meaning in turn that the ISDs necessarily exercised discretion when implementing SB 12 in their own way. Katy ISD is thus properly subject to suit under §1983 for the manner and specifics of how it chose to implement SB 12.

Last, it is true that SB 12 clearly contains directives that, if violated by school districts, may result in adverse consequences for the school district or its board of trustees. See §§11.005, 11.401, 28.0043, 33.0815; but see Dkt 87 at 52 (transcript, with Katy ISD unable to articulate what consequence might follow from noncompliance). Even so, like all government entities, school districts remain obligated to comply *first and foremost* with federal law, even when doing so requires disregarding contrary state directives. See *Arizona v United States*, 567 US 387, 399 (2012) (citation omitted): "The Supremacy Clause provides a clear rule that federal law 'shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.'"

Ongoing litigation regarding a separate Texas law from the same legislative sessions illustrates this point. SB 10 requires that the Ten Commandments be displayed in school classrooms. See §1.0041. Galveston ISD decided not to do so, upon belief that "SB 10 conflicts with the 'supreme Law of the land.'" See *Texas v Galveston Independent School District*, 3:25-cv-00378 (SD Tex), Dkt 5 at 7 (motion to dismiss). As a result, action is pending against it as brought by the Attorney General of Texas. Ibid; see also *Nathan v Alamo Heights ISD*, 25-50695 (5th Cir) (pending appeal of district court order enjoining implementation of SB 10 as unconstitutional).

Whether Galveston ISD was right or wrong in its own assessment isn't the point. Rather, its actions illustrate what a school district is *obligated* to do when it believes that compliance with state law would violate federal law. The Supremacy Clause dictates a clear answer—follow federal law.

As considered next below, Plaintiffs have alleged injuries arising from and traceable to policies implemented by Katy ISD. And certainly, an order enjoining enforcement of those policies would remedy such injuries. Katy ISD thus fails to establish that it isn't properly subject to suit under §1983.

The motion by Katy ISD to dismiss the claims against it will be denied. Dkt 53.

### 4. Standing

Houston, Katy, and Plano ISDs don't contest standing in any respect. See Dkts 54, 56 & 59. Even so, a federal court has "a continuing obligation to assure itself of its own jurisdiction, *sua sponte* if necessary." *Daves v Dallas County*, 22 F4th 522, 531 (5th Cir 2022) (citation omitted).

Analysis above as to Commissioner Morath and Katy ISD resolves necessary considerations of *traceability* and *redressability*. In short, the ISDs have each implemented policies or are otherwise enforcing SB 12, and an injunction proscribing further enforcement would afford cognizable relief to Plaintiffs.

But only light attention has been given to consideration of *injury in fact* as to the mix of Plaintiffs, provisions, and school districts. To the extent that at least one Plaintiff establishes an injury as to each challenged provision at each of the ISDs, the case-and-controversy requirement for issuance of injunctive relief is satisfied under Article III. See *Texas Democratic Party*, 978 F3d at 178.

### a. Club Provision

Rebecca Roe, Adrian Moore, and GSA Network have standing to challenge policies enacted by Houston, Katy, and Plano ISDs pursuant to the Club Provision as violating the First Amendment and the Equal Access Act.

*As to Rebecca Roe and Adrian Moore*, they are high school students in Houston ISD and Katy ISD, respectively. As to intention to engage in conduct of a constitutional dimension, they both state that they have previously participated in GSA-like clubs and would continue doing so, but for prohibition by policies implemented under the Club Provision. See Dkts 33-4 at ¶¶4, 10 (as to Roe) & 33-7 at ¶18 (as to Moore). It's also undisputed that such clubs have already been disbanded in Katy and Plano ISDs, demonstrating a credible threat of enforcement. Dkts 33-5 at ¶21 & 33-7 at ¶18. Rebecca Roe and Adrian Moore thus have standing to challenge the Club Provision against Houston ISD and Katy ISD, respectively.

*As to GSA Network*, it is an organization suing on behalf of both itself and its members. To sue on its own behalf, it must meet the same standing test that applies to individuals. See *Association of Community Organizations for Reform Now v Fowler*, 178 F3d 350, 356 (5th Cir 1999). And to sue on behalf of its members, it must establish that "(1) its individual members would have standing to bring the suit; (2) the association seeks to vindicate interests germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the individual members' participation." *NetChoice, LLC v Fitch*, 134 F4th 799, 804 (5th Cir 2025).

Regarding its own injuries, GSA Network states that it engages in constitutionally protected speech by communicating with students, parents, and teachers in GSA clubs, including by sharing resources and information with registered GSAs in Texas. Dkt 33-2 at ¶14. And it states an intention to continue doing so, but for SB 12's restrictions, which will result in the closure of GSAs in schools. Ibid. As already noted, it's undisputed that actions and policies enacted by the ISDs pursuant to the Club Provision proscribe GSA Network member clubs and have caused such clubs to disband in Katy and Plano ISDs. This demonstrates a credible threat of enforcement.

GSA Network also alleges that it has had to "reallocate considerable time and resources from its regular operations in order to support students and GSA clubs in preparing for the impacts of SB 12." Dkt 33-2 at ¶38. Such efforts resemble those that the Fifth Circuit found to constitute a cognizable injury in *OCA-Greater Houston v Texas*, 867 F3d 604, 612 (5th Cir 2017). The primary mission of the organizational plaintiff there was voter outreach and civic education. It challenged a Texas voting law imposing a restriction on the interpretation assistance available to voters with limited English proficiency. Id at 606. The plaintiff diverted time and resources to counteract the effect of the law, "mitigating its real-world impact on [its] members and the public." Id at 612. The Fifth Circuit found this was a cognizable injury, "perceptibly impairing" its ability to carry out its mission. So, too, here. GSA Network alleges that its core operations have been perceptibly impaired by policies enacted pursuant to the Club Provision, requiring it to divert time and resources away from its ordinary programming to address the impact of SB 12—namely, the closure of its member clubs. For example, see Dkt 33-2 at ¶¶38–41 (alleging expenses of $20,000 in mitigation efforts). Such injuries are cognizable.

Regarding standing on behalf of its members, it also clearly exists. As resolved above, its student members, who are similarly situated to Adrian Moore and Rebecca Roe, have individual standing. This action is also clearly germane to GSA Network's purpose, as an organization which "identifies and develops LGBTQ+ and allied youth leaders, training and mentoring young people to advocate for themselves and to organize for racial, economic, and social justice, beginning in the schools." Id at ¶2. And nothing suggests that either the claims asserted or the relief requested requires participation by the individual members.

### b. DEI, Social Transition, and LGBT Curriculum Provisions

The DEI, Social Transition, and LGBT Curriculum Provisions each differ in subject matter and substance. But

they may properly be considered together because the injuries alleged by Plaintiffs are essentially the same for each—arising from stated concerns of vagueness and overbreadth. Plaintiffs Polly Poe and Texas AFT, on behalf of its members, have standing to challenge policies enacted by Houston, Katy, and Plano ISDs pursuant to each provision as violating the First Amendment.

*As to Polly Poe*, she maintains that, as a high school teacher in Plano ISD, she finds it difficult to interpret and implement policies enacted pursuant to SB 12, along with the requirements of SB 12 itself. In sum, Poe states that, because of SB 12's alleged vagueness, she (i) doesn't know "how to safely do [her] job," and (ii) fears that she may face discipline, termination, or legal liability as a result. Dkt 33-5 at ¶42. Her particular concerns as to each of the three provisions are as follows:

- o  Regarding the DEI Provision, Poe states that she "do[es] not know what it means to 'develop' or 'implement' a 'policy, procedure, training, program, or activity that references race, color, ethnicity, gender identity, or sexual orientation,'" finding the language "so vague and broad that [she] do[es] not know how [she] can avoid being accused of violating it, especially when students choose to talk to [her] about these topics." See id at ¶31.

- o  Regarding the Social Transition Provision, Poe says that she has "no idea what it means to 'assist' a student's 'social transitioning,'" finding "the law's wording is so vague and confusing that [she] cannot tell if using a student's name and pronouns that align with their gender identity is actually prohibited." Id at ¶32.

- o  Regarding the LGBT Curriculum Provision, Poe maintains that it is "vague and confusing" and "seems to prohibit [her] speech even outside of school and [her] official work duties

31

and gives [her] no guidance on what is actually prohibited." Id at ¶35.

The merits of such allegations as to vagueness and overbreadth aren't resolved at this stage of analysis. The question instead is simply whether her claims at present demonstrate the "chilling effect of the allegedly vague [provisions], coupled with a range of potential penalties for violating the [provisions]." *Speech First*, 979 F3d at 322. This is sufficiently alleged and supported by her sworn declaration. And it is sufficient injury to satisfy First Amendment standing requirements. See *Center for Individual Freedom v Carmouche*, 449 F3d 655, 660 (5th Cir 2006): "[A] chilling of speech because of the mere existence of an allegedly vague or overbroad statute can be sufficient injury to support standing."

*As to Texas AFT*, it maintains that the challenged provisions are (i) vague and violate educators' due process rights, and (ii) interfere with free speech rights of Texas AFT members on matters of public concern beyond their official duties. Dkts 33 at 31–32 & 33-6 at ¶8 (declaration of Zeph Capo, President of Texas AFT).

Texas AFT asserts claims solely on behalf of its members. Polly Poe, for example, is a member of Texas AFT. Dkt 33-6 at ¶9. Associational standing is thus met. First, Texas AFT members, like Polly Poe, have individual standing as to policies enacted pursuant to the DEI Provision, the Social Transition Provision, and the LGBT Curriculum Provision for reasons just stated. Second, this action is germane to Texas AFT's purpose as a labor union advocating for the "employment rights of its members" and for "high quality public education, fairness, democracy, and economic opportunity." Dkt 33-6 at ¶2. Third, neither the claims asserted nor the relief requested requires the participation of individual members.

\*     \*     \*

In sum, at least one Plaintiff has standing with respect to each provision of SB 12 as against the policies enacted and actions taken by each of Houston, Katy, and Plano ISDs. As to the Club Provision, Rebecca Roe has standing

as to Houston ISD, Adrian Moore has standing as to Katy ISD, and GSA Network has standing at least as to Plano ISD. As to the DEI, Social Transition, and LGBT Curriculum Provisions, Polly Poe has standing as to Plano ISD, and Texas AFT has standing as to each of the three ISDs.

Whether these and other Plaintiffs also have standing in other respects, and to what extent, needn't be further considered at present.

### 5. Motion for preliminary injunction

The purpose of a preliminary injunction is to preserve the relative positions of the parties until a trial on the merits can occur. *University of Texas v Camenisch*, 451 US 390, 395 (1981). This is equitable relief. To obtain it, the burden is upon the applicant to make a sufficient showing of (i) a substantial likelihood of success on the merits, (ii) a substantial threat of irreparable injury, (iii) the threatened injury outweighing any harm the order might cause to the defendant, and (iv) the injunction not disserving the public interest. *City of El Cenizo, Texas v Texas*, 890 F3d 164, 176 (5th Cir 2018); see also *Winter v National Resource Defense Council, Inc*, 555 US 7, 20 (2008).

But rules of procedural regularity also pertain. A popular adage states that the obligation of a federal court is to call "balls and strikes," akin to an umpire considering the contest between pitcher and batter before him on the field. See Confirmation Hearing on the Nomination of John G. Roberts, Jr. to be Chief Justice of the United States Before the Senate Committee on the Judiciary, 109th Congress, at 56 (2005). But the metaphor extends further. For it is also the umpire's equal duty to call an out when the batter won't even step into the box. Major League Baseball, *Official Baseball Rules*, Rule 5.04(b)(3) (2025). And just as the umpire doesn't take a turn at bat when players won't come out of the dugout, a federal court doesn't step into the shoes of litigants who refuse to defend their own actions.

That's the situation at hand. The motion by Plaintiffs for preliminary injunction spans more than one hundred

pages, along with six declarations nearing an additional one hundred pages. See Dkt 33 (and attachments). The three ISDs address none of it in their terse and avoidant responses. See Dkts 54 (Katy ISD, three pages), 56 (Plano ISD, four pages) & 59 (Houston ISD, three pages). The motion for a preliminary injunction will thus be granted as unopposed.

### a. Party presentation and waiver

A key feature of litigation in federal court is the principle of party presentation. See *Johnson v Guerrero*, 2026 WL 89388, *1 (5th Cir) (Ho, J, dissenting from denial of *en banc* rehearing): "Our adversarial system of justice relies on party presentation." This requires that litigants "must assert their rights in timely fashion, or else risk forfeiting them." Ibid.

The United States Supreme Court recently emphasized in *United States v Sineneng-Smith* that "in both civil and criminal cases, in the first instance and on appeal . . . we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." 590 US 371, 375 (2020), quoting *Greenlaw v United States*, 554 US 237, 243 (2008). This means that federal courts "do not, or should not, sally forth each day looking for wrongs to right," but instead "normally decide only questions presented by the parties." Id at 376 (citation omitted). As even more sharply stated by Justice Antonin Scalia, "Our adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief." *Castro v United States*, 540 US 375, 386 (2003) (Scalia, J, concurring); see also *Carducci v Regan*, 714 F2d 171, 177 (DC Cir 1983) (Scalia, J): "The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented by and argued by the parties before them."

The Fifth Circuit also observes this principle, especially in the context of waiver. For example, see *Cargill v Garland*, 57 F4th 447, 465 (5th Cir 2023) (observing that

argument is waived if party fails to raise it when given opportunity, and that courts shouldn't consider arguments not presented by parties themselves). In full accord is Rule 7.4 of the Local Rules of the Southern District of Texas, which provides, "Failure to respond to a motion will be taken as a representation of no opposition." See also *Guarantee Company of North American USA v Housing and Land Development Corporation*, 2024 WL 3431339, *7 (SD Tex) (citation omitted): "Courts have consistently held that inadequate briefing results in a waiver of a party's argument."

In short, then, federal courts, being ones of limited jurisdiction, must decide cases based on the arguments presented by the parties. In the context of constitutional litigation, it also means that the party to be enjoined must state a position and defend itself if it wishes to avoid the requested relief. Such procedural norms matter in federal court litigation if judicial restraint is to have meaning in practice.

Such restraint is all the more appropriate when dealing with the politically charged issues present in a case such as this. As stated by Justice Felix Frankfurter on behalf of the Supreme Court in *Joint Anti-Fascist Refugee Committee v McGrath*, "The more issues of law are inescapably entangled in political controversies, especially those that touch the passions of the day, the more the Court is under duty to dispose of a controversy within the narrowest confines that intellectual integrity permits." 341 US 123, 149–50 (1951). And so, for example, in *Sineneng-Smith*, the Supreme Court chose to avoid the weighty First Amendment issues, complicated criminal law concerns, and deep political implications of that case, instead disposing of it for the Ninth Circuit's failure to abide by the party-presentation principle. See 590 US at 379–80.

This is no doubt important litigation. The State of Texas has fashioned a sweeping and complex law that engages on issues of social policy with respect to public education that are presently the subject of heated

disagreement in Texas and across the country. To say that SB 12 is a complex law presenting complicated constitutional issues is a vast understatement. It proceeds over thirty-one sections directing detailed edits and additions in numerous respects to the Texas Education Code, which itself is sprawling, detailed, and, at times, arcane.

Houston, Katy, and Plano ISDs explain none of it. Nor do they address any facts or present any legal rationale opposing entry of the requested preliminary injunction. Yet as determined above, SB 12 places authority almost exclusively in the hands of public school districts, directing them to fashion, implement, and enforce their own, district-wide polices with respect to the four challenged provisions. And here, the record is clear that Katy and Plano ISDs have each taken independent action to implement specific policies, with Houston ISD agreeing that it is complying with SB 12, even if it hasn't yet adopted formal policies. See Dkts 58 at ¶48 & 59 at 2.

Instead, their responses to this point specifically decline to either defend or disclaim the constitutionality of their actions, while also failing to oppose the motion for preliminary injunction:

- o "[Houston ISD] has not taken any independent position on the constitutionality or propriety of SB 12." Dkt 59 at 2.

- o "Defendant Katy ISD takes no position on Plaintiffs' Amended Motion for Preliminary Injunction," and "intends to comply with SB 12, but will comply with any injunctive order issued by the Court as to SB 12." Dkt 54 at 3.

- o "[Plano ISD] takes no position on the constitutionality or propriety of SB 12" and "does not support or oppose Plaintiffs' request for a preliminary injunction." Dkt 56 at 2.

One example—as to policies implemented with respect to the Club Provision—crystallizes the breadth of the waiver by the ISDs, along with their abject failure to abide by party-presentation rules.

On the one hand, the Supreme Court has explained, "Under the Equal Access Act, a public secondary school with a 'limited open forum' is prohibited from discriminating against students who wish to conduct a meeting within that forum on the basis of the 'religious, political, philosophical, or other content of the speech at such meetings.'" *Board of Education of Westside Community Schools v Mergens*, 496 US 226, 235 (1990), quoting 20 USC §§4071(a), (b).

On the other hand, the Club Provision states, "A school district or open-enrollment charter school may not authorize or sponsor a student club based on sexual orientation or gender identity." See §33.0815. And it's undisputed that each of the three ISDs has provided "a limited public forum" by allowing access to various student groups under the definition provided by §4071(b) of the Equal Access Act. See Dkt 33 at ¶214 n 55.

The Christian Legal Society submitted a brief as *amicus curiae* in support of Plaintiffs' position and seeking a holding that §33.0815(b) violates the Equal Access Act. Dkt 79-1. It articulated reasoning at length that the Club Provision is without question content-based discrimination if and when school districts implement policies in accord. But its summary was admirably succinct:

> A state law that denies LGBT students their rights under the EAA could easily be adapted by another state to deny religious students their rights under the EAA. Court decisions protecting LGBT students' EAA rights necessarily reinforce religious students' EAA rights.

Id at 7.

At hearing, pointed inquiry addressed whether any Defendant would argue in favor of the Club Provision on the merits as to this seeming conflict with the Equal Access Act. See Dkt 87 at 103 (transcript). No one, including Commissioner Morath, rose in defense.

But if resolution with respect to the Club Provision seems straightforward, the opposite is true as to resolution of the many issues presented with respect to the DEI, Social Transition, and LGBT Curriculum Provisions. Yet non-opposition by the ISDs is likewise manifest as to each of those provisions. Indeed, this extended to waiver of any evidentiary hearing, with the declarations submitted by Plaintiffs thus coming in without cross-examination. Dkt 60 (joint stipulation). Not that any reason exists to doubt those factual averments, but as submitted, their credibility must be assumed. And not surprisingly, those declarations were drafted to simply, and factually, confirm elements noted in the raft of First Amendment cases cited by Plaintiffs in their briefing.

Principles of judicial restraint counsel against the undersigned addressing defenses that the ISDs fail to advance on their own behalf and of their own accord. In sum, it is simply not the job of this Court to parse those declarations and match up what might or might not fit with controlling authority on behalf of the ISDs, who decline opportunity to do so themselves. Local Rule 7.4, along with principles of party presentation and waiver, thus foreclose their ability to resist the preliminary injunction at this juncture as to the Club, DEI, Social Transition, and LGBT Curriculum Provisions.

### b. Adoption of Commissioner's argument

The only wrinkle is a defense on the merits of SB 12 advanced by Commissioner Morath with respect to the preliminary injunction as requested against him. See Dkt 57 at 28–43. Notably, he joined the stipulation waiving evidentiary hearing or challenge to Plaintiffs' declarations. Dkt 60. In any event, his position was stated in the alternative to dismissal. And he has now been dismissed because Plaintiffs lack standing against him, as any enforcement authority he possesses under SB 12 is too attenuated to establish traceability or redressability at present.

Houston ISD purports to adopt by reference the Commissioner's arguments with statement that it "joins in

the arguments regarding the proposed injunction advanced by Defendant Mike Morath," while explaining that it does so only "to avoid unwarranted expenditure of HISD resources." Dkt 59 at 2. Neither Katy nor Plano ISD join this putative adoption. See Dkts 54 & 56. And even in so saying, Houston ISD proceeds with specific *caveat* that it in fact has "not taken any independent position on the constitutionality or propriety of SB 12." Ibid.

While purely legal arguments may in some contexts be adopted by reference, fact-specific ones cannot. See *Gil Ramirez Group, LLC v Houston Independent School District*, 2017 WL 3236110, *2 (SD Tex); see also *United States v Straker*, 800 F3d 570, 594 n 5 (DC Cir 2015) (noting that "adoption by reference is permitted only to the extent we can readily apply the proponent's arguments to the adopter's case"). This means that a "textbook perfunctory" adopt-by-reference statement waives the argument where it "offer[s] no explanation as to why [such] arguments pertained to him." *United States v Ramirez-Rivera*, 800 F3d 1, 11 n 1 (1st Cir 2015).

Here, the one-sentence statement of adoption by Houston ISD doesn't assert an actual belief that the Commissioner's arguments are correct. To the contrary, it at least implicitly *disclaims* agreement with those arguments by affirmatively stating it has "not taken any independent position on the constitutionality or propriety of SB 12." Dkt 59 at 2. More concerning is the abject failure to explain why (and how) arguments by the Commissioner pertain equally to school districts, for Houston ISD in no way explains how arguments advanced by the Commissioner square with the applicability of SB 12 to school districts.

True, some of the Commissioner's arguments address what could be considered the legal propriety of SB 12 at a level of generality. See Dkt 57 at 28–36 (asserting challenged provisions as aspects of government speech). But the arguments are far from complete, including any separate comprehension of implementation issues left to the school districts themselves. For example, as noted at

the outset, §1.009 prohibits "infringement of parental rights" upon implementation of the provisions of SB 12, including "the right to . . . make decisions concerning the child's education," unless "necessary to further a compelling state interest" and "narrowly tailored using the least restrictive means." It would seem that only a pertinent school district could state an individual position as to its own actions. Regardless, the Commissioner doesn't purport to consider this at all, much less from the point of view of an independent school district taking actions pursuant to the challenged provisions.

The purported adoption-by-reference by Houston ISD is thus insufficient to be treated as opposition to the preliminary injunction requested against it.

\*   \*   \*

The motion for preliminary injunction will be granted as unopposed. Dkt 33.

### 6.   Scope of preliminary injunction

Plaintiffs seek statewide relief, including as to the requested preliminary injunction, to essentially enjoin the four challenged provisions entirely—rather than solely as implemented by independent school districts. See Dkt 63 at 41. That Plaintiffs would naturally prefer to have single-shot litigation resolve SB 12 once and for all isn't surprising. But such relief would require identification of a Defendant through whom SB 12 can actually be enjoined statewide. This they have thus far failed to do.

Decision by the Supreme Court in *Whole Woman's Health v Jackson* addressed a prior Texas law, SB 8, and the apparent lack of enforcement authority vested in the Texas Attorney General due to its decentralized nature. See 595 US 30 (2021). It there observed:

> Even if we could overcome this problem, doing so would only expose another. Supposing the attorney general did have some enforcement authority under S. B. 8, the petitioners have identified nothing that might allow a federal court to parlay that

authority, or any defendant's enforcement authority, into an injunction against any and all unnamed private persons who might seek to bring their own S. B. 8 suits. The equitable powers of federal courts are limited by historical practice. A court of equity is as much so limited as a court of law. Consistent with historical practice, a federal court exercising its equitable authority may enjoin named defendants from taking specified unlawful actions. But under traditional equitable principles, no court may lawfully enjoin the world at large, or purport to enjoin challenged laws themselves.

595 US at 44 (cleaned up, citations omitted).

SB 12 presents a similarly decentralized structure and places enforcement authority in hands other than the Commissioner. And so here, with him dismissed, order may be directed only toward enjoining the policies and actions that the three ISDs have themselves implemented and taken with respect to the four challenged provisions of SB 12. Dkt 33 at 125.

The reality is that resolution of challenges to SB 12 must instead depend upon different actions brought against different school districts before different federal judges. This accords with recent decision by the Supreme Court in *Trump v CASA, Inc*, where it noted that it had historically "rebuffed requests for relief that extended beyond the parties," meaning in turn that injunctive relief may not "directly interfere with enforcement of contested statutes or ordinances except with respect to the particular [ ] plaintiffs." 606 US 831, 843–44 (2025). And it is a particularly appropriate result here, where SB 12 directs individual school districts to fashion and implement their own policies in compliance with the provisions of SB 12.

Separate order will enter to specify the terms and scope of preliminary injunction as against Houston, Katy, and Plano ISDs. In sum, during the pendency of this litigation,

they will be enjoined from implementing policies or otherwise taking action to enforce each challenged provision of SB 12. But preliminary injunction will extend no more broadly than that.

The scope of injunctive relief as to all ISDs will also accord with the joint stipulation between Plaintiffs and Houston ISD. See Dkt 84. As such, the preliminary injunction will not compel campus access or disrupt any preexisting policies governing the procedures by which any group may seek access to school facilities.

Last in this respect, no bond will be required. This action involves constitutional issues, and nothing suggests that the ISDs might suffer monetary harm from entry of the requested preliminary injunction. See FRCP 65(c), see also Dkt 33 at 124.

### 7. Procedural orders

As just addressed at length, Houston, Katy, and Plano ISDs have to this point sought the path of least resistance, attempting to thread a vanishingly small needle with several rather discordant positions. These are that (i) they don't have discretion to decide whether or how to follow the mandates of SB 12, (ii) and so they each will abide by and implement the challenged provisions, (iii) even as they decline to take any position to defend SB 12 or their actions on the merits, (iv) although they'd be happy to comply with any federal court order of preliminary injunction. See Dkts 54 at 1–2, 56 at 2 & 59 at 2. For reasons noted above, that's insufficient, particularly with respect to constitutional litigation.

Plano ISD in fact goes even further. It suggests that requiring it even to state a position puts it to a "Hobson's choice of either (1) implementing a state law at the risk of running afoul of First Amendment and Equal Access Act as alleged by Plaintiffs; or (2) refusing to implement SB 12 and facing discipline from the State." Dkt 56 at 4. Like it or not, however, declining to take a position on such basis isn't an available option—or at least, failing to do so comes with procedural consequences. The obligation of public

officials in the first instance is instead to proceed in accord with their own assessment of constitutionality. It may be *unpleasant* for the members of the various boards of trustees to face discipline or removal if they refuse to implement any of SB 12's provisions upon their own discernment of constitutional infirmity. But that is simply a consequence of the Supremacy Clause—coupled with their prior acceptance of duties as trustees.

On principle, then, the three ISDs should either defend SB 12 and their actions under it, or else state explicitly that they will not enforce it. But in practice, it appears that Texas statutory law may provide an alternative. Left unaddressed in the briefing is the potential for school districts to "request the assistance of the attorney general." §11.151(e). This itself appears to pair with statutory procedures requiring notice to the Office of the Texas Attorney General of challenges to the constitutionality of state law, which triggers the potential for intervention. See Texas Government Code §402.010.

Given their failure to articulate a position on the merits to this point, Houston, Katy, and Plano ISDs will be ordered to file a statement of position within fourteen days as to whether they (i) intend to defend SB 12 and their actions enforcing it, (ii) will seek representation from the Office of the Attorney General, per §11.151(e) of the Texas Education Code, or (iii) intend some other course altogether. Their consultation with the Attorney General must also confirm that this case involves a challenge to the constitutionality of a state law, in accord with §402.010 of the Texas Government Code.

### 8. Conclusion

The motion to dismiss by Defendant Commissioner Mike Morath is GRANTED for lack of standing Dkt 57. He is DISMISSED WITHOUT PREJUDICE from this action.

The motion to dismiss by Defendant Katy ISD is DENIED. Dkt 53.

The motion by Plaintiffs for preliminary injunction is GRANTED IN PART as unopposed. Dkt 33.

A separate order will enter to set out the specific terms of the preliminary injunction. In sum, during the pendency of this litigation, Houston, Katy, and Plano ISDs will be enjoined from implementing policies or otherwise taking action to enforce each of the four challenged provisions of Senate Bill 12. For the avoidance of doubt, because claims against Commissioner Morath have been dismissed, no statewide relief will be ordered at this juncture.

Houston, Katy, and Plano ISDs are further ORDERED to file a statement of position within fourteen days as to whether they intend to defend Senate Bill 12; whether they will seek representation from the Office of the Attorney General; or whether they intend some other course altogether.

SO ORDERED.

Signed on February 20, 2026, at Houston, Texas

Honorable Charles Eskridge
United States District Judge

44