**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **GSA NETWORK, STUDENTS ENGAGED IN ADVANDING TEXAS, REBECCA ROE**, by and through her next friend, **RUTH ROE**, and **POLLY POE**,<br>    *Plaintiffs*,<br><br>v.<br><br>**HOUSTON INDEPENDENT SCHOOL DISTRICT, KATY INDEPENDENT SCHOOL DISTRICT, and PLANO INDEPENDENT SCHOOL DISTRICT**,<br>    *Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Civil Action No. 4:25-cv-04090** |

## DEFENDANT/INTERVENOR THE STATE OF TEXAS'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

Defendant/Intervenor, The State of Texas ("Defendant"), respectfully files this Motion to Dismiss Plaintiffs' First Amended Complaint, Dkt. 32, in support thereof, would respectfully show unto the Court as follows:

On June 20, 2025, Governor Abbott signed Texas Senate Bill 12 (SB12) into law which was generally referred to as the Parental Bill of Rights. Plaintiffs originally brought claims against Mike Morath, in his official capacity as Commissioner of the Texas Education Agency, and Houston, Katy and Plano Independent School Districts alleging violations of the First Amendment to the United States Constitution including claims of viewpoint discrimination, vagueness, overbreadth, the freedom to associate and

unconstitutional prior restraint. After the Court dismissed Plaintiffs' claims against Mr. Morath due to a lack of standing, Houston ISD, Katy ISD and Plano ISD indicated they each had no desire to defend the constitutionality of SB12. As a result, the State of Texas intervened. Due to the Court's dismissal of Mr. Morath for jurisdictional deficiencies and the school districts' failures to file any response, the Court has yet to reach the merits of Plaintiffs' claims.[1] Plaintiffs' complaints regarding SB12 remain deficient because SB12 only targets protected government speech. Accordingly, Plaintiffs' claims fail to implicate any protections afforded by the First Amendment.

The State of Texas hereby moves for dismissal of Plaintiffs' First Amended Complaint under Fed. R. Civ. P. 12(b)(1) because Plaintiffs' lack standing. *See* Dkt. 32. The State further moves for dismissal of Plaintiffs' First Amended Complaint under Fed. R. Civ. P. 12(b)(6) as Plaintiffs fail to state a claim for relief.

---

[1] Much of the State of Texas's Motion to Dismiss remains similar to the Motion to Dismiss filed by Mr. Morath; however, due to the nuances of the State acting as Defendant/Intervenor, additional arguments are advanced herein.

**TABLE OF CONTENTS**

TABLE OF CONTENTS..................................................................................... iii

TABLE OF AUTHORITIES ............................................................................. v

INTRODUCTION.............................................................................................1

STANDARD OF REVIEW................................................................................ 3

ARGUMENT AND RESPONSE ....................................................................... 5

I.    Plaintiffs Cannot Establish Subject Matter Jurisdiction. ............................................ 6

      A.    Plaintiff Organizations do not have standing. ............................................... 8

            1.    GSA Network ........................................................................ 9

            2.    Students Engaged in Advancing Texas ................................................11

            3.    Texas AFT..........................................................................13

      B.    Student Plaintiffs do not have standing. ..................................................... 14

            1.    Rebecca Roe ..................................................................... 14

            2.    Adrian Moore ........................................................................15

      C.    Teacher Polly Poe does not have standing. ..................................................... 16

II.   SB 12 Simply Regulates Government Speech.............................................................17

      A.    The Club Restriction ..................................................................... 20

      B.    The Discrimination Ban ..................................................................... 23

      C.    Social Transition Ban ..................................................................... 24

      D.    Curricular Safeguards ..................................................................... 27

III.  SB 12 is Not Viewpoint Discrimination...................................................................... 28

IV.    SB 12 is Not Vague. ................................................................................. 30

V.     SB 12 is Not Overbroad ........................................................................... 32

VI.    SB 12 Does Not Implicate the Freedom to Associate. ............................. 34

VII.   SB 12 is Not a Prior Restraint. ................................................................ 35

VIII.  SB 12 Does Not Violate the Equal Access Act ......................................... 37

IX.    Plano ISD Cannot Determine the Constitutionality of SB 12 ................. 38

X.     If Any Provision of SB 12 is Facially Unconstitutional, the Court Should Sever

       That Provision and Leave the Rest of the Statute Intact. ........................ 40

**PRAYER** ........................................................................................................... **41**

**CERTIFICATE OF SERVICE**.......................................................................**42**

**CERTIFICATE OF CONFERENCE** ..............................................................**42**

**CERTIFICATE OF WORD COUNT** ..............................................................**43**

# TABLE OF AUTHORITIES

## Cases

*Abdullah v. Paxton,*
65 F.4th 204 (5th Cir. 2023) ................................................................. 7

*Aguillard v. Edwards,*
765 F.2d 1251 (5th Cir. 1985) ............................................................ 27

*Alexander v. United States,*
509 U.S. 544 (1993) ............................................................................ 36

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ............................................................................ 4

*Ashwander v. TVA,*
297 U.S. 288 (1936) ............................................................................ 3

*Baird v. State Bar of Arizona,*
401 U.S. 1 (1971) ............................................................................... 34

*Barr v. Am. Ass'n of Political Consultants, Inc.,*
591 U.S. 610 (2020) ............................................................................ 40

*Bd. of Ed. of Westside Comm. Schools v. Mergens,*
496 U.S. 226 (1990) ............................................................................ 10

*Board of Ed. of Ind. Sch. Dist. No. 92 of Pottawatomie Cty. v. Earls,*
536 U.S. 822 (2002) ....................................................................... 22, 29

*Board of Ed. v. Pico,*
457 U.S. 853 (1982) ............................................................................ 36

*Borden v. School Dist. of Tp. of East Brunswick,*
523 F.3d 153 (3d Cir. 2008) ............................................................... 33

*California v. Texas,*
593 U.S. 659 (2021) ............................................................................ 7

*Carney v. Adams,*
592 U.S. 53 (2020) .............................................................................. 8

*Catholic Leadership Coal. v. Reisman,*
  764 F.3d 409 (5th Cir. 2014) ...................................................................... 36

*Chiles v. Salazar,*
  146 S.Ct. 1010 (2026) ........................................................................... 22, 23

*Chiras v. Miller,*
  432 F.3d 606 (5th Cir. 2005) ............................................................ 19, 20, 28

*Chiras v. Miller,*
  No. 3:03-CV-2651-M, 2004 WL 10660388 (N.D. Tex. July 23, 2004) .......................... 20

*Christian Leg. Soc. Ch. of the Univ. of Cal. v. Martinez,*
  561 U.S. 661 (2010) ..........................................................................passim

*City of Dallas v. Stanglin,*
  490 U.S. 19 (1989)................................................................................ 35

*Clapper v. Amnesty Int'l,*
  568 U.S. 398 (2013) ............................................................................ 6, 7

*Cornelius v. NAACP Legal Def. and Educ. Fund, Inc.,*
  473 U.S. 788 (1985) .............................................................................. 15

*El Paso County v. Trump,*
  982 F.3d 332 (5th Cir. 2020) ..................................................................... 6

*Epperson v. State of Ark.,*
  393 U.S. 97 (1968) ............................................................................... 28

*Evans-Marshall v. Bd. of Tipp City Ex. Vill. Sch. Dist.,*
  624 F.3d 332 (6th Cir. 2010)..................................................................... 19

*Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.,*
  528 U.S. 167 (2000) ............................................................................... 7

*Garcetti v. Ceballos,*
  547 U.S. 410 (2006) .......................................................................... 13, 18

*Gonzales v. Carhart,*
  550 U.S. 124 (2007)............................................................................... 26

*Grossman v. South Shore Pub. Sch. Dist.,*
  507 F.3d 1097 (7th Cir. 2007) ................................................................... 33

*Hazelwood Sch. Dist. v. Kuhlmeier,*
484 U.S. 260 (1988) ................................................................... 14, 17, 19, 21

*Healey v. James,*
408 U.S. 169 (1972) ..................................................................... 21

*Henerey ex. rel. Henery v. City of St. Charles, Sch. Dist.,*
200 F.3d 1128 (8th Cir. 1999) ...................................................... 36

*Hill v. Colorado,*
530 U.S. 703 (2000) ................................................................... 31, 32

*Kolender v. Lawson,*
461 U.S. 352 (1983) ..................................................................... 30

*Lee v. York County Sch. Div.,*
484 F.3d 687 (4th Cir. 2007) ........................................................ 33

*Lewis v. Cont'l Bank Corp.,*
494 U.S. 472 (1990) ..................................................................... 6

*Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC,*
594 F.3d 383 (5th Cir. 2010) ......................................................... 4

*Louisiana v. Callais,*
146 S.Ct. 1131 (2026) ................................................................ 5, 24

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992) ...................................................................... 9

*Matal v. Tam,*
582 U.S. 218 (2017) ..................................................................... 29

*Mayer v. Monroe Cty. Comm. Sch. Corp.,*
474 F.3d 477 (7th Cir. 2007) ........................................................ 9, 13

*Milwaukee Police Ass'n v. Jones,*
192 F.3d 742 (7th Cir. 1999) ........................................................ 36

*Minn. Voters All. v. Mansky,*
585 U.S. 1 (2018) ........................................................................ 30

*Mirabelli v. Olson,*
691 F.Supp.3d 1197 (S.D. Cal. 2023) ............................................ 25

*Moody v. NetChoice, LLC,*
   603 U.S. 707 (2024) ................................................................................................ 2

*National End. for Arts v. Finley,*
   524 U.S. 569 (1998) ...............................................................................................15

*Netchoice, LLC v. Paxton,*
   49 F.4th 439 (5th Cir. 2022) ................................................................................ 33

*Palmer es. rel. Palmer v. Waxahachie Ind. Sch. Dist.,*
   579 F.3d 502 (5th Cir. 2009) ............................................................................... 28

*Parents Protecting Our Children, UA v. Eau Claire Area School Dist.,*
   145 S.Ct. 14 (2024) ............................................................................................... 24

*Paterson v. Weinberger,*
   644 F.2d 521 (5th Cir. 1981) ............................................................................ 3, 4

*Plotkin v. IP Axess Inc.,*
   407 F.3d 690 (5th Cir. 2005) ................................................................................. 4

*Ramming v. United States,*
   281 F.3d 158 (5th Cir. 2001) ................................................................................. 3

*Reed v. Town of Gilbert, Ariz.,*
   576 U.S. 155

*Roark v. Hardee LP v. City of Austin,*
   522 F.3d 546 (5th Cir. 2008) ......................................................................... 30, 32

*Roberts v. U.S. Jaycees,*
   468 U.S. 609 (1984) ..........................................................................................34, 35

*Rocky v. King,*
   900 F.2d 864 (5th Cir. 1990) ......................................................................... 38, 39

*Roper v. Simmons,*
   543 U.S. 551 (2005) ............................................................................................... 26

*Rose v. Doctors Hosp.,*
   801 S.W.2d 841 (Tex. 1990) ................................................................................ 40

*Serv. Emp. Int'l Union, Local 5 v. City of Hous.,*
   595 F.3d 588 (5th Cir. 2010) ............................................................................... 28

*SisterSong Women of Color Rep. Just. Coll. v. Gov. of Georgia,*
    40 F.4th 1320 (11th Cir. 2022) ...................................................................................31

*Smith v. Goguen,*
    415 U.S. 566 (1974)...................................................................................................... 32

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) ....................................................................................................... 6

*Stringer v. Whitley,*
    942 F.3d 715 (5th Cir. 2019) ......................................................................................... 7

*Students for Fair Admissions, Inc. v. Pres. And Fellows of Harvard Coll.,*
    600 U.S. 181 (2023)...................................................................................................... 24

*Sullivan v. Leor Energy, LLC,*
    600 F.3d 542 (5th Cir. 2010) ......................................................................................... 4

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ....................................................................................................... 8

*Turtle Island Foods, S.P.C. v. Strain,*
    65 F.4th 211 (5th Cir. 2023).......................................................................................... 8

*United States v. Hansen,*
    599 U.S. 762 (2023)...................................................................................................... 34

*United States v. Nat'l Treasury Emps. Union,*
    513 U.S. 454 (1995)...................................................................................................... 40

*United States v. Raines,*
    362 U.S. 17 (1960) ..................................................................................................33, 34

*United States v. Skrmetti,*
    145 S.Ct. 1816 (2025) ............................................................................................. 25, 26

*United States v. Stevens,*
    559 U.S. 460 (2010)...................................................................................................... 34

*United States v. Texas,*
    173 F.4th 659 (5th Cir. 2026).........................................................................9, 10, 11, 13

*United States v. Varner,*
    948 F.3d 250 (5th Cir. 2020) ....................................................................................... 16

*United States v. Windsor,*
  570 U.S. 744 (2013) ........................................................................... 39

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,*
  454 U.S. 464 (1982)...........................................................................11

*Village of Hoffman Estates v. Flipside, Hoffman Ests., Inc.,*
  455 U.S. 489 (1982)........................................................................... 30

*Walker v. Tex. Div., Sons of Conf. Veterans, Inc.,*
  576 U.S. 200 (2015)...........................................................................17

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989) ........................................................................... 23

*Wash. State Grange v. Wash. St. Rep. Party,*
  552 U.S. 442 (2008) ........................................................................... 34

*Washington State Grange v. Washington State Republican Party,*
  552 U.S. 442 (2008) ............................................................................ 3

*Waters v. Churchill,*
  511 U.S. 661 (1994) ...........................................................................13

*Widmar v. Vincent,*
  454 U.S. 263 (1981) ........................................................................... 21

*Women's Med. Ctr. of Nw. Hous. v. Bell,*
  248 F.3d 411 (5th Cir. 2001) ............................................................. 32

*Wood v. Strickland,*
  420 U.S. 308 (1975)...........................................................................15

**Statutes**

20 U.S.C. §4071................................................................................... 37

20 U.S.C. §4071(a) ............................................................................. 37

20 U.S.C. §4071(c)(5)......................................................................... 38

20 U.S.C. §4072 ................................................................................. 37

S.B. 12 §7(a)...................................................................................... 25

Tex. Educ. Code §1.007...............................................................................................1

Tex. Educ. Code §1.009 ..............................................................................................1

Tex. Educ. Code §11.005(e)........................................................................................15

Tex. Educ. Code § 26.011 .......................................................................................6, 7

Tex. Educ. Code §§28.0043 (b)(1)-(2) .......................................................................27

Tex. Educ. Code §33.0815 .......................................................................................6, 40

Tex. Educ. Code §33.0815(b) ...............................................................................20, 21

Tex. Fam. Code §151.001............................................................................................1

Tex. Gov't Code §311.032(c)......................................................................................40

U.S. Const. art. 3, § 2, cl. 1 ........................................................................................6

## Rules

Fed. R. Civ. P. 12(b)(1)........................................................................................ii, 2, 3

Fed. R. Civ. P. 12(b)(6) ....................................................................................ii, 4, 17, 20

## Other Authorities

Tex. House Journal, 89th Leg., R. S. (2025) ..............................................................1

Tex. S.B. 12, 89th Leg., R. S. (2025) .................................................................passim

## INTRODUCTION

With overwhelming legislative support, Governor Abbott signed Senate Bill 12 into law on June 20, 2025, and it became effective September 1, 2025. Tex. S.B. 12, 89th Leg., R. S. (2025); *see also,* House Journal, 89th Leg., R. S., 2025, at 7393. SB12 defines curriculum provisions, reaffirms parental rights and prohibits specific practices at public elementary or secondary schools as well as schools operating under a charter under Chapter 12 of the Texas Education Code. Tex. Educ. Code § 1.007. As recognized in SB12, "[t]he fundamental rights granted to parents by their Creator and upheld by the United States Constitution, the Texas Constitution, and the laws of this state, including the right to direct the moral and religious training of the parent's child, make decisions concerning the child's education, and consent to medical, psychiatric, and psychological treatment of the parent's child under Section 151.001, Tex. Fam. Code, may not be infringed on by any public elementary or secondary school or state governmental entity, including the state or a political subdivision of the state." Tex. Educ. Code § 1.009. Because of such foundational basis, SB12 is generally referred to as the Parents Bill of Rights.

While SB12 contains approximately thirty-seven pages of specific affirmations of parents' rights, Plaintiffs only challenge four distinct provisions of SB12. *See* Dkt. 32, ¶1; Dkt. 33 at pp. 2-3. More specifically, Plaintiffs allege SB12 wrongfully "(1) bans all student organizations 'based on sexual orientation or gender identity'"; (2) prohibits any reference to 'race, color, ethnicity, gender identity, or sexual orientation' in any policy, procedure, training, activity or program 'develop[ed] or implement[ed]' by a school employee,

contractor, volunteer 'at, for, or on behalf of' a school; (3) bars employees from 'assisting' any student's social transition, including by providing 'any information' about this topic; and (4) prevents all educators and third parties from providing 'instruction, guidance, activities, or programming regarding sexual orientation or gender identity to students enrolled in prekindergarten through 12th grade.'" Dkt. 32, ¶1.

*First*, the Plaintiffs lack Article III standing to facially challenge SB12 as none of Plaintiffs' claims fall within SB12's scope. *Second*, the Supreme Court's mandate in *Moody v. NetChoice, LLC,* 603 U.S. 707, 724 (2024) requires the Court to rigorously map a statute's constitutional and unconstitutional applications and facially enjoin provisions only if their unconstitutional applications "substantially outweigh" their constitutional applications. When considering the uncontroverted ability of the State to control the curriculum of its public schools, Plaintiffs' facial challenge "comes at a cost." *Id.* at 708.

Unable to satisfy jurisdictional hurdles, Plaintiffs' claims should be dismissed under Fed. R. Civ. P. 12(b)(1). Because Plaintiffs have not alleged a concrete injury, traceable to the State, Plaintiffs fail to satisfy the requirements for Article III standing. Plaintiffs' claims should also be dismissed for failure to state a claim upon which relief can be granted as SB12 clearly and definitively sets forth the conduct that is prohibited and, as such, is neither vague nor overbroad. Nor does SB12 violate the First Amendment rights of any plaintiff because, to the extent it regulates speech at all, SB12 only regulates government speech.

Since the State has not taken any action against any of the Plaintiffs under the provisions of SB12, Plaintiffs' challenge must be considered as a facial challenge. "Facial

challenges, which require a showing that a law is unconstitutional in all of its applications, are disfavored: They often rest on speculation; they run contrary to the fundamental principle of judicial restraint that courts should neither 'anticipate a question of constitutional law in advance of the necessity of deciding it' nor 'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied,' and they threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented consistent with the Constitution." *Washington State Grange v. Washington State Republican Party,* 552 U.S. 442, 443 (2008) (quoting *Ashwander v. TVA,* 297 U.S. 288, 347 (1936)). Pp. 1190 – 1191.

Finally, should the Court determine that any provision of SB12 is facially unconstitutional, it should sever that provision and preserve the remainder of the statute thereby maintaining Texas's substantial interest in parental rights.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(b)(1), a defendant may move for dismissal where a court lacks subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). A plaintiff has the burden to establish subject matter jurisdiction. *See Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (per curiam).

Under Rule 12(b)(1), a defendant may challenge a court's subject matter jurisdiction through a "facial attack" or a "factual attack." *See Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). Where, as here, a defendant challenges subject matter jurisdiction on the face of a complaint, the district court presumes the plaintiff's factual allegations to be true

and determines whether those allegations are legally sufficient to establish jurisdiction. *See id.*

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move for dismissal where a plaintiff fails to "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To avoid dismissal under Rule 12(b)(6), a plaintiff must plead sufficient facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* While the Court must accept all factual allegations as true, the Court "do[es] not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Plotkin v. IP Axess Inc.,* 407 F.3d 690, 696 (5th Cir. 2005); *see also, Iqbal,* 556 U.S at 679.

When reviewing a motion to dismiss for failure to state a claim, "[t]he court's review is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC,* 594 F.3d 383, 387 (5th Cir. 2010); *see also, Sullivan v. Leor Energy, LLC,* 600 F.3d 542, 546 (5th Cir. 2010).

## ARGUMENT AND RESPONSE

The Texas Legislature enacted SB12 "continue the Texas tradition of supporting and expanding the rights of roles of parents in their children's education" by "providing statutory changes to strengthen the rights of parents concerning their child's education, providing a clear and specific framework for grievances, making information available to a parent regarding their child's education easily accessible, and returning to an opt-in for human sexuality instruction." Bill Analysis, C.S.S.B. 12, Public Education Committee Report (Substituted) at 1. In the same report, Sen. Creighton correctly noted that the Supreme Court "has continually upheld the principle of a parent's fundamental right to direct the education and upbringing of their children under the Fourteenth Amendment, while maintaining that the specific details regarding instruction, curriculum and administration may be left in the hands of the state or local government." *Id.*

Disregarding the State's authority to define its schools' instruction and curriculum, Plaintiffs challenge four targeted provisions of SB12:

*DEI Ban*: Public schools are prohibited from implementing hiring and employment practices or promoting differential treatment due to race, sex, color or ethnicity. Tex. Educ. Code §11.005. As Justice Alito explained, "[A]llowing race to play any part in government decisionmaking represents a departure from the constitutional rule that applies in almost every other context." *Louisiana v. Callais,* 146 S.Ct. 1131, 1143 (2026).

*Social Transition Ban*: The board of trustees of a school district are required to adopt policies prohibiting employees from assisting students with social transitioning. Tex. Educ. Code §11.401.

*Curriculum Provision*: School district employees are prohibited from providing or allowing third parties to provide instruction or guidance regarding sexual orientation or gender identity to students. Tex. Educ. Code §28.0043.

*Club Provision*: Schools are prohibited from authorizing student clubs based on sexual orientation or gender identity. Tex. Educ. Code §33.0815.

Enforcement of SB12 is restricted to the grievance procedure outlined in Tex. Educ. Code 26.011 and newly added Section 26A of the Texas Education Code wherein parents are entitled to notify their respective school principal and school board regarding suspected violations of SB12, which schools are then required to investigate.

## I.     Plaintiffs Cannot Establish Subject Matter Jurisdiction.

"Under Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies." *Lewis v. Cont'l Bank Corp.,* 494 U.S. 472, 477 (1990); *see also*, U.S. Const. art. 3, § 2, cl. 1. To establish standing under Article III, Plaintiffs "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable decision." *Spokeo, Inc. v. Robins,* 578 U.S. 330, 338 (2016); *accord El Paso County v. Trump,* 982 F.3d 332, 337 (5th Cir. 2020). The alleged "injury in fact" will only suffice it is "concrete, particularized, and actual or imminent." *Clapper v. Amnesty Int'l,* 568 U.S. 398, 409 (2013).

Plaintiffs cannot establish the necessary injury in fact as Plaintiffs cannot establish standing merely by invoking the First Amendment. *Abdullah v. Paxton,* 65 F.4th 204, 210 (5th Cir. 2023) (per curiam). Plaintiffs "must assert [their] own legal rights and interests and cannot rest [their] claim to relief on the legal rights or interests of third parties." *Id.* Nor can Plaintiffs show an injury that is actual or imminent or one that is concrete and particularized based solely on the language of SB12. *See Clapper,* 568 U.S. at 409. Plaintiffs must establish standing as of "the time the action commences." *Stringer v. Whitley,* 942 F.3d 715, 724 (5th Cir. 2019). And, for prospective relief, Plaintiffs' injury "must be certainly impending to constitute injury in fact"—"allegations of possible future injury are not sufficient." *Clapper,* 568 U.S. at 409 (quotations omitted). Indeed, "[a]llegations of only a 'possible' future injury . . . will not suffice." *Abdullah,* 65 F.4th at 208.

Nor are Plaintiffs' alleged injuries redressable. Any action that could possibly be taken by the State would only occur after going through the entire grievance process as outlined in SB12 including investigations by the respective school and principal, the Board of Trustees, and then finally, if at all, by the Texas Education Administration. Tex. Educ. Code §26.011. "Redressability requires a plaintiff to show "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.,* 528 U.S. 167, 181 (2000). Remedies "operate with respect to specific parties." *California v. Texas,* 593 U.S. 659, 672 (2021). Here, the implementation of SB12 is driven by individual school districts, not the State. Dkt. 32, ¶43.

Even if the Court should apply the unique standing rules in First Amendment challenges, Plaintiffs do not fare any better. *See Turtle Island Foods, S.P.C. v. Strain,* 65 F.4th 211, 215 (5th Cir. 2023). Under *Strain,* Plaintiffs need to show that (1) they intend to engage in a course of conduct arguably affected with a constitutional interest; (2) that the course of action is arguably proscribed by statute; and (3) that there exists a credible threat of prosecution under the statute. *See id.* (citing *Susan B. Anthony List v. Driehaus,* 573 U.S. 149, 159 (2014)). Plaintiffs' failure to allege a course of conduct affected with a constitutional interest dooms their standing claims. A failure of any one of the foregoing reasons requires dismissal of Plaintiffs' claims for lack of subject matter jurisdiction.

### A.    Plaintiff Organizations do not have standing.

The organizational Plaintiffs, GSA Network, Students Engaged in Advancing Texas and Texas AFT, lack standing to bring their claims because their purported injury— being able to disseminate their materials to students *specifically through teachers* -- is not "affected with a constitutional interest" as each remains free to disseminate their materials under SB12. SB12 merely provides what schools may or may not do to achieve the State's desired curriculum outcomes. It does not regulate what independent third parties may or may not do. None of the organizational Plaintiffs have a constitutional right to command independent third parties to distribute their materials. Plaintiffs "bear[] the burden of establishing standing as of the time [they bring] th[e] lawsuit and maintaining it thereafter." *Carney v. Adams,* 592 U.S. 53, 59 (2020). As such, at least as of August 28, 2025, the filing date of Plaintiffs' Original Complaint, each Plaintiff must establish standing which is a

"constitutional prerequisite for jurisdiction." *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560 (1992). *See* Dkt. 1.

The Supreme Court has explained the "irreducible constitutional minimum of standing requires "an invasion of a legally protected interest which is concrete and particularized, not 'conjectural or 'hypothetical;' 'fairly trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court; and 'likely,' as opposed to merely 'speculative' that the injury will be 'redressed by a favorable decision.'" *Id.* (collecting cases). Here, Plaintiffs lack the required "legally protected interest" and lack standing. Because Plaintiffs challenge an alleged "unlawful regulation of someone else," standing is "substantially more difficult to establish." *United States v. Texas,* 173 F.4th 659, 664 (5th Cir. 2026).

### 1.    GSA Network

Plaintiff GSA Network alleges it "engages in constitutionally protected speech by communicating with students, parents and teachers [] about issues of racial justice and support for LGBTQ+ -- including by mailing and emailing resources and information." Dkt. 33, p. 25. Similar to the other organizational plaintiffs, GSA Networks remains fully able to communicate with whomever it chooses under SB12. "[P]ublic-school teachers must hew to the approach prescribed by principals (and others higher up in the chain of authority)." *Mayer v. Monroe Cty. Comm. Sch. Corp.,* 474 F.3d 477, 479 (7th Cir. 2007). There is no provision in SB12 that directly suppresses GSA Network's speech, *contra* Dkt. 33 at 29, as it can continue to mail and email its resources and information to anyone.

Considering the "significant measure of authority [given schools] over the type of officially recognized activities in which their students participate," *Bd. of Ed. of Westside Comm. Schools v. Mergens,* 496 U.S. 226, 240 (1990), Plaintiff GSA Networks does not enjoy a constitutional right to then demand independent parties disseminate information on school campuses when the appropriate governmental decision makers have determined such information fails to fit within the State-ordered curriculum. Lacking conduct arguably affected with a constitutional interest, GSA Networks lacks standing.

GSA Network further alleges SB12 would "prevent GSA Network from being able to support GSA clubs and their activities in Texas [and] forbid student members from being able to form or join GSA clubs in Texas," Dkt. 33, p. 15; yet, SB12 only prohibits clubs based on gender identity and sexual orientation *at schools*. GSA Network can form, host and support clubs anywhere else it may choose. As such, Maya Flores', the co-Executive Director of the Genders & Sexualities Alliance Network, declaration that "GSA Network's own freedom of speech will also be curtailed by S.B. 12 because the Network will be prohibited from sharing resources and information with audiences in Texas" rings hollow. Dkt. 33, Ex. 2 at ¶35.

Nor does GSA Network's claim that it "will have to expend more resources to speak and connect with these groups" provide a sufficient basis for standing. Dkt. 33, Ex. 2 at ¶36; *see also* ¶¶38-40. "Because an organization cannot 'spend its way into standing' or 'manufacture its own standing,'" GSA Network's claim that they would have to expend "more resources" is insufficient. *Id.; Texas,* 173 F.4th at 665. "That theory would mean

that all organizations in America would have standing to challenge almost every [] policy that they dislike, provided they spend a single dollar opposing those policies." *Id.* "An organization may not establish standing simply based on the 'intensity of the litigant's interest' or because of strong opposition to the government's conduct." *Id.* (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,* 454 U.S. 464, 486 (1982)).

SB12 says nothing about GSA Network or any of the services it wants to provide. That makes GSA Network a "complete stranger to the statute and its enforcement." *Texas,* 173 F.4th at 666. An organization "cannot have Article III standing merely because a new law or regulation requires it to understand the legal change, to adjust resources in response, or to increase the degree or scope of [its services] for its current or prospective clients who may be adversely affected." *Id.*

### 2. Students Engaged in Advancing Texas

Students Engaged in Advancing Texas (SEAT) alleges it "collaborates with schools, educators, student organizations, and students across Texas in a variety of ways [] by providing information and resources to [] clubs" that are now restricted at public and charter school campuses. Dkt. 33, p. 29. More specifically, SEAT alleges it "shares know-your-rights resources," "shares information with teachers," "hosts advocacy days," and "an annual summit." Dkt. 33, p. 30. None of which is proscribed by SB12. In fact, irrespective of SB12, SEAT may continue all identified activities. The fact that SB12 contains a limitation on the ability of third parties, i.e. teachers, to then further disseminate

such information to students does not affect the speech or activity of SEAT. Notwithstanding SEAT's claim that it "will not be able to actively participate in trainings, programs and activities that reference race, gender identity, and sexual orientation, or discuss topics of social transition, gender identity, or sexual orientation with school employees," *Id.,* there is simply no prohibition of same within SB12. Presumably, SEAT recognizes as much as it failed to specifically identify any specific provision of SB12 that might arguably affect conduct with a "constitutional interest." SEAT lacks standing, and its claims must be dismissed.

SEAT claims it exists to "empower Texas youth through hands-on civic engagement, advocacy, and leadership development to address systemic inequities and drive change in their communities." Dkt. 33, Ex. 3 at ¶6. Yet again, not a single provision of SB12 prohibits such activity. "Anyone can sign up for updates through [SEAT's] website," *Id.* at ¶14, people can join SEAT's online messaging platform, *Id.* at ¶15, and SEAT regularly communicates through virtual open meetings, their online messaging platform, social media, emails and its website. *Id.* at ¶17. SEAT can still share resources from partner organizations with students and educators, testify at school board meetings and legislative sessions, answer questions from educators, and speak directly with educators. Dkt. 33, Ex. 3 at ¶¶23-27. SB12 prohibits none of the activities in which SEAT engages.

Similar to GSA Network, *supra* at p. 9, SEAT's alleged diversion of resources due to SB12 also fails to satisfy standing requirements. So, too, is SEAT a "complete stranger

to the statute and its enforcement." *Texas,* 173 F.4th at 666.

### 3.    Texas AFT

Plaintiff Texas American Federation of Teachers (Texas AFT) claims fail right out of the gate. Texas AFT is a "statewide labor union that represents over 66,000 employees throughout Texas, including teachers, librarians, counselors, nurses, teaching assistants, and other public and charter school *employees*" and "advocates for the *employment* rights of its members." Dkt. 32, ¶12 (emphasis added). By definition, any speech of Texas AFT that may arguably be proscribed by SB12 is limited to that as an employee within their scope of employment. Yet, "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Garcetti v. Ceballos,* 547 U.S. 410, 411 (2006). "This is so in part because the school system does not 'regulate' speech as much as it *hires* that speech." *Mayer,* 474 F.3d at 479.

Texas AFT members, by virtue of their position as government employees, must accept certain limitations on their freedom. *See Waters v. Churchill,* 511 U.S. 661, 671 (1994) ("[T]he government as employer indeed has far broader powers than does the government as sovereign."). Nothing in SB12 prohibits Texas AFT from "advocat[ing] for the employment rights of its members," Dkt. 32, ¶17; however, as its members "hire out their own speech and must be willing to provide the service for which employers are willing to pay," Texas AFT has not alleged "a course of conduct arguably affected with a constitutional interest." Texas AFT does not have standing.

### B.    Student Plaintiffs do not have standing.

#### 1.    Rebecca Roe

Plaintiff Roe is a current high school freshman in Houston ISD. Dkt. 33, p. 36. Plaintiff Roe alleges that she "hopes to have" the same experiences she did while attending middle school "with the support and participation of her school, teachers, and third parties." *Id.* While Plaintiff Roe complains of her school's curriculum choices, "[a] school [retains] the authority to refuse to sponsor student speech that might reasonable be perceived to . . . associate the school with any position other than neutrality on matters of political controversy." *Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260, 272 (1988). Further, "[t]hese activities may fairly be characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences." *Id.* at 271. There is no disputing a public school student's lack of ability to influence or demand particulars regarding a school's curriculum. Moreover, Section 24, amending Tex. Educ. Code §28.0043(b), specifically prohibits "limit[ing] a student's ability to engage in speech or expressive conduct protected by the First Amendment to the United States Constitution or by Section 8, Article I, Texas Constitution, that does not result in material disruption to school activities."

Plaintiff Roe also identifies some festivals previously held by her school and claims "S.B. 12 could *arguably* prohibit her school from allowing" such festivals and programming to continue. Dkt. 33, p. 37 (emphasis added). Notwithstanding the discretion afforded

officials regarding curriculum choices, the Supreme Court has indicated a reluctance "to invalidate legislation on basis of its hypothetical application to situations not before the Court." *National End. for Arts v. Finley,* 524 U.S. 569, 584 (1998). In fact, SB12 specifically provides that "[n]othing in this section may be construed to: (2) limit or prohibit a school district from acknowledging or teaching the significance of state and federal holidays or commemorative months and how those holidays or months fit into the themes of history and the stories of this state." Tex. Educ. Code § 11.005(e). Plaintiff Roe's right and ability to learn and receive information is only curtailed while engaged in curriculum related activities at her school which is a limitation specifically reserved to be within the province of the schools. The Supreme Court has repeatedly stressed that a State's restriction on access to a limited public forum "need not be the most reasonable or the only reasonable limitation." *Cornelius v. NAACP Legal Def. and Educ. Fund, Inc.,* 473 U.S. 788, 808 (1985). Plaintiff Roe may prefer a different policy or curriculum, but the advisability of a school's policy does not control its permissibility. *See Wood v. Strickland,* 420 U.S. 308, 326 (1975).

SB12 does not encroach on any of Plaintiff Roe's constitutional rights, and, therefore, she lacks standing.

### 2.    Adrian Moore

Plaintiff Moore is a high school senior in Katy ISD. Dkt. 33, p. 38. Similar to Plaintiff Roe, Plaintiff Moore identified some programming that "he hopes to continue being able to watch and participate in similar events in the future. Yet, for the same reasons Plaintiff Roe's hopes were insufficient to create standing, neither does Plaintiff Moore's hopes.

Plaintiff Moore further complains of his district's decision to require his teachers "to only call him by the name given to him at birth." Dkt. 33, p. 40. However, Plaintiffs fail to provide any support that Plaintiff Moore possesses a constitutional right to be called any name other than that on the birth certificate. Indeed, no authority supports the proposition that schools or anyone else is required to refer to gender-dysphoric students with pronouns matching their subjective gender identity. *See United States v. Varner,* 948 F.3d 250, 254 (5th Cir. 2020). Nor does such fact alone create standing against Defendant. Plaintiff Moore has failed to allege any specific action taken by the State that might possibly establish standing.

### C.    Teacher Polly Poe does not have standing.

"Plaintiff Polly Poe is a high school teacher in Plano ISD and a member of Texas AFT." Dkt. 33, p. 42. Plaintiff Poe's complaints are based on her alleged inability to share information with her students referencing topics of race, sexual orientation, gender identity and social transitioning. Dkt. 33, p. 43. But, for the reasons more fully set forth *infra* at II, Plaintiff Poe, as a teacher has hired out her speech, and "those authorities charged by state law with curriculum development [may] require the obedience of subordinate employees, including the classroom teacher." *Webster v. New Lenox Sch. Dist. No. 122,* 917 F.2d 1004, 1007 (7th Cir. 1990). Such limitations make sense since "[g]overnment employers, like private employers, need a significant degree of control over their employee's words and actions; without it, there would be little chance for the efficient provision of public services." *Garcetti,* 547 U.S. at 418.

Plaintiff Poe, as a teacher, remains subject to the curriculum directives as determined by the Legislature and any other relevant government authorities charged with making curricula decisions for the State of Texas. SB12 does not prohibit Plaintiff Poe's receipt of any of the type of information for which she complains. Rather, her complaint relates to her inability to share such information with her students. Yet, "'[t]he determination of what manner of speech in the classroom [] is inappropriate properly rests with the school board,' rather than the federal courts." *Hazelwood,* 484 U.S. at 267 (quoting *Bethel Sch. Dist. No. 403 v. Fraser,* 478 U.S. 675, 683 (1986)). "The Constitution does not entitle teachers to present personal views to captive audiences against the instructions of elected officials." *Mayer,* 474 F.3d at 480. Plaintiff Poe's complaints do not equate to "a course of conduct arguably affected with a constitutional interest," and she lacks standing.

## II.    SB12 Simply Regulates Government Speech.

Plaintiffs' First Amendment claims fail out of the gate because SB12 concerns government speech and should be dismissed under Fed. R. Civ. P. 12(b)(6). "When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." *Walker v. Tex. Div., Sons of Conf. Veterans, Inc.,* 576 U.S. 200, 207 (2015). Moreover, when the State is speaking on its own behalf, the First Amendment strictures that attend the various types of government-established forums do not apply." *Id.* at 215.

Plaintiffs contend "the challenged provisions burden Plaintiffs' constitutionally protected speech," Dkt. 32, p. 82; however, the curricular speech of primary and secondary

school teachers is not protected by the First Amendment. As declared by the Supreme Court, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos,* 547 U.S. 410, 421 (2006). The Court further observed that "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Id.* at 421-22. *Garcetti* alone dooms Plaintiffs' First Amendment claims as the caption of SB12 specifically indicates it "relat[es] to parental rights in public education school requirements and prohibitions regarding instruction, diversity, equity, and inclusion duties, and social transitioning, and to student clubs **at public schools**." Tex. S.B. 12, 88th Leg., R. S. (2025) (emphasis added).

The threshold question under *Garcetti* is whether the speech at issue "is made pursuant to the employee's official duties." *Garcetti,* 547 U.S. at 413. If the answer is yes, then the speech is not protected by the First Amendment. *Id.* at 421. Indeed, it is difficult to surmise a situation in which a primary or secondary school teacher's curricular choices are made other than "pursuant to [that educator's official duties." *Id.* Those choices are not entitled to First Amendment protection.

"Education is compulsory, and children must attend public schools unless their parents are willing to incur the cost of private education or the considerable time commitment of home schooling." *Mayer,* 474 F.3d at 479. Because of such compulsion, the Seventh Circuit determined "[i]t is enough to hold that the first amendment does not

entitle primary and secondary teachers, when conducting the education of captive audiences, to cover topics, or advocate viewpoints, that depart from the curriculum adopted by the school system." *Id.* at 480. There is no disputing that public schools may limit the classroom speech of primary and secondary school teachers to curricular speech in order to promote educational goals. *See Borden v. School Dist. of Tp. of East Brunswick,* 523 F.3d 153 (3d Cir. 2008); *Lee v. York County Sch. Div.,* 484 F.3d 687 (4th Cir. 2007); *Grossman v. South Shore Pub. Sch. Dist.,* 507 F.3d 1097 (7th Cir. 2007). As the Sixth Circuit noted, "[t]he common thread through all of these cases is that, when it comes to in-class curricular speech at the primary and secondary level, no other court of appeals has held that such speech is protected by the First Amendment." *Evans-Marshall v. Bd. of Tipp City Ex. Vill. Sch. Dist.,* 624 F.3d 332, 343 (6th Cir. 2010).

Courts and the law have repeatedly acknowledged the wide authority regarding educational policy bestowed upon various Texas state entities, including the authority to "develop and update a long range plan for public education," Tex. Educ. Code §7.102(c)(1), and "establish curriculum and graduation requirements," Tex. Educ. Code §7.102(c)(4). *See Chiras v. Miller,* 432 F.3d 606, 608 (5th Cir. 2005); *Hazelwood,* 484 U.S. 260, 273 (1988).

The Supreme Court has long held that, "the education of the Nation's youth is primarily the responsibility of parents, teachers, and **state and local officials**, and not of federal judges." *Hazelwood,* 484 U.S at 273 (emphasis added). Further, "the government, including its educational institutions, has the discretion to promote policies and values of its own choosing free from forum analysis or the viewpoint-neutrality requirement." *Chiras,*

432 F.3d at 613. And, this remains the true even when the government employs private "speakers" to transmit its message. *Id.*

In *Chiras,* a textbook author and high school student filed suit, alleging the State Board of Education violated their First Amendment rights by refusing to approve Chiras' environmental science textbook. *See generally, Chiras v. Miller,* No. 3:03-CV-2651-M, 2004 WL 10660388, at *1 (N.D. Tex. July 23, 2004). The District Court found that Defendants acted within their discretion and granted their motion to dismiss, in accordance with Fed. R. Civ. P. 12(b)(6). The Fifth Circuit then affirmed the dismissal finding that when the relevant state entities—vested with the authority to do so—devise state curriculum, "it is the state speaking, and not the textbook author." *Chiras,* 432 F.3d at 614. So too here. In devising and implementing educational policy, it is the government's speech that is implicated, not that of the Plaintiffs.

"Underlying our cases has been the premise that while the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.'" *Garcetti,* 547 U.S. at 420. Senate Bill 12's requirements and prohibitions are related to curriculum speech and conduct at public schools. As such, SB12, on its face, only covers government speech at schools and fails to "support the existence of a constitutional cause of action." *Id.* at 426.

### A.    The Club Restriction

Section 27 of SB12, amending Tex. Educ. Code §33.0815(b), specifies "[a] school district or open-enrollment charter school may not authorize or sponsor a student club

based on sexual orientation or gender identity." Despite Plaintiffs' claim that §33.0815(b) "singles out one subset of student organizations for disfavored treatment," Dkt. 32, ¶23, neither the language of §33.0815(b) nor the legislative history supports Plaintiffs' conclusory allegation. Indeed, as referenced by Plaintiffs in their Amended Complaint, Rep. Leach, the House bill sponsor of SB12, explained, "We shouldn't be sexualizing our kids in public schools . . . and we shouldn't have clubs based on sex." Dkt. 32, ¶65; *see also,* Tex. H. of Representatives, Floor Debate on S.B. 12, 89th Leg., R.S. (Tex. May 31, 2025) (video at 2:24:32-2:28:50), https://house.texas.gov/videos/22353.

As noted by the Supreme Court, a school's mission is education, and its decisions have never denied a school's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities. *See Widmar v. Vincent,* 454 U.S. 263, 268 (1981). "Cognizant that judges lack the on-the-ground expertise and experience of school administrators, however, we have cautioned courts in various contexts to resist 'substitut[ing] their own notions of sound educational policy for those of the school authorities which they review.'" *Christian Leg. Soc. Ch. of the Univ. of Cal. v. Martinez,* 561 U.S. 661, 686 (2010) (citing *Hazelwood,* 484 U.S. at 273 (noting our "oft-expressed view that the education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local officials, and not of federal judges")) and *Healey v. James,* 408 U.S. 169, 180 (1972) ("[T]his Court has long recognized 'the need for affirming the comprehensive authority of the States  and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools.'")).

A school's ability to choose among pedagogical approaches is not simply confined to the classroom as extracurricular programs are considered "essential parts of the educational process. *Martinez,* 561 U.S. at 686 (quoting *Board of Ed. of Ind. Sch. Dist. No. 92 of Pottawatomie Cty. v. Earls,* 536 U.S. 822, 831 (2002) ("Schools, we have emphasized, enjoy a 'significant measure of authority over the type of officially recognized activities in which their students participate.'")). Accordingly, the State's decisions about the character of its student-group program are due decent respect. *Id.* at 687.

Moreover, the prohibition of clubs strictly based on gender identity or sexual orientation is a permissible content-neutral restriction. As Justice Kagan explained, "when a law, though based on content, raises no real concern that the government is censoring disfavored ideas—then we have not infrequently 'relax[ed] our guard.'" *Chiles v. Salazar,* 146 S.Ct. 1010, 1031 (2026) (Kagan, J., concurring) (citing *Reed v. Town of Gilbert, Ariz.,* 576 U.S. 155, 183 (Kagan, J., concurring). Rep. Leach specifically explained that SB12 was designed to prohibit *all* clubs based simply on sex. Tex. H. of Representatives, Floor Debate on S.B. 12, 89th Leg., R.S. (Tex. May 31, 2025) (video at 2:24:32-2:28:50), https://house.texas.gov/videos/22353. And, as Plaintiffs reference, Rep. Leach explained "[w]e're not going to allow gay clubs and we're not going to allow straight clubs." Dkt. 32, ¶65. Here, the result would remain exactly the same even if the speaker or group was communicating the exact opposite message as Plaintiffs such as a Men's Club or White Supremacist Club. SB12 does not "draw[] a line based on the speaker's 'opinion or perspective,' and thus enable[] 'speech on only one side'—the State's preferred side—of

an ideologically charged issue." *Chiles,* 146 S.Ct. at 1031. That is content-neutral. Because "[t]he government's purpose is the controlling consideration," there is no constitutional violation when the State prohibits all clubs based on sex. *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989).

### B.    The Discrimination Ban

Section 3 of SB12, amending Tex. Educ. Code §11.005, defines "diversity, equity and inclusion duties" as "(1) influencing hiring or employment practices with respect to race, sex, color or ethnicity except as necessary to comply with state or federal antidiscrimination laws; (2) promoting differential treatment of or providing special benefits to individuals on the basis of race, color, or ethnicity; [and] developing or implementing policies, procedures, trainings, activities or programs that reference race, color, ethnicity, gender identity, or sexual orientation." The only prohibitions contained in Section 11.005(b) state, "[e]xcept as required by state or federal law, a school district: (1) may not assign diversity, equity and inclusion duties to any person; and (2) shall prohibit a district employee, contractor, or volunteer from engaging in diversity, equity, and inclusion duties **at, for, or on behalf** of the district except as required by state or federal law." While Plaintiff chooses to refer to Section 3 as the "Inclusivity Ban," a more appropriate description for Section 3 would be the "Discrimination Ban" since discrimination is specifically proscribed. Promoting differential treatment based on race, color or ethnicity is textbook discrimination, and the Defendant, under any standard of review, has a compelling interest in eliminating it from the State's public schools. In fact, according to the Supreme

Court, "[t]he conclusion made by [*Brown v. Board of Education*] was thus unmistakably clear: the right to a public education 'must be made available to all on equal terms.'" *Students for Fair Admissions, Inc. v. Pres. And Fellows of Harvard Coll.,* 600 U.S. 181, 204 (2023).

The prohibitions set forth in the Discrimination Ban apply only to activities "at, for, or on behalf of the district." Per the specific language of Section 3, the prohibition does not apply (nor provides any indication otherwise) outside of school-related activities. As such, the Discrimination Ban is not only common sense, but it can only be considered under the government speech doctrine which fails to implicate First Amendment protection. The elimination of discrimination in schools is particularly constitutional and fits comfortably within the bounds of the laws of this Nation. "[A]llowing race to play any part in government decision making represents a departure from the constitutional rule that applies in almost every other context." *Louisiana,* 146 S.Ct. at 1143.

### C.    Social Transition Ban

Since, at least in 2024, there were apparently more than 1,000 public school districts that had adopted secret transition policies, it is impossible to determine the amount of families adversely affected every day. *See Parents Protecting Our Children, UA v. Eau Claire Area School Dist.,* 145 S.Ct. 14, 14 (2024) (Alito, J., dissenting from denial of certiorari). Social transition is "an active intervention because it may have significant effects on the child or young person in terms of their psychological functioning and longer-term outcomes." The Cass Review, *Independent Review of Gender Identity Services for Children and*

*Young People* 158 (Apr. 2024). For this reason alone, "embarking upon a social transition based solely upon the self-attestation of the youth without consultation with parents and appropriate professionals is unwise." *Mirabelli v. Olson,* 691 F.Supp.3d 1197, 1208 (S.D. Cal. 2023). Accordingly, the State ensured that students received information from only those persons qualified to provide such information.

Section 7 of SB12, amending Tex. Educ. Code §11.401, requires the board of trustees of a school district to adopt policies "prohibiting an employee of the district from assisting a student enrolled in the district with social transitioning, including by providing any information about social transitioning or providing guidelines intended to assist a person with social transitioning." "Social transitioning" is defined as a "person's transition from the person's biological sex at birth to the opposite biological sex . . . or other expressions of gender that deny or encourage a denial of the person's biological sex at birth." Tex. Educ. Code §11.401(a).

The Supreme Court recently analyzed a closely related issue. *See generally, United States v. Skrmetti,* 145 S.Ct. 1816 (2025). In *Skrmetti,* the Court was reviewing a Tennessee law restricting sex transition treatments for minors. *Id.* at 1826. Although the Tennessee law was related to medical treatments, those medical treatments involved a "person's transition from the person's biological sex at birth to the opposite sex." S.B. 12 §7(a). While noting the wide range of public and expert opinions on the subject, the Court noted, "[w]e afford States 'wide discretion to pass legislation in areas where there is medical and scientific uncertainty.'" *Skrmetti,* 145 S.Ct. at 1836 (quoting *Gonzales v. Carhart,* 550 U.S.

124, 163 (2007)). After applying a rational basis test, the Court upheld the Tennessee law restricting the transition treatments. *Id.* at 1837.

Affirming the application of the rational basis standard, Justice Thomas indicated "[t]here is no dispute [] that the 'decision-making capacity' of adolescents 'is developing, but not yet complete.'" *Id.* at 1846 (Thomas, J., concurring). And, "[t]his Court has recognized as much in other contexts, explaining that children's 'lack of maturity' and 'underdeveloped sense of responsibility' often lead to 'impetuous and ill-considered actions and decisions.'" *Id.* (quoting *Roper v. Simmons,* 543 U.S. 551, 569 (2005)). Thus, the State unquestionably has an interest in ensuring any information students may receive regarding social transitioning comes from appropriate medical providers, is not part of a public schools' instruction, and easily withstands rational basis scrutiny.

Noting the "fierce scientific and policy debates" surrounding "social transitioning," Justice Roberts concluded, "[q]uestions regarding the law's policy are thus appropriately left to the people, their elected representatives, and the democratic process." *Id.* at 1837. The same analysis applies here. Public schools are simply not the appropriate fora to provide instruction to students to enable a "transition from the person's biological sex at birth to the opposite biological sex." Tex. Educ. Code §11.401(a). Such inquiries should remain within the province of a student, his or her parents or guardians and their respective medical providers which is precisely the reason such prohibition was set forth in the Parental Bill of Rights (SB12).

### D.    Curricular Safeguards

Section 24 of SB12, amending Tex. Educ. Code §28.0043(a), provides, "[a] school district, open-enrollment charter school, or district or charter school employee may not provide or allow a third party to provide instruction, guidance, activities, or programming regarding sexual orientation or gender identity to students enrolled in prekindergarten through 12th grade." Decisions made by the Legislature regarding "instruction, guidance, activities, [and] programming" for public and charter school students is quintessential government speech as it is specifically defines curriculum boundaries. Indeed, the Fifth Circuit has affirmed "[s]tates have the right to prescribe the academic curricula of their public school systems." *Aguillard v. Edwards,* 765 F.2d 1251, 1254 (5th Cir. 1985).

Section 24 also includes exceptions to the proscriptions against the inclusion of instruction regarding sexual orientation or gender identity to specifically allow students to engage in whatever speech they choose as well as school medical providers. More specifically, Section 24 may not be construed to "limit a student's ability to engage in speech or expressive conduct protected by the First Amendment . . . that does not result in material disruption to school activities" nor "limit the ability of a person who is authorized by the district to provide physical or mental-health related services to provide the services to a student, subject to any required parental consent." Tex. Educ. Code §§28.0043 (b)(1)-(2). The exception language of "school activities" and the need for any required "parental consent" further affirms that Section 24 is strictly related to in-school curriculum matters.

The curricular safeguards do not run afoul of any constitutional limitations, especially since the rights of students to speak and receive health-related information from the properly authorized personnel is specifically protected. As such, the Court must exercise "great care and restraint when called upon to intervene in the operation of public schools." *Epperson v. State of Ark.,* 393 U.S. 97, 104 (1968).

### III.   SB12 is Not Viewpoint Discrimination.

Should the Court determine the provisions of SB12 are not con-neutral, when analyzing viewpoint discrimination, a court must decide whether the government is regulating speech because it disapproves of the ideas expressed. *Serv. Emp. Int'l Union, Local 5 v. City of Hous.,* 595 F.3d 588, 596 (5th Cir. 2010). As previously discussed, "the government, including its educational institutions, has the discretion to promote policies and values of its own choosing free from forum analysis or the viewpoint-neutrality requirement." *Chiras,* 432 F.3d at 613. And, this remains the true even when the government employs private "speakers" to transmit its message. *Id.* Such precedent alone ends the analysis of Plaintiffs' viewpoint discrimination claims. Moreover, as cited by Plaintiffs, Dkt. 33, p. 54, school regulation of student speech can be justified "[i]f the speech is disruptive, lewd, or *school sponsored.*" *Palmer es. rel. Palmer v. Waxahachie Ind. Sch. Dist.,* 579 F.3d 502, 509 (5th Cir. 2009).

As explained at II, *supra,* a school's ability to choose among pedagogical approaches is not simply confined to the classroom as extracurricular programs are considered "essential parts of the educational process." *Martinez,* 561 U.S. at 686 (quoting *Board of Ed.*

*of Ind. Sch. Dist. No. 92 of Pottawatomie Cty. v. Earls,* 536 U.S. 822, 831 (2002) ("Schools, we have emphasized, enjoy a 'significant measure of authority over the type of officially recognized activities in which their students participate.'")). Accordingly, Defendant's decisions about the character of its student-group program are due appropriate deference. *Id.* at 687.

Even if the Court were to determine that Plaintiffs enjoy some First Amendment protection, when a governmental entity (school districts and public charter schools) "create[] a limited public forum for private speech . . . some content- and speaker- based restrictions may be allowed." *Matal v. Tam,* 582 U.S. 218, 244 (2017). Such restrictions are further allowed when, as here, the speech at issue is government speech instead of private speech.

When a student group asks to use school resources—including campus facilities—for its own purposes, the limited-public forum analysis would apply. In *Martinez,* the Supreme Court decided that an analogous, albeit a university environment, "case fit[] comfortably within the limited-public forum category" because the plaintiff student group was not asking to be freed from a state prohibition. 561 U.S. at 682. Here, Plaintiffs are requesting just that—to be freed from state requirements regarding the curricula of public and charter schools. The Plaintiff student groups are free to forego the benefit of school spaces for gatherings and maintain exclusive membership based on sexual orientation or gender identity. The Supreme Court explained that "our decisions have distinguished between policies that require action and those that withhold benefits." *Id.* at 682-83. Just as

the student group in *Martinez* could continue to meet, albeit without the benefit of school funding and uninhibited use of campus facilities, the Plaintiff student groups to continue to meet outside of school sponsored venues should they wish to implement policies contradictory to State directed curriculum standards.

### IV.    SB12 is Not Vague.

Plaintiffs claim SB12 is unconstitutional for the independent reason that it is void for vagueness. Dkt. 32,¶233. A more stringent vagueness test applies when a law "interferes with the right of free speech." *Village of Hoffman Estates v. Flipside, Hoffman Ests., Inc.,* 455 U.S. 489, 499 (1982). However, as discussed at III, *supra,* any alleged speech at issue fails to implicate the First Amendment. Such laws may be constitutionally infirm where they "encourage arbitrary and discriminatory enforcement," *Kolender v. Lawson,* 461 U.S. 352, 357 (1983), or "have the capacity 'to chill constitutionally protected conduct, especially conduct protected by the First Amendment." *Roark v. Hardee LP v. City of Austin,* 522 F.3d 546 (5th Cir. 2008). SB12 is neither.

A law is unconstitutionally vague when it (1) fails to provide a "person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" or (2) fails to provide "explicit standards" for applying the law "to avoid arbitrary and discriminatory applications." *Roark,* 522 F.3d at 551. However, under most circumstances, "'[p]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.'" *Minn. Voters All. v. Mansky,* 585 U.S. 1 (2018). Perfection, however, is exactly what Plaintiffs demand. "[S]peculation about possible

vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid 'in the vast majority of its intended applications." *Hill v. Colorado,* 530 U.S. 703, 733 (2000) (citation omitted); *see also, SisterSong Women of Color Rep. Just. Coll. v. Gov. of Georgia,* 40 F.4th 1320, 1328 (11th Cir. 2022) ("To be sure, there might be vague applications of that definition in other provisions of the Georgia code, but challenges to those applications—like the arguments . . . about potential applications to constitutionally protected conduct—are properly brought in an as-applied manner.").

Regarding the Club Restriction, Plaintiffs argue both "sexual orientation" and "gender identity" are vague. Dkt. 32, ¶¶242-43. Yet, both terms are specifically defined Merriam-Webster Online.[2] And, as Rep. Leach explained, "[W]e shouldn't have clubs based on sex." Dkt. 32, ¶65. Regarding the Discrimination Ban, Plaintiffs argue "at, for, or on behalf of the district" is vague along with the term "duties." Dkt. 32, ¶¶244-45. Notwithstanding Plaintiffs parade of hypotheticals, duties "at, for, or on behalf of the district" clearly and definitively indicate the SB12 prohibits discrimination by those performing duties on behalf of schools. Regarding the Social Transition Ban, Plaintiffs claim confusion as "assisting" or "assist" are not defined. While it strains credulity that public school employees do not understand the word "assist," it is also specifically defined in the

---

[2] "Sexual orientation" is defined as "a person's identity or self-identification as bisexual, straight, gay, pansexual, etc." *Sexual orientation,* Merriam-Webster Online, https:www.merriam-webster.com/dictionary/sexual%20orientation (last viewed October 13, 2025). "Gender identity" is defined as "a person's internal sense of being male, female, some combination of male and female, or neither male nor female." *Gender identity,* Merriam-Webster Online, https:www.merriam-webster.com/dictionary/gender%20identity (last viewed October 13, 2025).

Merriam-Webster Online.[3] Such assistance is exactly what is proscribed under SB12. And, regarding the Curricular Safeguards, Plaintiffs allege "instruction, guidance, activities or programming" is undefined and vague. Dkt. 32, ¶263. As such activities encompass the very essence of school employee duties and prohibition applies to providing such information to students, the curricular safeguards are clearly intended for curriculum-based communications at schools.

"The Fourteenth Amendment's guarantee of Due Process proscribes laws so vague that persons 'of common intelligence must necessarily guess at [their] meaning and differ as to their application.'" *Women's Med. Ctr. of Nw. Hous. v. Bell,* 248 F.3d 411, 421 (5th Cir. 2001) (alterations in original) (quoting *Smith v. Goguen,* 415 U.S. 566, 572 n.8 (1974)). "'[O]nly a reasonable degree of certainty is required" for a statute to survive a vagueness challenge. *Roark,* 522 F.3d at 552-53.

SB12 neither encourages arbitrary and discriminatory enforcement nor chills constitutionally protected conduct. As Plaintiffs have filed a facial attack to SB12 and the complained of language is surely valid 'in the vast majority of its intended applications," Plaintiffs' vagueness challenge fails. *Hill,* 530 at 733.

## V.     SB12 is Not Overbroad.

The overbreadth doctrine eases a challenger's burden in the First Amendment context by permitting a plaintiff to succeed "if a substantial number of [the law's]

---

[3] "Assist" is defined as "to give support or aid." *Assist,* Merriam-Webster Online, https:www.merriam-webster.com/dictionary/assist (last viewed October 13, 2025).

applications are unconstitutional judged in relation to the statute's plainly legitimate speech." *Netchoice, LLC v. Paxton,* 49 F.4th 439, 450 (5th Cir. 2022) (quotation omitted). But the overbreadth doctrine is "a last resort," not a saving grace, and it "attenuates as the regulated expression moves from pure speech toward conduct. *Id.*

Moreover, nothing on the face of SB12 purports to burden Plaintiffs' constitutionally protected speech as Plaintiffs do not have a right to the speech which they claim. Any further "whataboutisms . . . exemplify why it's inappropriate to hold the law facially unconstitutional in a pre-enforcement posture." *Id.* at 451-52. When determining whether SB12 is facially invalid, the Court must be careful to not go beyond the statute's actual requirements and speculate about "hypothetical" or "imaginary" cases. *See United States v. Raines,* 362 U.S. 17, 22 (1960). As set forth in Section II, *supra,* SB12 is strictly related to the speech and conduct of employees, volunteers and third parties at or on behalf of public schools. And, "the first amendment does not entitle primary and secondary teachers, when conducting the education of captive audiences, to cover topics, or advocate viewpoints, that depart from the curriculum adopted by the school system." *Id.* at 480. There is no disputing that public schools may limit the classroom speech of primary and secondary school teachers to curricular speech in order to promote educational goals. *See Borden v. School Dist. of Tp. of East Brunswick,* 523 F.3d 153 (3d Cir. 2008); *Lee v. York County Sch. Div.,* 484 F.3d 687 (4th Cir. 2007); *Grossman v. South Shore Pub. Sch. Dist.,* 507 F.3d 1097 (7th Cir. 2007). Even if SB12 could be interpreted to reach Plaintiffs' "ability to engage in conversations" outside of the public school setting, Dkt. 32, ¶280, the Court should

"impose a limiting construction" wherein SB would only be applicable in the public school setting as SB12 is "readily susceptible to such a construction." *United States v. Stevens,* 559 U.S. 460, 481 (2010).

Since SB12 is not facially unconstitutional, any challenge to SB12 must be to the statute as it is applied. *See United States v. Hansen,* 599 U.S. 762, 784 (2023). "Exercising judicial restraint in a facial challenge 'frees the Court not only from unnecessary pronouncement on constitutional issues, but also from the premature interpretations of statutes in areas where their constitutional application might be cloudy." *Wash. State Grange v. Wash. St. Rep. Party,* 552 U.S. 442, 450 (2008) (citing *United States v. Raines,* 362 U.S. 17, 22 (1960)).

## VI.    SB12 Does Not Implicate the Freedom to Associate.

"While the freedom of association is not explicitly set out in the [First] Amendment, it has long been held to be implicit in the freedoms of speech, assembly and petition." *Baird v. State Bar of Arizona,* 401 U.S. 1, 6 (1971). As clearly shown herein, SB12 does not aim at the suppression of speech, does not license enforcement authorities to administer the statute based on constitutionally impermissible criteria, nor has SB12 been applied by the State for the purpose of hampering Plaintiffs' ability to express their views. *See Roberts v. U.S. Jaycees,* 468 U.S. 609, 623-24 (1984).

"The right to associate for expressive purposes is not, however, absolute." *Id.* "Infringements on that right may be justified by compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of

associational freedoms. *Id.* at 623 (internal cite omitted). As shown herein, SB12 is unrelated to the suppression of ideas. "It is possible to find some kernel of expression in almost every activity a person undertakes—for example, walking down the street or meeting one's friends at a shopping mall—but such a kernel is not sufficient to bring the activity within the protection of the First Amendment." *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989).

Plaintiffs allege "[b]ecause SB12 entirely prohibits Plaintiffs' ability to create, participate in, and engage with GSAs, it violates their right to freedom of association." Dkt. 32, ¶298. Yet, Plaintiffs' allegation is directly rebutted by the language of SB12 and their own admissions. "GSA Network is a membership-based organization with three different types of members: the GSA clubs registered with GSA Network; the student leaders organizing GSA clubs that are registered; and the state-level organizational partners in the National Association of GSA Networks." Dkt. 32, ¶72. Any and all such clubs remain free to continue their activities at any location other than public and charter school campuses based on the pedagogical directives issued by the State within its discretion and authority over public school curricula. Because schools treat all clubs based strictly on sex the same, *supra* at II.A., SB12 does not discriminate based on viewpoint or violate Plaintiffs' freedom of association.

## VII.    SB12 is Not a Prior Restraint.

Plaintiffs' complaint that "SB12 imposes an impermissible prior restraint on speech" because the provisions of SB12 "shut down entire forums of speech and censor

discussions on favored topics before they occur" is also wrong. *See* Dkt. 33, p. 102; Dkt. 32, ¶309. "The term prior restraint is used to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States,* 509 U.S. 544, 550 (1993) (internal quotations omitted). SB12 is clearly not such a policy.

SB12 does not prohibit constitutionally protected speech of any kind. *See supra* at II. Plaintiffs' complaints rely on an amorphous right of students to receive information, which debatably flows from the First Amendment as an "inherent corollary of the rights of free speech." *Board of Ed. v. Pico,* 457 U.S. 853, 867 (1982). Defendant has not forbidden anyone from speaking. None of the authorities cited by Plaintiffs support a student's independent right to receive particular information from teachers that would violate the First Amendment.

Even assuming *arguendo* that SB12 was a prior restraint, Plaintiffs have not demonstrated why it would be unconstitutional as prior restraints on speech are not always unconstitutional in a public school setting. *See Hazelwood,* 484 U.S. at 268-69; *Henerey ex. rel. Henery v. City of St. Charles, Sch. Dist.,* 200 F.3d 1128, 1134 (8th Cir. 1999). "[J]udicial decisions analyzing prior restraints have applied different standards of review depending on the restraint at issue." *Catholic Leadership Coal. v. Reisman,* 764 F.3d 409, 438 (5th Cir. 2014) (citing *Milwaukee Police Ass'n v. Jones,* 192 F.3d 742, 749 (7th Cir. 1999)). In fact, *Milwaukee Police* suggests a prior restraint in a non-public school forum need only be "reasonably related to legitimate pedagogical goals." 192 F.3d at 749. SB12 simply defines the contours

of the curriculum for public and charter school students in Texas and easily satisfies the minimal standard set forth in *Milwaukee Police.*

### VIII.   SB12 Does Not Violate the Equal Access Act

Plaintiffs allege that Katy ISD, Houston ISD and Plano ISD each violated the Equal Access Act (Act), 20 U.S.C. §4071, when they prohibited the formation or meeting space for GSA clubs. Dkt. 32, ¶¶285-290. The Act provides, "[i]t shall be unlawful for any public secondary school which receives Federal financial assistance and which has a limited open forum to deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of the . . . content of the speech at such meetings." 20 U.S.C. §4071(a).[4] The Act further provides a "safe harbor" provision that requires schools to provide a "fair opportunity" to students wishing to conduct a meeting as long as the meeting is voluntary and student-initiated and there is no sponsorship of the meeting by the school, the government, or its agents or employees. 20 U.S.C. §§4071(c)(1)-(2). This is clearly inapposite to the declarations of Polly Poe, a teacher at a high school in Plano ISD. Dkt. 33, Ex. 5 at ¶1.

"Sponsorship" means the act of promoting, leading or participating in a meeting. 20 U.S.C. §4072. According to Polly Poe's own declarations, she "participated" in the meetings by answering student questions, pointing students towards resources and information, and gave presentations to students. Dkt. 33, Ex. 5 at ¶¶4, 6. Moreover, she

---

[4] Based on the statutory language of the Equal Access Act, it does not apply to any schools other than secondary schools.

served as the faculty "sponsor" for the club. Dkt. 33, Ex. 5 at ¶¶6, 22. And, Polly Poe's high school "promoted" the club by making school-wide announcements for certain occasions. Dkt. 33, Ex. 5 at ¶6. As the club sponsored by Polly Poe clearly ran afoul of the provisions of the Act, Plano ISD's elimination of such club does not amount to a violation of the Equal Access Act.[5]

Further, the Act provides that "non-school persons may not direct, conduct, control or regularly attend activities of student groups." 20 U.S.C. §4071(c)(5). Such language specifically tracks the language of Section 24 of SB12. Tex. Educ. Code §28.0043.

There is not any provision of SB12 that, strictly based on the statutory text, could be considered to facially violate the Equal Access Act.

## IX.    Plano ISD Cannot Determine the Constitutionality of SB12.

Plano ISD has indicated that it believes some of the provisions of SB12 are unconstitutional, Dkt. 94, along with a Joint Motion for Entry of Agreed Judgment and Preliminary Injunction, Dkt. 93. As Plano ISD agrees, at least in part, with Plaintiffs' claims, the Court is without jurisdiction to decide such claims as they are now moot. "The mootness doctrine requires that the controversy posed by the plaintiff's complaint be 'live' not only at the time the plaintiff files the complaint but also throughout the litigation process." *Rocky v. King*, 900 F.2d 864, 866 (5th Cir. 1990). "An action is moot where (1) the controversy is no longer live or (2) the parties lack a personal stake in its outcome." *Id.* at

---

[5] The details of any existing or proposed clubs within Houston ISD or Katy ISD remain unknown at this time.

867. Absent a live controversy between Plaintiffs and Plano ISD, the Court should disregard the Joint Motion for Entry of Agreed Judgment.

Further, "[e]ven when Article III permits the exercise of federal jurisdiction, prudential considerations demand that the Court insist upon 'that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.'" *United States v. Windsor,* 570 U.S. 744, 760 (2013). In *Windsor,* the Attorney General advised the Speaker of the House of Representatives and the Department of Justice that it would no longer defend Section 3 of the Defense of Marriage Act (DOMA). In response, the Bipartisan Legal Advisory Group of the House of Representatives (BLAG) moved to intervene in the litigation to defend Section 3's constitutionality. When granting certiorari, the Supreme Court requested argument on whether the United States' agreement with Plaintiff's position precluded further review and appointed amicus curiae to argue the position. The amicus' position was that it was inappropriate for the Court to proceed and rule on the merits. However, the Court determined that such position "elides the distinction between two principles: the jurisdictional requirements of Article III and the prudential limits of its exercise." *Id.* at 756. As the *Windsor* court went on to analyze BLAG's argument for the constitutionality of Section 3 of DOMA. So too here as the Court should consider the State's arguments for the constitutionality of SB12 without allowing Plano ISD to essentially opine on the constitutionality of an existing state statute in a "friendly, non-adversary proceeding." *Id.* at 759.

**X.    If Any Provision of SB12 is Facially Unconstitutional, the Court Should Sever That Provision and Leave the Rest of the Statute Intact.**

Should the Court determine that any of the challenged provision of SB12 are facially unconstitutional and invalidate SB12's DEI prohibition (§11.005), social transition prohibition (§11.401), the curriculum provision (§28.0043) or the club prohibition (§33.0815) wholesale, the Court should sever it and uphold the remainder, thus preserving Texas's compelling interest in parental rights within constitutional limits.

Texas's presumption of severability, Tex. Gov't Code §311.032(c), which applies severability event to statutes without severability clauses and which the Texas Supreme Court enforces unless a statute's structure precludes it, *Rose v. Doctors Hosp.,* 801 S.W.2d 841, 844 (Tex. 1990). The U.S. Supreme Court similarly favors severance to avoid the over-invalidation of statutes that contain at least some standalone validity. *Barr v. Am. Ass'n of Political Consultants, Inc.,* 591 U.S. 610, 635-36 (2020) (plurality op.); *United States v. Nat'l Treasury Emps. Union,* 513 U.S. 454, 478-79 (1995).

Here, SB12's design supports severability because its provision addresses different things and thus can operate independently. Section §11.005(a)(1) and (2), the DEI prohibition, are certainly constitutional to the extent it prohibits differential treatment of persons on the bases of race, sex, color or ethnicity. There is not any constitutional requirement for using preferred pronouns under Section 11.401, the social transition ban. Section 28.0043, the curriculum provision specifically relates to the instruction of students and protects students' abilities to engage in speech protected by the First Amendment. As

such, the Court should reject any categorical invalidation and sever any facially invalid provisions of SB12.

## PRAYER

Defendants respectfully request the Court grant Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint. Defendants further pray for any additional relief, both at law and equity, to which Defendants may show themselves to be justly entitled.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Civil Litigation

KIMBERLY GDULA
Chief, General Litigation Division

/s/ William H. Farrell
**WILLIAM H. FARRELL**
Deputy Chief, General Litigation Division
Texas Bar No. 00796531
biff.farrell@oag.texas.gov
(512) 979-5561| FAX: (512) 320-0667

Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Phone: (512) 463-2120
Fax: (512) 320-0667

**COUNSEL FOR DEFENDANT/INTERVENOR,
THE STATE OF TEXAS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served via Court's CM/ECF system on this June 29, 2026, on all counsel of record.

/s/ William H. Farrell
**WILLIAM H. FARRELL**
Assistant Attorney General

## CERTIFICATE OF CONFERENCE

I hereby certify that I conferred with Plaintiffs' counsel, Mr. Brian Klosterboer, on June 26, 2026, regarding The State of Texas's Motion to Dismiss, and Mr. Klosterboer indicated Plaintiffs were opposed to the relief sought herein by Defendant.

/s/ William H. Farrell
**WILLIAM H. FARRELL**
Assistant Attorney General

## CERTIFICATE OF WORD COUNT

Pending before the Court is Defendant's Unopposed Motion to Exceed Word Count. Dkt. 117. The undersigned counsel hereby certifies that the total number of words in Defendant's Consolidated Motion to Dismiss and Response to Plaintiffs' Request for Preliminary Injunction, exclusive of areas not considered within the word count, is 10,982 words as counted by Microsoft Word.

/s/ William H. Farrell
**WILLIAM H. FARRELL**
Assistant Attorney General